UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| JOHN C. PORTER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GRAFTECH INTERNATIONAL LTD., DAVID RINTOUL, QUINN COBURN, MARCEL KESSLER, TIMOTHY K. FLANAGAN, JEREMY S. HALFORD, BCP IV GRAFTECH HOLDINGS LP, BROOKFIELD CAPITAL PARTNERS LTD., and BROOKFIELD ASSET MANAGEMENT LTD.,<br><br>Defendants. | No.<br><br>Judge<br><br>CLASS ACTION<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

LAW OFFICE OF GEORGE W. COCHRAN
GEORGE W. COCHRAN
1981 Crossfield Circle
Kent, OH  44240
Telephone:  330/607-2187
330/230-6136 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

John C. Porter ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings and press releases by GrafTech International Ltd. ("GrafTech" or the "Company"), Company press releases and earning calls, and analyst and media reports about the Company.[1]  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of GrafTech common stock between February 8, 2019 and August 3, 2023, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against GrafTech and certain of the Company's senior executives, directors, and controlling shareholder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company resides in this District and the events and omissions giving rise to

---

[1]      Emphasis has been added throughout unless otherwise noted.

the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statement in and from this District.  GrafTech is headquartered in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff John C. Porter, as set forth in the accompanying certification, which is incorporated by reference herein, purchased GrafTech common stock during the Class Period and has been damaged thereby.

7.      Defendant GrafTech is a global manufacturer of graphite electrode products and is headquartered in Brooklyn Heights, Ohio.  GrafTech common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "EAF."

8.      Defendant David Rintoul ("Rintoul") served as GrafTech's President and Chief Executive Officer ("CEO") and as a member of the Company's Board of Directors ("Board") from March 2018 until his resignation from the Company in June 2022.

9.      Defendant Quinn Coburn ("Coburn") served as GrafTech's Chief Financial Officer ("CFO") from September 2015 until November 2021.  Prior to his role as CFO, Coburn served as GrafTech's Vice President of Finance and as Treasurer.

10.      Defendant Marcel Kessler ("Kessler") was appointed to serve as CEO in July 2022 following defendant Rintoul's resignation.  GrafTech announced defendant Kessler's resignation on September 28, 2023.

11.      Defendant Timothy K. Flanagan ("Flanagan") served as GrafTech's CFO and Vice President Finance and Treasurer after defendant Coburn's resignation in November 2021.  Following the resignation of defendant Kessler, defendant Flanagan became GrafTech's Interim CEO.

12.     Defendant Jeremy S. Halford ("Halford") was appointed to serve as Executive Vice President and Chief Operating Officer ("COO") in October 2021.  Prior to his role as COO, Halford served as the Company's Senior Vice President, Operations and Development since May 2019.

13.     Defendants referenced above in ¶¶8-12 are referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are referred to herein as "defendants."

14.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

15.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

17.     Defendant BCP IV GrafTech Holdings LP is an indirect wholly owned subsidiary of defendant Brookfield Capital Partners.

18.     Defendant Brookfield Capital Partners Ltd. is the private equity arm of defendant Brookfield Asset Management Inc.

19.     Defendant Brookfield Asset Management Ltd. is a global alternative asset management based in Canada.

20.     Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd. are collectively referred to herein as "Brookfield." Defendant Brookfield was the controlling shareholder of GrafTech during the Class Period and controlled each of the Individual Defendants.

21.     Immediately following GrafTech's April 2018 initial public offering (the "IPO"), defendant Brookfield owned approximately 78% of GrafTech's outstanding common stock and maintained majority control over the Company. As such, GrafTech was considered a "controlled company" under NYSE rules. In addition, defendant Brookfield entered into a stockholders' agreement with the Company, pursuant to which defendant Brookfield had the right to appoint the

greater of 37.5% or three directors to the Board and providing Brookfield with certain special rights and privileges unavailable to outside shareholders.

22.     Defendant Brookfield also oversaw and controlled the management of the Company. For example, defendant Brookfield caused GrafTech to hire Rintoul and Coburn as CEO and CFO, respectively, prior to the IPO.  Numerous directors of GrafTech were also affiliated with Brookfield, including Denis A. Turcotte (Managing Partner at Brookfield), Jeffrey Dutton (President at Brookfield), Ron A. Bloom (Managing Partner and Vice Chairman at Brookfield), and David Gregory (Senior Vice President at Brookfield).

23.     Defendant Brookfield used its control over the Company to complete the IPO, in which it sold 35 million shares of GrafTech common stock at $15 per share, and to conduct 6 other registered public offerings in which it sold nearly $2 billion worth of GrafTech common stock at artificially inflated prices.  Defendant Brookfield also caused GrafTech to enter into various agreements with it that were favorable to its own financial interests, including two share repurchase agreements in August 2018 and December 2019 which required GrafTech to collectively purchase nearly 31 million shares directly from defendant Brookfield, providing further artificial price support to GrafTech shares.

**BACKGROUND**

24.     Headquartered in Brooklyn Heights, Ohio, GrafTech is a global manufacturer of graphite electrode products that are used in the production of electric arc furnace ("EAF") steel – a purportedly greener alternative to traditional steelmaking methods.  In contrast to conventional blast furnaces, which rely directly on coal, natural gas, and oil, EAF utilizes graphite electrodes to conduct electricity and to generate sufficient heat to melt scrap metal, iron ore, or other raw materials used to produce steel or other metals.  GrafTech's customers are comprised of steel manufacturers that use EAF to produce steel.

25.     As a manufacturing process, EAF steel requires less capital and operating expenditures, results in less environmental pollution, and offers greater flexibility in responding to demand changes as compared to traditional steelmaking methods.  As a result, EAF-produced steel has historically outpaced the growth of the overall steel market.  Beginning in 2011, however, the trend towards the steady adoption of EAF steel was partially reversed due to a glut in the global supply of steel, driven primarily by overproduction from blast furnace steel operators in China.  As a result, GrafTech underwent a period of declining demand for its graphite electrodes, which led to falling revenues and growing losses.  By the end of 2014, for example, GrafTech's annual net losses had ballooned to more than $285 million, growing 1,000% from a net loss of approximately $27 million in the year prior.  In April 2015, GrafTech's then-CEO Joel Hawthorne warned that the challenges were expected to continue, stating that:

> [G]raphite electrode demand continued to soften as global electric arc furnace (EAF) steel production weakened.  Lower end-market demand in certain steel consuming sectors, continued high Chinese steel exports and other market dynamics led to lower EAF customer utilization rates, particularly in North America.  These factors are expected to create a challenging operating environment for our Company and the industry as a whole for the remainder of 2015.

26.     Amid this slump in the market for graphite electrodes, GrafTech announced on May 17, 2015 that it had entered into an agreement to be purchased by defendant Brookfield.  Pursuant to the Plan of Merger Agreement, Brookfield agreed to make a cash tender offer to purchase all outstanding shares of GrafTech common stock at a purchase price of $5.05 share, resulting in a total valuation of approximately $700 million.  On August 17, 2015, GrafTech announced that the Company's acquisition by Brookfield had been completed and that GrafTech had become a wholly owned affiliate of Brookfield.  As a result, trading of GrafTech common stock on the NYSE ceased as of market open on August 17, 2015.

27.     Over the next three years, GrafTech underwent an extensive transformation that was intended to revamp the Company's business and return it to profitability.  As part of this

transformation, GrafTech shifted all of its manufacturing operations to three of its highest-capacity and lowest-cost facilities located in: (i) Monterrey, Mexico; (ii) Pamplona, Spain; and (ii) Calais, France. Following this shift, GrafTech manufactured all of its pin stock inventory at its Monterrey facility. Pin stock is a critical component in GrafTech's manufacturing process. To be utilized by GrafTech's customers, each graphite electrode must be affixed with one pin stock. Because GrafTech's Monterrey facility was the sole supplier of pin stock for all of the Company's manufacturing facilities, the uninterrupted operation of the Monterrey facility was of paramount importance for GrafTech's business and operational performance.

28.    As further part of its transformation, the Company implemented a new commercial strategy to sell a majority of its graphite electrode output through three-to-five year "take or pay" contracts, which were premised upon GrafTech's purported ability to reliably deliver its customers with graphite electrodes. GrafTech's take or pay agreements contained fixed annual prices and volumes for the contracted term. In addition, these agreements accounted for the majority of the Company's total net sales. For example, sales from GrafTech's long-term agreements represented 87% and 80% of the Company's net sales in 2020 and 2019, respectively. During the Class Period, sales from long-term agreements were generally of higher margin than non-contracted "spot" sales, and therefore, represented a more profitable source of revenues for the Company.

29.    Having completed this purported business turnaround, Brookfield conducted GrafTech's IPO on April 19, 2018, selling roughly 35 million shares, or approximately 12% of its equity stake, at $15 per share for gross offering proceeds of $525 million. An additional 3.1 million shares were sold by Brookfield pursuant to a partial exercise of the underwriters' overallotment option for an additional $46 million. None of the proceeds from these sales went to the Company, as all proceeds went to defendant Brookfield. Brookfield also caused GrafTech to enter into an

agreement to pay it a $160 million special cash dividend in connection with the IPO conditioned on the Company's financial results and certain other factors.

30.    IPO offering documents lauded GrafTech's "transformation" and claimed the Company had emerged from its restructuring with the "most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry."  The offering documents further represented that GrafTech's facilities were "modern, strategically located and well-maintained," which they claimed would provide the Company with efficient growth opportunities following the offering.  Key to this purportedly sustainable growth were claims in IPO offering materials regarding the "more environmentally friendly nature of EAF steelmaking" employed by GrafTech's customers.

