## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN C. PORTER,<br>Individually and on Behalf of All<br>Others Similarly Situated, | ) <br> ) <br> ) <br> ) | CASE NO. 1:24 CV 00154 |
| Plaintiff, | ) <br> ) | JUDGE DONALD C. NUGENT |
| v. | ) <br> ) | |
| GRAFTECH<br>INTERNATIONAL LTD., et al., | ) <br> ) <br> ) | **MEMORANDUM OF OPINION<br>REGARDING APPOINTMENT<br>OF LEAD PLAINTIFF AND** |
| Defendants. | ) <br> ) <br> ) | **APPROVAL OF SELECTION<br>OF COUNSEL** |

This matter is before the Court on two competing motions for appointment as lead plaintiff and for approval of lead counsel related to a Private Securities Litigation Reform Act of 1995 ("PSLRA") class action complaint, specifically: (1) *Motion of Shekhar Agrawal for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #18); and (2) *Motion of University of Puerto Rico Retirement System for Appointment as Lead Plaintiff and Approval of its Selection of Counsel* (ECF #20).[1]

---

[1]

There were initially five motions for appointment as lead counsel and for approval of lead counsel: (1) *Motion of Sam Kulumani for Appointment as Lead Plaintiff and Approval of Counsel* (ECF #17); (2) *Motion of Shekhar Agrawal for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #18); (3) *Notice of Motion of Mukhtar Osman to: (1) Appoint Lead Plaintiff; and (2) Approve Lead Plaintiff's Selection of Counsel* (ECF #19); (4) *Motion of University of Puerto Rico Retirement System for Appointment as Lead Plaintiff and Approval of its Selection of Counsel* (ECF #20); and (5) *Motion of Matthew Lynch for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #21). On April 8, 2024, three of the five movants effectively withdrew their motions, either through a *Notice of Withdrawal* or a *Notice of Non-Opposition* to the other competing motions (ECF #25 [*Mukhtar*

On May 7, 2024, the Court heard oral argument in open court on the remaining two competing motions.  (*See* ECF #23).

For the reasons stated below, the Court GRANTS movant University of Puerto Rico Retirement System's *Motion of University of Puerto Rico Retirement System for Appointment as Lead Plaintiff and Approval of its Selection of Counsel* (ECF #20), and appoints movant University of Puerto Rico Retirement System as lead plaintiff, and approves the law firms of Abraham, Fruchter & Twersky, LLP and Robbins Geller Rudman & Dowd LLP to serve as lead plaintiff counsel.  Accordingly, the motion of movant Shekhar Agrawal's *Motion of Shekhar Agrawal for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #18) is DENIED.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  *The Proposed Class Action Complaint*

The following facts are drawn from the proposed *Class Action Complaint* (ECF #1) ("*Complaint*") and the pleadings related to the motions for appointment of lead plaintiff and approval of lead counsel.  They are accepted as true only for the purpose of deciding the competing motions for appointment as lead plaintiff and approval of selected lead counsel.

### *1.  The Parties*

#### *a.  Plaintiffs/Movants*

Plaintiff John C. Porter is an investor who purchased 833 shares of GrafTech securities on June 28, 2021, a date which is within the proposed "Class Period" of February 8, 2019 and

---

*Osman*], ECF #26 [*Matthew Lynch*], ECF #27 [*Sam Kulumani*]).

August 3, 2023.  (ECF #1, ¶ 1 & Schedule A, PageID #58).[2]

Proposed lead plaintiff Shekhar Agrawal ("Agrawal") is an investor, who states that he moves on behalf of himself, as well as on behalf of his brother, Jai Agrawal, and Arya Samaj Greater Houston ("ASGH"), a non-profit Hindu temple and learning center he manages, (ECF #18-3, PageID #228 [*Certification of Plaintiff*], ECF #18-6, PageID #241-242 [*Declaration of Shekhar Agrawal*] & ECF #30, PageID #725 [*Reply Memorandum*]).  According to the motion papers filed by movant Agrawal, he (Shekhar Agrawal), Jai Agrawal, and ASGH collectively purchased 387,213 shares of GrafTech securities, retained 242,331 shares through the end of the Class Period, expended $2,555,587.15, and incurred a loss of $1,669,155.74 on transactions in GrafTech common stock.  (ECF #18-3, PageID #229-232 [*Certification of Plaintiff*] & ECF #18-1, PageID #218 [*Memorandum in Support of Motion*]).  Their collective claimed losses were described more particularly in a later filing: "Of the $1.7 million loss, Mr. [Shekhar] Agrawal individually lost approximately $560,000, his brother lost approximately $1.03 million, and ASGH lost approximately $75,000."  (ECF #30, *Shekhar Agrawal's Memorandum of Law in Reply to the Competing Lead Plaintiff Motion*, PageID #725) (insert supplied).[3]

Proposed lead plaintiff University of Puerto Rico Retirement System ("UPR Retirement System") is an investor which, during the Class Period, purchased 226,300 shares of GrafTech

---

[2]

Plaintiff John C. Porter has not moved to be appointed as lead plaintiff in this matter.

[3]

The *Motion of Shekhar Agrawal for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #18) identified five individual investment funds, each identifying Shekhar Agrawal alongside the heading "Client Name."  (ECF #18-4, PageID #234-236). Agrawal later clarified that:  Account 1 is owned by ASGH, with a claimed loss of $73,102.46; Accounts 2 and 3 are owned by Jai Agrawal, with a claimed loss of $1,037,058.79; and Accounts 4 and 5 are owned by Shekhar Agrawal, with a claimed loss of $558,994.49.  (ECF #30).

-3-

securities, expended $1,690,398.78, had net purchases of 102,900 shares of GrafTech common stock, and incurred net losses of $623,340.38.  (ECF #20-1, PageID #412-413 [*Memorandum in Support of Motion*], ECF #20-4, PageID #428-429 [*Certification of Plaintiff*] & ECF #20-5, PageID #431-433 [*Gain (Loss) Chart*]).

   *b.  Defendants*

   Defendant GrafTech is a global manufacturer of graphite electrode products headquartered in Brooklyn Heights, Ohio.  (ECF #1, ¶ 7).  GrafTech's common shares trade on the New York Stock Exchange under the ticker symbol "EAF."  (ECF #1, ¶ 7).

   Other named Defendants are:  (1) David Rintoul, who served as GrafTech's President and Chief Executive Officer, and as a member of GrafTech's Board of Directors from March 2018 until his resignation in June 2022 (ECF #1, ¶ 8); (2) Quinn Coburn, who served as GrafTech's Chief Financial Officer from September 2015 until November 2021, and previously served as GrafTech's Vice President of Finance and Treasurer (ECF #1, ¶ 9); (3) Marcel Kessler, who was appointed to serve as GrafTech's Chief Executive Officer in July 2022, who resigned on September 28, 2023 (ECF #1, ¶ 10); (4) Timothy K. Flanagan, who served as GrafTech's Chief Financial Officer and Vice President Finance and Treasurer beginning in November 2021, and who thereafter became GrafTech's Interim Chief Executive Officer in September 2023 (ECF #1, ¶ 11); (5) Jeremy S. Halford, who was appointed to serve as Executive Vice President of Chief Operating Officer of GrafTech in October 2021, who previously served as GrafTech's Senior Vice President, Operations and Development beginning in May 2019; (6) BCP IV GrafTech Holdings LP, which is an indirect wholly-owned subsidiary of Brookfield Capital Partners (ECF #1, ¶ 17); (7) Brookfield Capital Partners Ltd., which is the private equity arm of Brookfield

Asset Management Inc. (ECF #1, ¶ 18); and (8) Brookfield Asset Management Ltd., which is a global alternative asset management based in Canada (ECF #1, ¶ 19).

