UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| JOHN C. PORTER, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br> vs.<br><br>GRAFTECH INTERNATIONAL, LTD, et al.,<br><br>       Defendants. | No. 1:24-cv-00154-DCN<br><br>Judge Donald C. Nugent<br><br><u>CLASS ACTION</u><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

LAW OFFICE OF GEORGE W. COCHRAN
GEORGE W. COCHRAN
1981 Crossfield Circle
Kent, OH  44240
Telephone:  330/607-2187
330/230-6136 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
NATHAN R. LINDELL
JENNIFER N. CARINGAL
KEVIN S. SCIARANI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

[Additional counsel appear on signature page.]

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................1

II. NATURE OF THE ACTION ..................................................................................7

III. JURISDICTION AND VENUE .............................................................................7

IV. PARTIES ................................................................................................................8

V. OVERVIEW OF DEFENDANTS' FRAUD ...........................................................9

    A. Relevant Company Background ..................................................................9

    B. GrafTech Is Acquired by Brookfield and Undergoes Significant Operational Transformation ........................................................................10

    C. GrafTech's Second IPO .............................................................................12

    D. Defendants Conceal GrafTech's Prolonged Disregard for Environmental Safeguards at Its Monterrey Facility ........................................................12

    E. Defendants Deceive Investors About GrafTech's Purported De-risking of the Company's Pin Production .................................................................17

    F. Brookfield Reaps More than $2.8 Billion from Insider Trading ..............21

    G. Defendants' Fraud Begins to Unravel.......................................................21

    H. Defendants Continue to Mislead the Market About the Adverse Impacts of the Monterrey Facility's Shutdown .........................................................25

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................................................29

    A. Year-End 2018 Results ..............................................................................29

    B. First Quarter 2019 Results .........................................................................32

    C. Second Quarter 2019 Results.....................................................................33

    D. Third Quarter 2019 Results........................................................................34

    E. Year-End 2019 Results ..............................................................................35

    F. GrafTech's 2019 Sustainability Report ....................................................37

    G. Third Quarter 2020 Results........................................................................39

**Page**

H. Year-End 2020 Results ........................................................................41

I. First Quarter 2021 Results ................................................................44

J. Second Quarter 2021 Results............................................................45

K. 2020 Sustainability Report................................................................48

L. Third Quarter 2021 Results..............................................................50

M. Year-End 2021 Results .....................................................................52

N. First Quarter 2022 Results ...............................................................55

O. The Monterrey Facility's Shutdown ................................................57

P. Third Quarter 2022 Results...............................................................58

Q. The Monterrey Facility Is Permitted to Reopen ..............................60

R. Year-End 2022 Results .....................................................................61

S. First Quarter 2023 Results ...............................................................62

VII. ADDITIONAL SCIENTER ALLEGATIONS..................................................62

A. Defendants' Knowledge of and Access to Information Concerning the Monterrey Facility's Excessive Dust Pollution and Lack of Compliance with Environmental Laws and Regulations Shows a Disregard of the Most Current Factual Information Before Making Statements......................................64

B. Defendants' Knowledge of and Access to Information Concerning the St. Marys Facility Shows a Disregard of the Most Current Factual Information Before Making Disclosures .............................................71

C. Defendants' Knowledge of and Access to Information Concerning the Financial Impact of the Monterrey Facility's Suspension Shows a Disregard of the Most Current Factual Information Before Making Disclosures ..........................................................................................72

D. Defendants' Misrepresentations Concerned the Core Operations of the Company ............................................................................................74

E. The Self-Interested Motivation of Defendants in the Form of Saving Their Salaries or Jobs Supports an Inference of Scienter ................................75

VIII. BROOKFIELD'S CONTROL OF GRAFTECH ..............................................76

IX. LOSS CAUSATION............................................................................................77

4873-9624-3692.v1

**Page**

X.      NO SAFE HARBOR ...............................................................................................81

XI.     APPLICATION OF PRESUMPTION OF RELIANCE....................................................82

XII.    CLASS ACTION ALLEGATIONS ........................................................................83

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All
        Defendants Except Brookfield...........................................................................84

COUNT II For Violation of §20(a) of the Exchange Act  Against All Defendants .....................85

XIII.   PRAYER FOR RELIEF ........................................................................................86

XIV.    JURY DEMAND...................................................................................................86

4873-9624-3692.v1

Lead Plaintiff University of Puerto Rico Retirement System ("Plaintiff" or "UPR"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the ongoing investigation conducted by and through Plaintiff's counsel, which has included, among other things, review and analysis of: (i) certain U.S. Securities and Exchange Commission ("SEC") filings and press releases by GrafTech International Ltd. ("GrafTech" or the "Company"); (ii) press releases and other publications disseminated by the Company; (iii) other public statements issued or made by or about the Company, including during conference calls, investor conferences, media interviews, or other public events; (iv) news articles and reports; (v) public data reflecting the prices of GrafTech common stock; (vi) reports by securities and financial analysts; (vii) consultations with relevant experts;(viii) other publicly available materials and data identified herein; and (ix) information gathered through public records requests. Plaintiff believes that certain relevant information is known only by Defendants and is exclusively within their custody or control, and that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      GrafTech is a global manufacturer of graphite electrode products that are used by the Company's customers to produce electric arc furnace ("EAF") steel, a purportedly greener alternative to traditional blast furnace steel. To be utilized by GrafTech's customers, each graphite electrode must be affixed with one "connecting pin," making the "pin stock" from which such devices are machined a critical component of the Company's manufacturing process. At all times relevant to the claims alleged herein, GrafTech produced 100% of the pin stock utilized for its electrodes at the Company's Monterrey, Mexico manufacturing facility (the "Monterrey facility").

2.      Throughout the Class Period (defined below), Defendants repeatedly touted the competitive advantages of GrafTech's "low-cost" manufacturing plants to investors, while also extolling the Company's purportedly "proactive" commitment to reducing its environmental impacts and complying with all environmental laws and regulations.  But these representations were materially false and misleading.  The undisclosed truth was that GrafTech's purported cost leadership was achieved in substantial part by the Company's failure to adhere to its professed "rigorous internal environmental protection standards" at the Monterrey facility.

3.      Indeed, in direct contrast to Defendants' representations, GrafTech had, for decades, blatantly disregarded environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions at its Monterrey facility, resulting in repeated warnings from local authorities.  These warnings, however, were ineffective at curbing GrafTech's wanton disregard for the health and wellbeing of the Monterrey facility's surrounding communities.

4.      As a result, in March 2019, the Department of Sustainable Development of the State of Nuevo León ("Department of Sustainable Development") initiated an administrative proceeding against GrafTech concerning the Monterrey facility's failure to control the dust emissions generated by its manufacturing operations.  Among other things, the resolution of the proceeding resulted in: (i) a finding that GrafTech's Monterrey facility operated "*without the means of control to ensure that dust emissions are avoided*, which is mandatory as established in Article 131 section II of the Environmental Law of the State of Nuevo León, to ensure satisfactory air quality for population well-being and ecological balance;" (ii) a finding that GrafTech "*benefited economically* by evading the expense generated by the implementation of equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere during its operation"; (iii) an order that GrafTech "immediately and *permanently* . . . carry out the necessary actions, adaptations and/or maneuvers that *guarantee avoiding the generation of emissions of dust or any other contaminant to the*

- 2 -

*atmosphere*"; and (iv) an agreement by GrafTech to invest over $2 million in dust collection and containment projects to remedy its violations.[1]

5.      Although Defendants disclosed the administrative proceeding in GrafTech's SEC filings, they concealed the full extent and severity of GrafTech's environmental misconduct by mischaracterizing the proceeding as "involving certain ***potential violations*** of state environmental law" and reporting that the Company had paid "certain fines that were not material to the Company," ***without*** disclosing GrafTech's agreement to invest more than $2 million in dust collection and containment projects or the order requiring GrafTech to "immediately and permanently" remedy its deficient dust emission controls.

6.      More importantly, following the administrative proceeding's resolution, GrafTech quickly resumed its decades-long practice of failing to follow through on its repeated commitments to remedy the Monterrey facility's deficient environmental safeguards.  The Company's actions led to the filing of multiple environmental complaints, including one by the mayor of local municipality Apodaca, César Garza Villareal ("Garza").  Defendants, however, continued to tout their purported commitment to environmental protections and compliance with environmental laws and regulations, while concealing from investors the truth that the Monterrey facility's failure to operate in accordance with those representations exposed GrafTech to known material risks regarding government enforcement actions and corresponding business disruptions.

7.      Moreover, there is no doubt that Defendants were aware of the environmental failures at the Monterrey facility, given: (i) GrafTech's long history of environmental disputes with the Monterrey facility's surrounding communities; (ii) the significant fallout from the 2019 administrative proceeding, of which Defendants' SEC filings confirm they were undoubtedly aware; and (iii) Defendants' repeated representations touting their active involvement in, and leadership of,

---

[1]      Emphasis has been added throughout unless otherwise noted.

GrafTech's environmental management systems and initiatives – which, among other things, provided them with monthly environmental reports from site managers and weekly communications concerning "observations from site walk-throughs."

8.      In addition, Defendants also misled investors about material facts that directly bore on the potential impacts of any operational disruptions at the Monterrey facility.  Specifically, over the course of four earnings calls between August 6, 2021, and May 6, 2022, Defendants told investors that GrafTech had "***de[-]risk[ed] [its] pin production capacity***," by opening a "***pin production line***" at its St. Marys, Pennsylvania facility ("St. Marys facility"), which was purportedly "***operational***" by November 5, 2021, thus providing the Company with two "pin production facilities."  In truth, however, the St. Marys facility was ***not*** actually involved in any production of pins or pin stock during this time.  Indeed, as confirmed by a former GrafTech employee and Defendants' own subsequent admissions, Defendants had not even ***begun*** the process of obtaining the appropriate operating permits required for pin production at the St. Marys facility, and Monterrey remained GrafTech's only facility capable of producing the pin stock needed for all of the Company's electrodes.  As a result, contrary to Defendants' statements that they had "de[-]risk[ed]" GrafTech's pin production, the Company remained exposed to significant risks of commercial harm in the event that the Monterrey facility's operations were disrupted.

9.      On September 16, 2022, the risks concealed by Defendants' misrepresentations began to materialize after Defendants announced that the Monterrey facility had been shut down following an inspection by Mexican regulatory agencies.  That same day, Mayor Garza publicly celebrated the development, disclosing that it followed upon the heels of a request from the Apodaca City Council seeking environmental regulators' assistance in closing the Monterrey facility due to its history of dust pollution.  Investors also responded strongly to the news, causing the price of GrafTech common stock to decline approximately 8.5% in one trading day.  The stock price remained

- 4 -

artificially inflated, however, as Defendants continued to conceal the truth regarding the Company's reliance on the Monterrey facility for all of its critical pin stock, as well as other material information regarding the financial impact of the Monterrey facility's closure.

10.   On November 4, 2022, Defendants reported GrafTech's third quarter 2022 results and held an earnings call with investors.  During these disclosures, Defendants revealed that the Monterrey facility remained GrafTech's only facility capable of producing pin stock and that the St. Marys facility was not actually involved in "pin production."  In addition, Defendants disclosed that GrafTech's business performance could be "significantly impacted" during the first two quarters of 2023 if the Monterrey facility remained closed into 2023.  Investors again responded strongly to Defendants' disclosures, causing the price of GrafTech common stock to decline approximately 5%. The stock price remained artificially inflated, however, as Defendants concealed the truth that, because the closure coincided with a critical contract negotiation window and significantly depleted the Company's pin stock inventory, the effects of the Monterrey facility's closure would be significant, *even if* the facility reopened in short order.

11.   On November 18, 2022, GrafTech announced that the Monterrey facility had been conditionally permitted to resume operations.  Given Defendants' previous misrepresentations that the closure would only have a significant impact if the Monterrey facility remained closed into 2023, the market reacted positively to this disclosure, causing the price of GrafTech to rise significantly as a result.

12.   On February 3, 2023, however, Defendants once again shocked the market by disclosing that, despite the Monterrey facility reopening within two weeks of the Company's November 4, 2022 disclosures, the temporary closure would nonetheless have a significant negative impact upon the Company's performance during "the first half of 2023."  During an earnings call that same day, Defendants expanded on the reasons for the extended impact, revealing that: (i) the

- 5 -

temporary closure had coincided with a "critical" "negotiation window" for 2023 contracts; and (ii) although the Monterrey facility's "production of electrodes and pin stock began immediately upon the [lifting] of the suspension," the manufacturing of such products takes "several months," meaning it would "take time" to rebuild GrafTech's "pin stock inventory."  Given Defendants' previous misrepresentations, investors were clearly shocked by these disclosures, causing the price of GrafTech common stock to steeply decline by approximately 15%.  The stock price remained artificially inflated, however, as Defendants continued to conceal the full truth regarding the financial impact of the Monterrey facility's temporary closure by telling investors that the impact of the "contract negotiation window" issue was limited to "the first half of 2023," and that Defendants expected "second half sales volumes to recover as we move past the Monterrey suspension driven uncertainty."

13.     Finally, on August 4, 2023, GrafTech released its second quarter 2022 results and held an earnings call with investors.  Among other things, GrafTech reported a net loss of $8 million for the quarter, driven by a 49% year-over-year sales decline as GrafTech continued to be negatively impacted by the Monterrey facility's shutdown.  During the Q&A portion of the earnings call, Defendants described the Monterrey facility's suspension as the "***key driver***" of the Company's continued underperformance and revealed that, contrary to their previous representations, the impact of the "contract negotiation window" issue was ***not*** limited to the first half of 2023.  Investors once again reacted strongly to Defendants' disclosures, causing the price of GrafTech common stock to plunge nearly 23% in one trading day to close at a price of $4.05 per share on August 4, 2023 – a ***more than 73% decline*** from its Class Period high of $15.35 per share.

14.     As further detailed herein, Defendants' fraudulent misrepresentations during the Class Period violated the federal securities laws and caused significant economic losses to Plaintiff and other members of the Class as the truth was gradually revealed.

- 6 -

## II.    NATURE OF THE ACTION

15.    This is a federal securities class action on behalf of all persons or entities that purchased or otherwise acquired GrafTech common stock between February 8, 2019, and August 3, 2023, inclusive (the "Class Period"), and were harmed thereby (the "Class").[2]  Plaintiff seeks to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against GrafTech and certain of the Company's senior executives, directors, and controlling shareholders.

## III.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

17.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

18.    Venue is proper in this District pursuant to §27 of the Exchange Act, *id.*, and 28 U.S.C. §1391(b) because the Company is headquartered, and thus resides, in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

19.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

---

[2]    Excluded from the Class are: (i) Defendants (defined herein) and members of their immediate families; (ii) the officers and directors of GrafTech, at all relevant times, and members of their immediate families; (iii) the legal representatives, heirs, successors, or assigns of any of the foregoing; and (iv) any entity in which Defendants have or had a controlling interest.

## IV.    PARTIES

20.    Lead Plaintiff University of Puerto Rico Retirement System manages the pension benefits for employees of the University of Puerto Rico.  As set forth in its sworn Certification (ECF 20-4), UPR acquired GrafTech common stock at artificially inflated prices during the Class Period and suffered damages as a result of the conduct complained of herein.  On May 15, 2024, the Court appointed UPR as Lead Plaintiff for this Action.  *See* ECF 41-42.

21.    Defendant GrafTech is a global manufacturer of graphite electrode products and is headquartered in Brooklyn Heights, Ohio.  GrafTech common stock is listed under the ticker symbol "EAF" on the New York Stock Exchange ("NYSE").

22.    Defendant David Rintoul ("Rintoul") served as GrafTech's President and Chief Executive Officer ("CEO") and as a member of the Company's Board of Directors ("Board") from March 2018 until his resignation from the Company at the end of June 2022.

23.    Defendant Quinn Coburn ("Coburn") served as GrafTech's Chief Financial Officer ("CFO") from September 2015 until November 29, 2021.  Prior to his role as CFO, Coburn served as GrafTech's Vice President of Finance and as Treasurer.

24.    Defendant Marcel Kessler ("Kessler") served as GrafTech's CEO following defendant Rintoul's resignation in June 2022 and held that position until his departure from the Company in November 2023.

25.    Defendant Timothy K. Flanagan ("Flanagan") served as GrafTech's CFO and Vice President Finance and Treasurer after defendant Coburn's resignation in November 2021.  Following the resignation of defendant Kessler, defendant Flanagan became GrafTech's Interim CEO from November 2023 to March 2024.  Kessler currently serves as the Company's CEO and President.

