IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN C. PORTER, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>GRAFTECH INTERNATIONAL LTD., DAVID RINTOUL, QUINN COBURN, MARCEL KESSLER, TIMOTHY K. FLANAGAN, JEREMY S. HALFORD, BCP IV GRAFTECH HOLDINGS LP, BROOKFIELD CAPITAL PARTNERS LTD., and BROOKFIELD ASSET MANAGEMENT LTD.,<br><br>    Defendants. | Case No. 1:24-cv-00154<br><br>Judge Donald C. Nugent<br><br>Magistrate Judge Jonathan D. Greenberg |

**MEMORANDUM OF LAW IN
SUPPORT OF THE MOTION OF DEFENDANTS
GRAFTECH, KESSLER, COBURN, FLANAGAN, AND HALFORD
TO STRIKE ALLEGATIONS REGARDING "FORMER ENGINEERING LEAD"**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................................................... ii

SUMMARY OF ARGUMENT............................................................................................... 1

RELEVANT BACKGROUND................................................................................................ 2

LEGAL STANDARD .............................................................................................................. 5

ARGUMENT............................................................................................................................. 5

    I.   THE ALLEGATIONS THE COMPLAINT ATTRIBUTES TO THE FORMER
         ENGINEERING LEAD ARE IMMATERIAL AND IMPERTINENT ........................ 6

    II.  THE ALLEGATIONS ATTRIBUTED TO THE FORMER ENGINEERING LEAD
         ARE SCANDALOUS.................................................................................................... 8

CONCLUSION........................................................................................................................ 10

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Higginbotham v. Baxter Int'l, Inc.*,
495 F. 3d 753 (7th Cir. 2007) ....................................................................................6

*In re Millennial Media, Inc. Sec. Litig.*,
2015 WL 3443918 (S.D.N.Y. May 29, 2015) ........................................................8, 9

*Johnson v. Cnty. of Macomb*,
2008 WL 2064968 (E.D. Mich. May 13, 2008)...........................................................9

*Konkol v. Diebold*,
590 F.3d 390 (6th Cir. 2009), *abrogated on other grounds by Matrixx*
*Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).....................................................5

*McKinney v. Bayer Corp.*,
2010 WL 2756915 (N.D. Ohio July 12, 2010) .......................................................5, 7

*Novolex Holdings, LLC v. Wurzburger*,
2022 WL 391307 (E.D. Ky. Feb. 8, 2022) .......................................................5, 9, 10

*Schlosser v. Univ. of Tenn.*,
2014 WL 5325350 (E.D. Tenn. Oct. 20, 2014) ......................................................7, 8

*Student Res. Ctr., LLC v. E. Gateway Cmty. Coll.*,
2024 WL 3849440 (S.D. Ohio Aug. 15, 2024)...........................................................5

OTHER AUTHORITIES

Federal Rule of Civil Procedure 12(f) ...............................................................5, 6, 10

**SUMMARY OF ARGUMENT**

Straining to add substance to its First Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), ECF No. 56, representatives of Plaintiff sought out and spoke with former employees of GrafTech International Ltd. ("GrafTech" or the "Company").  With precious little discovered—and nothing that contradicted GrafTech's public statements—Plaintiff twisted what a "Former Engineering Lead" told its investigators about operations at the Company's St. Marys Plant.  The allegations in Paragraphs 58 through 63 of the Complaint purport to set forth what was learned from the Former Engineering Lead, but what is presented is something different entirely.  What's more, Plaintiff seemingly ignored best practices in securities litigation, twisting the Former Engineering Lead's words or their meaning without granting him the opportunity to review the Complaint *before* it was filed.  The Former Engineering Lead has now signed a declaration under penalty of perjury to make clear that the observations he made about operations at the St. Marys Plant related only to early stages of GrafTech's manufacturing process, and the St. Marys Plant *was* graphitizing and machining pins during his employment.  In other words, the allegations attributed to the Former Engineering Lead are, at best, irrelevant.  As a result, the Court should exercise its broad discretion and strike all allegations in the Complaint related to the Former Engineering Lead.[1]

---

[1] This Motion is submitted to address the irrelevant allegations attributed to the Former Engineering Lead. The Court need not grant this Motion to Strike in order to grant the Motion to Dismiss of Defendants GrafTech, Quinn Coburn, Marcel Kessler, Timothy K. Flanagan, and Jeremy S. Halford (the "Motion to Dismiss").  ECF No. 64.  The arguments in the Motion to Dismiss stand on their own—including that the allegations attributed to the Former Engineering Lead do not show falsity or give rise to a strong inference of scienter, because they are unparticularized and unrelated to the graphitizing and machining steps of GrafTech's manufacturing process.  *See* ECF No. 64-1, (Memorandum in Support of Motion to Dismiss ("Memorandum"), at Sections I.B and II.C).