31.    Defendants continued to represent throughout the Class Period that GrafTech was committed to protecting the environment and acting "proactively" to advance sustainability initiatives.  For example, speaking during a November 2020 conference call, defendant Rintoul represented that GrafTech was focused on being "good environmental stewards" and that they were "fully committed" to advancing their "ESG efforts."  Similarly, in a May 2022 conference call defendant Halford represented that GrafTech was making "good progress" on sustainability initiatives and serving as "a key contributor" to the decarbonization of steel.  The Company's SEC filings repeatedly highlighted the purportedly "environmentally friendly EAF model" used by GrafTech's customers and the favorable "environmental performance" of the Company overall and the Monterrey facility in particular.

32.    Unbeknownst to investors, however, GrafTech's purported cost leadership was achieved in substantial part by failing to implement effective environmental safeguards at the Monterrey facility.  As a result, GrafTech's operations in Monterrey, Mexico had for decades chronically contaminated neighboring communities with harmful carcinogenic gasses and particulate matter, leaving GrafTech acutely exposed to material undisclosed risks of government enforcement

actions, and consequently to business and operational disruptions and adverse financial and reputational impacts.  Indeed, GrafTech had been repeatedly warned by local authorities over an approximately 30-year period regarding the Company's wanton disregard for the health and wellbeing of local communities and the damage that its manufacturing processes were inflicting upon the environment.  GrafTech had even signed agreements with local authorities in the Monterrey area in which it promised to improve its local impacts, but had failed to honor these commitments causing the government of a local municipality, Apodaca, to seek help from the State of Nuevo León (where Monterrey is located) during the Class Period.

33.    Defendants continued their deception even in the face of government scrutiny.  In March 2019, the Department of Sustainable Development of the State of Nuevo León issued GrafTech a notice of administrative proceedings, which required the Company to design and implement certain corrective measures involving potential violations of environmental law relating to emissions.  Although GrafTech disclosed in its public filings with the SEC that it had received the notice, GrafTech failed to disclose the full extent and severity of its environmental misconduct, maintaining the Company's false narrative that its operations in Monterrey were environmentally above board.  Rather than come clean about its environmental impact, GrafTech concealed its transgressions by reporting that it had "cooperated" with the authorities and announcing that the department formally closed the proceeding in September 2019 following its payment of certain "non-material" fines and the implementation of various environmental improvements at the facility.  Indeed, GrafTech represented throughout the Class Period that it was in "compliance" with applicable environmental laws and regulations.

34.    While the price of GrafTech common stock was artificially inflated, defendant Brookfield unloaded more than $*2.8 billion* in GrafTech common stock, selling approximately 75% of its equity stake in the Company within just three years of returning to the public equity markets.

Notably, defendants caused GrafTech to enter into two share repurchase agreements in August 2018 and December 2019, which collectively required GrafTech to repurchase nearly 31 million shares directly from Brookfield at prices exceeding $19 per share, for total proceeds of approximately $475 million.

35.     Then, on September 16, 2022, GrafTech unexpectedly revealed that GrafTech's critical manufacturing facility in Monterrey, Mexico had been shut down by regulators following inspections by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment.  This information was of critical importance to investors as the Monterrey facility was responsible for manufacturing 30% of GrafTech's overall graphite electrode output and 100% of its pin stock.  In the wake of this revelation, Mexican news outlets reported that the cessation order had been made in response to GrafTech's excessive pollution of hazardous carcinogenic gasses and particulate matter into neighboring communities over a prolonged time frame.  Following the closure, the mayor of local municipality Apodaca, Cesar Garza, took to Facebook Live to applaud the shutdown and disclosed that the municipality had voted in plenary session to formally request that GrafTech's facility be required to close and relocate, citing more than 30 years of environmental abuses by the Company.

36.     On this news, the price of GrafTech common stock fell from $5.30 per share on September 16, 2022 to $4.61 per share on September 20, 2022, a decline of approximately 13% over a three-day trading period on above-average trading volume.

37.     On November 18, 2022, GrafTech announced that its facility in Monterrey, Mexico was conditionally permitted to resume operations subject to the Company's completion of certain remediation efforts.  Although the Monterrey facility was eventually permitted to re-open, defendant Kessler subsequently revealed during a February 2023 conference call that the temporary closure had severely disrupted the Company's operations and would have a "significant" negative impact on

GrafTech's business performance going forward.  Specifically, defendant Kessler revealed that the shutdown required GrafTech to irreparably deplete its critically needed pin stock inventory and to miss a key contract negotiation window, crippling its ability to secure contract orders for 2023.  As a result, GrafTech reported sales declines of 62% and 49% in the first and second quarters of 2023, respectively, pushing the Company from $50 million in net income for the fourth quarter of 2022 to a $15 million net loss for the first six months of 2023.  As a result of these subsequent disclosures, the price of GrafTech stock fell to less than $4 per share by mid-August 2023.  The price of GrafTech stock continued to fall thereafter, eventually dropping as low as $1.50.

38.     As a result of defendants' wrongful acts and omissions, and the significant decline in the market value of GrafTech common stock, plaintiff and other Class members (defined below) have suffered significant losses and economic damages under the federal securities laws.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING**
**STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

39.     The Class Period begins on February 8, 2019.  On that date, GrafTech issued a press release disclosing the Company's financial results for the fourth quarter and year ended December 31, 2018 ("4Q18 Release").  The 4Q18 Release emphasized GrafTech's manufacturing facilities, stating that the Company's plants "operated at high levels throughout 2018."  The 4Q18 Release reported production volume of 51 thousand and 179 thousand megatons ("MT") for the quarter and full year, respectively.

40.     Also on February 8, 2019, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the fourth quarter and full year.  During his prepared remarks, defendant Rintoul highlighted the purportedly "more resilient and environmentally friendly EAF steelmaking business model" of GrafTech's customers.

41.     On February 22, 2019, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2018 ("2018 Form 10-K"), which was signed by defendants

Rintoul and Coburn.  The 2018 Form 10-K highlighted the purportedly "environmentally friendly nature" of the EAF steelmaking employed by GrafTech's customers.  The 2018 Form 10-K similarly stated that as "a result of the increasing global availability of steel scrap and the more resilient, high-variable cost and environmentally friendly EAF model, we expect EAF producers to continue to grow at a faster rate than BOF producers globally."  The 2018 Form 10-K represented that GrafTech was in compliance with all applicable environmental laws and regulations in its manufacturing processes, stating: "We believe that we are currently in compliance in all material respects with the federal, state, local and foreign environmental laws and regulations to which we are subject."

42.     Similarly, the 2018 Form 10-K stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.  The 2018 Form 10-K also represented that the Company has an "on-going commitment to rigorous internal environmental protection standards."  The 2018 Form 10-K further stated that "[e]nvironmental considerations are part of all significant capital expenditure decisions."

43.     Under a heading titled "Competitive strengths," the 2018 Form 10-K highlighted GrafTech's "lowest cost large-scale" manufacturing plants, which included the Monterrey facility, stating in pertinent part as follows:

> We believe ***our facilities are among the most strategically located and lowest cost large-scale graphite electrode manufacturing plants in the world***.  Of the graphite electrode manufacturing facilities currently operating outside of China, we estimate that our three operating manufacturing facilities represent approximately 24% of estimated production capacity for graphite electrodes, making us a critical supplier to global EAF steel manufacturers.  ***Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors***, and excellent visibility into the large North American and European EAF steelmaking markets.

- 12 -

44.    In addition, the 2018 Form 10-K highlighted the "cost advantages" GrafTech enjoyed from its Monterrey facility, stating in pertinent part as follows:

> Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift.  By operating three of the five highest capacity graphite electrode production facilities in the world, we are able to achieve meaningful operating leverage relative to our competitors.  ***Because of the attractive cost of labor available to our Monterrey facility, we believe we have a significant cost advantage in the production of pins, which are used to connect and fasten graphite electrodes together in a furnace and are more labor-intensive to produce than other graphite electrodes***.  Our Calais, Pamplona and ***Monterrey facilities have access to low-cost sources of electricit***y, a significant element of our manufacturing costs.
>
> *          *          *
>
> Moreover, our Seadrift, Calais, Pamplona, Monterrey and St. Marys facilities each provide unique advantages for us. . . .  We also believe that Calais, Pamplona and Monterrey are three of the five highest capacity graphite electrode facilities in the world (excluding China), allowing for significant operating leverage.  We believe our facilities have significant cost advantages given their scale and access to low cost, reliable energy sources

45.    On May 1, 2019, GrafTech issued a press release disclosing the Company's financial results for the quarter ended March 31, 2019 ("1Q19 Release").  The 1Q19 Release reported production volume of 48 thousand MT for the quarter.

46.    That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2019 ("1Q19 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 1Q19 Form 10-Q reported that "[o]n March 1, 2019, the Department of Sustainable Development of the State of Nuevo León provided notice of an administrative proceeding with respect to the Company's Monterrey facility," which required the "Company to design and implement certain corrective measures involving certain potential violations of state environmental law relating to emissions."  The 1Q19 Form 10-Q represented that GrafTech was "cooperating with the Department" with respect to the administrative proceeding.  The 1Q19 Form 10-Q claimed that

GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

47.     On July 31, 2019, GrafTech issued a press release disclosing the Company's financial results for the quarter ended June 30, 2019 ("2Q19 Release").  The 2Q19 Release reported production volume of 48 thousand MT for the quarter.