For the purposes of this *Memorandum of Opinion*, Defendants Rintoul, Coburn, Kessler, Flanagan, and Halford will be referred to collectively as the "Individual Defendants," and Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd., will be referred to collectively as "Brookfield."

The *Complaint* asserts that Brookfield was the controlling shareholder of GrafTech during the Class Period and controlled each of the Individual Defendants. (ECF #1, ¶ 20).

## 2. *Plaintiffs' Assertion of the Facts*

The following recitation of background facts regarding Plaintiffs' claims is taken essentially *verbatim* from the paragraphs of the *Complaint*, and as such, in addition to a basic description of events, also contains certain representations best characterized as subjective allegations versus neutral and objective fact presentation.[4] As the issue to now be determined is which of the competing movants is "most adequate" to serve as lead plaintiff with the responsibility to present the Plaintiffs' collective position as the litigation moves forward, it is appropriate to set forth the factual background as the Court expects Plaintiffs intend to present it. This description should not be taken as the factual findings of the Court.

Headquartered in Brooklyn Heights, Ohio, GrafTech is a global manufacturer of graphite electrode products that are used in the production of electric arc furnace ("EAF") steel – a purportedly greener alternative to traditional steelmaking methods. In contrast to conventional

---

[4] The more overtly accusatory phrasing has been substituted with more neutral equivalent wording.

blast furnaces, which rely directly on coal, natural gas, and oil, EAF utilizes graphite electrodes to conduct electricity and to generate sufficient heat to melt scrap metal, iron ore, or other raw materials used to produce steel or other metals.  GrafTech's customers are comprised of steel manufacturers that use EAF to produce steel.  (ECF #1, ¶ 24).

As a manufacturing process, EAF steel requires less capital and operating expenditures, results in less environmental pollution, and offers greater flexibility in responding to demand changes as compared to traditional steelmaking methods.  As a result, EAF-produced steel has historically outpaced the growth of the overall steel market.  Beginning in 2011, however, the trend towards the steady adoption of EAF steel was partially reversed due to a glut in the global supply of steel, driven primarily by overproduction from blast furnace steel operators in China. As a result, GrafTech underwent a period of declining demand for its graphite electrodes, which led to falling revenues and growing losses.  By the end of 2014, for example, GrafTech's annual net losses had ballooned to more than $285 million, growing 1,000% from a net loss of approximately $27 million in the year prior.  In April 2015, GrafTech's then-CEO Joel Hawthorne warned that the challenges were expected to continue, stating that:

> [G]raphite electrode demand continued to soften as global electric arc furnace (EAF) steel production weakened.  Lower end-market demand in certain steel consuming sectors, continued high Chinese steel exports and other market dynamics led to lower EAF customer utilization rates, particularly in North America.  These factors are expected to create a challenging operating environment for our Company and the industry as a whole for the remainder of 2015.

(ECF #1, ¶ 25).

Amid this slump in the market for graphite electrodes, GrafTech announced on May 17, 2015 that it had entered into an agreement to be purchased by defendant Brookfield.  Pursuant to

the Plan of Merger Agreement, Brookfield agreed to make a cash tender offer to purchase all outstanding shares of GrafTech common stock at a purchase price of $5.05 share, resulting in a total valuation of approximately $700 million. On August 17, 2015, GrafTech announced that the Company's acquisition by Brookfield had been completed and that GrafTech had become a wholly owned affiliate of Brookfield. As a result, trading of GrafTech common stock on the NYSE ceased as of market open on August 17, 2015. (ECF #1, ¶ 26).

Over the next three years, GrafTech underwent an extensive transformation that was intended to revamp the Company's business and return it to profitability. As part of this transformation, GrafTech shifted all of its manufacturing operations to three of its highest-capacity and lowest-cost facilities located in: (i) Monterrey, Mexico; (ii) Pamplona, Spain; and (iii) Calais, France. Following this shift, GrafTech manufactured all of its pin stock inventory at its Monterrey facility. Pin stock is a critical component in GrafTech's manufacturing process. To be utilized by GrafTech's customers, each graphite electrode must be affixed with one pin stock. Because GrafTech's Monterrey facility was the sole supplier of pin stock for all of the Company's manufacturing facilities, the uninterrupted operation of the Monterrey facility was of paramount importance for GrafTech's business and operational performance. (ECF #1, ¶ 27).

As further part of its transformation, The Company implemented a new commercial strategy to sell a majority of its graphite electrode output through three-to-five year "take or pay" contracts, which were premised upon GrafTech's purported ability to reliably deliver its customers with graphite electrodes. GrafTech's take or pay agreements contained fixed annual prices and volumes for the contracted term. In addition, these agreements accounted for the majority of the Company's total net sales. For example, sales from GrafTech's long-term

-7-

agreements represented 87% and 80% of the Company's net sales in 2020 and 2019, respectively.  During the Class Period, sales from long-term agreements were generally of higher margin than non-contracted "spot" sales, and therefore, represented a more profitable source of revenues for the Company.  (ECF #1, ¶ 28).

Having completed this purported business turnaround, Brookfield conducted GrafTech's IPO on April 19, 2018, selling roughly 35 million shares, or approximately 12% of its equity stake, at $15 per share for gross offering proceeds of $525 million.  An additional 3.1 million shares were sold by Brookfield pursuant to a partial exercise of the underwriters overallotment option for an additional $46 million.  None of the proceeds from these sales went to the Company, as all proceeds went to defendant Brookfield.  Brookfield also caused GrafTech to enter into an agreement to pay it $160 million special cash dividend in connection with the IPO conditioned on the Company's financial results and certain other factors.  (ECF #1, ¶ 29).

IPO offering documents lauded GrafTech's "transformation" and claimed the Company had emerged from its restructuring with the "most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry."  The offering documents further represented that GrafTech's facilities were "modern, strategically located, and well maintained," which they claimed would provide the Company with efficient growth opportunities following the offering. Key to this purportedly sustainable growth were claims in IPO offering materials regarding the "more environmentally friendly nature of EAF steelmaking" employed by GrafTech's customers. (ECF #1, ¶ 30).