26.     Defendant Jeremy S. Halford ("Halford") has served as GrafTech's Executive Vice President, Chief Operating Officer ("COO") since October 2021.  Prior to his role as COO, Halford served as GrafTech's Senior Vice President, Operations and Development since May 2019.

27.     Defendants referenced above in ¶¶22-26 were among the senior-most executives of the Company and are referred to herein as the "Individual Defendants."

28.     Defendant BCP IV GrafTech Holdings LP is an indirect wholly owned subsidiary of defendant Brookfield Capital Partners.

29.     Defendant Brookfield Capital Partners Ltd. is the private equity arm of defendant Brookfield Asset Management Inc.

30.     Defendant Brookfield Asset Management Ltd. is a global alternative asset management firm based in Canada.

31.     Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd. are collectively referred to herein as "Brookfield" and, with the Company and Individual Defendants, are referred to herein as "Defendants."

## V.     OVERVIEW OF DEFENDANTS' FRAUD

### A.     Relevant Company Background

32.     GrafTech is a global manufacturer of graphite electrode products.  The Company initially went public in 1995 as UCAR International Inc., before changing its name to GrafTech International Ltd. in 2002.  GrafTech's customers are manufacturers that use the Company's graphite electrode products to produce EAF steel.  In contrast to conventional steelmaking methods – which use blast furnaces that rely directly on coal, natural gas, and oil – EAF steelmaking utilizes electricity produced by graphite electrodes to generate sufficient heat to melt scrap metal, iron ore, and other raw materials to produce steel.  As a result, EAF steel purportedly offers a greener

alternative to traditional steelmaking methods – a fact that GrafTech has repeatedly touted to investors.

33.     To be utilized by GrafTech's customers, each graphite electrode must be affixed with one "connecting pin."  As such, a critical component in GrafTech's manufacturing process is "pin stock," which the Company subsequently machines into connecting pins.

34.     Although the EAF process employed by GrafTech's customers offers environmentally friendly benefits compared to traditional steelmaking, the processes used by GrafTech to manufacture graphite electrode products are accompanied by significant environmental and health concerns.  Unlike its customers, GrafTech's manufacturing process relies on fossil fuel byproducts, such as needle coke.  The molding and cutting stage of this process, in particular, emits significant particulate matter and other pollutants into the atmosphere, the burdens of which fall heavily upon the local communities in which GrafTech operates.  Mitigation of these adverse environmental and health effects requires the employment of specific equipment and containment strategies, such as the use of specialized dust collectors and procedures intended to avoid open-air exposure of harmful materials.

35.     GrafTech owns four manufacturing facilities, which are located in: (i) Monterrey, Mexico; (ii) Pamplona, Spain ("Pamplona"); (iii) Calais, France ("Calais"); and (iv) St. Marys, Pennsylvania.  In addition, the Company owns a facility in Port Lavaca, Texas ("Seadrift"), which was acquired from Seadrift Coke LP in 2010 and produces needle coke used by GrafTech in its manufacturing of graphite electrodes.

**B.     GrafTech Is Acquired by Brookfield and Undergoes Significant Operational Transformation**

36.     Beginning in 2011, GrafTech underwent a period of declining demand for its graphite electrodes, which led to falling revenues and growing losses.  By the end of 2014, for example, GrafTech's annual net losses had ballooned to more than $285 million, growing 1,000% year-over-

- 10 -

year from a net loss of approximately $27 million in 2013.  In April 2015, GrafTech's then-CEO

Joel Hawthorne warned that the challenges were expected to continue, stating in pertinent part:

> [G]raphite electrode demand continued to soften as global electric arc furnace
> (EAF) steel production weakened.  Lower end-market demand in certain steel
> consuming sectors, continued high Chinese steel exports and other market dynamics
> led to lower EAF customer utilization rates, particularly in North America.  These
> factors are expected to create a challenging operating environment for our Company
> and the industry as a whole for the remainder of 2015.

37.     Amid this slump in the market for graphite electrodes, GrafTech announced on May

17, 2015, that it had entered into an agreement to be purchased by Brookfield.  Pursuant to the Plan

of Merger Agreement, Brookfield made a cash tender offer to purchase all outstanding shares of

GrafTech common stock at a purchase price of $5.05 per share, resulting in a total valuation of

approximately $700 million.  On August 17, 2015, GrafTech announced that its acquisition by

Brookfield had been completed and that it had become a wholly owned affiliate of Brookfield.  As a

result, trading of GrafTech common stock on the NYSE ceased that day.

38.     Over the course of the next three years, GrafTech underwent an extensive

transformation that was intended to revamp the Company's business and return it to profitability.  As

part of this transformation, GrafTech purportedly "warm idled" its St. Marys facility – which had

previously been a full-scale production facility capable of manufacturing graphite electrodes and

pins from their primary raw material, needle coke – during the second quarter of 2016.  By "warm

idling" the St. Marys facility, GrafTech could purportedly restart the facility in short order if

additional manufacturing volumes were needed, which purportedly provided the Company with

valuable flexibility and variability to meet peak demand or mitigate disruptions within its

manufacturing footprint.

39.     Following the purported warm idling of the St. Marys facility, GrafTech shifted all of

its graphite electrode manufacturing operations to its highest-capacity and lowest-cost facilities: (i)

Monterrey; (ii) Pamplona; and (iii) Calais.   Although all three locations were full-scale

- 11 -

manufacturing facilities, the Monterrey facility was the sole supplier of connecting pins and pin stock for all of the Company's manufacturing facilities.  As a result, the uninterrupted operation of the Monterrey facility was of paramount importance for GrafTech's business and operational performance.

### C.    GrafTech's Second IPO

40.    Having completed GrafTech's purported business turnaround, Brookfield conducted the Company's second IPO on April 19, 2018, selling roughly 35 million shares, or approximately 12% of its equity stake, at $15 per share for gross offering proceeds of $525 million.  An additional 3.1 million shares were sold by Brookfield pursuant to a partial exercise of the underwriters' overallotment option for an additional $46 million.  None of the proceeds from these sales went to the Company, as all proceeds went to Brookfield.  Brookfield also caused GrafTech to enter into an agreement to pay it a $160 million special cash dividend in connection with the IPO conditioned on the Company's financial results and certain other factors.

41.    The IPO offering documents lauded GrafTech's "transformation," claiming the Company had emerged from its restructuring with the "most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry."   The offering documents further represented that GrafTech's facilities were "modern, strategically located and well-maintained," and that the Company was well-positioned for efficient growth opportunities.  Key to this purportedly sustainable growth were claims in the IPO offering materials regarding a global shift to the "more environmentally friendly nature of EAF steelmaking."

### D.    Defendants Conceal GrafTech's Prolonged Disregard for Environmental Safeguards at Its Monterrey Facility

42.    Throughout the Class Period, Defendants repeatedly touted the competitive advantages GrafTech enjoyed due to its operation of the "*lowest cost* large-scale graphite electrode manufacturing plants in the world."   In addition, Defendants told investors that they had an

- 12 -

"***on-going commitment to rigorous internal environmental protection standards***," and adhered to "a strong environmental management system, which is anchored by ***policies and procedures that allow us to operate in compliance with our regulatory obligations, identify risks, and understand and reduce our environmental impacts***."  Defendants further claimed that their executive-led "sustainability strategy" encompassed "emission reduction efforts that include the installation of ***control technology on equipment on all of our sites***," and that GrafTech was "being ***proactive to improve [its] environmental footprint across [its] operations***."  Moreover, throughout the Class Period, Defendants repeatedly highlighted GrafTech's purported efforts to advance numerous environmental initiatives at both the Company level and, in particular, at its Monterrey facility.

43.     These representations were material to analysts and investors. For example, in two separate reports issued on May 6, 2021, and November 8, 2021, RBC Capital Markets ("RBC") analysts noted that "[GrafTech] takes a proactive approach to re[duc]e emission impacts throughout its operations."

44.     Defendants' representations, however, were materially false and misleading, as they concealed the truth that GrafTech's purported cost leadership had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards at its Monterrey facility, which left GrafTech exposed to known material risks regarding government enforcement actions, and consequently to business and operational disruptions.  Indeed, in direct contrast to Defendants' representations regarding GrafTech's purported commitment to "a strong environmental management system," the Company's Monterrey facility had, for decades, blatantly disregarded environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions.  Unbeknownst to investors, local authorities had repeatedly warned GrafTech regarding its wanton disregard for the health and wellbeing of local communities and the damage that its manufacturing operations in the Monterrey facility were inflicting upon the environment.

- 13 -

45.     In March 2019, the Department of Sustainable Development initiated an administrative proceeding against GrafTech concerning the Monterrey facility's failure to control the dust emissions generated by its manufacturing operations.  According to the formal resolution of these proceedings, a February 2019 inspection of the Monterrey facility found, among other things, significant accumulations of black dust around the facility and its surrounding areas.  As a result, the Department of Sustainable Development determined that GrafTech's Monterrey facility violated provisions of the Environmental Law of the State of Nuevo León intended "to ensure satisfactory air quality for population well-being and ecological balance" by operating "without the means of control to ensure that dust emissions are avoided."  The agency further concluded that GrafTech had "benefitted economically by evading the expense generated by the implementation of equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere during its operation."  In connection with the resolution of the proceedings, the Department of Sustainable Development issued an order "imposing corrective actions," including the following:

> *[I]mmediately and permanently*, [GrafTech] must carry out the necessary actions, adaptations and/or maneuvers that *guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere* during the development of the activities carried out in the establishment in question.

46.     In addition, as part of the resolution, GrafTech agreed to invest **over $2 million** in dust collection and containment projects to remedy its violations.

47.     Although GrafTech disclosed in its public filings with the SEC that it had received the notice of administrative proceeding, Defendants concealed the full extent and severity of the Company's environmental misconduct by mischaracterizing the proceedings as "involving certain *potential violations* of state environmental law" and reporting that GrafTech had "cooperat[ed]" with the authorities and paid "certain fines that were not material to the Company."  Moreover, Defendants' disclosures made *no mention* of the more than $2 million GrafTech agreed to invest in dust collection and containment projects to remedy its violations, or the Department of Sustainable

- 14 -

Development's order requiring GrafTech to "***immediately and permanently***" carry out the necessary actions "to guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

48.     In November 2019, following the resolution of the administrative proceeding, Mayor Garza celebrated GrafTech's supposed commitment to reduce the Monterrey facility's carbon emissions by measurable amounts within the next year and a half. At the time, Mayor Garza praised GrafTech's "'renewed commitment'" to environmental preservation, following what he described as "'decades'" of "'paralyzed environmental agenda.'" Mayor Garza's optimism was short-lived, however, as GrafTech soon resumed its decades-long practice of failing to follow through on its repeated commitments to remedy the Monterrey facility's deficient environmental safeguards concerning dust emissions.

49.     On March 11, 2020, Mayor Garza and Apodaca's Secretary of Urban Development, Ecology and Transportation, Andres M. Canto Ramirez, filed with the Secretary of Sustainable Development for the Nuevo León State Government a complaint against GrafTech asserting violations of "environmental regulations, biosafety and wildlife, among others, affecting matters of public order and social interest by expanding risks or threats of environmental contingency in neighborhoods, municipality and surrounding municipalities." Specifically, the complaint asserted that GrafTech "***constantly and continuously generate[s] emissions of fine graphite and coal dust that is deposited on streets, roofs, floors, garages and the flat parts of houses*** that are generated by the activities [of the Company]; this ***affects and decreases both the health of the neighbors and the surrounding environment***." Among other things, the complaint requested that the State Attorney General's Office for Sustainable Development: (1) consider GrafTech's acts identified within the complaint as violating applicable legal provisions and human rights; (2) exercise its regulatory

- 15 -

power to initiate proceedings and investigations into GrafTech's alleged misconduct; and (3) order the total stoppage of GrafTech's Monterrey facility.

50.     It is unclear what action, if any, the State Attorney General's Office for Sustainable Development took in response to the complaint filed by Mayor Garza and Mr. Ramirez.  What is clear, however, is that GrafTech continued to lack the necessary mechanisms to control the Monterrey facility's dust emissions, as required by the Environmental Law of the State of Nuevo León.

51.     Indeed, on September 30, 2021, an individual filed a citizen's complaint with the Federal Prosecutor's Office for Environmental Protection regarding GrafTech's continued failure to control the Monterrey facility's dust emissions, specifically stating: "IT'S A COMPANY THAT POLLUTES WITH EMISSIONS OF LARGE AMOUNTS OF GRAPHITE INTO THE ATMOSPHERE, THE PLACE IS DIRTY ALL THE TIME, THE HOUSES FULL OF GRAPHITE. THE COMPANY HAS BEEN AROUND FOR 70 YEARS, THE MAYORS HAVE DONE NOTHING AND NEITHER HAVE STATE GOVERNMENTS.  THE INHABITANTS HAVE BECOME ILL."  As with the 2020 complaint filed by Mayor Garza and Mr. Ramirez, it is unclear what action, if any, was taken in response to this citizen's complaint.

52.     Despite GrafTech's continued failure to remedy the known deficient dust emission controls at its Monterrey facility, Defendants continued to tout their purported commitment to environmental protection and compliance with environmental laws and regulations throughout the Class Period, claiming, among other things, that GrafTech was committed to "a strong environmental management system, which is anchored by policies and procedures that allow us to operate in compliance with our regulatory obligations, identify risks, and understand and reduce our environmental impacts."  But the Company's failure to operate its Monterrey facility in accordance with these representations exposed GrafTech to known material risks regarding government

- 16 -

enforcement actions, and consequently to business and operational disruptions – risks that would ultimately materialize in 2022.

> **E.      Defendants Deceive Investors About GrafTech's Purported De-risking of the Company's Pin Production**

53.      In addition to deceiving investors about the Company's purported commitment to environmental compliance and the true basis for GrafTech's manufacturing cost advantages, Defendants further misled investors during the Class Period regarding the Company's purported efforts to "de[-]risk" its critical pin production, which was entirely concentrated at GrafTech's Monterrey facility, by supposedly implementing pin production operations at the St. Marys facility.

54.      Specifically, during GrafTech's August 6, 2021 earnings call for the second quarter of 2021 ("2Q21"), defendant Halford told investors that GrafTech was "investing in a ***pin production line*** at our St. Marys, Pennsylvania facility that ***will be online in the third quarter***."  At the time, Halford further represented that the St. Marys facility's pin production line "diversifies our pin capability and provides production flexibility."  The following quarter, during the Company's November 5, 2021 earnings call for the third quarter of 2021 ("3Q21"), Halford continued to promote the St. Marys facility's pin production capabilities, stating in pertinent part, that "[t]he ***pin production line*** at our St. Mary's, Pennsylvania facility is ***now operational***, and we are ramping up ***production***."  Halford then went on to state: "Importantly, ***this provides us with 2 connecting pin production facilities***."

55.      Analysts and investors credited these representations.  For example, in an August 6, 2021 report, BMO Capital Markets ("BMO") analyst David Gagliano identified the "[r]estart of St. Mary's graphite electrode facility" as one of the "Key Catalysts" for GrafTech.

56.      During GrafTech's February 4, 2022 earnings call for the fourth quarter and year-end of 2021 ("4Q21"), Halford again touted the purported benefits of the St. Marys facility's pin production line, specifically stating: "Our investment in the new automated pin line at St. Marys

- 17 -

continues to progress well and helps to *de[-]risk our pin production capacity*."  The following quarter, during the Company's May 6, 2022 earnings call for the first quarter of 2022 ("1Q22"), Halford reiterated these comments, stating: "[O]ur recent investment in the automated pin line at St. Marys continues to progress and helps to *de[-]risk our pin production capacity*."

57.     Defendant Halford's statements regarding the "de[-]risk[ing]" of GrafTech's "pin production capacity" through St. Marys facility's supposed "pin production line" were important to investors, because they conveyed that the Company was insulated from potential commercial disruptions due to insufficient pin supply in the event that operations at the Monterrey facility were interrupted.

58.     But according to a former GrafTech Manufacturing Engineering Lead (the "Former Engineering Lead") – and Defendants' *own subsequent admissions* – Halford's statements regarding the purported "de[-]risk[ing]" of GrafTech's "pin production" were false and misleading.  Contrary to Halford's statements about the supposedly "operational" "pin production line" at the St. Marys facility, the truth was that the St. Marys facility produced *no pins or pin stock at all* during 2021 or 2022 and, in fact, did not even have the proper "operating permits" to perform such activities.