**RELEVANT BACKGROUND**[2]

GrafTech manufactures graphite electrode products for use in the steelmaking industry. ¶¶1, 21.  It operates several manufacturing facilities, including a plant in St. Marys, Pennsylvania. ¶35.  Long ago, the St. Marys Plant conducted all six steps of GrafTech's manufacturing process: (1) Screening and Blending, (2) Extrusion (Forming), (3) Baking, (4) Impregnating, (5) Graphitizing, and (6) Machining.  ¶¶38–39; ECF Nos. 64-1 (Memorandum at 4); 64-6 (2019 10-K at 16).

GrafTech repeatedly disclosed that it had idled the St. Marys Plant in 2016, except for the last two steps of the manufacturing process:  machining, and then, starting in 2018, graphitizing. *See* ECF No. 64-1 (Memorandum at 24 n.15) (collecting disclosures related to the limited operations at St. Marys since 2016).  When the Company announced the launch of an automated pin line at the Plant in 2021, it specified that the new line was restricted to machining pins, the final step of the manufacturing process.  *See e.g.*, ECF No. 64-7 (3Q21 Earnings Tr. at 7); ECF No. 64-26 (2021 10-K at 6, 14); ECF No. 64-28 (4Q21 Earnings Tr. at 7); ECF No. 64-29 (2Q22 Earnings Tr. at 10).

In September 2022, governmental authorities ordered the temporary shutdown of GrafTech's plant in Monterrey, Mexico.  ECF No. 64-8 (9/16/22 8-K).  After the shutdown, GrafTech reminded the market that the Monterrey Plant was GrafTech's only facility that manufactured the semi-finished product (pin stock) that other facilities like the St. Mary's Plant machined into pins.  *See* ¶172.  GrafTech announced that one measure the Company would take to mitigate the effects of the Monterrey shutdown would be to explore a potential restart of the

---

[2] Paragraph references ("¶__") are to the Complaint.  All internal citations and quotations are omitted, and all emphases are added unless otherwise noted.  Ex. A to the Declaration of Geoffrey J. Ritts is the Former Engineering Lead's declaration.

idled operations at St. Marys so that the Plant eventually could both manufacture semi-finished product and machine it into pins. *Id.*; ECF No. 64-12 (3Q22 10-Q at 24).

Ignoring GrafTech's repeated disclosures about the idling of St. Marys and its limited scope of operations, the Complaint alleges that it was only after the Monterrey plant shutdown that the market learned that the St. Marys Plant was not running the full manufacturing process and was not producing the "pin stock" from which connecting pins are machined. ¶172.

In an effort to bolster this narrative, the Complaint relies on information purportedly sourced from a confidential witness (i.e., the "Former Engineering Lead"). Factual allegations relating to the Former Engineering Lead are limited to six paragraphs of the Complaint. ¶¶58–63. GrafTech hired the Former Engineering Lead in August 2022. ¶59. Upon starting at the St. Marys Plant, the Complaint alleges that he observed that "there was no water in the cooling pond and it was apparent that the [extrusion] press had not been run in well over a year." ¶60. The Complaint asserts that the Former Engineering Lead also learned that "the St. Marys facility did not have the appropriate operating permits to produce graphite electrode products and pins." ¶61. His main responsibility was to help bring the full manufacturing process back online, and by late 2023 he had helped the Company start trial runs of the full production process. ¶62.

The Complaint insinuates that the lack of permits for the full production process and the inoperable cooling pond and extrusion press mean that GrafTech's statements about operations at St. Marys *must have been* false. But the allegations are a red herring. As explained in the Memorandum (ECF No. 64-1, at 26–27), the allegations about inoperable equipment and lapsed permits are not particularized to either the graphitizing or machining steps of the manufacturing process—the only steps that GrafTech said the St. Marys Plant was conducting. Nor does the

3

Complaint allege that the St. Marys Plant was not in fact conducting the graphitizing and machining steps of the manufacturing process during the proposed class period.