48.     That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2019 (the "2Q19 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 2Q19 Form 10-Q reported that "[o]n March 1, 2019, the Department of Sustainable Development of the State of Nuevo León provided notice of an administrative proceeding with respect to the Company's Monterrey facility," which required the "Company to design and implement certain corrective measures involving certain potential violations of state environmental law relating to emissions."  The 2Q19 Form 10-Q represented that GrafTech was "cooperating with the Department" with respect to the administrative proceeding.  The 2Q19 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

49.     Also on July 31, 2019, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for second quarter of fiscal 2019.  During his prepared remarks, defendant Rintoul touted the EAF steelmaking methods employed by GrafTech's customers, claiming that it was "advantaged" given its "environmental efficiency," among other things.

50.     On November 7, 2019, GrafTech issued a press release disclosing the Company's financial results for the quarter ended September 30, 2019 ("3Q19 Release").  The 3Q19 Release reported production volume of 40 thousand MT for the quarter.  The 3Q19 Release represented that

GrafTech was initiating a series of projects at its Monterrey Facility that were expected to "improv[e] environmental performance," stating in pertinent part as follows:

> GrafTech has begun a series of projects at our Monterrey and St. Marys facilities that will shift graphitization and machining of additional volume of semi-finished product from Monterrey to St. Marys. **We expect these projects will further optimize our manufacturing footprint by improving environmental performance and production** flexibility at both facilities and also leverage cost efficiencies at St. Marys.

51.    That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2019 ("3Q19 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 3Q19 Form 10-Q represented that GrafTech was improving its environmental performance by conducting a series of operational projects, stating that: "We have announced a series of operational improvement projects at our Monterrey and St. Marys facilities.  These **projects are intended to help optimize our manufacturing footprint while improving environmental performance** and increasing production flexibility."  The 3Q19 Form 10-Q reported that "[o]n March 1, 2019, the Department of Sustainable Development of the State of Nuevo León provided notice of an administrative proceeding with respect to the Company's Monterrey facility," which required the "Company to design and implement certain corrective measures involving certain potential violations of state environmental law relating to emissions."  The 3Q19 Form 10-Q represented that GrafTech had "cooperated with the Department" with respect to the proceeding, and that GrafTech made "payment of certain fines that were not material to the Company."  The 3Q19 Form 10-Q also reported that, in September 2019, "the Department of Sustainable Development formally closed the proceeding."

52.    Also on November 7, 2019, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2019.  During his prepared remarks, defendant Rintoul reiterated the "improving environmental performance" at GrafTech's Monterrey facility as a result of the "series of operational improvements" the Company was

undertaking.  Defendant Coburn similarly emphasized that "we will continue to invest in the health, safety and environmental performance."  Defendant Rintoul claimed that the EAF steelmaking method employed by GrafTech's customers was "advantaged relative to integrated mills" due to its "better environmental performance," among other things.

53.    On February 6, 2020, GrafTech issued a press release disclosing the Company's financial results for the fourth quarter and year ended December 31, 2019 (the "4Q19 Release"). The 4Q19 Release reported production volume of 41 thousand and 177 thousand MT for the quarter and full year, respectively.

54.    On that same day, GrafTech hosted a conference call with analysts to discuss the Company's financial and operational results for the fourth quarter and fiscal year 2019.  Defendant Coburn emphasized that "we will continue to invest in health, safety and environmental performance."  Defendant Rintoul claimed that the EAF steelmaking method employed by GrafTech's customers was "advantaged relative to integrated mills" due to its "better environmental performance," among other things.

55.    On February 21, 2020, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2019 ("2019 Form 10-K"), which was signed by defendants Rintoul and Coburn.  The 2019 Form 10-K highlighted the purportedly "environmentally friendly nature" of the EAF steelmaking employed by GrafTech's customers.  The 2019 Form 10-K similarly stated that as "a result of the increasing global availability of steel scrap and the more resilient, high-variable cost and environmentally friendly EAF model, we expect EAF producers to continue to grow at a faster rate than blast oxygen furnace ('BOF') producers globally."  The 2019 Form 10-K represented that GrafTech was in compliance with all applicable environmental laws and regulations in its manufacturing processes, stating: "We believe that we are currently in compliance in all

material respects with the federal, state, local and foreign environmental laws and regulations to which we are subject."

56.    Similarly, the 2019 Form 10-K stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.  The 2019 Form 10-K also represented that the Company has an "on-going commitment to rigorous internal environmental protection standards."  The 2019 Form 10-K further stated that "[e]nvironmental considerations are part of all significant capital expenditure decisions."

57.    Under a heading titled "Competitive strengths," the 2019 Form 10-K touted GrafTech's "lowest cost large-scale" manufacturing plants, stating in pertinent part as follows:

> We believe *our facilities are among the most strategically located and lowest cost large-scale graphite electrode manufacturing plants in the world*.  Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately 24% of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers.  *Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors*, and excellent visibility into the large North American and European EAF steelmaking markets.

58.    The 2019 Form 10-K pointed to GrafTech's restructuring actions and associated cost reductions, which the 2019 Form 10-K claimed resulted in "the industry's most efficient production platform of high production capacity assets," stating in pertinent part as follows:

> Over the . . . past decade, we have rationalized inefficient plants during the downturn and more recently completed a manufacturing footprint optimization program, which resulted in our ability to produce a greater quantity of graphite electrodes from our three primary operating facilities than we did from the six operating facilities we had in 2012.  We believe that the optimization of our graphite electrode plant network will continue to drive improved fixed cost absorption.  Moreover, our Calais, Pamplona, Monterrey and St. Marys facilities each provide unique cost advantages given their scale and access to low cost, reliable energy sources.

- 17 -

59.     The 2019 Form 10-K continued:

> *Our current facilities are modern, strategically located and well-maintained, providing us with ample operational optimization capabilities*.  In 2018, we completed the expansion of our production capacity by approximately 20%, to 202,000 MT, through strategic capital investments and operational improvements.  *As a result of our prior operational improvement activities, we are able to achieve this large capacity increase with specific, highly targeted capital investments*.  These expansions will provide additional fixed cost absorption and drive further efficiencies of scale across our manufacturing base.

60.     In addition, the 2019 Form 10-K highlighted the "cost advantages" GrafTech enjoyed from its Monterrey facility, stating in pertinent part as follows:

> Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift.  Our Calais, Pamplona, *Monterrey and St. Marys facilities have access to low-cost sources of electricity* with essential logistical infrastructure in place, which is a significant element of our manufacturing costs.

61.     The 2019 Form 10-K disclosed that GrafTech was initiating a series of "projects" at its Monterrey Facility that were expected to "improve environmental performance," stating in pertinent part as follows:

> We have recently begun a series of projects at our Monterrey and St. Marys facilities that will shift graphitization and machining of additional volume of semi-finished product from Monterrey to St. Marys.  *We expect these projects will further optimize our manufacturing footprint by improving environmental performance and production* flexibility at both facilities and also leverage cost efficiencies at St. Marys facility.

62.     On May 6, 2020, GrafTech issued a press release disclosing the Company's financial results for the quarter ended March 31, 2020 ("1Q20 Release").  The 1Q20 Release reported production volume of 33 thousand MT for the quarter.  The 1Q20 Release emphasized that "[g]lobal warming and other environmental concerns" were "critical issues" facing society, and claimed that GrafTech was "well positioned" to navigate the COVID-19 pandemic because it had the "most efficient and largest graphite electrode plants in the world," stating in pertinent part as follows:

> Global warming and other environmental concerns are critical issues facing society and global companies, and the EAF steelmakers are among the largest recycling

- 18 -

industries in the world.  EAF steel making produces 75% less carbon emissions than traditional blast oxygen furnace steel making.  EAF growth is continuing with significant capacity additions having been announced.

GrafTech is one of the largest graphite electrode producers in the world and a mission critical supplier to the EAF industry.  We have three of the most efficient and largest graphite electrode plants in the world and are the only substantially vertically integrated producer.  With this backdrop, and the decisive actions we have taken to manage through the COVID-19 pandemic, we are well positioned to weather this downturn.

63.     That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2020 ("1Q20 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 1Q20 Form 10-Q contained statements that were substantially identical to those made in the 1Q20 Release as detailed in ¶62.  In addition, the 1Q20 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

64.     Also on May 6, 2020, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2020.  During his prepared remarks, defendant Rintoul emphasized that "[g]lobal warming [was] a critical issue facing steel companies" and represented that "EAF production yields 75% less carbon emissions than traditional blast furnace production."

65.     On August 6, 2020, GrafTech issued a press release disclosing the Company's financial results for the quarter ended June 30, 2020 ("2Q20 Release").  The 2Q20 Release claimed that the "environmental and economic attributes" of the "Electric Arc Furnace and graphite electrode businesses" were "key advantages" for the graphite electrode industry, of which GrafTech was a part.  The 2Q20 Release stated that GrafTech was "well positioned" to navigate the challenges it faced due in part to its "advantaged cost position."

66.     That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2020 ("2Q20 Form 10-Q"), which was signed by defendants Rintoul and

Coburn.  The 2Q20 Form 10-Q contained statements that were substantially identical to those made in the 2Q20 Release as detailed in ¶65.  In addition, the 2Q20 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

67.     Also on August 6, 2020, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the second quarter of 2020.  During his prepared remarks, defendant Rintoul emphasized that the "environmental advantages" of the EAF industry placed GrafTech in a "strong position" to achieve long-term growth, stating in pertinent part as follows:

> Additionally, environmental considerations will continue to become an increasingly critical issue facing industrial companies.  And the EAF production yields 75% less carbon emissions than traditional blast furnace type operations.  These economic, operational and environmental advantages put the EAF industry in a strong position to weather this downturn in the short run and to achieve continued solid growth over the long term.