Defendants continued to represent throughout the Class Period that GrafTech was committed to protecting the environment and acting "proactively" to advance sustainability

-8-

initiatives. For example, speaking during a November 2020 conference call, defendant Rintoul represented that GrafTech was focused on being "good environmental stewards" and that they were "fully committed" to advancing their "ESG efforts." Similarly, in a May 2022 conference call defendant Halford represented that GrafTech was making "good progress" on sustainability initiatives and serving as "a key contributor" to the decarbonization of steel. The Company's SEC filings repeatedly highlighted the purportedly "environmentally friendly EAF model" used by GrafTech's customers and the favorable "environmental performance" of the Company overall and the Monterrey facility in particular. (ECF #1, ¶ 31).

Unbeknownst to investors, however, GrafTech's purported cost leadership was achieved in substantial part by failing to implement effective environmental safeguards at the Monterrey facility. As a result, GrafTech's operations in Monterrey, Mexico had for decades chronically contaminated neighboring communities with harmful carcinogenic gasses and particulate matter, leaving GrafTech acutely exposed to material undisclosed risks of governmental enforcement actions, and consequently to business and operational disruptions and adverse financial and reputational impacts. GrafTech had been repeatedly warned by local authorities over an approximately 30-year period regarding the Company's disregard for the health and wellbeing of local communities and the damage that its manufacturing processes were inflicting upon the environment. GrafTech had even signed agreements with local authorities in the Monterrey area in which it promised to improve its local impacts, but had failed to honor these commitments causing the government of a local municipality, Apodaca, to seek help from the State of Nuevo León (where Monterrey is located) during the Class Period. (ECF #1, ¶ 32).

Defendants continued in their representations even in the face of government scrutiny. In

March 2019, the Department of Sustainable Development of the State of Nuevo León issued GrafTech a notice of administrative proceedings, which required the Company to design and implement certain corrective measures involving potential violations of environmental law relating to emissions.  Although GrafTech disclosed in its public filings with the SEC that it had received the notice, GrafTech failed to disclose the full extent and severity of its environmental misconduct, maintaining the Company's narrative that its operations in Monterrey were environmentally satisfactory.  Instead of accurately describing its environmental impact, Graftech allegedly concealed its transgressions by reporting that it had "cooperated" with the authorities and announcing that the department formally closed the proceeding in September 2019 following its payment of certain "non-material" fines and the implementation of various environmental improvements at the facility.  GrafTech represented throughout the Class Period that it was in "compliance" with applicable environmental laws and regulations.  (ECF #1, ¶ 33).

While the price of GrafTech common stock was allegedly artificially inflated, defendant Brookfield unloaded more than $2.8 billion in GrafTech common stock, selling approximately 75% of its equity stake in the Company within just three years of returning to the public equity markets.  Defendants caused GrafTech to enter into two share repurchase agreements in August 2018 and December 2019, which collectively required GrafTech to repurchase nearly 31 million shares directly from Brookfield at prices exceeding $19 per share, for total proceeds of approximately $475 million.  (ECF #1, ¶ 34).

Then, on September 16, 2022, GrafTech unexpectedly revealed that GrafTech's critical manufacturing facility in Monterrey, Mexico had been shut down by regulators following inspections by the State Attorney's office for the Secretary of Environment and the Ministry of

the Environment.  This information was of critical importance to investors as the Monterrey facility was responsible for manufacturing 30% of GrafTech's overall graphite electrode output and 100% of its pin stock.  In the wake of this revelation, Mexican news outlets reported that the cessation order had been made in response to GrafTech's excessive pollution of hazardous carcinogenic gasses and particulate matter into neighboring communities over a prolonged time frame.  Following the closure, the mayor of local municipality Apodaca, Cesar Garza, took to "Facebook Live" to applaud the shutdown and disclosed that the municipality had voted in plenary session to formally request that GrafTech's facility be required to close and relocate, citing more than 30 years of environmental abuses by the Company.  (ECF #1, ¶ 35).

On this news, the price of GrafTech common stock fell from $5.30 per share on September 16, 2022 to $4.61 per share on September 20, 2022, a decline of approximately 13% over a three-day trading period on above-average trading volume.  (ECF #1, ¶ 36).

On November 18, 2022, GrafTech announced that its facility in Monterrey, Mexico was conditionally permitted to resume operations subject to the Company's completion of certain remediation efforts.  Although the Monterrey facility was eventually permitted to re-open, defendant Kessler subsequently revealed during a February 2023 conference call that the temporary closure had severely disrupted the Company's operations and would have "significant" negative impact on GrafTech's business performance going forward.  Specifically, defendant Kessler revealed that the shutdown required GrafTech to irreparably deplete its critically needed pin stock inventory and to miss a key contract negotiation window, crippling its ability to secure contract orders for 2023.  As a result, GrafTech reported sales declines of 62% and 49% in the first and second quarters of 2023, respectively, pushing the Company from $50

million in net income for the fourth quarter of 2022 to a $15 million net loss for the first six months of 2023.  As a result of these subsequent disclosures, the price of GrafTech stock fell to less than $4 per share by mid-August 2023.  The price of GrafTech stock continued to fall thereafter, eventually dropping as low as $1.50 per share.  (ECF #1, ¶ 37).

Accordingly, Plaintiffs assert that as a result of defendants' acts and omissions, and the significant decline in market value of GrafTech common stock, Plaintiffs have suffered significant losses and economic damages under the federal securities laws.  (ECF #1, ¶ 38).[5]

### B. *The Filing of Proposed Class Action Complaint and Notice Regarding Motions for Appointment as Lead Plaintiff and for Approval of Counsel*

On January 25, 2024, Plaintiff John C. Porter filed this action in the U.S. District Court for the Northern District of Ohio, on behalf of all purchasers of GrafTech common stock between February 8, 2019 and August 3, 2023, inclusive (the "Class Period"), against Defendants asserting violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  (ECF #1, ¶ 1).  On this same date, Plaintiff, through counsel, then published a notice regarding the pendency of this action on *Businesswire*, a national, business-oriented newswire service.  (ECF #18-2, Declaration of James R. Cummins [attached to Movant Agrawal's motion], ¶ 2 & ECF #18-5, *Businesswire* Press Release [attached to Cummins Decl.]; ECF #20-2, Declaration of George W. Cochran [attached to movant UPR Retirement System's motion], ¶ 2 & ECF #20-3, *Businesswire* Press Release [attached to Cochran Decl.]).  The notice provided that "[P]urchasers of GrafTech International Ltd. (NYSE: EAF) common stock between

---

[5]     A detailed account of each alleged "materially false and misleading statement[] and omission[] issued during the Class Period" asserted by plaintiffs is further set forth in paragraphs 39 through 141 of the *Complaint*.  (ECF #1, PageID #12-47).

February 8, 2019 and August 3, 2023, inclusive (the 'Class Period') have until March 25, 2024 to

seek appointment as lead plaintiff of the *GrafTech* class action lawsuit." (ECF #18-5, PageID

#238; ECF #20-3, PageID #423).  Five timely motions for appointment as lead plaintiff and for

approval of class counsel were filed.  Three of the motions were later withdrawn, with the

motions of movant Shekhar Agrawal and movant UPR Retirement System remaining for

decision. (*See supra*, note 1).