59.     The Former Engineering Lead was hired by GrafTech in August 2022 to work as part of the team responsible for restarting the St. Marys facility.  In this role, the Former Engineering Lead reported to GrafTech's Director of Central Engineering and Reliability, Tom Knoll ("Knoll"), who reported directly to defendant Halford.  According to the Former Engineering Lead, at the time of his hiring, the St. Marys facility was not involved in the production or manufacturing of any pins.

60.     One of the Former Engineering Lead's primary responsibilities upon being hired was to ensure that the St. Marys facility had the proper equipment needed for manufacturing graphite electrode products and pins, which included a large press for extruding graphite, a cooling pond, and the tools needed to operate such equipment.  At the time of the Former Engineering Lead's hiring,

there was no water in the cooling pond and it was apparent that the press had not been run in well over a year, given that the tools for the press were rusted and covered in dust.  As such, it was clear to the Former Engineering Lead that the St. Marys facility had not produced or manufactured pins at any point within the last year.

61.     At the time of the Former Engineering Lead's hiring, the objectives for his team included preparing the St. Marys facility to be capable of producing graphite electrode products at some point in late-2023 or early-2024.  However, shortly after the Monterrey facility was shut down by Mexican regulators in September 2022, Knoll called an emergency meeting, which was attended by the Former Engineering Lead and other members of the team responsible for restarting the St. Marys facility, during which the employees were informed that the efforts to restart production at the St. Marys facility would need to be accelerated.  At the time, however, the St. Marys facility did not have the appropriate operating permits to produce graphite electrode products and pins, despite Halford's statement to investors nearly one year prior that "[t]he ***pin production line*** at our St. Mary's, Pennsylvania facility is ***now operational***."  Indeed, according to the Former Engineering Lead, GrafTech did not ***begin*** the process of obtaining the operating permits required for such production until early-2023.

62.     Moreover, it was not until late-2023 that the St. Marys facility conducted its first "pin trial run."  According to the Former Engineering Lead, the St. Marys facility conducted three trials, but never actually got the pin production operation up and running.  Thus, according to this former employee, the St. Marys facility never produced or manufactured any actual pins at any point during his tenure with GrafTech, which came to an end in April 2024.

63.     According to the Former Engineering Lead, defendant Halford was aware of and familiar with the activities at the St. Marys facility, and definitely would have known that the plant was not involved in actual pin production during 2021 and 2022.  According to the Former

Engineering Lead, Halford regularly visited the St. Marys facility, was ultimately responsible for overseeing GrafTech's efforts to restart the plant, and was regularly informed about the activities and issues at the St. Marys facility by Knoll.

64. Because the St. Marys facility was not actually involved in any manufacturing or production of pins during 2021 or 2022, and the Monterrey facility remained the Company's only facility capable of producing the pin stock needed for all of GrafTech's electrodes and pins, Halford's statements to investors regarding the St. Marys facility's supposedly "***operational***" "**pin production** line," which purportedly helped to "***de[-]risk [GrafTech's] pin production capacity***," were materially false and misleading. Halford's statements misleadingly conveyed to investors that GrafTech had secured an alternative source of pins through the St. Marys facility's "pin production," thereby insulating GrafTech from potential commercial disruptions in the event that operations at the Monterrey facility were interrupted. The truth, however, was that the Company remained exposed to significant commercial disruptions in the event that operations at the Monterrey facility were interrupted.

65. Indeed, Defendants' ***own subsequent admissions*** confirm as much, while also serving to corroborate the above facts provided by the Former Engineering Lead. Specifically, on November 4, 2022, during GrafTech's first earnings call following the Monterrey facility's closure, defendant Kessler told investors, for the first time, that the Monterrey facility was "the ***only site that produces the pin stock needed for all our electrodes***." During that same call, Kessler further revealed: "We are ***now*** actively ***pursuing approvals for operating permits to restart the [St. Marys] facility for pin production***." Then, on April 28, 2023, defendant Halford responded to a question from an analyst by admitting that, "***when we came into [2023], our intent was to do the full restart of St. Marys really to de-risk our pin supply chain***," further confirming the falsity of his previous statements

- 20 -

from 2022 that the St. Marys facility's "pin production line . . . is ***now operational***" and "help[ing] to ***de[-]risk our pin production capacity***."

### F.    Brookfield Reaps More than $2.8 Billion from Insider Trading

66.     While the price of GrafTech common stock was artificially inflated throughout the Class Period by Defendants' false and misleading statements, defendant Brookfield, which oversaw and controlled the management of the Company, unloaded more than ***$2.8 billion*** in GrafTech common stock, selling approximately 75% of its equity stake in the Company within just three years of returning to the public equity markets.  Notably, Brookfield caused GrafTech to enter into two share repurchase agreements in August 2018 and December 2019, which collectively required the Company to repurchase nearly 31 million shares directly from Brookfield at prices exceeding $19 per share, for total proceeds of approximately $475 million.

### G.    Defendants' Fraud Begins to Unravel

67.     On August 11, 2022, Mayor Garza, fed up with GrafTech's repeated failures to follow through on its commitments to remedy the Monterrey facility's deficient environmental safeguards, addressed the Apodaca City Council with an impassioned plea for the Council to take action against the Company.  Among other things, Mayor Garza detailed GrafTech's persistent failures to rectify its environmental misconduct, despite its repeated agreements to do so, stating in pertinent part:

> Over more than 60 years, there have been various efforts by authorities, particularly municipal ones, to regulate the operation of this company.  However, the power to sanction these companies is a concurrent state and federal power.  ***This company has always had the ability, the skill, to be able to evade the inspection actions that various authorities attempted to carry out over time. I have witnessed how various attempts have been made over time, none of which have been successfully completed***.  In fact, in the first triennium that corresponded to presiding over the municipal presidency in this administration, that is, for the year 2018-2021, together with a group of neighbors, including José Luis Zambrano, who led this effort, we began a new negotiation management with the company.  ***Agreements were signed, follow-ups were carried out, investments were made, but we have no results.  The children in this part of the city are condemned to be taught to crawl***

- 21 -

*on their hands and knees and their little black feet.  Women, people who daily attend to the needs of their home, have to sweep away the smut, the soot, that stands out on the cars*.

68.    Mayor Garza went on to explain:

This important company, GrafTech, employs 400 people, but *causes damage to the health and environment of thousands of people*.  We have access to a report from the Ministry of the Environment, in which *monitoring shows that the emission of carbon particles increases during the night*.  That is to say, it allows us to presume a *fraud on the part of the company that knows that the black cloud of coal that they discard at night is less perceptible to citizens who wake up with the dust scattered on their properties, on the porches of their houses, on the cars from our city*.

69.    Based on GrafTech's history of environmental misconduct, Mayor Garza implored

the Council to seek assistance from the State of Nuevo León in bringing an end to the Company's

harmful presence, stating in pertinent part:

I am obliged in my responsibility to propose to this council that together we sign a respectful exhortation to the Governor of the State and the Secretariat of the Environment of the Government of Nuevo León, the Secretariat of Health and the State Attorney for Sustainable Development, to the effect that a formal inspection and audit process be initiated on the company GrafTech México SADCB, with the objective of confirming the violation of regulations, especially health and also environmental, that put our population at risk so that we *proceed to the precautionary measures of provisional closure* and begin the process that leads to a definitive closure that motivates the relocation of this company.

\*     \*     \*

We have *no doubt that the company is the main cause of the emission of carbon particles and combustion soot in this area of the city*.  There is no doubt in this regard that *legal tricks are what have allowed this company to be subject to State oversight*.  It is very simple.

\*     \*     \*

Specifically, I ask the Secretary to submit to the council's consideration the authorization for this exhortation to be drafted in specific terms to the Ministry of Health, the Ministry of the Environment, the Environmental Attorney of the State Government, *supporting the concern of the city government and its council*, which is its highest authority, about *the effect that these emissions have on the health of our population and secondly, although no less important, on the environment of our community*.

70.     A little over one month later, after the close of markets on September 16, 2022, Defendants shocked investors by unexpectedly filing a Form 8-K with the SEC, which disclosed that GrafTech's critical Monterrey facility had received a "temporary suspension notice" ordering the facility to "wind down operations within seven days," following the conclusion of a September 15, 2022 inspection of the "facility and certain of the facility's environmental and operating permits" by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment of the State of Nuevo León, Mexico.  The Form 8-K further disclosed that "[i]n parallel, the Director of Integral Air Management of the Undersecretary of Climate Change and Air Quality of the Ministry of the Environment determined that, among other things, GrafTech Mexico's operating license was no longer in effect."  The Form 8-K provided no further details regarding the cause for the temporary suspension notice or the potential financial impacts of the critical Monterrey facility's closure.

71.     In the wake of this revelation, multiple Mexican news outlets linked the cessation order to GrafTech's excessive pollution of hazardous emissions into neighboring communities.  For example, a news article published by *El Norte* on September 17, 2022, stated: "***For launching polluting emissions in Apodaca, the State Government yesterday temporarily closed the operations of the Graftech company***."

72.     On September 16, 2022, Mayor Garza also took to Facebook Live to applaud the shutdown, disclosing that the municipality had voted in an August 2022 plenary session to formally request that GrafTech's facility be required to close and relocate, citing more than 30 years of environmental abuses by the Company.  Among other things, Mayor Garza stated, in pertinent part:

> On the one hand, for a long time [GrafTech] provided employment almost as an exclusive source of employment to many Apodaca families.  But also ***from the beginning, the emission of dust, highly polluting, carcinogenic carbon particles, which affect the health of people and families, was a controversy***.

*     *     *

- 23 -

[GrafTech] **always signs agreements and always says it will solve the problem, but it never does**.  They never do anything to really change things.  All the residents of the modern Apodaca sector and the city center witness every morning the little **dust that fills the apartments, the cars and that also fills our lungs, unfortunately.  The company has always found a way to evade its responsibility**.  Always, through hiring influential firms, through carrying out maneuvers that evade the responsibility they have.  Last August, the Plenary Council of Apodaca sent a request to the Undersecretariat of the Environment of the State Government to associate and help us, because the municipality does not have the power to close.  We thank Dr. Alfonso, Undersecretary of the Environment, because today he gave us the happy news that the undersecretary of the Graf[T]ech company was notified of the general temporary suspension of activities.

*    *    *

We already gave them 30 years to correct themselves and they didn't.  We no longer trust that they are going to do it.

73.    The market was clearly shocked by the news of the Monterrey facility's closure, with several analysts taking note.  For example, a September 18, 2022 analyst report from BMO described the Monterrey facility's shutdown as a "key point[]" and noted that "local Mexico media reports indicate this is tied to local authorities' view of excessive carbon emissions."  Similarly, a September 19, 2022 analyst report from RBS Capital Markets made note of the Monterrey facility shutdown under a heading entitled "Sentiment: Negative," while further advising investors that the "most significant risk . . . for [GrafTech] is the duration of the suspension."

74.    As a result, the price of GrafTech common stock fell $0.45 per share, or approximately 8.5%, from a closing price of $5.30 per share on September 16, 2022, to a closing price of $4.85 per share the following trading day, September 19, 2022.  The price of GrafTech common stock remained artificially inflated, however, as Defendants continued to conceal the truth regarding the Company's reliance on the Monterrey facility to produce all of its pin stock, Defendants' misrepresentations regarding GrafTech's purported efforts to "de[-]risk" its pin production capacity, and other material information regarding the financial impact of the Monterrey facility's closure.

4873-9624-3692.v1

**H.      Defendants Continue to Mislead the Market About the Adverse
Impacts of the Monterrey Facility's Shutdown**

75.      On the morning of November 4, 2022, Defendants issued a press release announcing GrafTech's results for the third quarter of 2022 ("3Q22") and held the Company's 3Q22 earnings call with investors.  Among other things, Defendants' disclosures revealed, *for the first time*, that the Monterrey facility was "*the only site that produces the pin stock needed for all our electrodes*." During the 3Q22 earnings call, Kessler also revealed that Halford's previous statements regarding the St. Marys facility's supposedly "*operational*" "pin *production* line," which purportedly helped to "*de[-]risk* [GrafTech's] *pin production capacity*" were materially false and misleading, by admitting that GrafTech was *just now* "actively *pursuing approvals for operating permits to restart the [St. Marys] facility for pin production*."  During the call, Kessler also told investors that GrafTech's business performance could be "significantly impacted" during the first two quarters of 2023, "*unless Monterrey reopens*."

76.      The market was again shocked by Defendants' disclosures, with multiple analysts making note of the above disclosures.  As a result, the price of GrafTech common stock fell $0.24 per share, or approximately 5%, from a closing price of $4.85 per share on November 3, 2022, to a closing price of $4.61 per share on November 4, 2022.  The price of GrafTech common stock remained artificially inflated, however, as Defendants continued to mislead investors by concealing the full truth regarding the financial impact of the Monterrey facility's closure.

77.      In particular, defendant Kessler told investors during the 3Q22 earnings call that the financial impact of the Monterrey facility shutdown would only be significant *if* the facility remained closed into 2023, and even then, would be limited to the first two quarters of 2023, stating in pertinent part:

> [U]nless Monterrey reopens, our business performance will be significantly impacted *for the first 2 quarters of 2023* with a reduction in sales volume of 50% or more *before recovering in the back half of the year*.

* * *

The ***impact will be less significant for the fourth quarter*** as existing pin stock inventory is supporting our ability to fulfill most customer needs in the near term. ***For next year, if Monterrey remains suspended***, sales volume will be reduced by 50% or more in the ***first half of 2023*** compared to the first half of 2022, but ***will recover after that***.  We expect to be able to meet our LTA commitments throughout 2023.

78.     In addition, during the Q&A portion of the call, defendant Halford had the following exchange with analyst Arun Viswanathan of RBC regarding the impact of the Monterrey facility's closure upon GrafTech's contract negotiations with its customers:

[Analyst:] Okay.  And then maybe you could just help us understand or get ***your perspective on contracting***.  Unfortunately, the Monterrey facility is not running full out.  So your volumes are going to be down in the first half.  And so ***maybe that limits the kind of commercial opportunities that you can put forward to your customers, is that true***?  And are you kind of now operating more at a kind of shorter time frame, maybe 1 to 3 months of visibility?  Or how are you thinking about setting up the next couple of periods of the order book?  Is there other options for you in front of you?

[Halford] Yes, thanks.  It's an important question, Arun.  And one of the things that I want to make clear is that while we need to consider the near-term supply constraints related to the Monterrey situation, ***none of this changes our commercial strategy***.  We continue to believe that we are unique in the market in our ability to offer a variety of different contracting terms to our customers. that's supported by our vertical integration, and that's a key differentiator, our ability to provide that certainty to our customers.  And while in the very near term, we're dealing with the Monterrey situation, we have absolute confidence in our ability to resolve this current environment we're in, and ***it's not changing our commercial strategy at all***.

79.     The above statements by defendants Kessler and Halford misled investors by conveying that the Monterrey facility's closure: (i) would ***not*** impact GrafTech's "commercial strategy" regarding contract negotiations "***at all***"; and (ii) would ***not*** significantly impact GrafTech's business performance, ***unless*** the facility remained closed beyond 2022 – and even then, the impact would be limited to the first half of 2023.  As Defendants would later admit, however, the undisclosed truth was that: (i) the Monterrey facility's closure coincided with a "critical" negotiating window, and thus, significantly limited GrafTech's ability to negotiate customer contracts for 2023;

- 26 -

and (ii) GrafTech did not have sufficient pin stock to withstand even a temporary shutdown of the Monterrey facility.

80.     On November 18, 2022, GrafTech announced that the Monterrey facility was conditionally permitted to resume operations subject to the Company's completion of certain remediation efforts.  Given Defendants' previous misrepresentations that the closure would only have a significant impact if the Monterrey facility remained closed into 2023, the market reacted positively to this disclosure, with multiple analysts making note of the development and raising their estimates, causing the price of GrafTech to rise significantly.