The Complaint also mischaracterizes what the Former Engineering Lead told Plaintiff's representatives.  The Former Engineering Lead is Joshua Geitner, who worked at the St. Marys Plant between August 2022 and April 2024.  Ex. A ¶¶1–2 ("I believe that I am the individual referred to as 'Former Engineering Lead' in the First Amended Complaint.").  Before the Complaint was filed, Mr. Geitner spoke with representatives for Plaintiff by telephone on a few occasions.  *Id.* ¶3.  Plaintiff's representatives never gave him a draft of the Complaint or any written summary of what he supposedly had said so that he could review it for accuracy or make any needed corrections.  *Id.*

Later, when Mr. Geitner was provided a copy of the as-filed Complaint by counsel to GrafTech, he realized Plaintiff's representatives either misrepresented or misconstrued what he said on the calls.  In reality, his work at St. Marys focused on the manufacturing process's "initial stages, not the later stages (e.g., graphitizing pin stock and machining the pin stock to produce pins)."  *Id.* ¶4.  His "comments to the lawyers or investigators [for Plaintiff] about operations, equipment (including a press and cooling pond), and permits at the St. Marys Plant were limited to initial stages of the production process," such as forming.  *Id.*  Mr. Geitner does not recall telling Plaintiff's representatives that the St. Marys Plant "was not involved in the production or manufacturing of any pins," and he did not tell anyone that "GrafTech was not graphitizing or machining at St. Marys" during his employment.  *Id.* ¶5.  Indeed, "during the entirety of [his] tenure at GrafTech, [he] believe[d] that the St. Marys facility was operational from the standpoint of graphitizing and machining," consistent with the Company's statements during the putative class period.  *Id.* ¶6.

4

## LEGAL STANDARD

Rule 12(f) allows courts to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Immaterial matters are those that have "no bearing on the subject matter of the litigation," impertinent matters are those that "are not necessary to the issues presented," and scandalous matters are those that "unnecessarily reflect[] on the moral character of an individual or state[] anything in repulsive language that detracts from the dignity of the court." *McKinney v. Bayer Corp.*, 2010 WL 2756915, at *1 (N.D. Ohio July 12, 2010).

Motions to strike "serve a useful purpose by saving the time and expense which would otherwise be spent in litigating issues which would not affect the outcome of the case." *Student Res. Ctr., LLC v. E. Gateway Cmty. Coll.*, 2024 WL 3849440, at *7 (S.D. Ohio Aug. 15, 2024) (ellipses omitted). As a result, district courts are endowed with "broad discretion in determining whether to grant a motion to strike." *McKinney*, 2010 WL 2756915, at *2. Courts exercise this discretion when the allegations at issue are "both irrelevant to the subject matter of the litigation and prejudicial to the objecting party," *id.*, and when they are "designed to improperly illicit sympathy, to curry favor, or to cast aspersions on the defendants." *Novolex Holdings, LLC v. Wurzburger*, 2022 WL 391307, at *3 (E.D. Ky. Feb. 8, 2022).

## ARGUMENT

Faced with the Private Securities Litigation Reform Act's demanding pleading standard, securities complaints often cite to information obtained from so-called confidential witnesses. As the reliance on confidential witnesses has grown, courts have responded by closely examining the allegations and sharply discounting those that are vague, conclusory, or irrelevant. *Konkol v. Diebold*, 590 F.3d 390, 399 (6th Cir. 2009) ("Bare-bones statements, such as the allegation that the Scorecards were 'of huge importance to the decision-making of the Company,' are the type of

5

vague and conclusory allegations from confidential witnesses that are properly discounted."),
*abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48–49 (2011);
*Higginbotham v. Baxter Int'l, Inc.*, 495 F. 3d 753, 757 (7th Cir. 2007) ("Usually that discount will
be steep."). Here, the allegations related to the Former Engineering Lead are so distorted, and the
prejudice to Defendants so great, that the Court should do more than simply discount the
allegations in deciding Defendants' Motion to Dismiss: it should strike them.