68.     On September 16, 2020, GrafTech published its inaugural sustainability report ("2019 Sustainability Report").  The 2019 Sustainability Report represented that the publication symbolized an "important step towards demonstrating ***our commitment to transparency regarding environmental, social, and governance topics***."  The 2019 Sustainability Report further claimed that GrafTech was "proactively" taking steps to address its environmental impacts, stating in pertinent part as follows:

> As a manufacturer of graphite electrodes, we are cognizant of our impacts on the environment.  ***From energy consumption and air emissions*** to water use and waste handling, ***we proactively take steps to reduce these impacts throughout our operations***.

69.     The 2019 Sustainability Report represented that GrafTech was "focused" on reducing air emissions and dust around its manufacturing plants, including specifically at its Monterrey facility, stating in pertinent part as follows:

*To reduce emissions, we have installed control technology on our equipment, which limits the amount of air emissions that enter the environment*. In coordination with our sites, our HS&EP and Technology Teams look for and evaluate new and innovative ways to reduce our emissions. Reducing air emissions may come from a variety of activities, including changes and upgrades in processes; upgrading and adding control equipment (dust collectors and SO2 abatement systems); and increased preventative maintenance programs. GrafTech has also focused on improving the housekeeping around our plants to further reduce dirt and dust. *In Monterrey, a new dust collector was installed for our bake process and a new material transport system was installed for moving raw materials from storage to the processing area*.

70.     The 2019 Sustainability Report disclosed that GrafTech was initiating a series of "projects" at its Monterrey facility that were expected to "further optimize" its environmental impact, stating in pertinent part as follows:

GrafTech recently began a series of projects at our Monterrey and St. Marys facilities that will shift graphitization and machining of additional volume of semi-finished product from Monterrey to St. Marys. *We expect these projects will further optimize our manufacturing footprint by improving environmental performance and production* flexibility at both facilities, as well as leverage cost efficiencies at our St. Marys facility.

71.     On November 3, 2020, GrafTech issued a press release disclosing the Company's financial results for the quarter ended September 30, 2020 ("3Q20 Release"). The 3Q20 Release reported production volumes of 32 thousand MT for the quarter. The 3Q20 Release claimed that the "environmental and economic advantages of electric arc furnace steel production position[ed]" the "graphite electrode industry for continued long-term growth." The 3Q20 Release also represented that GrafTech's purportedly "*advantaged low cost structure*" was a "*sustainable*" competitive advantage.

72.     That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2020 ("3Q20 Form 10-Q"), which was signed by defendants Rintoul and Coburn. The 3Q20 Form 10-Q contained statements that were substantially identical to those made in the 3Q20 Release as detailed in ¶71. In addition the 3Q20 Form 10-Q, stated that GrafTech

"manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

73.     Also on November 3, 2020 GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2020.  During his prepared remarks, defendant Rintoul claimed that GrafTech was focused "***on being good environmental stewards***" and that they were "***fully committed***" to advancing their "***ESG efforts***."  In addition, defendant Rintoul represented that GrafTech was "well positioned" given the Company's "low-cost structure" which purportedly represented a "sustainable and long-term" competitive advantage. Defendant Rintoul represented that they were "proud of [their] inaugural sustainability report" and that they were "fully committed to [those] efforts across [the] organization."

74.     On November 10, 2020, GrafTech filed with the SEC a Prospectus Supplement on Form 424B7 (the "November 2020 Prospectus").  The November 2020 Prospectus touted GrafTech's "low-cost" graphite electrode manufacturing facilities, stating in pertinent part as follows:

> ***We believe that we have the most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry***, including three of the highest capacity facilities in the world.  We are the only large scale graphite electrode producer that is substantially vertically integrated into petroleum needle coke, a key raw material for graphite electrode manufacturing.  ***This unique position provides us with competitive advantages in product quality and cost***.

75.     On December 16, 2020, GrafTech filed with the SEC a Prospectus Supplement on Form 424B7 (the "December 2020 Prospectus").  The December 2020 Prospectus touted GrafTech's "low-cost ultra-high power" graphite electrode manufacturing facilities, stating in pertinent part as follows:

> ***We believe that we have the most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry***, including three of the five highest capacity facilities in the world (excluding China).  We are the only large scale graphite electrode producer that is substantially vertically integrated into petroleum needle coke, the primary raw material for graphite electrode manufacturing, which is

currently in limited supply.  ***This unique position provides us with competitive advantages in product quality and cost***.

76.     The December 2020 Prospectus also highlighted GrafTech's restructuring activities, and reported that the Company had begun a series of projects at its Monterrey facility that were expected to improve its "environmental performance," stating in pertinent part as follows:

> In 2018, we completed an operational improvement and debottlenecking initiative to increase production capacity at our three primary operating facilities in Calais, France, Pamplona, Spain, and Monterrey, Mexico, by approximately 20% to a total of 202,000 metric tons ("MT").  ***We have begun a series of projects at our Monterrey and St. Marys facilities*** that will shift graphitization and machining of additional volume of semi-finished product from Monterrey to St. Marys.  We expect these projects will further ***optimize our manufacturing footprint by improving environmental performance*** and production flexibility at both facilities and also leverage cost efficiencies at our St. Marys facility.

(Footnote omitted.)

77.     Substantially similar statements as detailed in ¶¶75-76 were included in prospectus supplements that GrafTech filed with the SEC on Form 424B7 on January 19, 2021, March 3, 2021, and May 26, 2021.

78.     On February 5, 2021, GrafTech issued a press release disclosing the Company's financial results for the fourth quarter and year ended December 31, 2020 ("4Q20 Release").  The 4Q20 Release quoted defendant Rintoul who claimed that the "'environmental and economic advantages of electric arc furnace steel production position[ed]'" the "'graphite electrode industry for long-term growth.'"  The 4Q20 Release further quoted defendant Rintoul who represented that GrafTech's "'***advantaged low-cost structure***'" was a "'***sustainable***'" competitive advantage.

79.     That same day, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the fourth quarter and full year 2020.  During his prepared remarks, defendant Rintoul touted GrafTech's "sustainability strategy" which he claimed was "***centered on improving [their] environmental footprint***," and encompassed a wide range of

activities, including "greenhouse gas emissions" and "air quality," stating in pertinent part as follows:

> ***The steering committee oversees our sustainability strategy, which compromises*** – or comprises rather, of employee health and safety, community relations, materials sourcing and efficiency, energy management, greenhouse gas emissions, air quality, water and wastewater management and waste management. ***The strategy encompasses activities as varied as our community involvement and outreach in Monterrey, Mexico***, our capture of energy generated at our Seadrift Coke facility to create additional sources of electricity for the area and our emission reduction efforts that include the installation of control technology on equipment on all of our sites. ***Our goals are centered on improving our environmental footprint across our operations***. ***We are working hard to be good corporate citizens in the communities where we operate***. And every day, our business decisions and actions are guided by our code of conduct and ethics. We look forward to continuing our ESG dialogue with you and publishing our second annual sustainability report later this year.

80. An earnings presentation used throughout the conference call further represented that GrafTech was "being proactive to improve [the Company's] environmental footprint."

81. In addition, defendant Rintoul touted GrafTech's "low-cost structure" and claimed that the Company was "well positioned" as a result of its purportedly "sustainable and long-term" competitive advantage.

82. On February 23, 2021, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2020 ("2020 Form 10-K"), which was signed by defendants Rintoul and Coburn. The 2020 Form 10-K highlighted the purportedly "environmentally friendly nature" of the EAF steelmaking employed by GrafTech's customers. The 2020 Form 10-K similarly stated that as "a result of the increasing global availability of steel scrap and the more resilient, high-variable cost and environmentally friendly EAF model, we expect EAF producers to continue to grow at a faster rate than blast oxygen furnace ('BOF') producers globally." The 2020 Form 10-K represented that GrafTech was in compliance with all applicable environmental laws and regulations in its manufacturing processes, stating: "We believe that we are currently in compliance in all

material respects with the federal, state, local and foreign environmental laws and regulations to which we are subject."

83. Similarly, the 2020 Form 10-K stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors. The 2020 Form 10-K also represented that the Company has an "on-going commitment to rigorous internal environmental protection standards." The 2020 Form 10-K further stated that "[e]nvironmental considerations are part of all significant capital expenditure decisions."

84. Under a heading titled "Competitive strengths," the 2020 Form 10-K touted GrafTech's "lowest cost, large-scale" manufacturing plants, stating in pertinent part as follows:

> *We believe our facilities are among the most strategically located and lowest cost, large-scale graphite electrode manufacturing plants in the world*. Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately a quarter of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers*. Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors*, and excellent visibility into the large North American and European EAF steelmaking markets.

85. The 2020 Form 10-K pointed to GrafTech's restructuring actions and associated cost reductions, which the 2020 Form 10-K claimed resulted in "the industry's most efficient production platform of high production capacity assets," stating in pertinent part as follows:

> Over the past decade, we have rationalized inefficient plants during the downturn and more recently completed a manufacturing footprint optimization program. We believe that *the optimization of our graphite electrode plant network will continue to drive improved fixed cost absorption*. Moreover, our Calais, Pamplona, Monterrey and St. Marys facilities *each provides unique cost advantages given its scale and access to low cost, reliable energy sources*.

86. In addition, the 2020 Form 10-K highlighted the cost advantages GrafTech enjoyed from its Monterrey facility, stating in pertinent part as follows:

*Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials*, and our substantial vertical integration with Seadrift. Our Calais, Pamplona, Monterrey and St Marys facilities *have access to low-cost sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs*.