    The Court heard oral argument in open court on the competing motions of Agrawal and

UPR Retirement System on May 7, 2024.

## II.    SELECTION OF LEAD PLAINTIFF AND COURT APPROVAL OF LEAD COUNSEL

### *Selection of Lead Plaintiff*

    The Private Securities Litigation Reform Act of 1995 ("PSLRA") governs the procedure

relating to the appointment of the lead plaintiff in "each private action arising under [the

Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil

Procedure." 15 U.S.C. § 78u-4(a)(1).  Under the PSLRA, the plaintiff who files the initial action

must, within 20 days of filing the complaint, publish notice to the class informing potential class

members of the pendency of the action, the claims asserted in the complaint, the purported class

period, and the right of any member of the purported class to move the Court to serve as lead

plaintiff on behalf of the purported class. 15 U.S.C. § 78u-4(a)(3)(A)(1).  Plaintiff Porter

published the required notice on the same day as filing his complaint. (ECF #18-2 & ECF #18-5;

ECF #20-2 & ECF #20-3).

    Within 60 days of publication of the notice, any person or group of persons who are

members of the proposed class may move the Court for appointment to serve as lead plaintiff. 15

U.S.C. § 78u-4(a)(3)(B)(i).  The notice in this case identified the cut-off date for the filing of any such motion as March 25, 2024.  (ECF #18-5 & ECF #20-3).  All five of the motions seeking appointment as lead plaintiff were filed timely with the Court on that day.  (ECF #17, #18, #19, #20 & #21).

Within 90 days after publication of the notice, under the PSLRA, "the Court shall consider any motion made by a purported class member in response to the notice, including any motion made by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B).

### Initial Determination of a "Presumptive" Lead Plaintiff

The PSLRA sets forth the following factors for the Court to use in making its decision:

[T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under [the Exchange Act] is the person or group of persons that –

(aa)  has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

(bb)  in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc)  otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

#### *Timely Filing of Motion*

As to the first factor, both remaining movants, Agrawal and UPR Retirement System, filed timely motions.  (ECF #18, #20).

-14-

*Largest Financial Interest*

As is often case where there are competing motions for appointment of lead plaintiff, the

deciding issue is determination of which competing movant has claimed the greatest loss.[6] Here,

movant Shekhar Agrawal claims (on behalf of himself, his brother, and ASGH) a loss of close to

---

[6]    With respect to this factor, "[t]he PSLRA does not specify which test should be used to
determine which plaintiff has the 'largest financial interest in the relief sought by the class,'" *City
of Hollywood Firefighters' Pension Fund v. TransDigm Grp., Inc.* No. 17-CR-1958, 2017 U.S.
Dist. LEXIS 199868 at *6-*7, 2017 WL 6028213 at *2 (N.D. Ohio Dec. 5, 2017), but "[s]ome
courts simply determine which potential lead plaintiff has suffered the greatest total losses, while
other courts apply the *Lax* [*v. First Merchants Acceptance Corp.*, No. 97-Civ-2715, 1997 U.S.
Dist. LEXIS 11866 at *17, 1997 WL 461036 at *5 (N.D. Ill. Aug. 11, 1997)] four factor test,
which examines (1) the number of shares purchased during the class period; (2) the number of
net shares purchased during the class period; (3) the total net funds expended during the class
period; and (4) the approximate losses suffered during the class period." *City of Hollywood*,
2017 U.S. Dist. LEXIS 199868 at *7, 2017 WL 6028213 at *2. *See Takara Trust v. Molex, Inc.*,
229 F.R.D. 577, 579 (N.D. Ill. 2005) (looking solely to greatest losses); *In re the Goodyear Tire
& Rubber Co. Sec. Litig.*, No. 5:03-CV-2166, 2004 U.S. Dist. LEXIS 27043 at *16-*17. 2004
WL 3314943 at *3 (N.D. Ohio May 12, 2004) (applying *Lax* factors and collecting cases); *see
also Owens v. FirstEnergy Corp.*, Nos. 20-CV-3785, 20-CV-4827, 2020 U.S. Dist. LEXIS
219573 at *17, 2020 WL 6873421 at *5 (S.D. Ohio Nov. 23, 2020) (applying what has become
known as the *Lax/Olsten* test); *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001)
(applying test effectively similar to *Lax/Olsten* factors in a three-part test).

       To calculate losses, district courts favor using a "last in, first out" (LIFO) method over
using a "first in, first out" (FIFO) method. *Plagens v. Deckard*, No. 20-CV-2744, 2021 U.S.
Dist. LEXIS 143359 at *23, 2021 WL 3284265 at *7 (N.D. Ohio Aug. 2, 2021). Some courts
modify the LIFO calculation by only considering shares held at the time of a corrective
disclosure. *Plagens*, 2021 U.S. Dist. LEXIS 143359 at *22, 2021 WL 3284265 at *7 ("[One of
the movants] advocates a 'modified LIFO methodology' that the Second Circuit uses, which
excludes losses from investments sold before a corrective disclosure is made"); *see also Peacock
v. Dutch Bros., Inc.*, No. 23-CV-1794, 2023 U.S. Dist. LEXIS 135360 at *9, 2023 WL 4976814
at *4 (S.D.N.Y. Aug. 3, 2023) ("[T]he LIFO methodology excludes losses incurred from 'in-and-
out' transactions" which are when "a prospective lead plaintiff purchases and sells their holdings
during the class period – that is, after the stock price was allegedly fraudulently inflated and
before it dropped due to a corrective disclosure").

       The movants here do not disagree on the use of a LIFO method of calculating loss, and
each has measured their losses using a form of LIFO calculation. (*See* ECF #18-4 [Agrawal],
PageID #234-236; ECF #20-5 [UPR Retirement System], PageID #431-433).

-15-

$1.7 million.  (ECF #18-1, *Memorandum in Support of Motion*, PageID #210).  Movant UPR

Retirement System claims a loss of over $600,000.  (ECF #20-1, *Memorandum of Points and*

*Authorities in Support of Motion*, PageID #412 & ECF #29, *Opposition to Competing Motions*,

PageID #715).  But the analysis does not stop there.  A question arises in this case as to whether

movant Agrawal has appropriately satisfied the requirements of the PSLRA to claim the close to

$1.7 million in losses he asserts, or whether his claim is limited to the approximately $560,000

he claims to have individually lost.  (*See* ECF #30, *Reply Memorandum*, PageID #725).

Determination of which movant can support the greatest claimed loss is often (and

usually) decisive because the PSLRA establishes a rebuttable presumption that the most adequate

plaintiff is the "person or group of persons" who "has the largest financial interest in the relief

sought by the class" and who "otherwise satisfies the requirements of Rule 23 of the Federal

Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) & (cc).