81.     A little over two months later, on the morning of February 3, 2023, Defendants issued a press release announcing GrafTech's financial results for the fourth quarter and full year of 2022 ("4Q22") and held the Company's 4Q22 earnings call with investors.  Among other things, these disclosures revealed that, contrary to Defendants' previous misrepresentations: (i) the Monterrey facility's shutdown "***coincide[d] with the critical time frame to secure customer orders for the first half of 2023***," and "the uncertainty caused by the suspension ***during this contract negotiation window***" limited GrafTech's "ability to enter into new customer commitments for the first half of 2023"; and (ii) ***despite the facility reopening within two weeks of the Company's November 4, 2022 earnings call***, the temporary closure was expected to have a significant impact upon GrafTech's sales volume "in the first half of 2023," due in part to the fact that "the required manufacturing time for [GrafTech's] products is generally ***several months***," meaning "the rebuilding of our pin stock inventory ***will take time***."

82.     The market was once again shocked by this news, with multiple analysts making note of the above disclosures.  As a result, the price of GrafTech common stock plummeted $1.01 per share, or approximately 15%, from a closing price of $6.59 per share on February 2, 2023, to a closing price of $5.58 per share on February 3, 2023.  The price of GrafTech common stock

remained artificially inflated, however, as Defendants continued to conceal the full truth regarding the financial impact of the Monterrey facility's temporary closure by, among other things, telling investors that the impact of the "contract negotiation window" issue was limited to "the first half of 2023," and that Defendants expected "second half sales volumes to recover as [GrafTech] move[d] past the Monterrey suspension driven uncertainty."

83.     Finally, on the morning of August 4, 2023, the Company reported its financial results for the second quarter of 2023 ("2Q23").  Among other things, GrafTech reported a net loss of $8 million for the quarter, driven by a 49% year-over-year decline in sales as GrafTech continued to "recover" from the effects of the Monterrey facility's shutdown.  During the Q&A portion of the 2Q23 earnings call held that same day, defendant Kessler described the Monterrey facility's suspension as the "***key driver***" of the Company's continued underperformance and revealed that, contrary to Kessler's previous representations, the impact of the "contract negotiation window" issue was ***not*** limited to the first half of 2023, stating in pertinent part:

> . . . In regards to the impact of Monterrey, and I think we've talked about that in some detail on the last 2 calls, right?  During that suspension in late 2022, right?  ***We lost the ability to negotiate volumes***, especially for the first half of '23 and maybe even ***to some extent in the second half***, right?  So that was the worst possible time for that suspension.  So that is really the ***key driver of the impact and underperformance and the disconnect between what you're highlighting here***, the steel utilization rates versus the electro plant utilization rate.  I think it's the indirect impact of Monterrey, the loss of that negotiation window during the most critical negotiation time in late 2022.

84.     These disclosures once again shocked the market, causing the price of GrafTech common stock to plunge $1.18 per share, or nearly 23%, from its $5.23 per share closing price on August 3, 2023, to a closing price of $4.05 per share on August 4, 2023.

85.     As a result of the substantial declines in the market price of GrafTech common stock caused by the gradual revelation of the truth regarding Defendants' material misstatements and

omissions throughout the Class Period, Plaintiff and other members of the Class suffered significant losses and economic damages under the federal securities laws, as further detailed herein.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Year-End 2018 Results

86.    The Class Period begins on February 8, 2019.  On that date, GrafTech issued a press release disclosing the Company's financial results for the fourth quarter and year ended December 31, 2018 ("4Q18") and held its 4Q18 earnings call with investors.

87.    During the 4Q18 earnings call, defendant Rintoul touted the purported competitive advantages of GrafTech's manufacturing facilities, while concealing that those advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards at its Monterrey facility, specifically stating: "***Ongoing operational improvements and vertical integration give GrafTech economies of scale and a competitive cost structure***."

88.    During the same call, Rintoul also emphasized the St. Marys facility's ability to "support overall flexibility of [GrafTech's] manufacturing footprint," specifically describing the St. Marys facility's role as follows: "***We will ramp up production at St. Marys if required by the market at any point in the future***.  St. Marys can be thought of as ***essentially the equivalent of a peaking plant***, and we will operate in that fashion."  Rintoul later elaborated on this point during the Q&A portion of the call, specifically stating: "We will use St. Marys to allow us flexibility and variability.  We expect ***the degree to which we run that will move up and down based upon the market dynamics, not unlike that of, again, in the analogy of a peaking plant***."

89.    The statements referenced in ¶¶87-88 above were materially false and misleading when made, for the following reasons:

(a)    defendant Rintoul's statement that GrafTech had achieved its "competitive cost structure" due to "operational improvements and vertical integration" was materially

- 29 -

misleading, because Rintoul concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility; and

(b)     defendant Rintoul's statements regarding GrafTech's ability to operate the St. Marys facility as "the equivalent of a peaking plant" were materially misleading, because they created the misleading impression that GrafTech could "ramp up production at St. Marys" in short order to meet increases in demand or supplement production shortcomings due to operational disruptions at GrafTech's other facilities, when the truth was that the St. Marys facility had neither the appropriate equipment nor operating permits to produce pins or electrodes and would require approximately 18-24 months to actually ramp up for production.

90.     On February 22, 2019, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2018 ("2018 Form 10-K"), which was signed by defendants Rintoul and Coburn. The 2018 Form 10-K represented that GrafTech was in compliance with all applicable environmental laws and regulations in its manufacturing processes, stating: "We believe that we are *currently in compliance in all material respects with the federal, state, local and foreign environmental laws and regulations to which we are subject*."

91.     Similarly, the 2018 Form 10-K stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, *environmental and regulatory requirements*," among other factors. The 2018 Form 10-K also represented that the Company has an "*on-going commitment to rigorous internal environmental protection standards*." The 2018 Form 10-K further stated that *"[e]nvironmental considerations are part of all significant capital expenditure decisions*."

- 30 -

92.     Under a heading titled "Competitive strengths," the 2018 Form 10-K highlighted GrafTech's "lowest cost large-scale" manufacturing plants, which included the Monterrey facility, stating in pertinent part as follows:

> We believe our facilities are among the most strategically located and ***lowest cost large-scale graphite electrode manufacturing plants in the world***.  Of the graphite electrode manufacturing facilities currently operating outside of China, we estimate that our three operating manufacturing facilities represent approximately 24% of estimated production capacity for graphite electrodes, making us a critical supplier to global EAF steel manufacturers.  ***Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors***, and excellent visibility into the large North American and European EAF steelmaking markets.

93.     The 2018 Form 10-K also highlighted the specific "cost advantages" GrafTech enjoyed from its Monterrey facility, stating in pertinent part as follows:

> Our manufacturing facilities significantly benefit from their ***size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift***.  By operating three of the five highest capacity graphite electrode production facilities in the world, we are able to achieve meaningful operating leverage relative to our competitors.  ***Because of the attractive cost of labor available to our Monterrey facility, we believe we have a significant cost advantage in the production of pins***, which are used to connect and fasten graphite electrodes together in a furnace and are more labor-intensive to produce than other graphite electrodes.  Our Calais, Pamplona and ***Monterrey facilities have access to low-cost sources of electricity***, a significant element of our manufacturing costs.
>
> *           *           *
>
> Moreover, our Seadrift, Calais, Pamplona, ***Monterrey*** and St. Marys facilities each provide ***unique advantages for us***. . . .  We believe our facilities have ***significant cost advantages given their scale and access to low cost, reliable energy sources***.

94.     The statements referenced in ¶¶90-93 above were materially false and misleading when made, for the following reasons:

(a)     Defendants' statements regarding their purported "commitment to rigorous internal environmental protection standards," compliance with "environmental laws and regulations"

and consideration of "environmental and regulatory requirements" in connection with capital expenditure decisions were materially false and misleading, because they concealed that the Company's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions; and

(b)     Defendants' statements regarding the purported "cost advantages" of GrafTech's manufacturing facilities were materially misleading, because they concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility.

### B.     First Quarter 2019 Results

95.     On May 1, 2019, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2019 ("1Q19 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 1Q19 Form 10-Q reported that "[o]n March 1, 2019, the [Department of Sustainable Development] provided notice of an administrative proceeding with respect to the Company's Monterrey facility," which required the "Company to design and implement certain corrective measures involving certain *potential violations of state environmental law relating to emissions*."  The 1Q19 Form 10-Q represented that GrafTech was "cooperating with the Department" with respect to the administrative proceeding.

96.     The 1Q19 Form 10-Q also reiterated Defendants' claim that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, *environmental and regulatory requirements*," among other factors.

97.     The statements referenced in ¶¶95-96 above were materially false and misleading when made, because they concealed that the Company's Monterrey facility had, for decades,

- 32 -

blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions.

### C. Second Quarter 2019 Results

98.     On July 31, 2019, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2019 ("2Q19 Form 10-Q"), which was signed by defendants Rintoul and Coburn. The 2Q19 Form 10-Q substantially repeated Defendants' misrepresentations from ¶95 above, specifically stating that "[o]n March 1, 2019, the [Department of Sustainable Development] provided notice of an administrative proceeding with respect to the Company's Monterrey facility," which required the "Company to design and implement certain corrective measures involving certain *potential violations of state environmental law relating to emissions*." The 2Q19 Form 10-Q further represented that GrafTech was "cooperating with the Department" with respect to the administrative proceeding.

99.     The 2Q19 Form 10-Q also reiterated Defendants' claim that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, *environmental and regulatory requirements*," among other factors.

100.    The statements referenced in ¶¶98-99 above were materially false and misleading when made, for the following reasons:

    (a)     Defendants concealed that, on July 30, 2019, the Department of Sustainable Development issued a formal resolution of the administrative proceeding with respect to the Company's Monterrey facility, which: (i) determined that GrafTech's Monterrey facility operated "*without the means of control to ensure that dust emissions are avoided, which is mandatory as established in Article 131 section II of the Environmental Law of the State of Nuevo León*, to ensure satisfactory air quality for population well-being and ecological balance;" (ii) found that GrafTech "*benefited economically* by evading the expense generated by the implementation of

equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere during its operation"; and (iii) ordered GrafTech to "*immediately and permanently* . . . carry out the necessary actions, adaptations and/or maneuvers that *guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere*."

(b)     Defendants concealed that the Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions.

### D.     Third Quarter 2019 Results

101.     On November 7, 2019, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2019 ("3Q19 Form 10-Q"), which was signed by defendants Rintoul and Coburn.

102.     The 3Q19 Form 10-Q reiterated that "[o]n March 1, 2019, the [Department of Sustainable Development] provided notice of an administrative proceeding with respect to the Company's Monterrey facility," which required the "Company to design and implement certain corrective measures involving certain *potential violations of state environmental law relating to emissions*."  The 3Q19 Form 10-Q further represented that GrafTech had "cooperated with the Department" with respect to the proceeding, "including *payment of certain fines that were not material to the Company*."  The 3Q19 Form 10-Q also reported that, in September 2019, "the Department of Sustainable Development formally closed the proceeding."

103.     Also on November 7, 2019, GrafTech held an earnings call with analysts to discuss the Company's 3Q19 results.  During the call, defendant Coburn emphasized that "*we will continue to invest in health, safety and environmental performance*."

104.     The statements referenced in ¶¶102-103 above were materially false and misleading when made, for the following reasons:

- 34 -

(a)     Defendants concealed the order and findings set forth in the Department of Sustainable Development's July 30, 2019 resolution, summarized in ¶100(a) above;

(b)     Defendants concealed that, in connection with the resolution of the administrative proceeding, GrafTech had agreed to invest **over $2 million** in dust collection and containment projects to remedy its violations; and

(c)     Defendants concealed that the Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "**immediately and permanently** . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

### E.     Year-End 2019 Results

105.    On February 6, 2020, GrafTech hosted an earnings call with analysts to discuss the Company's financial and operational results for the fourth quarter and fiscal year 2019.  During the call, defendant Coburn reiterated that "**we will continue to invest in health, safety and environmental performance**."

106.    On February 21, 2020, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2019 ("2019 Form 10-K"), which was signed by defendants Rintoul and Coburn.  The 2019 Form 10-K represented that GrafTech was in compliance with all applicable environmental laws and regulations in its manufacturing processes, stating: "We believe that we are **currently in compliance in all material respects with the federal, state, local and foreign environmental laws and regulations to which we are subject**."

107.    Similarly, the 2019 Form 10-K stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, **environmental and regulatory**

*requirements*," among other factors.  The 2019 Form 10-K also represented that the Company has an "**on-going commitment to rigorous internal environmental protection standards**."  The 2019 Form 10-K further stated that **"[e]nvironmental considerations are part of all significant capital expenditure decisions**."

108.    Under a heading titled "Competitive strengths," the 2019 Form 10-K touted GrafTech's purported "lowest cost large-scale" manufacturing plants, stating in pertinent part:

> We believe our facilities are among the most strategically located and ***lowest cost large-scale graphite electrode manufacturing plants in the world***.  Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately 24% of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers.  ***Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors***, and excellent visibility into the large North American and European EAF steelmaking markets.

> \*       \*       \*

> We believe our business has the ***lowest manufacturing cost structure of all of our major competitors, primarily due to the large scale of our manufacturing facilities***.

109.    The 2019 Form 10-K also highlighted the specific "cost advantages" GrafTech enjoyed from its Monterrey facility, stating in pertinent part:

> [O]ur Calais, Pamplona, ***Monterrey*** and St. Marys facilities each provide ***unique cost advantages*** given their scale and access to low cost, reliable energy sources.

> \*       \*       \*

> Our manufacturing facilities significantly ***benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key*** raw materials, and our substantial vertical integration with Seadrift.  Our Calais, Pamplona, ***Monterrey*** and St. Marys facilities have ***access to low-cost sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs***.

- 36 -

110.    The statements referenced in ¶¶105-109 above were materially false and misleading when made, for the following reasons:

(a)    Defendants' statements regarding the purported "cost advantages" of GrafTech's manufacturing facilities were materially misleading, because they concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility; and

(b)    Defendants' statements regarding their purported "commitment to rigorous internal environmental protection standards," compliance with "environmental laws and regulations," and consideration of "environmental and regulatory requirements" in connection with capital expenditure decisions, were materially false and misleading, because they concealed that GrafTech's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "***immediately and permanently*** . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

### F.    GrafTech's 2019 Sustainability Report

111.    On September 16, 2020, GrafTech published its inaugural sustainability report ("2019 Sustainability Report").  The 2019 Sustainability Report opened with a "message" from defendant Rintoul, who described the report as providing stakeholders "a better understanding of our sharp focus on and plans for continued improvement of our ESG programs."  The report similarly represented that the publication symbolized an "important step towards demonstrating ***our commitment to transparency regarding environmental, social, and governance topics***."  The 2019

- 37 -

Sustainability Report further claimed that GrafTech was "proactively" taking steps to address its environmental impacts, stating in pertinent part as follows:

> As a manufacturer of graphite electrodes, we are cognizant of our impacts on the environment. *From energy consumption and air emissions* to water use and waste handling, *we proactively take steps to reduce these impacts throughout our operations*.

112.    The 2019 Sustainability Report represented that GrafTech was "focused" on reducing air emissions and dust around its manufacturing plants, including specifically at its Monterrey facility, stating in pertinent part as follows:

> *To reduce emissions, we have installed control technology on our equipment, which limits the amount of air emissions that enter the environment*. In coordination with our sites, our HS&EP and Technology Teams look for and evaluate new and innovative ways to reduce our emissions. Reducing air emissions may come from a variety of activities, including changes and upgrades in processes; upgrading and adding control equipment (dust collectors and SO2 abatement systems); and increased preventative maintenance programs. GrafTech has also focused on *improving the housekeeping around our plants* to further reduce dirt and dust. *In Monterrey, a new dust collector was installed for our bake process and a new material transport system was installed for moving raw materials from storage to the processing area*.

113.    The 2019 Sustainability Report also emphasized GrafTech's efforts to "foster relationships" with the relevant governmental authorities overseeing its Monterrey facility:

> While this exponential growth of the Monterrey community has substantial benefits, it also raises concerns – including noise, dust, traffic, and pollution. Over the last year, *we have worked hard to develop and foster relationships with the government and community representatives*. Whether it is upgrading the perimeter of our property, planting trees, sharing our sports complex with the community, or holding open houses to educate people about our business, GrafTech is looking for ways to become a better neighbor.

114.    The statements referenced in ¶¶111-113 above were materially false and misleading when made, because they concealed that GrafTech had a contentious relationship with the local government in Apodaca, and that the Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order

4873-9624-3692.v1

requiring GrafTech to "*immediately and permanently* . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

### G.     Third Quarter 2020 Results

115.     On November 3, 2020, GrafTech issued a press release disclosing the Company's financial results for the quarter ended September 30, 2020 ("3Q20 Release"), which was also filed with the SEC as an exhibit to a Form 8-K signed by defendant Coburn.  Among other things, the 3Q20 Release represented that GrafTech's purportedly "*advantaged low cost structure*" was a "*sustainable*" competitive advantage.