The Court should strike paragraphs 58 through 63 of the Complaint—as well as the
associated references to supposed statements by the Former Engineering Lead in paragraphs 8,
213, and 214—on any of three grounds listed in Rule 12(f). First, because the allegations have
nothing to do with graphitizing and machining, they are immaterial and impertinent—they only
serve to confuse the issues before the Court. They also are immaterial and impertinent because
they mischaracterize what Mr. Geitner told representatives of Plaintiff. Second, the allegations are
scandalous. Not only do the allegations hurt Mr. Geitner's reputation by mischaracterizing what
he told Plaintiff's representatives, they reflect unfairly on Mr. Halford's character by baselessly
suggesting that he intentionally committed fraud.

## I. THE ALLEGATIONS THE COMPLAINT ATTRIBUTES TO THE FORMER ENGINEERING LEAD ARE IMMATERIAL AND IMPERTINENT.

The allegations in paragraphs 58 through 63 (which also are characterized in paragraphs 8,
213, and 214) have nothing to do with Defendants' alleged misstatements about operations at the
St. Marys Plant. Mr. Geitner's statements to Plaintiff's representatives related solely to the *early*
stages of GrafTech's pin stock manufacturing process; they had nothing to do with the graphitizing
and machining processes at St. Marys. Ex. A. ¶¶4–5. In fact, he believed the graphitizing and
machining processes at St. Marys *were* operational throughout his tenure. *Id.* ¶6.

The allegations in paragraphs 58 through 63 cannot be considered to "bear[] on the subject

6

matter of the litigation" or be "necessary to the issues presented" when they have nothing to do with the graphitizing and machining steps of the manufacturing process at St. Marys—which GrafTech repeatedly said were the only steps that were being carried out at St. Marys. *McKinney*, 2010 WL 2756915, at *1. The analysis in *McKinney* is instructive. There, the plaintiff sued Bayer over false claims that certain vitamin products promoted prostate health. *Id.* One paragraph in the complaint contained allegations about Bayer's other products and the company's past settlements of lawsuits. *Id.* at *2. The court determined that "none of the allegations in Paragraph 56 relate to the Vitamin Products at issue here," the "statements are unnecessary to the assertions in the Complaint, neither setting forth an element of a claim made, nor providing the needed factual predicate for one," and "the assertions appear gratuitous." *Id.* The court granted Bayer's motion and struck the offending paragraph. *Id.* ("Accordingly, the Court finds that Paragraph 56 is immaterial and scandalous and should be stricken."). Like the allegations about other products in *Bayer*, the allegations about other steps of GrafTech's manufacturing process do not relate to the graphitizing and machining phases at the heart of the alleged misstatements about St. Marys, do not serve as a factual predicate to Plaintiff's claim, and appear only to confuse the issues in the litigation causing Defendants undue prejudice. The Court should strike them.

The Court also should strike the paragraphs as immaterial and impertinent because they distort what Mr. Geitner told Plaintiff's representatives. "[A] court may grant a motion to strike for falsity if the court finds that the allegations are obviously false and clearly injurious to a party." *Schlosser v. Univ. of Tenn.*, 2014 WL 5325350, at *3 (E.D. Tenn. Oct. 20, 2014).

Mr. Geitner's declaration is similar to one of the declarations submitted in *Schlosser*. There, the plaintiff sued over discrimination, and the complaint set forth unrelated allegations about another employee supposedly having been forced into involuntary retirement. *Id.* at *1. In

response to learning of the allegations about her, the other employee submitted a declaration, swearing under oath that she chose to retire voluntarily.  *Id.* at \*4 ("[The employee] was neither terminated nor demoted, she has not filed any suit alleging discrimination, and she stated in a sworn declaration that she voluntarily chose to retire from her position.").  Based on the declaration, the court concluded that "[t]he allegation set forth in Paragraph 49 is clearly false and therefore immaterial" and "prejudicial to the moving party."  *Id.*  The court struck the offending paragraph.  *Id.* at \*5.

Here, too, Mr. Geitner's sworn declaration contradicts Plaintiff's characterization of his observations, and details how Plaintiff misused him to try to create inaccurate impressions in the Complaint.  Plaintiff's tactic—cherry picking Mr. Geitner's observations about the cooling pond and extrusion press, and then urging the Court to draw the conclusion that graphitizing and machining were not occurring at St. Marys—is exactly the type of characterization that is false, immaterial, impertinent, and highly prejudicial to Defendants.  The associated allegations should be stricken from the Complaint.