87.     The 2020 Form 10-K disclosed that GrafTech had begun a series of "projects" at its Monterrey facility that were expected to "improve environmental performance," stating in pertinent part as follows:

We have begun a series of projects at our Monterrey and St. Marys facilities that will shift graphitization and machining of additional volume of semi-finished product from Monterrey to St. Marys. *We expect these projects will further optimize our manufacturing footprint by improving environmental performance and production* flexibility at both facilities and also leverage cost efficiencies at our St. Marys facility. We believe that our business has the lowest manufacturing cost structure of all our major competitors, primarily due to the large scale of our manufacturing facilities.

88.     On May 5, 2021, GrafTech issued a press release disclosing the Company's financial results for the quarter ended March 31, 2021 ("1Q21 Release"). The 1Q21 Release reported production volume of 36 thousand MT for the quarter. In addition, the 1Q21 Release touted GrafTech's "portfolio of low cost graphite electrode manufacturing facilities" including that the assets were "three of the highest capacity facilities in the world," which it claimed provided the Company with "competitive advantages in product quality and cost."

89.     That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2021 ("1Q21 Form 10-Q"), which was signed by defendants Rintoul and Coburn. The 1Q21 Form 10-Q reported production volume of 36 thousand MT for the quarter. The 1Q21 Form 10-Q touted GrafTech's "low cost structure" as a purported "sustainable" competitive advantage. In addition, the 1Q21 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

90.     Also on May 5, 2021, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2021.  In connection with the conference call, GrafTech released an earnings presentation, which was referenced throughout the conference call.  The earnings presentation claimed GrafTech was being "proactive to improve [the Company's] environmental footprint," including by "upgrading manufacturing equipment."  Included within the earning presentation was the following graphic:



91.     During the call, defendant Rintoul claimed the graphic represented GrafTech's "***constant focus***" on "***safety, environment, [and] quality***" and that "SEQ" was a "core mission" for the Company.  Defendant Rintoul represented that GrafTech was "well positioned" given the Company's "low-cost structure" which purportedly represented a "sustainable and long-term" competitive advantage.

92.     On August 6, 2021, GrafTech issued a press release disclosing the Company's financial results for the quarter ended June 30, 2021 ("2Q21 Release").  The 2Q21 Release reported production volume of 44 thousand MT for the quarter.  The 2Q21 Release highlighted GrafTech's "low-cost, ultra-high power graphite electrode manufacturing facilities" including that the assets were "three of the highest capacity facilities in the world," which it claimed provided the Company with "competitive advantages in product quality and cost."

93.     That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2021 (the "2Q21 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 2Q21 Form 10-Q touted GrafTech's "low cost structure" as a purported "sustainable" competitive advantage.  In addition, the 2Q21 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.  The 2Q21 Form 10-Q also reported production volume of 44 thousand MT for the second quarter.

94.     Also on August 6, 2021, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the second quarter of 2021.  During his prepared remarks, defendant Halford pointed to the "***good progress***" GrafTech was making on its ESG efforts, stating in pertinent part as follows:

> ***We continue to make good progress with our ESG efforts along several pads***. Notably, in the second quarter, we completed a full materiality assessment with the assistance of external experts to ***identify and prioritize the key ESG issues for our business and our stakeholders***.  The process allowed us to objectively determine the ESG topics that will drive our sustainability strategy, reporting and actions moving forward.
>
>      The assessment included peer and industry benchmarking, a robust series of interviews with internal and external stakeholders and a full validation of the assessment by our executive team.

95.     An earnings presentation used during the conference call claimed that GrafTech was setting "[s]ustainability" goals to "drive performance" on the Company's ESG initiatives and highlighted recent actions undertaken at the Company's Monterrey facility, as depicted in the following slide:



96.     Defendant Rintoul highlighted the environmental benefits of the EAF industry compared to traditional steel producers and represented that GrafTech was "committed" to helping the EAF industry "further advance these sustainability initiatives," stating in pertinent part as follows:

> We have an enviable customer base comprising of the lowest cost producers of steel where some of the largest recyclers in the world, producing steel with 75% less carbon emissions compared to traditional integrated steel producers.  And the EAF steel industry is committed to taking their leadership and sustainable steel production even further, innovating to increase efficiency, ***reduce greenhouse gas emissions*** and reinforce material reuse and recycling.

> As we look forward, ***we are committed to helping our industry further advance these sustainability initiatives***.  From its leading position, we expect the EAF and steel industry growth to continue to outpace global GDP over the long term, positioning our products for solid long-term growth.

97.     Defendant Rintoul also represented that GrafTech was "well positioned" given the Company's "low-cost structure" which purportedly represented a "sustainable and long-term" competitive advantage.

98.     On September 23, 2021, GrafTech published its 2020 Sustainability Report (the "2020 Sustainability Report").  Included within the 2020 Sustainability Report was a "message" from defendant Rintoul, which claimed that GrafTech was "committed" to improving its

environmental footprint and emphasized the progress the Company was purportedly making at its

Monterrey facility, stating in pertinent part as follows:

> As you will read about further in this report, ***we are committed to improving our environmental footprint***. We continue to monitor and track our progress on energy consumption and air emissions to identify opportunities for improvements. ***During 2020, at our Monterrey, Mexico facility, we continued to implement projects focused on controlling emissions***, such as installation of new dust collection systems and upgrades to our mill, mix and forming, and baking operations to enhance our air emission controls.

99. Under a heading titled "Environment," the 2020 Sustainability Report claimed

GrafTech had conducted "extensive work" to better understand its environmental footprint and

claimed that it was "committed to the protection of our communities and environment."

100. The 2020 Sustainability Report featured GrafTech's Monterrey facility in a

"Spotlight" which highlighted the Company's purportedly broad based commitment to "HS&EP"

(Health Safety and Environmental Protection), stating in pertinent part as follows:

> At GrafTech, our employees are actively engaged in efforts to improve HS&EP. ***It is not only acknowledged and communicated as a priority, but it is clear in our operations when you visit our sites***. Our employees in Monterrey, Mexico, are involved in how we translate our health, safety, and environmental commitment into practice.
>
> . . . ***Our Monterrey team continued their work on housekeeping, improving environmental controls and facility upgrades***. For example, during 2020, we completed construction of a new raw material handling system and improved management of our dust collection systems.

101. In addition, the 2020 Sustainability Report highlighted the "initiatives" GrafTech had

undertaken across its operations, and specifically at its Monterrey facility, to improve emissions and

air quality, stating in pertinent part as follows:

> Each GrafTech operation has a program that details the standard practices for managing and controlling air emissions.
>
> *        *        *
>
> We have undertaken an initiative to improve critical assets, such as our bake and graphitizing furnaces and emission control equipment, with digital controls and predictive alerts, to help identify potential issues and mitigate process interruptions.

- 30 -

These enhancements are expected to result in improved process efficiency and reliability in our operations.

> *In Monterrey, we recently invested in automated controls, which maintain temperatures in the bake furnace thermal oxidizers, resulting in more thorough reduction of air emissions from these operations*.  We modified our bake ovens to allow for increased air circulation to reduce accumulation of particulate matter in the ovens.  Our team in charge of this project meets on a regular basis to report on progress.

102.    On November 5, 2021, GrafTech issued a press release disclosing the Company's financial results for the quarter ended September 30, 2021 ("3Q21 Release").  The 3Q21 Release reported production volume of 39 thousand MT for the quarter.  The 3Q21 Release also highlighted GrafTech's "low-cost, ultra-high power graphite electrode manufacturing facilities" stating that the assets were "three of the highest capacity facilities in the world," which it claimed provided the Company with "competitive advantages in product quality and cost."

103.    That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2021 ("3Q21 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 3Q21 Form 10-Q touted GrafTech's "low cost structure" as a purported "sustainable" competitive advantage.  In addition, the 3Q21 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.  The 3Q21 Form 10-Q reported production volume of 39 thousand MT for the third quarter.

104.    Also on November 5, 2021, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2021.  During his prepared remarks, defendant Halford stated that GrafTech was "pleased with [their] progress" on their ESG initiatives over the past year and indicated the Company was "continuing to develop [its] longer-term ESG goals."  Defendant Rintoul also represented that GrafTech was "well positioned" given the Company's "low-cost structure" which purportedly represented a "sustainable and long-term" competitive advantage.

105.    On February 4, 2022, GrafTech issued a press release disclosing the Company's financial results for the fourth quarter and year ended December 31, 2021 ("4Q21 Release").  The 4Q21 Release reported production volume of 46 thousand MT and 165 thousand MT for the fourth quarter and full fiscal year, respectively.  The 4Q21 Release quoted defendant Rintoul who highlighted the purported "'progress'" GrafTech was making on its ESG efforts and noted GrafTech's role in helping the environment, stating in pertinent part as follows:

> "We continued to ***make progress with our ESG efforts*** including a number of projects throughout our manufacturing plants in an effort to minimize our environmental footprint.  EAF steel production is an effective way to de-carbonize the steel making industry and with our product being a mission critical component, ***we are proud of our role in helping the industry and the environment***."

106.    The 4Q21 Release also highlighted GrafTech's "portfolio of low-cost, ultra-high power graphite electrode manufacturing facilities," stating that the assets were "three of the highest capacity facilities in the world," which it claimed provided the Company with "competitive advantages."