Another key factor in any decision on appointment of lead plaintiff under the PSLRA is

that a movant's (whether as an individual movant or as a group movant) evidentiary support for a

claimed loss must be clearly demonstrated at the time of filing the initial motion to be appointed

as lead plaintiff.  *See In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999)

("The PSLRA is unequivocal and allows for no exceptions.  All motions for lead plaintiff must

be filed within sixty (60) days of the published notice for the first-filed action.  The plain

language of the statute precludes consideration of a financial loss asserted for the first time in a

complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has

closed.") (emphasis in original); *id.,* at 819 ("Accordingly, consistent with the express terms of

the PSLRA, and in order to dispose of the lead plaintiff determination in the most expeditious

-16-

manner, the Court concludes that the class period and loss figure asserted in the original motion for appointment as lead plaintiff controls, and cannot be supplemented or augmented beyond the sixty (60) day window established by the PSLRA."); *see also Friedman v. Quest Energy Partners LP*, 261 F.R.D. 607, 612 (W.D. Okla. 2009) ("The plain language of the [PSLRA] precludes consideration of any supplemental information filed after the sixty day window has closed.") (citing *Telxon*, 67 F. Supp. 2d at 818); *In re Bard Assocs., Inc.*, Case No. 09-6243, 2009 U.S. App. LEXIS 26289, at *6-*7 (10th Cir. Dec. 2, 2009) (upholding, in connection with a mandamus proceeding, district court's decision not to recognize claimed losses assigned to movant after 60-day initial motion deadline set forth in the PSLRA).

Here, at the time of filing his initial motion to be appointed as lead plaintiff, movant Shekhar Agrawal, while stating that his motion was filed "individually and on behalf of Jai Agrawal and Arya Samaj Greater Houston," (ECF #18, *Motion of Shekhar Agrawal*, PageID #204), and asserting the same in his individual certification, (ECF #18-3, *Certification of Plaintiff*, PageID #228, ¶ 1) (which identifies himself singularly as "Plaintiff" and uses the terms "I" and "my" throughout), included no documents representing the amount or portion of his own specific claimed losses within the overall claimed loss of $1.7 million, or the amounts or portions claimed by his brother, Jai Agrawal, or claimed by the entity he claims to represent, ASGH. In fact, his motion is accompanied by two charts identifying himself as the sole "Client" on the five investment accounts on which the losses are claimed. (ECF #18-3, PageID #229-232 [chart showing purchases of GrafTech shares] & ECF #18-4, PageID #234-236 [gain/loss chart]). Nor does his initial filing contain any document showing an assignment to him of the others' ownership interest in their shares which he claims to represent, or even a power of attorney

-17-

document from either Jai Agrawal or ASGH demonstrating his ability to include their interests (and losses) as part of his motion.[7]

While the PSLRA, by its language, contemplates multiple person or multiple entity lead plaintiffs by inclusion of the term "person or group of persons," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), and courts have often recognized "family groups" of persons as "most adequate" to serve as lead plaintiffs, *see, e.g.*, *Beckman v. Ener1, Inc.*, Case Nos. 11 Civ. 5794, 5795 & 6030 (PAC), 2012 U.S. Dist. LEXIS 19972 (S.D.N.Y. Feb. 15, 2012); *In re eSpeed Inc. Sec. Litig.*, 232 F.R.D. 95 (S.D.N.Y. 2005); *Bhojwani v. Pistiolis*, Case No. 06 Civ. 13761 (CM) (KNF), 2007 U.S. Dist. LEXIS 96246 (S.D.N.Y. July 30, 2007); *In re McDermott Int'l Secs. Litig.*, Case No. 08 Civ. 9943 (DC), 2009 U.S. Dist. LEXIS 21539 (S.D.N.Y. Mar. 6, 2009); *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 855 (S.D. Ind. 1999), in this case, Shekhar Agrawal's motion contained no document whatsoever demonstrating the individual ownership interests held by each "group member" (in fact, the charts submitted with his motion seem to indicate Shekhar Agrawal as the "Client" on all of the pertinent shares) or any support (assignment, power of attorney, or otherwise) demonstrating his authority to represent their interests.[8]

---

[7]    The Agrawal motion also did not contain certifications from either Jai Agrawal or ASGH, which, given the absence of any documentation filed by Shekhar Agrawal at the time of his motion to claim authority related to their ownership interests, calls into question whether the Agrawal motion was properly certified under the PSLRA at the time of filing. *See* 15 U.S.C § 78u-4(a)(2) ("Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff").

[8]    Nor did his later reply brief include any such document. It was only a few days before the hearing in this matter when Shekhar Agrawal first filed "Special Power of Attorney" forms (predating the date of the filing of his initial motion) signed by Jai Agrawal and by Shekhar

-18-

While the reply brief filed by Shekhar Agrawal shows that he was apparently not without *any* ownership interest in at least *some* of the loss resulting from the GrafTech share investment he claims to represent at the time of his motion, which may distinguish him somewhat from the case of an investment advisor with no personal investment interest at the time of filing seeking to represent others with a direct ownership interest as lead plaintiff, which was at issue in the case of *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), that central case stands for the general proposition that one seeking to be appointed as lead plaintiff in a securities class action must show that they have an ownership interest in the claimed loss, and that they are not merely seeking to be the named lead plaintiff in the role of an investment advisor in the shares they claim to represent through a "power of attorney" granted by the actual share owners  *W.R. Huff*, 549 F.3d at 107-110.  "[T]he grant of a power of attorney . . . is not the equivalent of an assignment of ownership; and standing alone, a power of attorney does not enable the grantee to bring suit in his own name." *Id.* at 108 (omission in original) (citing and quoting *Advanced Magnetics, Inc. v.. Bayfront Partners, Inc.*, 106 F.3d 11, 17-18 (2d Cir. 1997)); *see also Phuong Ho v. NQ Mobile, Inc.*, Case Nos. 13 Civ. 7608, 7685, 7713, 7637 & 8125 (WHP), 2014 U.S. Dist. LEXIS 51623, at *11 (S.D.N.Y. Apr. 9, 2014) ("[A] mere power-of-attorney – i.e., an instrument that authorizes the grantee to act as an agent or an attorney-in-fact for the grantor – does not confer standing to sue in the holder's own right.  Rather, a plaintiff must 'have legal title to, or a proprietary interest in, the claim.'") (citing and quoting *W.R. Huff*, 549 F.3d at 108).

---

Agrawal, as Treasurer on behalf of ASGH (but not otherwise indicating his authority to designate ASGH's power of attorney rights).

-19-

Here, at the time of filing his motion, and in particular in his accompanying certification, it was not entirely clear what was Shekhar Agrawal's personal stake in GrafTech shares, whether he was an owner of shares or seeking to be named solely in his role as a "family investment advisor" or "investment advisor" for ASGH, or whether he had the authority to act on behalf of his brother Jai Agrawal or on behalf of ASGH. Although his later-filed reply brief attested to some personal ownership of GrafTech shares (which resulted in a loss less than that claimed by UPR Retirement System) – and his even-later-filed "Special Power of Attorney" forms signed by Jai Agrawal and by himself on behalf of ASGH attest to his ability to act as "attorney in fact" in their interests (but conveying no ownership interests) – this at best still represents an example of "too little" (as to claimed personal interests) "too late" (as not clearly delineating his own interests or authority to act on behalf of the others until well after the filing of his initial motion). *See, e.g.*, *In re Bard Assocs. Inc.*, 2009 U.S. App. LEXIS 26289, at *6-*7 (10th Cir. Dec. 2, 2009) (holding that the district court's decision that a movant "demonstrated its financial interest too late because it did not produce assignments of its clients' claims until after the deadline set forth in [the PSLRA] . . . was not an abuse of discretion," as "the concept announced in *Huff* is not new").