116.     That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2020 ("3Q20 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 3Q20 Form 10-Q contained statements that were substantially identical to those identified in ¶115 above.

117.     In addition, the 3Q20 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, *environmental and regulatory requirements*," among other factors.

118.     Also on November 3, 2020 GrafTech held an earnings call with analysts to discuss the Company's financial and operational results for the third quarter of 2020.  During the call, defendant Rintoul claimed that GrafTech was focused "*on being good environmental stewards*," "*fully committed*" to the efforts described in the 2019 Sustainability Report, and was continuing to "*monitor progress on our environmental initiatives*."

119.     During the call, Rintoul also represented that GrafTech was "well positioned" given the Company's "*low-cost structure*," which purportedly represented a "*sustainable and long-term competitive advantage*."

- 39 -

120.   On November 10, 2020, GrafTech filed with the SEC a Prospectus Supplement on Form 424B7 (the "November 2020 Prospectus").   The November 2020 Prospectus touted GrafTech's purported "low-cost" graphite electrode manufacturing facilities, stating in pertinent part:

> **We believe that we have the most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry**, including three of the highest capacity facilities in the world.  We are the only large scale graphite electrode producer that is substantially vertically integrated into petroleum needle coke, a key raw material for graphite electrode manufacturing.  **This unique position provides us with competitive advantages in product quality and cost**.

121.   On December 16, 2020, GrafTech filed with the SEC a Prospectus Supplement on Form 424B7 (the "December 2020 Prospectus").   The December 2020 Prospectus contained statements that were substantially identical the November 2020 statements identified in ¶120 above.

122.   Substantially similar statements as detailed in ¶¶120-121 were included in prospectus supplements GrafTech filed with the SEC on Form 424B7 on January 19, 2021, March 3, 2021, and May 26, 2021.

123.   The statements referenced in ¶¶115-122 above were materially false and misleading when made, for the following reasons:

(a)   Defendants' statements regarding the purported "cost advantages" of GrafTech's manufacturing facilities were materially misleading, because they concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility; and

(b)   Defendants' statements regarding their purported focus on "environmental and regulatory requirements" and commitment to the "environmental initiatives" described in the 2019 Sustainability Report were materially false and misleading, because they concealed that GrafTech's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and

4873-9624-3692.v1

chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "***immediately and permanently*** . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

### H.    Year-End 2020 Results

124.    On February 5, 2021, GrafTech issued a press release disclosing the Company's financial results for the fourth quarter and year ended December 31, 2020 ("4Q20 Release"), which was also filed with the SEC as an exhibit to a Form 8-K signed by defendant Coburn.  The 4Q20 Release quoted defendant Rintoul as stating that GrafTech's "'***advantaged low-cost structure***'" was a "'***sustainable***'" competitive advantage.

125.    That same day, GrafTech held an earnings call with analysts to discuss the Company's financial and operational results for the fourth quarter and full year 2020.  During his prepared remarks, defendant Rintoul touted GrafTech's "sustainability strategy," which he claimed was "***centered on improving our environmental footprint***," stating in pertinent part:

> ***Quinn [Coburn] and I and our senior executives participate in our ESG steering committee.  The steering committee oversees our sustainability strategy, which compromises*** – or comprises rather, of employee health and safety, community relations, materials sourcing and efficiency, energy management, greenhouse gas emissions, air quality, water and wastewater management and waste management. ***The strategy encompasses activities as varied as our community involvement and outreach in Monterrey, Mexico***, our capture of energy generated at our Seadrift Coke facility to create additional sources of electricity for the area and our emission reduction efforts that include the installation of control technology on equipment on all of our sites.  ***Our goals are centered on improving our environmental footprint across our operations.  We are working hard to be good corporate citizens in the communities where we operate***.  And every day, our business decisions and actions are guided by our code of conduct and ethics.  We look forward to continuing our ESG dialogue with you and publishing our second annual sustainability report later this year.

126. In addition, Rintoul touted GrafTech's purported "***low-cost structure***," which he described as a "***sustainable and long-term competitive advantage***."

127. On February 23, 2021, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2020 ("2020 Form 10-K"), which was signed by defendants Rintoul and Coburn. The 2020 Form 10-K represented that GrafTech was in compliance with all applicable environmental laws and regulations in its manufacturing processes, stating: "We believe that we are ***currently in compliance in all material respects with the federal, state, local and foreign environmental laws and regulations to which we are subject***."

128. Similarly, the 2020 Form 10-K stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, ***environmental and regulatory requirements***," among other factors. The 2020 Form 10-K also represented that the Company has an "***on-going commitment to rigorous internal environmental protection standards***." The 2020 Form 10-K further stated that "***[e]nvironmental considerations are part of all significant capital expenditure decisions***."

129. Under a heading titled "Competitive strengths," the 2020 Form 10-K touted GrafTech's "lowest cost, large-scale" manufacturing plants, stating in pertinent part as follows:

> We believe our facilities are among the most strategically located and ***lowest cost, large-scale graphite electrode manufacturing plants in the world***. Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately a quarter of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers. ***Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors***, and excellent visibility into the large North American and European EAF steelmaking markets.

130. The 2020 Form 10-K also highlighted the specific "cost advantages" GrafTech enjoyed from its Monterrey facility, stating in pertinent part:

[O]ur Calais, Pamplona, **Monterrey** and St. Marys facilities each provides **unique cost advantages** given its scale and access to low cost, reliable energy sources.

\*     \*     \*

Our manufacturing facilities significantly **benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials**, and our substantial vertical integration with Seadrift.  Our Calais, Pamplona, **Monterrey** and St Marys facilities have **access to low-cost sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs**.

131.    The statements referenced in ¶¶124-103 above were materially false and misleading when made, for the following reasons:

(a)     Defendants' statements regarding the purported "cost advantages" of GrafTech's manufacturing facilities were materially misleading, because they concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility; and

(b)     Defendants' statements regarding their purported "commitment to rigorous internal environmental protection standards," focus on "improving [GrafTech's] environmental footprint," compliance with "environmental laws and regulations," and consideration of "environmental and regulatory requirements" in connection with capital expenditure decisions were materially false and misleading, because they concealed that GrafTech's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "**immediately and permanently** . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

- 43 -

### I.    First Quarter 2021 Results

132.    On May 5, 2021, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2021 ("1Q21 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 1Q21 Form 10-Q touted GrafTech's "***low cost structure***" as a purported "***sustainable***" competitive advantage.  In addition, the 1Q21 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, ***environmental and regulatory requirements***," among other factors.

133.    Also on May 5, 2021, GrafTech held an earnings call with analysts to discuss the Company's financial and operational results for the first quarter of 2021.  In connection with the earnings call, GrafTech released an earnings presentation, which was referenced throughout the earnings call.  The earnings presentation claimed GrafTech was being "***proactive to improve [the Company's] environmental footprint***," including by "upgrading manufacturing equipment."  Included within the earning presentation was the following graphic:



134.    During the call, defendant Rintoul claimed the graphic represented GrafTech's "***constant focus***" on "***safety, environment, [and] quality***" and that "SEQ" was a "***core mission***" for the Company.

135.    Defendant Rintoul further highlighted GrafTech's purported "***low-cost structure***," which he described as a "***sustainable and long-term competitive advantage***."

136.    During his prepared remarks, defendant Halford echoed Rintoul's claims regarding GrafTech's purported focus on the environment, stating in pertinent part:

> Our ESG efforts fit seamlessly with our ***focus on safety, environment and quality***, as Dave described. Our ***ESG Steering Committee, comprised of several members of our executive team, including me, Dave and Quinn, oversees our sustainability strategy***.

137.    The statements referenced in ¶¶132-136 above were materially false and misleading when made, for the following reasons:

(a)    Defendants' statements regarding the purported "cost advantages" of GrafTech's manufacturing facilities were materially misleading, because they concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility; and

(b)    Defendants' statements regarding their purported "constant focus" on GrafTech's "core mission" of improving GrafTech's "environmental footprint" were materially false and misleading, because they concealed that GrafTech's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "***immediately and permanently*** . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

## J.    Second Quarter 2021 Results

138.    On August 6, 2021, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2021 ("2Q21 Form 10-Q"), which was signed by defendants Rintoul and

- 45 -

Coburn. The 2Q21 Form 10-Q touted GrafTech's "**low cost structure**" as a purported "**sustainable**" competitive advantage. In addition, the 2Q21 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, **environmental and regulatory requirements**," among other factors.

139. Also on August 6, 2021, GrafTech held an earnings call with analysts to discuss the Company's financial and operational results for 2Q21. During the call, defendant Halford pointed to the "**good progress**" GrafTech was making on its ESG efforts with the "full validation" of the Company's "executive team," stating in pertinent part:

> **We continue to make good progress with our ESG efforts along several pads**. Notably, in the second quarter, we completed a full materiality assessment with the assistance of external experts to **identify and prioritize the key ESG issues for our business and our stakeholders**. The process allowed us to objectively determine the ESG topics that will drive our sustainability strategy, reporting and actions moving forward.
>
> The assessment included peer and industry benchmarking, a robust series of interviews with internal and external stakeholders and **a full validation of the assessment by our executive team**.

140. An earnings presentation used during the earnings call claimed that GrafTech was using "[s]ustainability goal settings to drive performance" on the Company's ESG initiatives and highlighted recent actions undertaken at the Company's Monterrey facility, as depicted in the following slide:



141.    Defendant Rintoul further highlighted GrafTech's purported "***low-cost structure***," which he described as a "***sustainable and long-term competitive advantage***."

142.    In addition, defendant Halford stated during the call that GrafTech was "investing in a ***pin production line*** at our St. Marys, Pennsylvania facility that ***will be online in the third quarter***." Halford further claimed that "[t]his ***diversifies our pin capacity and provides production flexibility***."

143.    The statements referenced in ¶¶138-142 above were materially false and misleading when made, for the following reasons:

(a)    Defendants' statements regarding the purported cost advantages of GrafTech's manufacturing facilities were materially misleading, because they concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility;

(b)    Defendants' statements regarding the St. Marys facility's purported "pin production line," which supposedly "diversifie[d] [GrafTech's] pin capacity and provide[d] production flexibility," were false and misleading, because the Company was not actually investing in a "pin production line" that would be "online in the third quarter," the Monterrey facility remained

the Company's only facility capable of producing the pin stock needed for all of GrafTech's electrodes and pins, and GrafTech had not yet even initiated the process of obtaining the operating permits required to commence pin production at the St. Marys facility; and

(c)     Defendants' statements regarding their purported focus on environmental initiatives were materially false and misleading, because they concealed that GrafTech's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "***immediately and permanently*** . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

### K.     2020 Sustainability Report

144.     On September 23, 2021, GrafTech published its 2020 Sustainability Report ("2020 Sustainability Report").  Included within the 2020 Sustainability Report was a "message" from defendant Rintoul, which claimed that GrafTech was "committed" to improving its environmental footprint and emphasized the progress the Company was purportedly making at its Monterrey facility, stating in pertinent part as follows:

> As you will read about further in this report, ***we are committed to improving our environmental footprint***.  We continue to ***monitor and track our progress*** on energy consumption and air emissions to identify opportunities for improvements.  ***During 2020, at our Monterrey, Mexico facility, we continued to implement projects focused on controlling emissions***, such as installation of new dust collection systems and upgrades to our mill, mix and forming, and baking operations to enhance our air emission controls.

145.     Under a heading titled "Environment," the 2020 Sustainability Report claimed GrafTech had conducted "extensive work" to better understand its environmental footprint and claimed that it was "committed to the protection of our communities and environment."

- 48 -

146.    The 2020 Sustainability Report further stated that "GrafTech believes in a strong environmental management system, which is anchored by policies and procedures that allow us to operate in compliance with our regulatory obligations, identify risks, and understand and reduce our environmental impacts."

147.    The 2020 Sustainability Report featured GrafTech's Monterrey facility in a "Spotlight," which highlighted the Company's purportedly broad based commitment to "HS&EP" (Health Safety and Environmental Protection), stating in pertinent part as follows:

> At GrafTech, our employees are actively engaged in efforts to improve HS&EP.  ***It is not only acknowledged and communicated as a priority, but it is clear in our operations when you visit our sites***.  Our employees in Monterrey, Mexico, are involved in how we translate our health, safety, and environmental commitment into practice.
>
> \*       \*       \*
>
> ***Our Monterrey team continued their work on housekeeping, improving environmental controls and facility upgrades***.  For example, during 2020, we completed construction of a new raw material handling system and improved management of our dust collection systems.

148.    In addition, the 2020 Sustainability Report highlighted the "initiative[s]" GrafTech had undertaken across its operations, and specifically at its Monterrey facility, to improve emissions and air quality, stating in pertinent part as follows:

> Each GrafTech operation has a program that details the standard practices for managing and controlling air emissions.
>
> \*       \*       \*
>
> ***We have undertaken an initiative to improve critical assets, such as our bake and graphitizing furnaces and emission control equipment***, with digital controls and predictive alerts, to help identify potential issues and mitigate process interruptions.  These enhancements are expected to result in improved process efficiency and reliability in our operations.
>
> ***In Monterrey, we recently invested in automated controls, which maintain temperatures in the bake furnace thermal oxidizers, resulting in more thorough reduction of air emissions from these operations***.  We modified our bake ovens to allow for increased air circulation to reduce accumulation of particulate matter in the

- 49 -

ovens.  Our team in charge of this project meets on a regular basis to report on progress.

149.    The statements referenced in ¶¶144-148 above were materially false and misleading when made, because they concealed that GrafTech's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "***immediately and permanently*** . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

### L.    Third Quarter 2021 Results

150.    On November 5, 2021, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2021 ("3Q21 Form 10-Q"), which was signed by defendants Rintoul and Coburn.  The 3Q21 Form 10-Q touted GrafTech's "***low cost structure***" as a purported "***sustainable***" competitive advantage.  In addition, the 3Q21 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, ***environmental and regulatory requirements***," among other factors.

151.    The Form 10-Q provided an update on the St. Marys facility, noting "[i]n the third quarter of 2021, we introduced additional connecting ***pin production capabilities*** at our St. Marys, Pennsylvania facility."

152.    Also on November 5, 2021, GrafTech held an earnings call with analysts to discuss the Company's financial and operational results for 3Q21.  During the call, Rintoul again highlighted GrafTech's purported "***low-cost structure***," which he described as a "***sustainable and long-term competitive advantage***."

- 50 -

153.     In addition, defendant Halford told investors: "The **pin production line** at our St. Marys, Pennsylvania facility is **now operational, and we are ramping up production**. Importantly, this provides us with **2 connecting pin production facilities**."

154.     The statements referenced in ¶¶150-153 above were materially false and misleading when made, for the following reasons:

(a)     Defendants' statements regarding the purported cost advantages of GrafTech's manufacturing facilities were materially misleading, because they concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility;

(b)     Defendants' statements regarding the St. Marys facility's purportedly "operational" "pin production line," which supposedly provided GrafTech with "2 connecting pin production facilities," were false and misleading, because the St. Marys facility was not, in fact, involved in the production or manufacturing of any pins, the Monterrey facility remained the Company's only facility capable of producing the pin stock needed for all of GrafTech's electrodes and pins, and GrafTech had not yet even initiated the process of obtaining the operating permits required to commence pin production at the St. Marys facility; and

(c)     Defendants' statement regarding their purported concern for "environmental and regulatory requirements" was materially false and misleading, because it concealed that GrafTech's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "**immediately and permanently** . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

- 51 -

### M.    Year-End 2021 Results

155.    On February 4, 2022, GrafTech issued a press release disclosing the Company's

financial results for the fourth quarter and year ended December 31, 2021 ("4Q21 Release"), which

was also filed with the SEC as an exhibit to a Form 8-K signed by defendant Flanagan.  The 4Q21

Release quoted defendant Rintoul regarding the purported "'progress'" GrafTech had made on its

efforts "minimize [GrafTech's] environmental footprint," stating in pertinent part:

> "***We continued to make progress with our ESG efforts*** including a number
> of projects throughout our manufacturing plants in an effort to ***minimize our***
> ***environmental footprint***."