## II.  THE ALLEGATIONS ATTRIBUTED TO THE FORMER ENGINEERING LEAD ARE SCANDALOUS.

The allegations are also scandalous.  First, by distorting Mr. Geitner's statements, plaintiffs have created a needless cloud over a former employee's professional reputation.  The court found a similar employee-centered scandal in *Schlosser* to weigh in favor of striking the allegation at issue.  *Schlosser*, 2014 WL 5325350, at \*4 ("[T]he allegation in Paragraph 49 constitutes an attempt to create a scandal around [the employee] where none exists, and one which is wholly irrelevant to the Plaintiffs' claims.").[3]

---

[3] Plaintiff also failed to provide Mr. Geitner with a copy of the Complaint before it was filed or any written record of what they thought he said so that he could review it for accuracy.  Ex. A ¶3.  He had "the right to expect better of [plaintiff's] counsel."  *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at \*14 (S.D.N.Y. May 29,

Second, the allegations aim to impugn Mr. Halford's character but have no relevant substance. In this regard, they are like the allegations in *Novolex*. There, the plaintiff sued for fraudulent misrepresentation, amongst other claims. *Novolex Holdings, LLC*, 2022 WL 391307, at *1. In *Novolex*, the plaintiff included allegations in the complaint about the defendant's participation "in extra-marital relationships and a secret gambling ring" to show what motivated his conduct and "highlight his deceptive nature and dishonesty." *Id.* at *3. The court found "that these allegations could cause significant prejudice to [the defendant] and function to cast aspersions in relation to [his] character." *Id.*

Like the allegations in *Novolex*, the statements of the Former Engineering Lead as mis-reported in the Complaint cast aspersions on Mr. Halford's character by suggesting that he committed intentional fraud, which the Complaint makes explicit: "Defendant Halford's knowledge of and access to information directly contradicting his misrepresentations is confirmed by the allegations from the Former Engineering Lead[.]" ¶213. In reality, the opposite is true: what Mr. Geitner said to Plaintiff's representatives is entirely *consistent with* the statements Mr. Halford made to the market. *See also Johnson v. Cnty. of Macomb*, 2008 WL 2064968, at *1–2 (E.D. Mich. May 13, 2008) (striking allegation that an employee of defendants was "tied to organized crime" as scandalous).

*   *   *

The Court should strike the allegations about the Former Engineering Lead pursuant to

---

2015) ("By globally identifying 11 interviewees as Confidential Witnesses with no advance notice to them and no consideration given to their situations and interests, counsel here treated these people shabbily. The Court's hope and expectation is that, in future cases, counsel will aspire to better."). In *Millennial Media*, the court (Engelmeyer, J.) warned that "it is a best practice—if not an ethical imperative—for counsel, before designating a person as a CW in a Complaint, to notify that person of counsel's intent to do so and to verify the statements that counsel propose to attribute to him or her." *Id.* at *1; *cf. id.* at *11 ("[T]he Federal Rules of Civil Procedure do not countenance a 'see no evil' approach to pleading.").

9

Rule 12(f).  The allegations are immaterial to any of the alleged misstatements, and their existence could lead to unnecessary and costly proceedings that are bound to be futile.  ECF Nos. 64–66. These are the sort of allegations Rule 12(f) seeks to eliminate, and the Court should exercise its broad discretion to strike them.  *Novolex Holdings, LLC*, 2022 WL 391307, at *2 ("Generally, motions to strike should function to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with them early in the case.").

## CONCLUSION

The Court should strike paragraphs 58 through 63 of the Complaint as well as the associated references to supposed statements by the Former Engineering Lead in paragraphs 8, 213, and 214.

Dated:  January 20, 2025

/s/ *Geoffrey J. Ritts*

Geoffrey J. Ritts (0062603)
Adrienne Ferraro Mueller (0076332)
Brittany N. Wilhelm (0096866)
Connor F. Lang (0100348)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone:  (216) 586-3939
gjritts@jonesday.com
afmueller@jonesday.com
bwilhelm@jonesday.com
clang@jonesday.com

Marjorie P. Duffy (0083452)
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
Telephone: (614) 469-3939
mpduffy@jonesday.com

*Attorneys for Defendants GrafTech International Ltd., Marcel Kessler, Quinn Coburn, Timothy K. Flanagan, and Jeremy S. Halford*