107.    Also on February 4, 2022, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the fourth quarter and fiscal year 2021.  During his prepared remarks, defendant Halford highlighted GrafTech's "enhanced reporting" with respect to its sustainability initiatives, and represented that GrafTech had completed "several projects," including improvements at all of its manufacturing plants "to improve air emissions," stating in pertinent part as follows:

> ***We continue to progress on our ESG journey***.  In September, we published our second annual sustainability report, which is available on our website.  ***Our enhanced reporting in this area will not only benefit our stakeholders but will also assist us in identifying projects that will improve our environmental impact***.
>
> ***We've already completed several projects in this area.  For example, in 2021, every electrode manufacturing plant completed at least one capital project to improve air emissions***.  We plan to keep up our momentum in this area and have already identified additional projects for 2022 that will further advance our environmental efforts.

108.    Defendant Rintoul also represented that GrafTech was "well positioned" given the Company's "low-cost structure" which purportedly represented a "sustainable and long-term" competitive advantage.

109.    On February 22, 2022, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 ("2021 Form 10-K"), which was signed by defendants Rintoul and Flanagan.  The 2021 Form 10-K highlighted the purportedly "environmentally friendly nature" of the EAF steelmaking employed by GrafTech's customers.  The 2021 Form 10-K similarly stated that as "a result of the increasing global availability of steel scrap and the more resilient, high-variable cost and environmentally friendly EAF model, we expect EAF steel producers to continue to grow at a faster rate than blast oxygen furnace ('BOF') producers globally."  The 2021 Form 10-K represented that GrafTech was in compliance with all applicable environmental laws and regulations in its manufacturing processes, stating in pertinent part that "[w]e believe we operate in compliance in all material respects with applicable laws and regulations."

110.    Similarly, the 2021 Form 10-K stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.  The 2021 Form 10-K also represented that the Company has an "on-going commitment to rigorous internal environmental protection standards."  The 2021 Form 10-K further stated that "[e]nvironmental considerations are part of all significant capital expenditure decisions."  The 2021 Form 10-K further claimed that GrafTech's HS&EP Policy governed its actions and decisions and that it was a top priority, stating:

> Our global Health, Safety and Environmental Protection ("HS&EP") Policy applies to all employees, contractors, and visitors, and governs our actions and decisions every day.  We also have a Code of Conduct and Ethics for Suppliers and Contractors that includes HS&EP guidelines required for doing business with GrafTech.  GrafTech's focus on HS&EP is a top priority for all employees.

111.    Under a heading titled "Competitive strengths," the 2021 Form 10-K touted GrafTech's "lowest cost, large-scale" manufacturing plants, stating in pertinent part as follows:

> **We believe our facilities are among the most strategically located and lowest cost, large-scale graphite electrode manufacturing plants in the world**. Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately a quarter of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers. **Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors**, and excellent visibility into the large North American and European EAF steelmaking markets.

112.    The 2021 Form 10-K pointed to GrafTech's restructuring actions and associated cost reductions, which the 2021 Form 10-K claimed resulted in "the industry's most efficient production platform of high production capacity assets," stating in pertinent part as follows:

> From 2014 to 2016, we rationalized inefficient plants during the downturn and more recently completed a manufacturing footprint optimization program. **We believe that the optimization of our graphite electrode plant network will continue to drive improved fixed cost absorption**. Moreover, our Calais, Pamplona, Monterrey and St. Marys facilities each **provides unique cost advantages given its scale and access to reliable energy sources**.

113.    In addition, the 2021 Form 10-K highlighted the cost advantages GrafTech enjoyed from its Monterrey facility, stating in pertinent part as follows:

> **Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials**, and our substantial vertical integration with Seadrift. Our Calais, Pamplona, Monterrey and St Marys facilities **have access to reliable sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs**.

114.    The 2021 Form 10-K disclosed that in 2021, GrafTech shifted certain work streams at its Monterrey facility to "improve environmental performance."

115.    On May 6, 2022, GrafTech issued a press release disclosing the Company's financial results for the quarter ended March 31, 2022 ("1Q22 Release"). The 1Q22 Release reported production volumes of 46 thousand MT for the quarter. The 1Q22 Release quoted defendant

Rintoul, who highlighted GrafTech's continued progress on its sustainability efforts and improved environmental performance, stating in pertinent part as follows:

> "***We are proud of the continued progress we are making with our sustainability efforts across the organization***.  These include capital projects to improve our environmental footprint and the establishment of key environmental goals, which includes targeting a meaningful reduction in greenhouse gas emissions. Electric arc furnaces play a critical role in helping the steel industry reduce its impact on the environment and ***our sustainability initiatives will further strengthen our ability to support the decarbonization of steel production***."

116.    The 1Q22 Release also highlighted GrafTech's "portfolio of low-cost, ultra-high power graphite electrode manufacturing facilities" stating that the assets were "three of the highest capacity facilities in the world," which it claimed provided the Company with "competitive advantages."

117.    That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022 ("1Q22 Form 10-Q"), which was signed by defendants Rintoul and Flanagan.  The 1Q22 Form 10-Q stated: "We believe that we have the ***most competitive portfolio of low-cost ultra-high power graphite electrode manufacturing facilities in the industry***, including three of the highest capacity facilities in the world."  The 1Q22 Form 10-Q represented that GrafTech's low-cost structure was a sustainable competitive advantage, stating: "We believe GrafTech's leadership positon, strong cash flows, and ***advantaged low cost structure*** and vertical integration are ***sustainable competitive advantages***."  In addition, the 1Q22 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.  The 1Q22 Form 10-Q reported production volume of 46 thousand MT for the first quarter.

118.    Also on May 6, 2022, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2022.  During his prepared remarks, defendant Halford claimed that GrafTech was proud of "being a key contributor" to the

decarbonization of steel and pointed to the "good progress" the Company was making on its own

sustainability initiatives, stating in pertinent part as follows:

> Electric arc furnaces play a critical role in helping the steel industry reduce its impact on the environment. ***And as graphite electrodes are indispensable to the operation of electric arc furnaces, we're proud to be a key part of the solution***.  EAF steelmaking produces 75% less greenhouse gas emissions compared to integrated steelmakers.  In addition, our business in the EAF industry contributes to a circular economy as electrodes facilitate the recycling of steel, as EAFs are the largest steel recyclers in the world.
>
> For these reasons, Green Steel as a critical element to the green economy can only be achieved through the ongoing shift to EAF steelmaking, which requires a reliable supply of graphite electrodes.  As a leader in the electrode industry, these dynamics support our positive long-term outlook on our business.  ***We take great pride in being a key contributor to the decarbonization of steel***.
>
> In addition to these broader contributions to the steel industry, ***we also continue to make good progress on our own key sustainability initiatives***.  Most recently, we've established environmental goals, which will be highlighted in our next annual sustainability report.  These include a commitment for a meaningful reduction in greenhouse gas emissions.  ***To support this objective, we continue to invest in capital projects that will further improve our environmental impact***.

119.    During his prepared remarks, defendant Rintoul stated that EAF steelmaking was

advantaged relative to integrated steelmaking due to its "variable cost structure, operational

flexibility, and lower environmental footprint."  Defendant Rintoul continued: "EAFs are more cost-

effective and environmentally friendly process representing an effective way to decarbonize the steel

industry."  Defendant Rintoul also represented that GrafTech was "well positioned" given the

Company's "low-cost structure" which purportedly represented a "sustainable and long-term"

competitive advantage.

120.    On August 5, 2022, GrafTech issued a press release disclosing the Company's

financial results for the quarter ended June 30, 2022 ("2Q22 Release").  The 2Q22 Release reported

production volume of 43.9 thousand MT.  The 2Q22 Release highlighted GrafTech's "competitive

portfolio of low-cost, ultra-high power graphite electrode manufacturing facilities" stating that the

assets were "three of the highest capacity facilities in the world," which it claimed provided the Company with "competitive advantages."

121.    That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2022 ("2Q22 Form 10-Q"), which was signed by defendants Kessler and Flanagan.  The 2Q22 Form 10-Q claimed that the "environmental and economic advantages of electric arc furnace steel production position[ed]" the "graphite electrode industry for continued long-term growth."  The 2Q22 Form 10-Q stated: "We believe that we have the ***most competitive portfolio of low-cost ultra-high power graphite electrode manufacturing facilities in the industry***, including three of the highest capacity facilities in the world."  The 2Q22 Form 10-Q represented that GrafTech's low-cost structure was a sustainable competitive advantage, stating that: "We believe GrafTech's leadership positon, strong cash flows, and ***advantaged low cost structure*** and vertical integration are ***sustainable competitive advantages***."  In addition, the 2Q22 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

122.    Also on August, 5, 2022, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the second quarter of 2022.  In response to a question from an analyst, defendant Halford touted the financial benefits stemming from the Company's purported "ESG" investments, stating in pertinent part as follows:

> As we go forward, we're continuously monitoring the underlying economics of running those factories and comparing those economics to our ability to command price on the selling side.  And we'll make prudent decisions as this progresses and we're selling incremental tons.  And so – fortunately, if we go back in time a little bit, ***we've really dialed up a lot of our focus on ESG initiatives and in particular, the environmental side of things***.

> And so we do have some things that we were doing to improve the energy efficiency of our facilities around the globe, but I'm talking specifically about Europe right now.  And some of those investments that we were making primarily for environmental purposes, now command or now generate a pretty substantial economic return given the price of gas and where it's going.