Agrawal has not sufficiently demonstrated under the strict standards required under the PSLRA that his motion truly represented the greatest claimed financial loss. *Telxon*, 67 F. Supp. 2d at 818-19 ("The plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed.") (emphasis in original); *Friedman*, 261 F.R.D. at 612 ("The plain language of the [PSLRA] precludes consideration of any supplemental information filed

-20-

after the sixty day window has closed."); *Bard*, 2009 U.S. App. LEXIS 26289, at *6-*7.[9]

Thus, the movant with the highest supported claimed loss, (*see* ECF #20-4, *Certification of Plaintiff [UPR Retirement System]* (signed by the Executive Director of UPR Retirement System) & Attached Charts), is UPR Retirement System.  Accordingly, it is entitled to the rebuttable presumption of being "the most adequate plaintiff in any private action arising under this chapter" of the PSLRA.  15 U.S.C. § 78u-4(a)(3)(B)(iii).

<u>Satisfaction of Federal Rule of Civil Procedure 23 Requirements</u>

The PSLRA requires that, in addition to possessing the largest financial interest in the outcome of the litigation, a proposed lead plaintiff must "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).

Federal Rule of Civil Procedure 23(a) provides that a party may serve as a class representative only if the following four requirements are met:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  FED. R. CIV. P. 23(a).  This inquiry is generally limited to determining whether the

---

[9]

Agrawal points the Court to the case of *Roby v. Ocean Power Techs.*, Case Nos. 14-cv-3799 (FLW) (LHG), 14-cv-3815 (FLW) (DEA), 14-cv-4015 (FLW) (DEA) & 14-cv-4592 (FLW) (TJB), 2015 U.S. Dist. LEXIS 43288 (D.N.J. March 17, 2015), for the proposition that courts should accept late-filed certifications to remedy defects or omissions related to the initial certification filed with a motion to be appointed as lead plaintiff.  *Roby*, 2015 U.S. Dist. LEXIS, at *27 ("Courts have found supplemental certifications sufficient to remedy deficiencies in the PSLRA certification").  In *Roby*, the late-filed certification was filed by the managing director of an investment fund to confirm his authority to act on behalf of a managed fund movant, which authority was evident and supported in the initial filings, and in which "power of attorney" authority was not the claimed source of authority to act on behalf of the managed fund.

-21-

movant has made a *prima facie* showing of typicality and adequacy. *See Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, Case No. 3:16-CV-1106, 2017 U.S. Dist. LEXIS 195118, at *27 (N.D. Ohio Nov. 28, 2017) ("Only two of the four prerequisites, typicality and adequacy, directly address the personal characteristics of class representatives") (quoting *Ohio Public Employees Ret. Sys. v. Fannie Mae*, 357 F. Supp. 2d 1027, 1034 (S.D. Ohio 2005)); *see also Rodriguez v. Draftkings, Inc.*, Case No. 21-Civ-5739, 2021 U.S. Dist. LEXIS 219489 at *17-*18 (S.D.N.Y Nov. 12, 2021) ("At this early stage in the litigation, however, only the last two factors – typicality and adequacy – are pertinent"). Thus, in deciding a motion to serve as lead plaintiff, the Court limits its inquiry to the typicality and adequacy prongs of Rule 23(a) and defers its examination of the remaining requirements until a motion for class certification is made. *Lax v. First Merchants Acceptance Corp.*, Case No. 97-Civ-2715, 1997 U.S. Dist. LEXIS 11866 at *20 (N.D. Ill. Aug. 11, 1997); *Ohio Public Employees Ret. Sys.,* 357 F. Supp. 2d at 1034.

*Typicality*

Rule 23(a)(3)'s typicality requirement is satisfied when the putative lead plaintiff's claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of the other class members, and if his or her claims are based on the same legal theory." *City of Hollywood Firefighters' Pension Fund v. TransDigm Group, Inc.*, Case No. 1:17-CV-1958, 2017 U.S. Dist. LEXIS 199868, at *9-*10 (N.D. Ohio Dec. 5, 2017) (citing *Beattie v. Century Tel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007)); *see also Garden City Employees Ret. Sys. v. Psychiatric Sols., Inc.*, Case No. 3:09-00882, 2012 U.S. Dist. LEXIS 44445, at *99-*100 (M.D. Tenn. Mar. 29, 2012) (quoting *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996)); *Rodriguez*, 2021

U.S. Dist. LEXIS 219489 at *18 (A lead plaintiff's claims are typical where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability") (quoting *Sgalambo v. McKenzie*, 268 F.R.D. 170, 173-74 (S.D.N.Y. 2010)).  UPR Retirement System meets this requirement, as it, like all proposed class members, purchased GrafTech securities in reliance upon Defendants' allegedly materially false and misleading statements and suffered the same damages when the later statements from GrafTech about the events related to its Monterrey, Mexico facilities were disclosed.  Movant Agrawal does not meaningfully challenge this assertion.

*Adequacy*

Rule 23(a)(4)'s adequacy requirement is satisfied if the representative party or parties will fairly and adequately protect the class's interests.  FED. R. CIV. P. 24(a)(4).  A lead plaintiff is adequate where he or she "does not have interests that are antagonistic to the class that he [or she] seeks to represent and has retained counsel that is capable and qualified to vigorously represent the interests of the class that he [or she] seeks to represent."  *Rodriguez,* 2021 U.S. Dist. LEXIS 219489 at *23, 2021 WL 5282006 at *8 (quoting *Glauser v. EVCI Ctr. Coils. Holding Corp.*, 236 F.R.D. 184, 189 (S.D.N.Y. 2006)) (inserts in original).

Here, movant Agrawal challenges UPR Retirement System's adequacy to serve as lead plaintiff by asserting that UPR Retirement System's financial stability may become both a distracting issue in litigation and a factor in being able to continue serving as lead plaintiff if it were appointed.  (*See* ECF #30, *Reply Brief*, PageID #732-734).

In opposition to UPR Retirement System's motion,[10] Agrawal points to the case of *Karp v.*

---

[10]  This argument was not actually raised in Agrawal's opposition brief to UPR Retirement

*Diebold Nixdorf, Inc.*, Case No. 19 Civ. 6180 (LAP), 2019 U.S. Dist. LEXIS 188670 (S.D.N.Y.