156.    Also on February 4, 2022, GrafTech held an earnings call with analysts to discuss the

Company's financial and operational results for the fourth quarter and fiscal year 2021.  During the

call, defendant Halford highlighted GrafTech's "enhanced reporting" with respect to its

sustainability initiatives, and represented that GrafTech had completed "several projects," including

improvements at all of its manufacturing plants "to improve air emissions," stating in pertinent part

as follows:

> ***We continue to progress on our ESG journey***.  In September, we published
> our second annual sustainability report, which is available on our website.  Our
> enhanced reporting in this area will not only benefit our stakeholders but will also
> ***assist us in identifying projects that will improve our environmental impact***.
>
> ***We've already completed several projects in this area.  For example, in***
> ***2021, every electrode manufacturing plant completed at least one capital project to***
> ***improve air emissions***.  We plan to keep up our momentum in this area and have
> already identified additional projects for 2022 that will further advance our
> environmental efforts.

157.    In addition, defendant Rintoul again highlighted GrafTech's purported "***low-cost***

***structure***," which he described as a "***sustainable and long-term competitive advantage***."

158.    During the call, defendant Halford also told investors:  "Our investment in the new

automated pin line at St. Marys continues to progress well and helps to ***de[-]risk our pin production***

***capacity***."

- 52 -

159.    On February 22, 2022, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 ("2021 Form 10-K"), which was signed by defendants Rintoul and Flanagan.  The 2021 Form 10-K represented that GrafTech was in compliance with all applicable environmental laws and regulations in its manufacturing processes, stating in pertinent part: "We believe **we operate in compliance in all material respects with applicable laws and regulations**."

160.    Similarly, the 2021 Form 10-K stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, **environmental and regulatory requirements**," among other factors.  The 2021 Form 10-K also represented that the Company has an "**on-going commitment to rigorous internal environmental protection standards**."  The 2021 Form 10-K further stated that "**[e]nvironmental considerations are part of all significant capital expenditure decisions**."

161.    Under a heading titled "Competitive strengths," the 2021 Form 10-K touted GrafTech's "lowest cost, large-scale" manufacturing plants, stating in pertinent part as follows:

> We believe our facilities are among the most strategically located and **lowest cost, large-scale graphite electrode manufacturing plants in the world**.  Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately a quarter of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers.  **Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors**, and excellent visibility into the large North American and European EAF steelmaking markets.

162.    The 2021 Form 10-K also highlighted the "cost advantages" GrafTech enjoyed from its Monterrey facility, stating in pertinent part:

> [O]ur Calais, Pamplona, **Monterrey** and St. Marys facilities each provides **unique cost advantages** given its scale and access to reliable energy sources.

*       *       *

- 53 -

Our manufacturing facilities significantly *benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials*, and our substantial vertical integration with Seadrift.  Our Calais, Pamplona, *Monterrey* and St Marys facilities *have access to reliable sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs*.

163.     The statements referenced in ¶¶155-162 above were materially false and misleading when made, for the following reasons:

(a)     Defendants' statements regarding the purported cost advantages of GrafTech's manufacturing facilities were materially misleading, because they concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility;

(b)     Defendants' statement regarding the St. Marys facility's purported "de[-]risk[ing]" of GrafTech's "pin production capacity" was false and misleading, because the St. Marys facility was not, in fact, involved in the production or manufacturing of any pins, the Monterrey facility remained the Company's only facility capable of producing the pin stock needed for all of GrafTech's electrodes and pins, and GrafTech had not yet even initiated the process of obtaining the operating permits required to commence pin production at the St. Marys facility; and

(c)     Defendants' statements regarding their purported efforts to "minimize [GrafTech's] environmental footprint," and the Company's purported "commitment to rigorous internal environmental protection standards," compliance with "applicable laws and regulations," and consideration of "environmental and regulatory requirements" in connection with capital expenditure decisions were materially false and misleading, because they concealed that GrafTech's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "*immediately and permanently* . . . carry out the necessary actions, adaptations and/or maneuvers

- 54 -

that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

## N.     First Quarter 2022 Results

164.    On May 6, 2022, GrafTech issued a press release disclosing the Company's financial results for the quarter ended March 31, 2022 ("1Q22 Release"), which was also filed with the SEC as an exhibit to a Form 8-K signed by defendant Flanagan.  The 1Q22 Release quoted defendant Rintoul regarding GrafTech's purported commitment to improving its environmental impacts, stating in pertinent part:

> "We are proud of the continued progress we are making with our sustainability efforts across the organization.  These include capital projects to *improve our environmental footprint and the establishment of key environmental goals*, which includes targeting a meaningful reduction in greenhouse gas emissions."

165.    That same day, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022 ("1Q22 Form 10-Q"), which was signed by defendants Rintoul and Flanagan.  The 1Q22 Form 10-Q again touted GrafTech's purported "*low cost structure*," which Defendants described as a "*sustainable*" competitive advantage.  In addition, the 1Q22 Form 10-Q stated that GrafTech "manage[s] [its] capital expenditures by taking into account quality, plant reliability, safety, *environmental and regulatory requirements*," among other factors.

166.    Also on May 6, 2022, GrafTech held an earnings call with analysts to discuss the Company's financial and operational results for 1Q22.  During the call, defendant Halford again highlighted GrafTech's purported focus on improving its "environmental impact," stating in pertinent part:

> [W]e also continue to make good progress on our own key sustainability initiatives.  Most recently, we've established *environmental goals*, which will be highlighted in our next annual sustainability report.  These include a commitment for a meaningful reduction in greenhouse gas emissions.  To support this objective, *we continue to invest in capital projects that will further improve our environmental impact*.

- 55 -

167.    In addition, defendant Rintoul again emphasized GrafTech's "**low-cost structure**," which he described as a "**sustainable and long-term competitive advantage**."

168.    During the call, defendant Halford also told investors: "[O]ur recent investment in the automated pin line at St. Marys continues to progress and helps to **de[-]risk our pin production capacity**."

169.    The statements referenced in ¶¶164-168 above were materially false and misleading when made, for the following reasons:

(a)    Defendants' statements regarding the purported cost advantages of GrafTech's manufacturing facilities were materially misleading, because they concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility;

(b)    Defendants' statement regarding the St. Marys facility's purported "de[-]risk[ing]" of GrafTech's "pin production capacity" was false and misleading, because the St. Marys facility was not, in fact, involved in the production or manufacturing of any pins, the Monterrey facility remained the Company's only facility capable of producing the pin stock needed for all of GrafTech's electrodes and pins, and GrafTech had not yet even initiated the process of obtaining the operating permits required to commence pin production at the St. Marys facility; and

(c)    Defendants' statements regarding their purported efforts to "improve [GrafTech's] environmental impact" and account for "environmental and regulatory requirements" were materially false and misleading, because they concealed that GrafTech's Monterrey facility had, for decades, blatantly disregarded local environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions, and continued to do so, despite the Department of Sustainable Development's order requiring GrafTech to "**immediately and**

4873-9624-3692.v1

*permanently* . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

### O.    The Monterrey Facility's Shutdown

170.    After the markets closed on September 16, 2022, GrafTech filed a Form 8-K signed by defendant Flanagan, which disclosed that GrafTech's critical Monterrey facility had received a "temporary suspension notice" ordering the facility to "wind down operations within seven days," following the conclusion of a September 15, 2022 inspection of the "facility and certain of the facility's environmental and operating permits" by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment of the State of Nuevo León, Mexico.  The Form 8-K further disclosed that "[i]n parallel, the Director of Integral Air Management of the Undersecretary of Climate Change and Air Quality of the Ministry of the Environment determined that, among other things, GrafTech Mexico's operating license was no longer in effect."  The Form 8-K provided no further details regarding the cause for the temporary suspension notice or the potential financial impacts of the critical Monterrey facility's closure.

171.    The statements referenced in ¶170 above were materially misleading when made, because they concealed material information known to Defendants regarding the impact of the Monterrey facility's closure upon GrafTech's business and financial prospects.  Specifically, Defendants knew, but failed to disclose, that:

(a)    the Monterrey facility remained the Company's only facility capable of producing the pin stock needed for all of GrafTech's electrodes and pins;

(b)    the Monterrey facility's closure coincided with a "critical" negotiating window, and thus, significantly limited GrafTech's ability to negotiate customer contracts for 2023;

(c)    GrafTech did not have sufficient pin stock to withstand even a temporary shutdown of the Monterrey facility; and

- 57 -

(d)      the St. Marys facility had neither the appropriate equipment nor operating permits to produce pin stock and would require approximately 18-24 months to actually ramp up production to replace Monterrey facility's pin stock production.

**P.      Third Quarter 2022 Results**

172.      On November 4, 2022, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022 ("3Q22 Form 10-Q"), which was signed by defendants Kessler and Flanagan.  Among other things, the 3Q22 Form 10-Q revealed that the St. Marys facility's purportedly "operational" "pin production line" had not "de[-]risk[ed]" the Company's "pin production capacity" and was not capable of replacing Monterrey facility's manufacturing capacity in the near term.  Specifically, the 3Q22 Form 10-Q disclosed that the Monterrey facility was "***currently [GrafTech's] only site that produces the pin stock utilized for all [of the Company's graphite] electrodes***."  In addition, the 3Q22 Form 10-Q stated in pertinent part:

> [W]e are pursuing several alternatives with respect to production and sourcing of pin stock as well as other mitigation activities to minimize the impact on our business and our customers if the Monterrey suspension continues for the foreseeable future. These include ***a potential restart of our St. Marys, Pennsylvania facility, where the scope of production is currently limited to graphitizing and machining of electrodes and pins***.  We are ***actively pursuing approvals for operating permits for a restart of the facility for pin production***.

173.      In addition, the 3Q22 Form 10-Q represented that the financial impact of the closure would only significantly impact the Company's financial results beyond the fourth quarter of 2022 if the Monterrey facility remained suspended, stating in pertinent part:

> Beyond the fourth quarter of 2022, ***if Monterrey remains suspended***, the impact on the Company's results ***in the first half of 2023 will be significant***, with sales volume reduced by 50% or more, compared to sales volume in the first half of 2022, before recovering in the back half of the year.

174.      Also on November 4, 2022, GrafTech held an earnings call with analysts to discuss the Company's financial and operational results for 3Q22.  During the call, defendant Kessler reiterated that GrafTech's business performance would ***only*** be significantly impacted by the

- 58 -

Monterrey facility's shutdown *if the facility remained closed* – and that, under those circumstances, the impact would be *limited to the first half of 2023* – specifically stating: "*[U]nless Monterrey reopens*, our business performance will be *significantly impacted for the first 2 quarters of 2023* with a reduction in sales volume of 50% or more *before recovering in the back half of the year*."

175.    In response to analyst questions, Kessler provided assurance that "the *impact for Q4 will be modest* because we do have quite a bit of existing pin inventory."

176.    During the Q&A portion of the call, defendant Halford confirmed Kessler's sentiment regarding the GrafTech's inventory of pin stock:

> The substantial majority of the pins that are required to achieve what we're talking about are already in inventory in one form or another. So this is not something that we are going to be dependent on third parties or some other source for achieving the level of achievement that Marcel talked about. *We have a substantial amount of inventory. We have kept a substantial amount of inventory all the way along of pins and pin stock*, and we will be processing that through the other facilities in order to achieve what Marcel was talking about.

177.    In addition, during the Q&A portion of the call, defendant Halford had the following exchange with analyst Arun Viswanathan of RBC regarding the impact of the Monterrey facility's closure upon GrafTech's contract negotiations with its customers:

> [Analyst:] Okay. And then maybe you could just help us understand or get *your perspective on contracting*. Unfortunately, the Monterrey facility is not running full out. So your volumes are going to be down in the first half. And so *maybe that limits the kind of commercial opportunities that you can put forward to your customers, is that true*? And are you kind of now operating more at a kind of shorter time frame, maybe 1 to 3 months of visibility? Or how are you thinking about setting up the next couple of periods of the order book? Is there other options for you in front of you?
>
> [Halford:] Yes, thanks. It's an important question, Arun. And one of the things that I want to make clear is that while we need to consider the near-term supply constraints related to the Monterrey situation, *none of this changes our commercial strategy*. We continue to believe that we are unique in the market in our ability to offer a variety of different contracting terms to our customers, that's supported by our vertical integration, and that's a key differentiator, our ability to provide that certainty to our customers. And while in the very near term, we're dealing with the Monterrey situation, we have absolute confidence in our ability to

- 59 -

resolve this current environment we're in, **and it's not changing our commercial strategy at all**.

178.    The statements referenced in ¶¶172-177 above were materially false and misleading when made because they concealed material information known to Defendants regarding the impact of the Monterrey facility's closure upon the GrafTech's business and financial prospects. Specifically, Defendants knew, but failed to disclose, that:

(a)    the Monterrey facility's closure coincided with a "critical" negotiating window, and thus, significantly limited GrafTech's ability to negotiate customer contracts for 2023; and

(b)    GrafTech did not have sufficient pin stock to withstand even a temporary shutdown of the Monterrey facility.

## Q.    The Monterrey Facility Is Permitted to Reopen

179.    On November 18, 2022, GrafTech issued a press release that was also filed with the SEC as an exhibit to a Form 8-K signed by defendant Flanagan.  The press release announced that GrafTech's Monterrey facility was conditionally permitted to immediately resume operations pending the Company's "completion of certain agreed upon activities," including the submission of an environmental impact study regarding the Monterrey facility's operations.  The press release further stated that, for the fourth quarter of 2022, the impact of the Monterrey facility's temporary closure on customer orders would be "consistent with its previous outlook provided on November 4, 2022," but declined to provide any update regarding the estimated impact of the closure with regard to GrafTech's 2023 outlook.

180.    The statements referenced in ¶179 above were materially false and misleading when made because they concealed material information known to Defendants regarding the impact of the Monterrey facility's closure upon GrafTech's business and financial prospects.  Specifically, Defendants knew, but failed to disclose, that:

(a)     the Monterrey facility's closure coincided with a "critical" negotiating window, and thus, significantly limited GrafTech's ability to negotiate customer contracts for 2023; and

(b)     GrafTech did not have sufficient pin stock to withstand even a temporary shutdown of the Monterrey facility.

### R.     Year-End 2022 Results

181.    On February 3, 2023, GrafTech issued a press release disclosing the Company's financial and operational results for the fourth quarter and full year ended December 31, 2022 ("4Q22 Release"), which was also filed with the SEC as an exhibit to a Form 8-K signed by defendant Flanagan, and held the Company's 4Q22 earnings call with analysts.  Among other things, these disclosures revealed that, ***despite the Monterrey facility reopening within two weeks of the Company's November 4, 2022 earnings call***, the temporary closure had a significant impact on GrafTech's fourth quarter performance and was expected to have a significant impact upon the Company's sales volume in the first half of 2023.

182.    During the 4Q22 earnings call, defendant Kessler expanded on the reasons for the extended impact from the Monterrey facility's closure, despite its prompt reopening on November 18, 2022, stating in pertinent part:

> While we are encouraged to be working towards final resolution of the situation, the negative impact of the suspension on our operating performance in the first half of 2023 will be significant.  ***Although production of electrodes and pin stock began immediately upon the [lifting] of the suspension, the required manufacturing time for our products is generally several months.  As such, the rebuilding of our pin stock inventory will take time***.
>
> In addition, on the commercial front, the ***timing of the suspension coincides with the critical time frame to secure customer orders for the first half of 2023***.  As a result of the uncertainty caused by the suspension ***during this contract negotiation window, our ability to enter into new customer commitments for the first half of 2023 was limited***.  As a result, we estimate our sales volume for the first 6 months of this year will be approximately half of the level we reported in 2022 with the largest negative impact materializing in the first quarter of this year.

183.     But Kessler reassured investors that the negative impact from the Monterrey facility's closure would be limited to the first half of 2023, specifically stating: "***We expect our second half sales volumes to recover as we move past the Monterrey suspension driven uncertainty*** . . . ." This statement, however, was materially false and misleading, as it concealed Defendants' awareness that the impact of the "contract negotiation window" issue would not be limited to the first half of 2023.

### S.     First Quarter 2023 Results

184.     On April 28, 2023, GrafTech issued a press release disclosing the Company's financial and operational results for the quarter ended March 31, 2023 ("1Q23 Release"), which was also filed with the SEC as an exhibit to a Form 8-K signed by defendant Flanagan.  The 1Q23 Release again told investors: "***In the second half of the year, we anticipate sales volume levels will further recover, as we move past Monterrey suspension-driven uncertainty*** . . . ."  During an earnings call the same day, Halford similarly stated: "***In the second half of the year, we anticipate our sales volume will further recover as we move past Monterrey suspension driven impact***."