- 37 -

And so as we think about how we run our factories and how we prioritize our business.  We expect that as we look into the medium-term, we will start seeing some benefit from investments that were initially made more for environmental reasons, we'll now be generating pretty strong financial results for us as well

123.    The statements referenced in ¶¶39-122 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a)    that GrafTech's manufacturing operations in Monterrey, Mexico had for decades chronically contaminated neighboring communities with harmful carcinogenic gasses and particulate matter;

(b)    that GrafTech had signed agreements with local authorities committing itself to improving the environmental performance of its Monterrey facility, but repeatedly failed to honor these commitments;

(c)    that GrafTech had been repeatedly warned over an approximately 30-year period regarding its wanton disregard for the environment and health and well-being of people near its operations in Monterrey, Mexico;

(d)    that GrafTech's operations in Monterrey, Mexico were not in compliance with applicable environmental laws and regulations;

(e)    that the Company had failed to adequately remediate the environmental problems caused by the Monterrey facility following the 2019 administrative proceeding conducted by the Department of Sustainable Development of the State of Nuevo León;

(f)    that the government of Apodaca had sought intervention from the State of Nuevo León authorities to curtail and prevent the adverse environmental impacts and noncompliance with environmental laws and regulations caused by the Monterrey facility;

(g)     that GrafTech's purported cost leadership was achieved in substantial part by failing to implement appropriate and effective environmental safeguards at its manufacturing facility in Monterrey, Mexico;

(h)     that GrafTech's capital expenditures and/or related operational projects were woefully insufficient to adequately address the harm that the Company's operations in Monterrey, Mexico had inflicted on the environment and people within the neighboring communities;

(i)     that as a result of (a)-(h), GrafTech was acutely exposed to undisclosed material risks that the Company's manufacturing operations in Monterrey, Mexico would be severely disrupted by government action or enforcement; and

(j)     that as a result of (a)-(i), GrafTech was acutely exposed to undisclosed material risks that its supplies of pin stock and graphite electrodes would be withdrawn and/or materially diminished, thereby materially harming the Company's business, operations, reputation, and financial results.

124.    In addition, throughout the Class Period, GrafTech's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [GrafTech] speculative or risky" and an explanation of "how [the] risk affecte[d] [GrafTech]."  Defendants' failure to disclose the extent and severity of the adverse environmental impacts of the Monterrey facility and GrafTech's failure to comply with applicable environmental laws and regulations violated Item 303 because these activities represented known trends and uncertainties that were

likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in GrafTech speculative or risky.

125. Then, on September 16, 2022, GrafTech filed with the SEC a current report on Form 8-K. The current report revealed that GrafTech's manufacturing facility in Monterrey, Mexico had been ordered to shut down by regulators following a pair of inspections by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment. In the wake of this revelation, multiple Mexican news outlets reported that the cessation order had been made in response to GrafTech's excessive pollution of hazardous carcinogenic gasses and particulate matter into neighboring communities. For example, a news article published by *El Norte* stated: "For launching polluting emissions in Apodaca, the State Government yesterday temporarily closed the operations of the Graftech company."

126. Following the closure, the mayor of a local municipality, Cesar Garza, celebrated the shutdown in a video broadcast via Facebook Live and reported that the municipality had voted in plenary session to formally request that GrafTech's facility be required to close and relocate, citing more than 30 years of environmental abuses by the Company. During the broadcast, Garza detailed GrafTech's widespread environmental offences, stating: "All of the residents of the modern Apodaca sector and the city center *witness every morning the little dust that fills the apartments, the cars and that also fills our lungs, unfortunately*." Garza further stated that GrafTech's operations had long been recognized as posing a serious health risk to community members, including its children: "40 years ago, children from the schools here in Apodaca were taken once a year to have their lungs tested because there was recognition that there was a risk with this company and the dust they threw onto public roads." In addition, Garza described that GrafTech had a long history of reneging on

prior commitments to improve its environmental footprint: "The company always signs agreements and always says it will solve the problem, but it never does. ***They never do anything to really change things***." He continued: "***We already gave them 30 years to correct themselves*** and they didn't. We no longer trust that they are going to do it. We want this company to move its operations and we are willing to listen to a reasonable time frame so that they can emigrate to another place where they do not have a direct population affect with their carbon emissions."[2]

127. On this news, the price of GrafTech common stock fell from $5.30 per share on September 16, 2022 to $4.61 per share on September 20, 2022, or approximately 13%, on above-average trading volume. However, the price of GrafTech common stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

128. On November 4, 2022, GrafTech issued a press release disclosing the Company's financial results for the quarter ended September 30, 2022 (the "3Q22 Release"). The 3Q22 Release provided investors with an update on GrafTech's operations in Monterrey, Mexico. Specifically, the 3Q22 Release indicated that GrafTech was complying with the suspension notice but disagreed with the actions taken by the authorities, stating that "[w]hile we are complying with the suspension notice, we strongly disagree with the course of action taken by the state authorities and will continue to seek resolution, including a restart of our Monterrey production operations."

129. That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022 ("3Q22 Form 10-Q"), which was signed by defendants Kessler and Flanagan. The 3Q22 Form 10-Q contained statements that were substantially identical to those made in the 3Q22 Release as detailed in ¶128.

---

[2]     The Facebook Live broadcast video was transcribed by counsel using Happyscribe.com, then translated from Spanish to English by Google Translate, and reviewed by a Spanish speaker.

130.    In addition, the 3Q22 Form 10-Q represented that the financial impact of the closure would only significantly impact the Company's financial results beyond the fourth quarter of 2022 if the Monterrey plant remained suspended, stating that "[b]eyond the fourth quarter of 2022, *if Monterrey remains suspended*, the impact on the Company's results in the first half of 2023 will be significant, with sales volume reduced by 50% or more, compared to sales volume in the first half of 2022, before recovering in the back half of the year."

131.    Also on November 4, 2022, GrafTech held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2022.  During his prepared remarks, defendant Kessler told investors that, if the Monterrey plant remained closed, GrafTech's business performance would be significantly impacted for the first half of 2023, stating that "*unless Monterrey reopens*, our business performance will be significantly impacted for the first 2 quarters of 2023 with a reduction in sales volume of 50% or more before recovering in the back half of the year."  Defendant Kessler further advised investors that the financial impact would be less significant in the near-term but more pronounced in the longer-term if the Monterrey plant remained closed, stating in pertinent part as follows:

> However, *until our Monterrey operations are resumed* or our St. Marys facility's operational or other mitigation activities are successfully implemented, our ability to fulfill customer orders will be significantly impacted, particularly as we get into the next year.
>
> The impact will be less significant for the fourth quarter as existing pin stock inventory is supporting our ability to fulfill most customer needs in the near term. For next year, if Monterrey remains suspended, sales volume will be reduced by 50% or more in the first half of 2023 compared to the first half of 2022, but will recover after that.  We expect to be able to meet our LTA commitments throughout 2023.

132.    During the call, an analyst from RBC Capital Markets inquired directly whether the reduced production volumes resulting from the non-operation of GrafTech's Monterrey facility would impact the Company's ability to enter into long-term agreements with customers.  In response, defendant Halford assured investors that GrafTech had "absolute confidence" in its ability

to navigate the suspension of its Monterrey facility and that its commercial strategy of securing long-term agreements would be unchanged, stating in pertinent part as follows:

> Yes, thanks.  It's an important question, Arun.  ***And one of the things that I want to make clear*** is that while we need to consider the near-term supply constraints related to the Monterrey situation, ***none of this changes our commercial strategy***.  We continue to believe that we are unique in the market in our ability to offer a variety of different contracting terms to our customers.  [T]hat's supported by our vertical integration, and that's a key differentiator, ***our ability to provide that certainty to our customers***.  And while in the very near term, we're dealing with the Monterrey situation, we have absolute confidence in our ability to resolve this current environment we're in, and ***it's not changing our commercial strategy at all***.

133.    Subsequently, on November 18, 2022,  GrafTech issued a press release disclosing that GrafTech's Monterrey facility was conditionally permitted to immediately resume operations pending the Company's "completion of certain agreed upon activities," including the submission of an environmental impact study regarding the Monterrey facility's operations  ("November 2022 Release").  The November 2022 Release quoted defendant Kessler, who stated that he was "'pleased to have received an order that allows for the immediate restart of our operations in Mexico.'"

134.    The statements referenced in ¶¶128-133 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them:

(a)    that the suspension of GrafTech's Monterrey facility required the Company to irreparably deplete its critically needed pin stock inventory;

(b)    that due to the non-operation of GrafTech's Monterrey facility, the Company had lost its ability to reliably supply its customers with graphite electrodes;

(c)    that as a result of (a)-(b), GrafTech's ability to enter into long-term agreements with its customers was materially impaired, rendering its commercial strategy unviable;

(d)      that  the suspension of activities at GrafTech's Monterrey facility, and/or the uncertainty regarding GrafTech's ability to  reliably deliver graphite electrodes, coincided with a critical  negotiation  window  during  which  the  Company  was  expecting  to  secure  customer commitments for the first half of fiscal 2023; and

(e)      that as a result of (a)-(d), the financial ramifications of the Monterrey facility's closure  on  GrafTech's  financial  and  business  performance  in  the  first  half  of  fiscal  2023  were substantially more severe than defendants had represented.