Oct. 30, 2019), in which the court denied UPR Retirement System's motion to be appointed as

lead plaintiff, based on the "non-speculative" risk that UPR Retirement "will not be an adequate

lead plaintiff," *Karp*, 2019 U.S. Dist. LEXIS 188670, at *15-*16, citing the following passage

from the court's decision:

> The UPR System is highly dependent on funding from the University of Puerto
> Rico[,] which receives its funding from the Commonwealth of Puerto Rico, which
> itself filed for bankruptcy in May 2017.  Since then, the destruction caused by
> Hurricane Maria and political instability stemming from Governor Ricardo
> Rosselló's resignation have exacerbated Puerto Rico's already dire fiscal
> situation.  This has placed constraints on the amount that the University has been
> able to contribute to the UPR System, which received under half of its expected
> contribution from the University for 2020.  And, as Puerto Rico's financial
> collapse drags onward, there appears to be a material risk that these funding
> constraints continue to grow more severe.
>
> In the Court's eyes, the UPR System's financial predicament undermines the
> presumption that the UPR/Detroit Movants are the most adequate plaintiff.

*Karp*, 2019 U.S. Dist. LEXIS 188670, at *13-*14 (citation to news article omitted).

While acknowledging that this decision dates back to events of five years ago, Agrawal

states that "UPR [Retirement System]'s financial instability continues to this day," (ECF #30,

*Reply Brief*, PageID #733), and notes:

> Presently, UPR [Retirement System] is embroiled in a lawsuit against the
> University of Puerto Rico to prevent it from creating a "second defined
> contribution retirement plan" that, if allowed to proceed, would effectively
> eviscerate UPR [Retirement System] because contributions would be diverted to
> the new retirement plan (instead of UPR [Retirement System]).  In a statement
> given to *The San Juan Daily Star*, UPR [Retirement System]'s President, Luis
> Vicenty Santini, ominously warned that:  "The solvency of the UPR Retirement
> System is not only considered in the assets it has, but also in the contributions it
> receives . . . If any of these variables, which are the contributions of the

---

System's motion, but rather in his later reply brief.  (ECF #30, PageID #733).

> participants, the employer and the return on investments, is seen to be at risk or
> has a problem that is not corrected within a reasonable time, this causes damage to
> the future stability of the trust. The [University of Puerto Rico] knows this very
> well and that is why it is delaying payments, on purpose, so that it appears in the
> state financial [reports] as if we had no solvency . . . ." Richard Gutierrez, *Pay-
> Up Time*, THE SAN JUAN DAILY STAR (Aug. 16, 2023) (Supplemental Declaration
> of James R. Cummins, Exhibit G). According to UPR [Retirement System]'s
> complaint, the University of Puerto Rico has already withheld "a $58.7 million
> debt" that has forced UPR [Retirement System] to recently "sell $8 million in
> investment assets in order to cover its needs, including loan disbursements and
> supplier payments." *Id.*

(ECF #30, PageID #733) (inserts supplied).

Agrawal thus asserts that "UPR [Retirement System]'s 'probable insolvency' creates both a distraction and an acute risk that the litigation in this Court may need to be stayed pending UPR [Retirement System]'s unwinding or substitution. Second to that, UPR [Retirement System] may be inclined to pursue a litigation strategy that would prioritize its need for liquidity over the greater interests of the class at large." (ECF #30, PageID #733) (inserts supplied).

In response, UPR Retirement System points the Court to the decision in *Utesch v. Lannett Co., Inc.*, Case (CIVIL ACTION) No. 16-5932, 2021 U.S. Dist. LEXIS 151694 (E.D. Pa. Aug. 12, 2021), *aff'd sub nom. Univ. of Puerto Rico Ret. Sys. v. Lannett Co.*, Case No. 21-3150, 2023 U.S. App. LEXIS 9143 (3d Cir. Apr. 18, 2023), where the court, deciding a class action certification motion (requiring a higher level of "adequacy" to serve as class representative than that at issue in lead plaintiff determination), rejected concerns about UPR Retirement System's adequacy, and ultimately appointed UPR Retirement System to serve as a class representative (along with three Ironworkers Local Security Funds):

> Defendants also contest adequacy on the grounds that UPRRS is underfunded,
> arguing that UPRRS's "precarious financial position raises serious concerns about
> potential conflicts of interest and whether it could represent the putative class if it
> is forced to declare bankruptcy or faces an immediate liquidity crunch." To

-25-

preclude class certification, a conflict of interest "must be fundamental" and cannot be "unduly speculative." . . . Although Defendants suggest that UPRRS's financial status could pressure UPRRS to settle the case, this does not constitute a fundamental conflict as the Third Circuit has defined it.  Further, UPRRS has vigorously litigated the case since its appointment as lead plaintiff over four years ago.  Potential adverse consequences of UPRRS's financial situation are speculative, and do not render UPRRS inadequate.

*Utesch*, 2021 U.S. Dist. LEXIS 151694, at *13 n.5.

At the hearing held before the Court in this matter, on May 7, 2024, counsel for UPR

Retirement System addressed this issue:

[T]he insolvency issue is a nonissue, which is why they [Agrawal] didn't raise it in opposing us.  It comes in on reply, keep in mind.

[T]hey point to this one case from 2019 where in the *Diebold* decision [*Karp v. Diebold Nixdorf, Inc.*, 2019 U.S. Dist. LEXIS 188670 (S.D.N.Y. Oct. 30, 2019)] the judge said:  Well, that can be an issue.

Well, now, we have a five-year track record where the University of Puerto Rico Retirement System has not only served as lead plaintiff, they've been certified as a class representative, which requires a much higher burden of evidentiary proof.  And so, they've proven over the last five years they are a capable, diligent class representative.

This issue regarding the financing of the retirement system, it's very common to pension funds, and you're talking about a relatively immaterial amount of money, $60 million on a $1.7 billion fund that has been around for decades, which has a board of governors that have fiduciary responsibilities, that are tasked and experienced in overseeing lawyers, that are the quintessential lead plaintiff that the statute says should be allowed to lead these cases, and that's exactly who we have before Your Honor.

And, you know, they put in a news article on reply.  There's no question, the University of Puerto Rico Retirement System is not going anywhere.  Not any time within the foreseeable life of this lawsuit.  And they have a board of governors who are experienced fiduciaries, who are experienced not only in governing retirement systems but actually leading these exact kind of cases very successfully.  They've done that.

(ECF #40, *Hearing Transcript, 05/07, 2024*, at pp. 8-9, PageID #823-824).

-26-

UPR Retirement System also highlights statements made in a number of prior decisions reflecting Congress's expressed preference for appointment of institutional investors as lead plaintiffs in PSLRA actions. *See Ohio Pub. Emps. Ret. Sys. v. Fannie Mae*, 357 F. Supp. 1027, 1035 (S.D. Ohio 2005) ("The Court also notes that Plaintiffs are institutional investors, which comports with the PSLRA's expressed preference for such lead plaintiffs. The PSLRA's legislative history explains: 'with pension funds accounting for $4.5 trillion or nearly half of the institutional assets, in many cases the beneficiaries of pension funds – small investors – ultimately have the greatest stake in the outcome of the lawsuit.'") (citing H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733); *In re Vicuron Pharms., Inc. Sec. Litig.*, 225 F.R.D. 508, 511 (E.D. Pa. 2004) (after applying a three-part test as set forth in *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001), which is effectively similar to the four-part *Lax/Olsten* test described earlier in this *Memorandum of Opinion*, at note 6, the court notes: "There is a fourth factor which we cannot overlook. Under the PSLRA, institutional investors are considered preferred lead plaintiffs.") (also citing H.R. Conf. Rep. No. 104-369); *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 113 (E.D.N.Y. 2012) ("Although not explicitly stated in the PSLRA, the Court bears in mind that many courts have demonstrated a clear preference for institutional investors to be appointed as lead plaintiffs") (citing cases). This Court also takes this expressed preference into consideration in rendering its decision.