185.     The statements referenced in ¶184 above were materially false and misleading when made because they continued to conceal Defendants' awareness that the impact of the previously disclosed "contract negotiation window" issue would not be limited to the first half of 2023.

## VII.     ADDITIONAL SCIENTER ALLEGATIONS

186.     As alleged herein, numerous facts demonstrate that Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of GrafTech and the Individual Defendants were materially false and misleading or were reckless to the truth; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

187.     The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of GrafTech, including the Individual Defendants.  The Individual Defendants were each provided with or had access to the information alleged herein to be false or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein were being concealed from the public and that the positive representations being made were then materially false and misleading.  This is particularly true given that the alleged misrepresentations concerned fundamental aspects of GrafTech's business – two of its four manufacturing facilities, including one facility that was responsible for 30% of the Company's total annual production capacity and *100%* of the pin stock utilized for *all* of GrafTech's electrodes – which were repeatedly the focus of detailed representations made by the Individual Defendants.

188.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

189.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to

- 63 -

promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

190.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

191.    The following additional facts, when considered collectively with those alleged elsewhere herein, support a strong inference that Defendants knowingly or recklessly issued the materially false and misleading statements and/or omissions alleged above.

A.    **Defendants' Knowledge of and Access to Information Concerning the Monterrey Facility's Excessive Dust Pollution and Lack of Compliance with Environmental Laws and Regulations Shows a Disregard of the Most Current Factual Information Before Making Statements**

192.    As detailed above, throughout the Class Period, Defendants repeatedly told investors that they had an "***on-going commitment to rigorous internal environmental protection standards,***"

- 64 -

and adhered to "a strong environmental management system, which is anchored by ***policies and procedures that allow us to operate in compliance with our regulatory obligations, identify risks, and understand and reduce our environmental impacts***."  In addition, Defendants claimed that their executive-led "sustainability strategy" encompassed "emission reduction efforts that include the installation of ***control technology on equipment on all of our sites***," and that GrafTech was "being ***proactive to improve [its] environmental footprint across [its] operations***."

193.    As detailed also above, these representations were materially false and misleading because Defendants failed to disclose that GrafTech's critical Monterrey facility had, for decades, chronically contaminated neighboring communities with harmful dust and emissions due to GrafTech's failure to implement necessary control systems, which left the Monterrey facility exposed to known material risks regarding government enforcement actions and consequently operational disruptions.

194.    The Individual Defendants' knowledge of and access to information concerning the Monterrey facility's insufficient environmental controls is demonstrated by their own representations concerning their active involvement in GrafTech's environmental management systems and initiatives, as well as other facts confirming that the Individuals Defendants were undoubtedly aware of the issues at the Monterrey facility.

195.    GrafTech's 2019 Sustainability Report, which contained a signed full-page message from defendant Rintoul at the outset of the report, stated that "[e]ach GrafTech operation has a ***written program*** that describes the ***strategy, requirements, and standard practices for managing and controlling air emissions***," and that "[t]he program is ***reviewed annually*** to ensure it is current and meeting operational needs."  In addition, the report stated: "Our sites also maintain an Air Emissions Inventory (AEI) of all applicable equipment and processes."  During GrafTech's 3Q20 earnings call, Rintoul specifically addressed the "environmental initiatives" set forth in the 2019

- 65 -

Sustainability Report and told investors: "We are proud of our inaugural sustainability report and are *fully committed to these efforts across our organization*."

196. During GrafTech's 4Q20 earnings call, Rintoul once again emphasized the active role that he and defendant Coburn, as well as other executives, played in the Company's environmental initiatives through their involvement on the ESG Steering Committee, specifically stating:

> *Quinn [Coburn] and I and our senior executives participate in our ESG [S]teering [C]ommittee*. The steering committee *oversees our sustainability strategy*, which compromises – or comprises rather, of employee health and safety, community relations, materials sourcing and efficiency, energy management, *greenhouse gas emissions, air quality*, water and wastewater management and waste management. The strategy encompasses activities as varied as our *community involvement and outreach in Monterrey, Mexico* . . . . *Our goals are centered on improving our environmental footprint across our operations. We are working hard to be good corporate citizens in the communities where we operate. And every day, our business decisions and actions are guided by our code of conduct and ethics*.

197. Similarly, the slides accompanying the 4Q20 earnings call highlighted the fact that GrafTech's "*Senior management-led Steering Group* oversees our sustainability strategy which is guided by topics material to GrafTech."

198. Further confirming Defendants' awareness of the specific issues at the Monterrey facility, the Company's 2020 Sustainability Report once again contained a signed full-page message from defendant Rintoul at the outset of the report, which included the following representations regarding the Monterrey facility:

> During 2020, *at our Monterrey, Mexico facility*, we continued to implement *projects focused on controlling emissions, such as installation of new dust collection systems* and upgrades to our mill, mix and forming, and baking operations to *enhance our air emission controls*.

199. In addition, the 2020 Sustainability Report stated that the team in charge of managing the Monterrey facility's air emissions "*meets on a regular basis to report on progress*," and further confirmed senior management's active involvement in GrafTech's environmental processes, stating in pertinent part:

- 66 -

GrafTech believes it is ***important for management to see and understand what is happening on the plant floor by walking the production floor and observing activity firsthand***.  We refer to this as 'Managing by Walking Around.'  ***Each week, our plant management communicates with our CEO and senior leadership on their*** contacts with employees, ***observations from site walk-throughs***, and any ***corrective actions and/or best practices that were implemented*** to emphasize our ***shared commitment*** to health, safety, and ***environmental performance***.

200.     During the Company's 1Q21 earnings call, defendant Halford confirmed the intimate role that he and the other members of the ESG Steering Committee (including defendants Rintoul and Coburn) played in GrafTech's ESG initiatives, specifically stating: "Our ESG efforts fit seamlessly with our focus on safety, environment and quality, as Dave described.  ***Our ESG Steering Committee, comprised of several members of our executive team, including me, Dave and Quinn, oversees our sustainability strategy***."  During these remarks, Halford specifically referenced Slide 7 of GrafTech earnings presentation, which included, under the heading "Environment," the following bullet points: "***We are being proactive to improve our environmental footprint across our operations***"; "***Ongoing focus on improving environmental metrics at all of our production facilities, including upgrading manufacturing equipment***."

201.     Rintoul once again emphasized the involvement of GrafTech's executive team in the Company's ESG initiatives during the Company's 2Q21 earnings call, specifically representing that GrafTech had "completed a full materiality assessment with the assistance of external experts to identify and prioritize the key ESG issues for our business and our stakeholders," which included a "***a full validation of the assessment by our executive team***."  In addition, the accompanying slides referenced by Halford during his remarks detailed "Material Topics" identified by the assessment, which included "Climate and Energy" and "Air Emissions," and note that the "Next Steps" included "[s]ustainability goal setting to drive performance on material topics," and "[e]stablishing targets and key performance indicators for our material topics."

202.    Throughout 2021 and 2022, Halford continued to make similar representations regarding GrafTech's ESG initiatives – and, specifically, efforts to improve emissions – during the Company's earnings calls, further confirming senior management's awareness of and involvement in such issues.

203.    GrafTech's 2021 Sustainability Report contained a signed full-page message from defendant Kessler at the outset of the report, which highlighted "emissions reduction efforts that include capital investments and advanced engineering technology on the equipment at our sites," and represented that GrafTech was "using the materiality assessment [it] completed in 2021 to help [it] build the foundation and strategy of our future sustainability work."  In addition, the report contained the following representations:

> Our 2021 materiality assessment revealed ***two top environmental priorities: climate and energy, and air emissions***.  Recognizing the importance of these topics, GrafTech ***maintains environmental management systems at each of our manufacturing sites that allow us to measure our efforts and identify and address risks***.  Protecting the environment and ***reducing our environmental footprint are critical to our operations and the long-term success of our business***.

> \*        \*        \*

> Each of our sites has implemented ***programs to manage and control air emissions***.  Air emissions are monitored alongside our climate and energy initiatives and are subject to the same management structure.

> \*        \*        \*

> At each of our sites, ***environmental professionals are responsible for overseeing compliance, tracking progress, and reporting performance on environmental metrics***.

> \*        \*        \*

> ***Site managers provide monthly reports to the senior leadership team*** that include environmental and ESG-related performance data and initiatives.  We also ***report our environmental and sustainability performance metrics to the Board quarterly***.

204.   The report also included a representation that it had "gone through an internal review process including executive and subject matter expert reviews."  In addition, the 2021 Sustainability Report represented the following with regard to senior management's involvement in ESG-related issues:

> At GrafTech, we believe **active engagement with stakeholders** is essential to our success – helping us build strong, mutual relationships that **inform our sustainability practices, policies, and priorities**.  We identify stakeholders through **interviews with the senior leadership team, the ESG Steering Committee**, the ESG working group, and subject matter experts within GrafTech.  We select stakeholders for engagement based on their knowledge and understanding of our overall operations, industry positions, regulatory history, and community involvement.

205.   The 2021 Sustainability Report also reported that "**[m]anager-led discussions focused on environmental care**" took place during a week-long event at the Monterrey facility in April 2021.

206.   Given the above representations regarding the Individual Defendants' intimate involvement with and awareness of GrafTech's environmental management systems and initiatives – including with regard to the Monterrey facility, specifically – it is inconceivable that the Individual Defendants would not have been aware of the deficient environmental controls at the Monterrey facility.

207.   Indeed, according to Mayor Garza, the environmental disputes and resulting tension between GrafTech and the Monterrey facility's surrounding community had been going on for well over 30 years and involved GrafTech's signing of multiple agreements to remedy their deficient environmental control systems.  Moreover, GrafTech's SEC filings expressly acknowledged Defendants' awareness of the 2019 administrative procedures described above, which included: (i) a finding that the Monterrey facility operated "without the means of control to ensure that dust emissions are avoided, which is mandatory as established in Article 131 section II of the Environmental Law of the State of Nuevo León, to ensure satisfactory air quality for population

- 69 -

well-being and ecological balance"; (ii) a finding that GrafTech "benefited economically by evading the expense generated by the implementation of equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere during its operation"; (iii) an order that GrafTech "**immediately and permanently** . . . carry out the necessary actions, adaptations and/or maneuvers that **guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere**"; and (iv) an agreement by GrafTech to invest **over $2 million** in dust collection and containment projects to remedy its violations.

208.    Defendants were clearly aware of the above facts related to the 2019 administrative proceeding, and – as they represented throughout the Class Period – they were kept of apprised of important environmental matters through their roles on the ESG Steering Committee and regular updates received through GrafTech's "environmental management systems," which included "**monthly reports to the senior leadership team**" from site managers and **weekly communications "with [the] CEO and senior leadership"** concerning "observations from site walk-throughs."

209.    As such, it is inconceivable that Defendants would not have been aware of the Monterrey facility's continuing problems with excessive dust emissions following the 2019 administrative proceeding, which formed the basis for environmental complaints filed in 2020 and 2021, and ultimately led to the facility's temporary suspension in 2022.

210.    Yet, throughout the Class Period, Defendants continued to make the representations detailed above regarding GrafTech's purported commitment to environmental initiatives and compliance with environmental laws and regulations, which stood in stark contrast to the reality regarding the Monterrey facility's deficient dust emission controls.

211.    Defendants' disclosures thus created a divergence between internal reports and external statements on the same subject and disregarded the most current factual information about the Company's compliance with environmental laws and regulations in the Monterrey facility.

**B.** **Defendants' Knowledge of and Access to Information Concerning the St. Marys Facility Shows a Disregard of the Most Current Factual Information Before Making Disclosures**

212.    As detailed above, defendant Halford made multiple material misrepresentations to investors concerning the purported ability of the St. Marys facility's supposedly "*operational*" "pin production line," to help "*de[-]risk* [GrafTech's] *pin production capacity*." As also detailed above, these representations were materially false and misleading at the time they were made, because: (i) the St. Marys facility was not, in fact, involved in the production or manufacturing of any pins; (ii) the Monterrey facility remained the Company's only facility capable of producing the pin stock needed for all of GrafTech's electrodes and pins; and (iii) GrafTech had not yet even initiated the process of obtaining the operating permits required to commence pin production at the St. Marys facility.

213.    Defendant Halford's knowledge of and access to information directly contradicting his misrepresentations is confirmed by the allegations from the Former Engineering Lead, the specific nature of Halford's repeated false statements, and Defendants' subsequent admissions concerning the falsity of Halford's statements.

214.    Specifically, according to the Former Engineering Lead, the St. Marys facility did *not produce any pins at all* during the time frame when Halford represented that the St. Marys facility had an "*operational*" "*pin production line*." Indeed, during this time, the St. Marys facility lacked the appropriate operating permits required for pin production, and GrafTech had not yet even *begun* the process of obtaining such permits – and, in fact, did not begin that process until *at least* six months after the latest of Halford's misrepresentations regarding the St. Marys facility's purported pin production. Moreover, according to the Former Engineering Lead, Halford regularly visited the St. Marys facility, was ultimately responsible for overseeing GrafTech's efforts to restart the plant, and was regularly informed about the activities and issues at the St. Marys facility by Knoll. As a

- 71 -

result, it is inconceivable that Halford would have been unaware that the St. Marys facility was not involved in actual pin production at the time he made the above misrepresentations concerning the St. Marys facility's supposedly "operational" "pin production line."

215.    In addition, the specific and unambiguous nature of Halford's misrepresentations further confirms his scienter.  Specifically, Halford definitively told investors that the St. Marys facility's "pin production line" is "now operational," "[i]mportantly" provides GrafTech with "2 connecting pin production facilities," and "helps to de-risk our pin production."  These statements implied direct knowledge of the activities then-occurring at the St. Marys facility – which Defendants' own subsequent admissions confirmed to be irreconcilably at odds with Halford's representations, as detailed above.  As such, there is no doubt Halford either understood the falsity of his statements or was severely reckless in disregarding the truth.

**C.      Defendants' Knowledge of and Access to Information Concerning the Financial Impact of the Monterrey Facility's Suspension Shows a Disregard of the Most Current Factual Information Before Making Disclosures**

216.    As detailed above, on November 4, 2022, following the Monterrey facility's September 15, 2022 suspension, Defendants told investors that the facility's closure: (i) would ***not*** impact GrafTech's "commercial strategy" for contract negotiations "***at all***"; and (ii) would ***not*** significantly impact GrafTech's business performance, ***unless*** the facility remained closed beyond 2022 - and even then, the impact would be limited to the first half of 2023.  As also detailed above, these representations were materially false and misleading because, as Defendants would soon admit, the undisclosed truth was that: (i) the Monterrey facility's closure coincided with a "critical" "contract negotiating window," and thus, significantly limited GrafTech's ability to negotiate customer contracts for 2023; and (ii) GrafTech did not have sufficient pin stock to withstand even a temporary shutdown of the Monterrey facility.

- 72 -

217.    Defendants' knowledge of and access to information directly contradicting the above misrepresentations is confirmed by their subsequent admission of facts that they could not have possibly been unaware of at the time they made the above statements.

218.    Specifically, on February 3, 2023, defendant Kessler revealed that "the timing of the suspension coincide[d] with the ***critical time frame to secure customer orders for the first half of 2023***."  Defendants' misrepresentations that the Monterrey facility's shutdown would ***not*** impact their "***commercial strategy at all***" – which were offered in direct response to an analyst question concerning GrafTech's "***contracting***," and specifically, whether the Monterrey facility's closure "***limits the kind of commercial opportunities that you can put forward to your customers*** – were made ***seven weeks after*** the Monterrey closure and ***two weeks before*** the plant reopened.  As such, the misrepresentations were unquestionably made towards the back-end of the "***critical time frame to secure customer orders for the first half of 2023***" referred to in Kessler's February 3, 2023 admission, making it highly implausible that Defendants would not have been aware of that issue at the time they told investors the Monterrey facility's closure would not impact GrafTech's "commercial strategy" for contract negotiations "***at all***."