135.    Then, on February 3, 2023, GrafTech issued a press release disclosing the Company's financial and operational results for the fourth quarter and full year ended December 31, 2022 (the "4Q22 Release").  Contrary to prior representations that GrafTech's business performance would only be significantly impacted beyond the fourth quarter of 2022 if the Monterrey facility remained closed, the 4Q22 Release revealed that the temporary closure of the Monterrey facility would have a "significant" adverse impact on the Company's business performance in first half of fiscal 2023.  In particular,  the  4Q22  Release  reported  that  the  suspension  of  operations  at  the  Monterrey  facility "resulted  in  uncertainty  during  a  key  customer  commitment  window  for  customer  purchases covering the first six months of 2023."  As a result, GrafTech slashed its expected sales volume for the  first  half  of  fiscal  2023  by  50%  relative  to  the  Company's  sales  in  fiscal  2022.   On  the corresponding  conference  call,  defendant  Kessler  disclosed  that  the  temporary  suspension  of GrafTech's operations had forced the Company to deplete their on-hand pin stock inventory, which could  not  be  readily  replenished  even  with  the  reopening  of  the  Monterrey  facility  as  the manufacturing time for pin stock took several months.  In addition, defendant Kessler explained that the Company's ability to secure customer contracts during key contract negotiation window "was limited" due to the uncertainty surrounding GrafTech's pin stock inventory.

136. On this news, the price of GrafTech common stock fell from $6.59 per share on February 2, 2023 to $5.58 per share on February 3, 2023, a decline of approximately 15%, on above-average trading volume. However, the price of GrafTech common stock continued to be artificially inflated as the full truth regarding the Company's business, operations, and financial results continued to be concealed.

137. Then, on April 28, 2023, GrafTech issued a press release disclosing the Company's financial and operational results for the quarter ended March 31, 2023 ("1Q23 Release"). The 1Q23 Release disclosed that GrafTech sales declined 62% compared to the first quarter of 2022 due to the suspension of operations at GrafTech's Monterrey facilities, causing GrafTech to report a net loss of more than $7 million, down significantly from reported net income of approximately $124 million in the prior year quarter. On the corresponding conference call, defendant Halford confirmed that the closing of the GrafTech's Monterrey facility in 2022 was the "primary driver" of the precipitous year-over-year decline in sales volume.

138. On this news, the price of GrafTech common stock fell from $4.73 per share on April 27, 2023 to $3.92 per share on May 2, 2023, a decline of approximately 17%, on above-average trading volume. However, the price of GrafTech common stock continued to be artificially inflated as the full truth regarding the Company's business, operations, and financial results continued to be concealed.

139. Then, on August 4, 2023, GrafTech issued a press release disclosing the Company's financial and operational results for the quarter ended June 30, 2023 ("2Q23 Release"). The 2Q23 Release reported that sales declined 49% compared to the second quarter of 2022 as the Company continued to "recover" from the effects of the Monterrey facility shutdown in 2022. As a result of the substantial decline in net sales, the 2Q23 Release reported a net loss of $8 million compared to $115 million in net income the Company reported in the second quarter of 2022. On the

corresponding conference call, defendant Kessler described the Monterrey suspension as the "key driver" of the underperformance and revealed that GrafTech's ability to secure customer contracts would continue to be indirectly impacted in the second half of fiscal 2023, stating in pertinent part as follows:

> Yes.  So a couple of thoughts.  I don't think we can comment directly on market shares.  I don't think we have enough transparency around that.  In regards to the impact of Monterrey, and I think we've talked about that in some detail on the last 2 calls, right?  During that suspension in late 2022, right?  *We lost the ability to negotiate volumes, especially for the first half of '23 and maybe even to some extent in the second half,* right?  So that was the worst possible time for that suspension.  So that is really the key driver of the impact and underperformance and the disconnect between what you're highlighting here, the steel utilization rates versus the electro plant utilization rate.  I think it's the indirect impact of Monterrey, the loss of that negotiation window during the most critical negotiation time in late 2022.

140.    On this news, the price of GrafTech common stock fell from $5.23 per share on August 3, 2023 to $4.05 per share on August 4, 2023, or nearly 23%, on above-average trading volume.  The price of GrafTech stock has continued to fall thereafter, dropping as low as $1.50 per share.

141.    Ultimately, the price of GrafTech common stock fell 90% from the Class Period high, causing plaintiff and the Class to suffer hundreds of millions of dollars in losses and economic damages under the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

142.    As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding GrafTech, and their control over and/or receipt and/or modification of GrafTech's

materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

143.    Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

144.    The Individual Defendants, because of their positions with GrafTech, controlled the contents of GrafTech's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.   Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  In particular, the Individual Defendants, by virtue of their roles as members of GrafTech's executive management, also served as members of the Company's ESG Steering Committee.  As members of the ESG Steering Committee, the Individual Defendants were responsible for defining the Company's ESG mission and implementing and overseeing the company-wide ESG strategy.  GrafTech's ESG strategy encompassed a wide range of environmental issues, including specifically air quality and greenhouse gas emissions at GrafTech's Monterrey facility.  Indeed, as defendant Rintoul explained during a conference call in February 2021:

> The steering committee oversees our sustainability strategy, which compromises – or comprises rather, of employee health and safety, community relations, materials sourcing and efficient, energy management, **greenhouse gas emissions, air quality**, water and waste water management.  **The strategy encompasses activities as varied**

*as our community involvement and outreach in Monterrey, Mexico*, our capture of energy generated at our Seadrift Coke facility to create additional sources of electricity for the area *and our emission reduction efforts that include the installation of control technology on equipment on all of our sites*.

In addition, pursuant to their responsibilities as members of the ESG Steering Committee, the Individual Defendants provided ESG strategy updates, including ESG metrics, at each Board meeting.  As a result, each of the defendants is responsible for the accuracy of GrafTech corporate statements and is, therefore, responsible and liable for the representations contained therein.

145.    GrafTech's adverse environmental footprint also jeopardized the Company's operations, which was among the most important issues facing the Company and the focus of GrafTech management, including the Individual Defendants.  The Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding GrafTech's manufacturing facilities, operational improvements, ESG strategies and initiatives, and cost structure.

146.    Defendants and Company insiders also had the motive and opportunity to commit fraud.  While the price of GrafTech common stock was artificially inflated, defendant Brookfield (to whom the Individual Defendants were beholden) sold approximately of $571 million worth of GrafTech stock in the IPO plus an additional $2.8 billion worth of GrafTech common stock after the IPO, primarily through six registered public offerings held within approximately three years of the IPO.  In addition, the Individual Defendants caused GrafTech to purchase directly from defendant Brookfield $475 million worth of GrafTech shares pursuant to two share purchase agreements. These sales further bolster an already compelling inference of scienter.

147.    Defendants' scienter is further underscored by the mandated certifications under the Sarbanes-Oxley Act of 2002 of the Individual Defendants filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about GrafTech was made known to them and that the Company's disclosure-related controls were operating effectively.

148.    The fact that numerous executive officers, including many of the Individual Defendants, resigned from the Company either during the Class Period or shortly thereafter further bolsters an already compelling inference of scienter.

## NO SAFE HARBOR

149.    GrafTech's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

150.    Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and approved by an executive officer of GrafTech who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE;
## FRAUD ON THE MARKET

151.    At all relevant times, the market for GrafTech common stock was an efficient market for the following reasons, among others:

(a)    GrafTech common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     according to the Company's Form 10-K for the fiscal year ended December 31, 2022, GrafTech had over 256 million shares outstanding as of February 10, 2023;

(c)     as a regulated issuer, GrafTech filed periodic public reports with the SEC;

(d)     GrafTech regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about GrafTech was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

152.   As a result of the foregoing, the market for GrafTech common stock promptly digested current information regarding GrafTech from publicly available sources and reflected such information in the price of GrafTech common stock.  Under these circumstances, all purchasers of GrafTech common stock during the Class Period suffered similar injury through their purchases of GrafTech common stock at artificially inflated prices, and a presumption of reliance applies.

153.   A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding GrafTech's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

**LOSS CAUSATION/ECONOMIC LOSS**

154. During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of GrafTech common stock and operated as a fraud or deceit on Class Period purchasers of GrafTech common stock by misrepresenting the value of the Company's business and prospects in the Company's operations. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's stock fell precipitously on numerous occasions as the prior artificial inflation came out of the stock's price, as detailed herein. As a result of their purchases of GrafTech common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

155. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of GrafTech during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

156. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GrafTech common stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there could be hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GrafTech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

157.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

158.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

159.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business and operations of GrafTech; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

160.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants Except Brookfield**

161.     Plaintiff incorporates ¶¶1-160 by reference.

162.     During the Class Period, the defendants named herein disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

163.    The defendants named herein violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of GrafTech common stock during the Class Period.

164.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GrafTech common stock.  Plaintiff and the Class would not have purchased GrafTech common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

165.    Plaintiff incorporates ¶¶1-164 by reference.

166.    The Individual Defendants acted as controlling persons of GrafTech within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause GrafTech to engage in the wrongful conduct complained of herein.  Defendant Brookfield controlled GrafTech and the Individual Defendants for the reasons detailed herein, including their ownership of a majority of GrafTech

voting stock, control of the Board, influence over GrafTech's management, historical relationship with the Company, and the various agreements that these defendants had caused the Company to enter into.  GrafTech controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 25, 2024   LAW OFFICE OF GEORGE W. COCHRAN
             GEORGE W. COCHRAN


                s/ George W. Cochran
             GEORGE W. COCHRAN (Bar # 0031691)
             1981 Crossfield Circle
             Kent, OH  44240
             Telephone:  330/607-2187
             330/230-6136 (fax)
             E-mail:  lawchrist@gmail.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com
fmejia@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

John C. Porter ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this <u>21</u> day of January, 2024.

DocuSigned by:

*John Porter*

BF2CZF4BB9E442E...

_____
John C. Porter

GRAFTECH

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date **Acquired** | Amount of **Shares Acquired** | **Price** |
|---|---|---|
| 06/28/2021 | 833 | $11.95 |

Prices listed are rounded up to two decimal places.