While UPR Retirement System's past and present financial issues are certainly a factor to consider, the Court does not find that these issues negate its ability to satisfy the "adequacy" requirement of Federal Rule of Civil Procedure 23(a)(4) or the requirements of the PSLRA in appointing a lead plaintiff in this case.

### *Court Approval of Selection of Lead and Liaison Counsel*

The PSLRA further provides that "[t]he most adequate plaintiff shall, subject to approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v).  The evidence shows that movant UPR Retirement System has selected and proposed highly qualified lead counsel, the law firms of Abraham, Fruchter & Twersky, LLP and Robbins Geller Rudman & Dowd LLP, to represent the interests of the proposed class, each of which have extensive experience in conducting complex litigation on behalf of shareholders, including major securities class and derivative actions nationwide.  (*See* ECF #20-1, PageID #415 [Abraham, Fruchter & Twersky, LLP] & ECF #20-1, PageID #416-418 [Robbins Geller Rudman & Dowd LLP]).  Accordingly, movant UPR Retirement System's selection of these law firms as Lead Counsel is hereby approved.

### IV.  <u>SELECTION OF LEAD PLAINTIFF AND APPROVAL OF COUNSEL</u>

Accordingly, for the reasons stated above, movant University of Puerto Rico Retirement System's *Motion of University of Puerto Rico Retirement System for Appointment as Lead Plaintiff and Approval of its Selection of Counsel* (ECF #20) is GRANTED, and movant Shekhar Agrawal's *Motion of Shekhar Agrawal for Appointment as Lead Plaintiff and Approval of Selection of Counsel* (ECF #18) is DENIED.  The Court also approves the law firms of Abraham, Fruchter & Twersky, LLP and Robbins Geller Rudman & Dowd LLP to serve as lead counsel on behalf of the proposed class.

University of Puerto Rico Retirement System is hereby APPOINTED to serve as lead plaintiff in this Action pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995.

University of Puerto Rico Retirement System's selection of lead counsel is hereby APPROVED, and the law firms of Abraham, Fruchter & Twersky, LLP and Robbins Geller Rudman & Dowd LLP are appointed as lead counsel for the proposed class.

*Responsibilities of Lead Counsel*

Lead counsel shall have the following responsibilities and duties, to be carried out either personally or through counsel whom lead counsel shall designate:

1. To coordinate the briefing and argument of any and all motions;

2. To coordinate the conduct of any and all discovery pleadings;

3. To coordinate the examination of any and all witnesses in depositions;

4. To enter into stipulations with opposing counsel necessary for the conduct of this Action;

5. To coordinate the selection of counsel to act as spokesperson(s) at all pretrial conferences;

6. To call meetings of the Plaintiffs' counsel as they deem necessary and appropriate from time to time;

7. To coordinate all settlement negotiations with counsel for Defendants;

8. To coordinate and direct pretrial discovery proceedings, preparation for trial, and trial of this matter and delegate work responsibilities to selected counsel as may be required;

9. To coordinate the preparation and filings of all pleadings;

10. To prepare and distribute to the Plaintiffs periodic status reports;

11. To maintain adequate time and expense records covering services of all individuals in their offices and all members to whom tasks are delegated;

12. To assure that schedules are met and unnecessary expenditures of time and funds are avoided; and

13. To supervise all other matters concerning the prosecution of the claims

asserted in the Action.

No motion, discovery request, or other pretrial proceedings shall be initiated or filed by any Plaintiffs without the approval of lead counsel, so as to prevent duplicative pleadings or discovery by Plaintiffs.  No settlement negotiations shall be conducted without the approval of lead counsel.

Service upon any Plaintiff of all pleadings, motions, or other papers in the Action, except those specifically addressed to a Plaintiff other than lead plaintiff, shall be completed upon service of lead counsel.  Service upon lead counsel is sufficient service except in the following circumstances:

Defaults, Sanctions:  Motions claiming default or seeking other penalties or sanctions against a party for failure to take some action within a time period measured from the date of service of a document MUST be served on counsel of record for that party as well as on lead counsel;

Case Specific Filings:  Case specific filings (i.e., papers that effect only a particular party or particular case – for example, a motion seeking to dismiss a party in a case or to remand a case to state court) MUST be served on counsel in that specific case, as well as on lead counsel.

Lead counsel shall be the contact between Plaintiffs and Plaintiffs' counsel and Defendants' counsel, as well as the spokespersons for all Plaintiffs' counsel, and shall direct and coordinate the activities of Plaintiffs' counsel.  Lead counsel shall be the contact between the Court and Plaintiffs and their counsel.

The Clerk of Court shall copy each order to lead counsel for distribution as appropriate to counsel and parties.  The Clerk shall also serve each order to all counsel who have registered for Electronic Service.

*Newly Filed or Transferred Actions*

The file in Case No. 1:24-CV-00154 shall constitute the master file for this Action and any other case that may be subsequently filed in this Court or transferred to this Court from another court. When a document being filed pertains to all such actions, the phrase "All Actions" shall appear immediately after the phrase "This Document Relates To:". When a pleading applies to some, but not all, of such actions, the document shall list, immediately after the phrase "This Document Relates To:", the Docket number for each individual action to which the document applies, along with the last name of the first-listed Plaintiff in said action.

When a case that arises out of the subject matter of this Action is hereinafter filed in this Court or transferred to this Court from another court, the Clerk of this Court shall:

1. File a copy of this Court's *Order* accompanying this *Memorandum of Opinion* in the separate file for such action;

2. Mail a copy of such *Order* to the attorneys for the Plaintiff(s) in the newly filed or transferred case and to any new Defendant(s) in the newly filed or transferred case; and

3. Make the appropriate entry in the Docket for this Action.

Each new case arising out of the subject matter of this Action that is filed in this Court or transferred to this Court shall be consolidated with this Action and the *Order* accompanying this *Memorandum of Opinion* in this Action shall apply thereto, unless a party objecting to such *Order* or any provision of such *Order* shall, within ten (10) days after the date upon which a copy of such *Order* is served on counsel for such party, file an application for relief from such *Order* or any provision therein and this Court deems it appropriate to grant such application.

During the pendency of this litigation, or until further order of this Court, the parties shall take reasonable steps to preserve all documents within their possession, custody, or control,

-31-

including computer-generated and stored information and materials such as computerized data and electronic mail, containing information that is relevant to or may lead to the discovery of information to the subject matter of the pending litigation.

    IT IS SO ORDERED.


DONALD C. NUGENT
United States District Judge


DATED: _May 15, 2024_