219.    In addition, on both February 3, 2023, and April 28, 2023, Defendants represented that the impact of the "contract negotiation window" issue would be limited to the "first half of 2023."  These misrepresentations were made nearly three months after the Monterrey facility had reopened, and thus, well after the "critical" "contract negotiation window" that in Kessler referred to on February 3, 2023 had closed.  As such, at the time these representations were made, Defendants would have possessed a complete understanding of the impacts from that issue.  But their statements regarding those impacts did not accurately convey that understanding to investors, as Kessler would subsequently confirm during an August 4, 2023 earnings call, when he revealed that the impacts from the "contract negotiation window" issue extended into the second half of 2023.

- 73 -

220.    Defendant Kessler also revealed that following information to investors on February 3, 2023:

> Although production of electrodes and pin stock [at Monterrey] began immediately upon the [lifting] of the suspension, ***the required manufacturing time for our products is generally several months***.  As such, ***the rebuilding of our pin stock inventory will take time***.

221.    It is implausible that Defendants would not have been aware of this information when they represented to investors on November 4, 2022 – seven weeks after the Monterrey facility was suspended – that the Monterrey facility's closure would not significantly impact GrafTech's business performance **unless** the facility remained closed beyond 2022.  As such, it is clear that Defendants disregarded the most current factual information in their possession at the time of their November 4, 2022 misrepresentations.

### D.    Defendants' Misrepresentations Concerned the Core Operations of the Company

222.    GrafTech is a "manufacturer of high-quality graphite electrode products." Throughout the Class Period, Defendants repeatedly boasted about the "competitive advantages" GrafTech enjoyed as a result of having "the most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry."  Their filings with the SEC contained extensive details expounding upon the purported basis for such claims, and Defendants frequently spoke in great detail about their facilities' purportedly unique advantages during their quarterly earnings calls. As such, there is no doubt that GrafTech's four manufacturing facilities comprised the core operations of the Company.  The material misrepresentations alleged herein concerned the operations at two such facilities, including one facility that was responsible for 30% of the Company's total annual production capacity and ***100%*** of the pin stock utilized for ***all*** of GrafTech's electrodes and the impacts of the suspension of that specific facility.

- 74 -

223.    In addition, certain of the alleged misrepresentations were directly related to GrafTech's purported compliance with environmental laws and regulations and commitment to environmental protections.  Throughout the Class Period, Defendants told investors that they had and "*on-going commitment to rigorous internal environmental protection standards*," and that "[e]nvironmental considerations" were "*part of all significant capital expenditure decisions*." Defendants further described their "*constant focus*" on "safety, *environment*, [and] quality" as a "*core mission*" for the Company, assembled an ESG Steering Committee comprised of GrafTech's senior-most executives, and frequently discussed the Company's ESG-related efforts and initiatives during GrafTech's earnings calls and annual Sustainability Reports.  As such, there is no doubt that GrafTech's purported compliance with environmental laws and regulations and commitment to environmental protections was a fundamental component of its business.

224.    Given the unquestionable significance of the matters underlying Defendants' material misrepresentations, it is completely implausible that Defendants – GrafTech's senior-most executives, who frequently and repeatedly spoke in great detail about such topics – would not have been aware of the information alleged to have been misrepresented and omitted.

### E.    The Self-Interested Motivation of Defendants in the Form of Saving Their Salaries or Jobs Supports an Inference of Scienter

225.    Defendants' scienter is further supported by facts demonstrating their motive and opportunity to commit fraud, including the self-interested motivation of Defendants in the form of saving their salaries and high-ranking jobs at GrafTech.

226.    Defendant Coburn's total compensation from the Company was: $758,582 in 2018; $758,582 in 2019; $872,948 in 2020; and $26,799,310 in 2021.

227.    Defendant Halford's total compensation from the Company was: $1,356,522 in 2019; $1,746,527 in 2020; $2,711,005 in 2021; $2,137,974 in 2022; and $1,996,159 in 2023.

228.     Defendant Rintoul received a large amount of stock options in connection with the IPO and his total compensation from the Company was: $4,457,510 in 2018; $2,361,058 in 2019; $2,433,525 in 2020; $ 3,445,257 in 2021; and $1,406,150 in 2022.  In addition, on August 10, 2021, four days *after* defendant Halford told investors that GrafTech was "investing in a pin production line at our St. Marys, Pennsylvania facility that will be online in the third quarter[,]" defendant Rintoul executed a Rule 10b5-1 trading plan, pursuant to which he sold approximately $588,000 worth of GrafTech common stock on November 8, 2021.

229.     Defendant Flanagan's total compensation from the Company was: $1,336,438 in 2022; and $1,535,021 in 2023.

230.     Defendant Kessler's total compensation from the Company was: $1,407,268 in 2022; and $3,521684 in 2023.

## VIII.  BROOKFIELD'S CONTROL OF GRAFTECH

231.     The Brookfield Defendants were the controlling shareholder of GrafTech during the Class Period and controlled each of the Individual Defendants.

232.     Immediately following the IPO, defendant Brookfield owned approximately 78% of GrafTech's outstanding common stock and maintained majority control over the Company.  As such, GrafTech was considered a "controlled company" under NYSE rules.  In addition, defendant Brookfield entered into a stockholders' agreement with the Company, pursuant to which defendant Brookfield had the right to appoint the greater of 37.5% or three directors to the Board and providing Brookfield with certain special rights and privileges unavailable to outside shareholders.

233.     Defendant Brookfield also oversaw and controlled the management of the Company. For example, defendant Brookfield caused GrafTech to hire Rintoul and Coburn as CEO and CFO, respectively, prior to the IPO.  Numerous directors of GrafTech were also affiliated with Brookfield, including Denis A. Turcotte (Managing Partner at Brookfield), Jeffrey Dutton (President at

Brookfield), Ron A. Bloom (Managing Partner and Vice Chairman at Brookfield), and David Gregory (Senior Vice President at Brookfield).

234.     Defendant Brookfield used its control over the Company to complete the IPO, in which it sold 35 million shares of GrafTech common stock at $15 per share, and to conduct six other registered public offerings in which it sold nearly $2 billion worth of GrafTech common stock at artificially inflated prices.   Defendant Brookfield also caused GrafTech to enter into various agreements with it that were favorable to its own financial interests, including two share repurchase agreements in August 2018 and December 2019 which required GrafTech to collectively purchase nearly 31 million shares directly from defendant Brookfield, providing further artificial price support to GrafTech shares.

## IX.    LOSS CAUSATION

235.     As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the GrafTech common stock.  This scheme operated as a fraud or deceit on members of the Class by failing to disclose and misrepresenting the adverse facts detailed herein.  By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of GrafTech's businesses, prospects, and operations.  Defendants' material misrepresentations and fraudulent course of conduct had the intended effect of causing GrafTech common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $15.35 per share on February 25, 2019.

236.     As a result of Defendants' material misrepresentations and fraudulent course of conduct, Plaintiff and other members of the Class purchased or otherwise acquired GrafTech common stock at artificially inflated prices during the Class Period.  But for Defendants' material misrepresentations and fraudulent course of conduct, Plaintiff and other members of the Class would not have purchased or otherwise acquired GrafTech common stock at artificially inflated prices.

237.     As the truth regarding Defendants' material misrepresentations and fraudulent course of conduct was gradually revealed to the market through multiple partial corrective disclosures during the Class Period, the price of GrafTech common stock declined significantly, causing significant economic losses to Plaintiff and other members of the Class as a result.  However, the corrective impact of each partial corrective disclosure during the Class Period was tempered by Defendants' continued material misrepresentations and fraudulent course of conduct, as detailed above.  It was not until the final corrective disclosure that the full truth regarding Defendants' material misrepresentations and fraudulent course of conduct was revealed and the artificial price inflation caused thereby was fully dissipated.

238.     The corrective disclosures alleged below confirm that Plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws, as a direct result of their purchases of GrafTech common stock at artificially inflated prices, when the price of such securities declined in response to corrective disclosures that partially revealed the truth regarding Defendants' material misrepresentations and fraudulent course of conduct.  The timing and magnitude of the price declines negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to Defendants' fraudulent conduct.  The disclosures alleged below, however, do not necessarily represent an exhaustive list of all price declines attributable to Defendants' material misrepresentations and fraudulent conduct, given that fact and expert discovery in this case has not yet begun.  Plaintiff expressly reserves the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this action.

239.     After the markets closed on September 16, 2022, Defendants filed a Form 8-K with the SEC, which revealed that GrafTech's critical Monterrey facility had received a "temporary

- 78 -

suspension notice" instructing the facility to "wind down operations within seven days," following the conclusion of a September 15, 2022 inspection of the "facility and certain of the facility's environmental and operating permits" by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment of the State of Nuevo León, Mexico. The Form 8-K further disclosed that "[i]n parallel, the Director of Integral Air Management of the Undersecretary of Climate Change and Air Quality of the Ministry of the Environment determined that, among other things, GrafTech Mexico's operating license was no longer in effect."

240.    That same day, Mayor Garza disclosed on Facebook Live that the suspension notice had come after an August 2022 vote by the Apodaca city council to formally request that GrafTech's facility be required to close and relocate, citing more than 30 years of environmental abuses by the Company. In addition, multiple Mexican news outlets reported that the cessation order had been made in response to GrafTech's excessive pollution into neighboring communities. For example, a news article published by *El Norte* stated: "***For launching polluting emissions in Apodaca, the State Government yesterday temporarily closed the operations of the Graftech company***."

241.    On this news, the price of GrafTech common stock declined $0.45 per share, or approximately 8.5%, from a closing price of $5.30 per share on September 16, 2022, to a closing price of $4.85 per share the following trading day, September 19, 2022. However, because Defendants continued to conceal the full truth regarding the material misrepresentations alleged herein, the price of GrafTech common stock remained artificially inflated.

242.    On the morning of November 4, 2022, Defendants issued a press release announcing GrafTech's results for 3Q22 and held the Company's 3Q22 earnings call with investors. Among other things, Defendants' disclosures revealed that: (i) the Monterrey facility was the only site that produces the pin stock needed for all of GrafTech's electrodes; (ii) the St. Marys facility did ***not*** have an "operational" "pin production line" that had helped to de[-]risk" the Company's "pin

- 79 -

production capacity," as previously represented by Defendants; and (iii) GrafTech's business performance could be "significantly impacted" during the first two quarters of 2023, if the Monterrey facility remained suspended.

243.    On this news, the price of GrafTech common stock declined $0.24 per share, or approximately 5%, from a closing price of $4.85 per share on November 3, 2022, to a closing price of $4.61 per share on November 4, 2022.  However, because Defendants continued to conceal the full truth regarding the material misrepresentations alleged herein, the price of GrafTech common stock remained artificially inflated.

244.    On the morning of February 3, 2023, Defendants issued a press release announcing GrafTech's results for 4Q22 and held the Company's 4Q22 earnings call with investors.  Among other things, these disclosures revealed that, contrary to Defendants' previous misrepresentations:(i) the Monterrey facility's shutdown "coincide[d] with the critical time frame to secure customer orders for the first half of 2023," and "the uncertainty caused by the suspension during this contract negotiation window" limited GrafTech's "ability to enter into new customer commitments for the first half of 2023"; and (ii) despite the facility reopening within two weeks of the Company's November 4, 2022 earnings call, the temporary closure had a significant impact on GrafTech's fourth quarter performance and was expected to have a significant impact upon the Company's sales volume "in the first half of 2023."

245.    On this news, the price of GrafTech common stock plummeted $1.01 per share, or approximately 15%, from a closing price of $6.59 per share on February 2, 2023, to a closing price of $5.58 per share on February 3, 2023.  However, because Defendants continued to conceal the full truth regarding the material misrepresentations alleged herein, the price of GrafTech common stock remained artificially inflated.

- 80 -

246.     Finally, on the morning of August 4, 2023, Defendants reported GrafTech's results for 2Q23 and held the Company's 2Q23 earnings call with investors.  Among other things, these disclosures reported a net loss of $8 million for the quarter, driven by a 49% year-over-year decline in sales as GrafTech continued to "recover" from the effects of the Monterrey facility's shutdown. During the Q&A portion of the 2Q23 earnings call, defendant Kessler described the Monterrey facility's suspension as the "key driver" of the Company's continued underperformance and revealed that, contrary to Kessler's previous representations, the impact of the "contract negotiation window" issue was ***not*** limited to the first half of 2023.

247.     On this news, the price of GrafTech common stock once again plummeted, falling $1.18 per share, or nearly 23%, from a closing price of $5.23 per share on August 3, 2023, to a closing price of $4.05 per share on August 4, 2023.

248.     As alleged above, the economic losses, *i.e.*, damages, suffered by Plaintiff and other members of the Class were the direct result of Defendants' fraudulent scheme to artificially inflate the price of GrafTech common stock during the Class Period and the significant declines in the value of GrafTech common stock as the truth regarding Defendants' prior misrepresentations and omissions and other fraudulent conduct was revealed.

## X.     NO SAFE HARBOR

249.     GrafTech's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

250.    Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and approved by an executive officer of GrafTech who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XI.    APPLICATION OF PRESUMPTION OF RELIANCE

251.    At all relevant times, the market for GrafTech common stock was an efficient market for the following reasons, among others:

(a)    GrafTech common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's Form 10-K for the fiscal year ended December 31, 2022, GrafTech had over 256 million shares outstanding as of February 10, 2023;

(c)    as a regulated issuer, GrafTech filed periodic public reports with the SEC;

(d)    GrafTech regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)    unexpected material news about GrafTech was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

252.    As a result of the foregoing, the market for GrafTech common stock promptly digested current information regarding GrafTech from publicly available sources and reflected such

information in the price of GrafTech common stock.  Under these circumstances, all purchasers of GrafTech common stock during the Class Period suffered similar injury through their purchases of GrafTech common stock at artificially inflated prices, and a presumption of reliance applies.

253.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on Defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding GrafTech's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.    CLASS ACTION ALLEGATIONS

254.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of GrafTech during the Class Period.  Excluded from the Class are: Defendants and members of their immediate families; the officers and directors of the Company, at all relevant times, members of their immediate families; the legal representatives, heirs, successors, or assigns of any of the foregoing; and any entity in which Defendants have or had a controlling interest.

255.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GrafTech common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there could be hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by GrafTech or its transfer agent and may be notified of the

- 83 -

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

256.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

257.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

258.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented material facts about the business and operations of GrafTech; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

259.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
### For Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants Except Brookfield

260.    Plaintiff incorporates ¶¶1-259 by reference.

- 84 -

261.     During the Class Period, the defendants named herein disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

262.     The defendants named herein violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of GrafTech common stock during the Class Period.

263.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GrafTech common stock.  Plaintiff and the Class would not have purchased GrafTech common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

264.     Plaintiff incorporates ¶¶1-263 by reference.

265.     The Individual Defendants acted as controlling persons of GrafTech within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the

4873-9624-3692.v1

Individual Defendants had the power and authority to cause GrafTech to engage in the wrongful conduct complained of herein.  Defendant Brookfield controlled GrafTech and the Individual Defendants for the reasons detailed herein, including their ownership of a majority of GrafTech voting stock, control of the Board, influence over GrafTech's management, historical relationship with the Company, and the various agreements that these Defendants caused the Company to enter into.  GrafTech controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 7, 2024                    LAW OFFICE OF GEORGE W. COCHRAN
                                           GEORGE W. COCHRAN


                                           _____
                                                 s/ GEORGE W. COCHRAN

- 86 -

GEORGE W. COCHRAN (Bar # 0031691)
1981 Crossfield Circle
Kent, OH  44240
Telephone:  330/607-2187
330/230-6136 (fax)
lawchrist@gmail.com

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
NATHAN R. LINDELL (admitted *pro hac vice*)
JENNIFER N. CARINGAL (admitted *pro hac vice*)
KEVIN S. SCIARANI (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com
jcaringal@rgrdlaw.com
ksciarani@rgrdlaw.com

ABRAHAM, FRUCHTER & TWERSKY, LLP
MITCHELL M.Z. TWERSKY (admitted *pro hac vice*)
MICHAEL J. KLEIN (admitted *pro hac vice*)
450 Seventh Avenue, 38th Floor
New York, NY  10123
Telephone:  212/279-5050
212/279-3655 (fax)
mtwersky@aftlaw.com
mklein@aftlaw.com

ABRAHAM, FRUCHTER & TWERSKY, LLP
PATRICE L. BISHOP (admitted *pro hac vice*)
9440 Santa Monica Boulevard, Suite 301
Beverly Hills, CA  90210
Telephone:  310/279-5125
pbishop@aftlaw.com

Lead Counsel for Lead Plaintiff

- 87 -