UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| JOHN C. PORTER, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    vs.<br><br>GRAFTECH INTERNATIONAL, LTD, et al.,<br><br>             Defendants. | No. 1:24-cv-00154-DCN<br><br>Judge Donald C. Nugent<br><br><u>CLASS ACTION</u> |

OMNIBUS MEMORANDUM IN OPPOSITION TO THE MOTIONS TO DISMISS

LAW OFFICE OF GEORGE W. COCHRAN
GEORGE W. COCHRAN
1981 Crossfield Circle
Kent, OH  44240
Telephone:  330/607-2187
330/230-6136 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
NATHAN R. LINDELL
JENNIFER N. CARINGAL
KEVIN S. SCIARANI
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

[Additional counsel appear on signature page.]

4903-3909-1988.v1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................1

II. FACTUAL BACKGROUND ................................................................................7

    A. Relevant Company Background ................................................................7

    B. GrafTech Is Acquired by Brookfield and Undergoes a Significant
        Operational Transformation........................................................................8

    C. GrafTech's Second IPO .............................................................................9

    D. Brookfield's Control over GrafTech..........................................................9

    E. Defendants Conceal the Monterrey Facility's Failure to Comply with
        Environmental Laws.................................................................................10

    F. Defendants Deceive Investors About GrafTech's Purported De-Risking of
        the Company's Pin Production .................................................................14

    G. Defendants Continue to Deceive Investors as Their Fraud Begins to
        Unravel.....................................................................................................15

III. ARGUMENT......................................................................................................18

    A. The Complaint Alleges Actionable Misstatements and Omissions.........19

        1. Defendants Made Materially False and Misleading Statements
            About the Monterrey Facility.....................................................20

            a. Defendants' Statements About GrafTech's Competitive and
                Cost Advantages Were Materially Misleading When Made .........20

            b. Defendants' Statements About GrafTech's Environmental
                Compliance and Efforts Were Materially Misleading When
                Made .........................................................................................23

            c. Defendants' Statements About the 2019 Administrative
                Proceeding Were Materially False and Misleading When
                Made .........................................................................................26

            d. The Challenged Statements About the Monterrey Facility
                Are Actionable Opinions Because Defendants Omitted
                Material Facts Regarding the Basis for Their Opinions ...............28

            e. The Challenged Statements About the Monterrey Facility
                Are Not Puffery..........................................................................29

**Page**

2.  Defendants Made Materially False and Misleading Statements About the St. Marys Facility ..................................................................31

    a.  Defendant Rintoul Falsely Claimed St. Marys Was a Peaking Plant ................................................................................32

    b.  Defendants Falsely Represented that St. Marys Was an Operational "Pin Production Facilit[y]" Capable of "De-Risk[ing]" GrafTech's "Pin Production Capacity"........................34

3.  Defendants Made Materially False and Misleading Statements About the Impact of the Monterrey Shutdown ...........................................41

    a.  Defendants' Misstatements Are Not Inactionable Statements of Opinion......................................................................44

    b.  Defendants' Misstatements Are Not Protected by the PSLRA Safe Harbor..................................................................45

B.  The Complaint Alleges a Strong Inference of Scienter .........................................47

1.  The Complaint Alleges a Strong Inference of Scienter Regarding the Monterrey Facility Misrepresentations .................................................50

2.  The Complaint Alleges a Strong Inference of Scienter Regarding the St. Marys Facility Misrepresentations .................................................55

3.  The Complaint Alleges a Strong Inference of Scienter Regarding the Misrepresentations Concerning the Impact of the Monterrey Shutdown .....................................................................................................60

4.  The Individual Defendants' Inference of Scienter is Bolstered by Their Financial Incentive to Deceive...........................................................63

C.  Defendants Are Liable Under Section 20(a)...........................................................64

1.  The Complaint Adequately Alleges the Predicate Section 10(b) Claim.............................................................................................................65

2.  The Complaint Adequately Alleges the Brookfield Defendants Had "Control" Under Section 20(a) .................................................................65

IV.  CONCLUSION.....................................................................................................................68

4903-3909-1988.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ...................................................................................48

*Allegheny Cnty Emps.' Ret. Sys. v. Energy Transfer LP*,
52 F. Supp. 3d 189 (E.D. Pa. 2021) ......................................................................44

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...............................................................................................18

*Ashland, Inc. v. Oppenheimer & Co.*,
648 F.3d 461 (6th Cir. 2011) .................................................................................49

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................................................18

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................19

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022) ......................................................28, 49, 57

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ..........................................................................25

*Chamberlain v. Reddy Ice Holdings, Inc.*,
2010 WL 1711760 (E.D. Mich. Apr. 28, 2010) ....................................................19

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010) ................................................................22

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ........................................................................ *passim*

*City of Painsville v. First Montauk Fin. Corp.*,
178 F.R.D. 180 (N.D. Ohio 1998) ...................................................................65, 66

*Doshi v. Gen. Cable Corp.*,
386 F. Supp. 3d 815 (E.D. Ky. 2019) ...................................................................54

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ...........................................................................33, 49

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ...............................................................................................19

- iii -

**Page**

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ........................................................................48

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ...............................................................47, 48, 62

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................43, 57

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ...............................................54, 64

*Gauquie v. Albany Molecular Rsch., Inc.*,
2016 WL 4007591 (E.D.N.Y. July 26, 2016)........................................................55

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
2014 WL 4064256 (N.D. Ohio Aug. 18, 2014) .....................................................48

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)............................................. *passim*

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001),
*abrogated by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....................................................................... *passim*

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ...............................................................64

*In re CBL & Assocs. Props., Inc. Sec. Litig.*,
2022 WL 1405415 (E.D. Tenn. May 3, 2022)................................................31, 37

*In re Century Bus. Servs. Sec. Litig.*,
2002 WL 32254513 (N.D. Ohio June 27, 2002).....................................................64

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) .......................................... *passim*

*In re Ferro Corp.*,
2007 WL 1691358 (N.D. Ohio June 11, 2007)......................................................64

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004)..............................................................24

*In re Grand Casinos, Inc. Sec. Litig.*,
988 F. Supp. 1273 (D. Minn. 1997)..................................................................62

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) .......................................................................34

**Page**

*In re Home Point Cap. Inc. Sec. Litig.*,
  2022 WL 18932069 (E.D. Mich. Oct. 5, 2022) ........................................................30

*In re Huntington Bancshares Inc. Sec. Litig.*,
  674 F. Supp. 2d 951 (S.D. Ohio 2009) ...................................................................53

*In re Initial Pub. Offering Sec. Litig.*,
  383 F. Supp. 2d 566 (S.D.N.Y. 2005)....................................................................26

*In re K-tel Int'l, Inc. Sec. Litig.*,
  300 F.3d 881 (8th Cir. 2002) ................................................................................28

*In re Micron Techs., Inc. Sec. Litig.*,
  2007 WL 576468 (D. Idaho Feb. 21, 2007).............................................................22

*In re N. Dynasty Mins. Ltd. Sec. Litig.*,
  2023 WL 9509337 (E.D.N.Y. Jan. 25, 2023) ..........................................................33

*In re Nat'l Century Fin. Enters., Inc.*,
  504 F. Supp. 2d 287 (S.D. Ohio 2007) .............................................................65, 67

*In re Omnicare, Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) ..........................................................................30, 53

*In re Prison Realty Sec. Litig.*,
  117 F. Supp. 2d 681 (M.D. Tenn. 2000).................................................................46

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ...................................................................57

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
  124 F. Supp. 2d 527 (S.D. Ohio 2000) ...................................................................64

*In re Upstart Holdings, Inc. Sec. Litig.*,
  2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ...................................26, 30, 49, 57

*In re Upstart Holdings, Inc. Sec. Litig.*,
  2024 WL 3647705 (S.D. Ohio Aug. 5, 2024).........................................................49

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
  2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021)....................................................29, 46

*Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*,
  510 F. Supp. 3d 583 (M.D. Tenn. 2020).................................................................20

*Konkol v. Diebold, Inc.*,
  590 F.3d 390 (6th Cir. 2009) ..........................................................................53, 59

4903-3909-1988.v1

**Page**

*Kyrstek v. Ruby Tuesday, Inc.*,
  2016 WL 1274447 (M.D. Tenn. Mar. 31, 2016) ........................................................48

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
  2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) ........................................................46

*Lim v. Hightower*,
  2024 WL 4349409 (N.D. Ohio Sept. 30, 2024).....................................................43, 44

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ...........................................................................43, 57, 62

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)...................................................................................................19

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014).....................................................................................25

*MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*,
  2009 WL 4506418 (E.D. Mich. Nov. 30, 2009) ......................................................47

*No. 84 Employer-Teamster Joint Council Pension
  Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ...................................................................................66

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
  877 F.3d 687 (6th Cir. 2017) ...................................................................................19

*Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l Inc.*,
  2013 WL 9925989 (E.D. Ky. July 31, 2013)............................................................46

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016) ..............................................................................18, 19

*Omnicare, Inc. v. Laborers Dist. Council
  Const. Indus. Pension Fund*,
  575 U.S. 175 (2015).......................................................................................28, 29, 44

*Padilla v. Cmty. Health Sys., Inc.*,
  2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) ......................................................30

*Pittman v. Unum Grp.*,
  861 F. App'x 51 (6th Cir. 2021) ...............................................................................49

*Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*,
  556 F. Supp. 3d 772 (N.D. Ohio 2021),
  *aff'd*, 2022 WL 3972478 (6th Cir. 2022)..........................................................44, 53, 59, 64

4903-3909-1988.v1

**Page**

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004),
  *abrogated on other grounds by*
  *Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)......................................................................................54, 65, 67

*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...................................................55, 57

*Shupe v. Rocket Cos.*,
  660 F. Supp. 3d 647 (E.D. Mich. 2023)....................................................33, 36, 39

*Stavroff v. Meyo*,
  1997 WL 720475 (6th Cir. Nov. 12, 1997)..............................................................65

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*,
  2021 WL 195370 (M.D. Tenn. Jan. 20, 2021)........................................................29

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
  83 F.4th 514 (6th Cir. 2023) ........................................................................53, 59

*Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*,
  396 F. Supp. 3d 413 (E.D. Pa. 2019) .....................................................................45

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)...............................................................................18, 48, 49, 63

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
  342 F.3d 634 (6th Cir. 2003) .................................................................................68

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
  2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) .....................................................37

*Williams v. Duke Energy Int'l, Inc.*,
  681 F.3d 788 (6th Cir. 2012) .................................................................................18

*Willis v. Big Lots, Inc.*,
  2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) .............................................19, 40, 64

*Winslow v. BancorpSouth, Inc.*,
  2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011).................................................52, 62

*Woolgar v. Kingstone Cos.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020)...................................................................44

*Yuhasz v. Brush Wellman, Inc.*,
  341 F.3d 559 (6th Cir. 2003) .................................................................................19

- vii -

**Page**

*Zwick Partners, LP v. Quorum Health Corp.*,
   2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) ..................................................37, 39

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §78j(b) ..................................................................................................................19, 65
   §78t(a) ..........................................................................................................64, 65, 66, 67
   §78u-4(b)(1)(B) ..............................................................................................................19
   §78u-4(b)(2)(A) ..............................................................................................................19
   §78u-5(c)(1)(A)(i) ....................................................................................................34, 46

Federal Rules of Civil Procedure
   Rule 8 .........................................................................................................................65, 66
   Rule 9(b) ...................................................................................................................18, 19
   Rule 12(b)(6) ...........................................................................................................18, 26

17 C.F.R.
   §230.405 .........................................................................................................................65

4903-3909-1988.v1

Lead Plaintiff University of Puerto Rico Retirement System ("Plaintiff") respectfully submits this omnibus memorandum in opposition to the motions to dismiss (the "Motions") filed by: (1) GrafTech International Ltd. ("GrafTech" or the "Company"), Marcel Kessler, Quinn Coburn, Timothy K. Flanagan, and Jeremy S. Halford (ECF 64, *et seq.*);[1] (2) David Rintoul (ECF 65, *et seq.*);[2] and (3) BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd. (collectively, "Brookfield") (ECF 66, *et seq.*).[3]

## I.    INTRODUCTION

Desperate to avoid liability for their numerous fraudulent misrepresentations, defendants' Motions repeatedly strain to paint the Complaint as a speculative story of "must haves" and "fraud-by-hindsight."  But the Complaint's actual allegations – which defendants consistently ignore or misconstrue – tell a much different story.  ***That story*** is one of a company that: concealed its most important facility's failure to comply with local environmental laws, despite being formally notified of such deficiencies and ordered to remediate them; falsely represented that it had taken specific steps to "de-risk" its exposure to potential operational disruptions involving a critical component produced only by the noncompliant facility; and then concealed material known facts regarding the financial consequences that arose after the noncompliant facility was temporarily shut down by environmental authorities.  And rather than resting upon must haves or hindsight-based accusations, ***that story*** is supported by contemporaneous facts, formal findings and orders from an environmental regulator, complaints filed by governmental officials and a private citizen, statements made by the

---

[1]    ECF 64-1 is referred to herein as the "GrafTech Memorandum" or "GrafTech Mem."

[2]    ECF 65-1 is referred to herein as the "Rintoul Memorandum" or "Rintoul Mem."

[3]    ECF 66-1 is referred to herein as the "Brookfield Memorandum" or "Brookfield Mem."  Unless otherwise noted: all "¶__" or "¶¶__" references are to the First Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF 56); all capitalized terms have the same meanings as defined in the Complaint; emphasis is added; and citations and footnotes are omitted.

4903-3909-1988.v1

Mayor of a local municipality, observations provided by a former employee, and defendants' own damning admissions.

Throughout the Class Period, defendants touted the "policies and procedures" that allowed GrafTech "to operate in compliance with [its] regulatory obligations, identify risks, and understand and reduce [its] environmental impacts," while highlighting their executive-led "sustainability strategy," which supposedly included "the installation of control technology on equipment on all of [GrafTech's] sites." ¶¶2, 42. In addition, defendants repeatedly boasted about the competitive cost advantages GrafTech enjoyed due to specific aspects of its manufacturing network. ¶¶2, 42.

What defendants did *not* disclose, however, was that GrafTech's Monterrey facility – the Company's *only* facility engaged in the production of GrafTech's critical "pins" and "pin stock" – had, for years, failed to adequately control the polluting dust emissions generated by its operations. Nor did they disclose a Mexican regulator's formal findings in 2019 that the facility's failure to control such emissions constituted an *actual* – not potential – violation of local environmental laws and that GrafTech had "***benefited economically***" from that violation. Or that the regulator ordered GrafTech to "immediately and permanently" remediate its deficient emission controls, but GrafTech failed to do so. ¶¶1-7, 39, 44-52.

Contrary to defendants' arguments, the Complaint's allegations regarding GrafTech's failure to comply with the regulator's order are *not* based solely on the Monterrey facility's subsequent shutdown by Mexican environmental authorities. Instead, those allegations are also supported by two environmental complaints (one filed by local government officials in 2020 and another filed by a private citizen in 2021), as well as multiple public statements from the Mayor of local municipality Apodaca, which detail the Monterrey facility's failure to remedy its deficient dust emission controls following the 2019 regulatory order requiring it to do so. ¶¶6, 49-51, 67-69, 72.

4903-3909-1988.v1

While defendants were concealing the Monterrey facility's failure to comply with regulatory orders regarding its deficient dust emission controls, defendants also issued a series of false statements that directly bore on the potential consequences of any operational disruptions at the Monterrey facility. Specifically, over the course of four earnings calls between August 6, 2021 and May 6, 2022, defendants told investors that GrafTech had "*de[-]risk[ed]* [its] *pin production capacity*," by opening a "*pin production line*" at its St. Marys facility, which was purportedly "operational" by November 5, 2021, thus providing the Company with "*2 connecting pin production facilities*." ¶¶8, 53-57.

In truth, however, the St. Marys facility was not actually engaged in the "production" of any pins or pin stock at the time of these misstatements – and thus, offered no ability to "de[-]risk [GrafTech's] pin production capacity." Indeed, *as the Company would later admit*, GrafTech had yet to even *begin* the process of obtaining the operating permits required for "pin production" at the St. Marys facility, and Monterrey remained GrafTech's only facility capable of producing the pin stock needed for all of the Company's electrodes. As a result, contrary to defendants' misrepresentations, GrafTech remained exposed to significant risks of commercial harm in the event that the Monterrey facility's operations were disrupted. ¶¶8, 58-65, 75.

Defendants' argument that investors could not possibly have been misled by their misrepresentations regarding St. Marys's "pin production" operations fails for a myriad of reasons, including that it relies on fact-bound inquiries that cannot be resolved in defendants' favor at the pleading stage. In addition, the argument defies common sense and ignores the specific words defendants used to mislead investors regarding the purported benefits of St. Marys's operations. If, as defendants contend, the misstatements were intended to convey nothing more than a continuation of St. Marys's previously disclosed "graphitizing and machining" activities, defendants would not have described the new operations "*introduced*" at St. Marys as "*[i]mportantly* . . . provid[ing]

- 3 -

[GrafTech] with 2 connecting *pin production facilities*" or claimed that they helped "*de[-]risk* [GrafTech's] *pin production capacity*." ¶¶8, 53-57, 142, 151, 153, 158, 168,172.

Defendants' misrepresentations regarding the Monterrey and St. Marys facilities artificially inflated the price of GrafTech common stock by concealing significant known risks regarding operational disruptions at the Monterrey facility. On September 16, 2022, the concealed risks began to materialize. On that date, defendants announced that the Monterrey facility had been shut down following an inspection by Mexican environmental authorities. Apodaca's Mayor also issued a statement detailing the Monterrey facility's long and persistent failure to implement adequate dust emission controls, which disclosed that the Monterrey shutdown had followed upon the heels of a request from the Apodaca City Council for environmental regulators' assistance in closing the Monterrey facility due to its history of dust pollution. Although these revelations caused a significant decline in GrafTech's stock price, the price remained artificially inflated by defendants' continued concealment of material information concerning the financial impact of the Monterrey facility's closure. ¶¶9, 70-74.

Specifically, at the time of the announcement, defendants failed to disclose that GrafTech relied on the Monterrey facility for *all* of its critical pin stock inventory, and that the closure had coincided with a "critical" "negotiation window" for the Company's 2023 customer contracts. These concealed facts were partially revealed on November 4, 2022, when defendants disclosed that the Monterrey facility was "the *only site* that produces the pin stock needed for all [of GrafTech's] electrodes" and that the St. Marys facility was not actually involved in "*pin production*," as previously represented. In addition, defendants disclosed that GrafTech's business performance could be "significantly impacted" during the first two quarters of 2023 *if the Monterrey facility remained closed into 2023*. ¶¶9-10, 75-77.

Although these revelations once again caused a significant decline in GrafTech's stock price, the price remained artificially inflated by defendants' continued concealment of the truth that, because the closure coincided with a critical contract negotiation window and significantly depleted the Company's pin stock inventory, the effects of the Monterrey shutdown would be significant, *even if* the facility reopened in short order.  In addition to other misrepresentations defendants made at the time, defendant Halford specifically concealed the impact of the critical contract negotiation window by stating – in response to an analyst question about the Monterrey shutdown's impact on GrafTech's customer contract negotiations – that the shutdown would not impact the Company's "*commercial strategy at all*."  ¶¶10, 76-79, 218.

On November 18, 2022, GrafTech announced that the Monterrey facility had been conditionally permitted to resume operations.  Given defendants' previous misrepresentations that the closure would only have a significant impact if the Monterrey facility remained closed into 2023, the market reacted positively to this disclosure, causing the price of GrafTech stock to significantly rise as a result.  ¶¶11, 80.

On February 3, 2023, however, GrafTech once again shocked the market by disclosing that, despite the Monterrey facility reopening *within two weeks* of the Company's November 4, 2022 disclosures, the temporary closure would nonetheless have a significant negative impact on the Company's performance during "the first half of 2023."  At the same time, the Company revealed the previously concealed facts that: (i) the temporary closure had coincided with a "critical" "negotiation window" for 2023 contracts; (ii) the "uncertainty" caused by the shutdown "*during this contract negotiation window*" limited GrafTech's ability to enter into customer contracts for 2023; and (iii) although the Monterrey facility's "production of electrodes and pin stock began immediately upon the [lifting] of the suspension," the manufacturing of such products takes "*several*

- 5 -

*months*," meaning it would "take time" to rebuild GrafTech's "pin stock inventory."  ¶¶12, 79, 81, 182, 218.

Defendants contend that Plaintiff's claims concerning the alleged misrepresentations that followed the Monterrey shutdown are based solely upon the fact that the "impacts of the shutdown . . . proved to be more severe and long-lasting than initially projected."  They are wrong.  Contrary to defendants' contentions, the fraudulent nature of the misstatements is confirmed by defendants' February 3, 2023 admissions, which revealed that, *at the time* of the alleged misrepresentations: (i) GrafTech was *in the middle* of a "critical time frame to secure customer orders" for 2023; (ii) the Monterrey shutdown was, *at that time*, limiting the Company's "ability to enter into new customer commitments"; and (iii) Defendants were aware that it would take "*several months*" to rebuild GrafTech's pin stock inventory, even if Monterrey *reopened immediately*.  As such, these admissions confirm that, *at the time of defendants' previous representations*, they were necessarily aware of material facts indicating that the effects of the shutdown would be more significant than their statements led investors to believe.  Accordingly, it is defendants' *own admissions* – not the results that ultimately transpired – which confirm the fraudulent nature of defendants' misrepresentations following the Monterrey shutdown.  ¶¶217-221.

Although the Company's February 3, 2023 disclosures once again caused a significant decline in GrafTech's stock price, the price remained artificially inflated by defendants' continued concealment of the truth – specifically, that the impact of the "contract negotiation window" issue, which had concluded several months prior and thus would have been fully understood by defendants at the time, would not be limited to "the first half of 2023."  This fact was finally revealed to investors on August 4, 2023, when GrafTech described the Monterrey shutdown as the "key driver" of the Company's continued underperformance, while further conceding that the previously disclosed contract negotiation window issue had impacted GrafTech's ability to negotiate contracts

- 6 -

"to *some extent in the second half*" of 2023. Following this disclosure, GrafTech's stock price again plummeted, falling to $4.05 per share – *a more than 73% decline* from its Class Period high of $15.35 per share. ¶¶13, 82-85.

As further detailed below, defendants' specific arguments regarding the adequacy of Plaintiff's allegations concerning the elements of falsity and scienter either ignore or mischaracterize the Complaint's allegations and are not supported by the authorities upon which defendants rely. When the Complaint's *actual* allegations are accepted as true and appropriately afforded all reasonable inferences, it is clear that Plaintiff's claims are adequately alleged. As a result, the Motions should be denied in their entirety.

## II. FACTUAL BACKGROUND

### A. Relevant Company Background

GrafTech is a global manufacturer of graphite electrode products that are used in the production of electric arc furnace ("EAF") steel, a purportedly greener alternative to traditional blast furnace steel. ¶¶1, 32. GrafTech's customers are manufacturers that use the Company's graphite electrodes to produce EAF steel. ¶32. GrafTech's products consist of two components: (1) the graphite electrodes themselves; and (2) "connecting pins," one of which must be affixed to each graphite electrode. ¶¶1, 33. The connecting pins are manufactured through a separate process by which GrafTech first produces "pin stock" and then machines the pin stock into connecting pins. *Id.* As such, GrafTech's manufacturing capabilities are critically dependent upon the Company's ability to generate a steady and reliable supply of pin stock. *Id.*

Although the EAF process employed by GrafTech's customers offers environmentally friendly benefits compared to traditional steelmaking, the processes used by GrafTech to manufacture graphite electrode products rely on fossil fuel byproducts, such as needle coke. ¶34. As a result, without appropriate mitigation efforts, the manufacturing of graphite electrodes emits

- 7 -

significant particulate matter and other pollutants into the atmosphere, the burdens of which fall heavily upon the local communities in which GrafTech operates. *Id.*

GrafTech owns four manufacturing facilities, which are located in: (1) Monterrey, Mexico ("Monterrey"); (2) Pamplona, Spain ("Pamplona"); (3) Calais, France ("Calais"); and (4) St. Marys, Pennsylvania ("St. Marys"). ¶35.

**B.    GrafTech Is Acquired by Brookfield and Undergoes a Significant Operational Transformation**

Beginning in 2011, GrafTech experienced a prolonged period of declining demand for its graphite electrode products, resulting in falling revenues and growing financial distress. ¶36. By the end of 2014, GrafTech's annual net losses had grown 1,000% year-over-year to $285 million, up from a net loss of approximately $27 million in 2013. *Id.*

Amid this market downturn, GrafTech announced on August 17, 2015, that it had been acquired by defendant Brookfield via a cash tender offer to purchase all outstanding shares of its common stock, thus making it a wholly-owned affiliate of Brookfield and ceasing the trading of GrafTech common stock. ¶¶36-37. Over the course of the next three years, Brookfield engineered a significant transformation of GrafTech's operations intended to return the Company to profitability. ¶¶38-39. In connection with this transformation, GrafTech: (1) purportedly "warm-idled" its St. Marys facility, which had previously operated as a full scale manufacturing facility capable of producing both pins and graphite electrodes; (2) consolidated all of the Company's manufacturing operations at its Monterrey, Pamplona, and Calais facilities; and (3) concentrated 100% of its pin stock and connecting pin production at the Monterrey facility. *Id.* GrafTech claimed, however, that its warm-idling of the St. Marys facility allowed the Company to quickly restart manufacturing activities there to meet peak supply requirements, providing GrafTech with valuable operational flexibility needed to satisfy excess demand or mitigate other operational disruptions. ¶38.

- 8 -

4903-3909-1988.v1

## C.     GrafTech's Second IPO

Having completed this purported business turnaround, Brookfield conducted GrafTech's second initial public offering ("IPO") on April 19, 2018, selling approximately 35 million shares, or approximately 12% of its equity stake, at $15 per share for gross offering proceeds of $525 million. ¶¶40, 234.  Brookfield also sold 3.1 million shares, pursuant to a partial exercise of the underwriters' overallotment option, for an additional $46 million and caused GrafTech to enter into an agreement to pay Brookfield a $160 million special cash dividend in connection with the second IPO.  ¶40.

The Brookfield-led Company "transformation" was lauded in the second IPO offering materials as, among other things, well-positioning GrafTech for purportedly sustainable growth due to a global shift to the "more environmentally friendly nature of EAF steelmaking."  ¶41.

## D.     Brookfield's Control over GrafTech

Immediately following the second IPO, Brookfield owned approximately 78% of GrafTech's outstanding common stock and maintained majority control over the Company.  ¶232.  As such, GrafTech was a "controlled company" under the NYSE rules.  *Id.*

Furthermore, during the Class Period, Brookfield oversaw and controlled GrafTech's management.  ¶233.  For example, Brookfield caused GrafTech to hire defendant Rintoul, who served as CEO and a Board member from March 2018 to June 2022, and defendant Coburn, who served as CFO from September 2015 to November 2021.  ¶¶22-23, 233.

In connection with the second IPO, Brookfield also entered into a stockholders' agreement with GrafTech which provided Brookfield with the right to appoint the greater of 37.5% or three directors to the Board and provided Brookfield with certain special rights and privileges unavailable to outside shareholders.  ¶232.  During the Class Period, numerous directors of GrafTech were directly affiliated with Brookfield, including Denis A. Turcotte (Managing Partner at Brookfield),

4903-3909-1988.v1

Jeffrey Dutton (President at Brookfield), Ron A. Bloom (Managing Partner and Vice Chairman at Brookfield), and David Gregory (Senior Vice President at Brookfield). ¶233.

In addition to the second IPO, Brookfield's oversight and control over GrafTech caused the Company to conduct six other registered public offerings in which Brookfield sold nearly $2 billion of GrafTech common stock at artificially inflated prices. ¶234. Moreover, within just three years of GrafTech's second IPO, Brookfield sold more than $2.8 billion of GrafTech common stock, selling approximately 75% of its equity stake in the Company and capitalizing on the artificially inflated stock resulting from defendants' fraud. ¶66. Brookfield also caused GrafTech to enter into various agreements with Brookfield that were favorable to its own financial interests. ¶¶66, 234. These included two share repurchase agreements in August 2018 and December 2019, which required GrafTech to collectively purchase nearly 31 million shares directly from Brookfield (at prices exceeding $19 per share, for approximately $475 million). *Id.*

### E. Defendants Conceal the Monterrey Facility's Failure to Comply with Environmental Laws

Throughout the Class Period, defendants repeatedly highlighted the competitive advantages GrafTech enjoyed as a result of purportedly having the "lowest cost large-scale graphite electrode manufacturing plants in the world." ¶¶42, 92, 108, 129, 161. Defendants further represented to investors that GrafTech had an "on-going commitment to *rigorous internal environmental protection standards*" and that it was "*being proactive to improve [its] environmental footprint across [its] operations*." ¶¶42, 91, 107, 128, 160, 192, 200, 223. In addition, defendants emphasized the Company's supposedly "*strong environmental management system*," which purportedly enabled GrafTech to "*operate in compliance* with [its] regulatory obligations, *identify risks*, and understand and reduce our environmental impacts." ¶¶42, 146. Defendants also claimed that GrafTech's "sustainability strategy" – an initiative that was *directly overseen by GrafTech's*

- 10 -

*executive team* – focused on "emission reduction efforts that include[d] the installation of *control technology on equipment on all our sites*." ¶¶42, 125, 192.

Defendants' representations were materially false and misleading, however, as they failed to disclose that GrafTech's purported cost leadership had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards at its Monterrey facility, which left GrafTech acutely exposed to known material risks of government enforcement actions, and consequently, to business and operational disruptions. ¶¶9, 44, 52, 67-73. Indeed, contrary to defendants' representations regarding GrafTech's supposedly "strong environmental management system," the Monterrey facility had, for decades, chronically contaminated neighboring communities with harmful dust emissions. ¶¶44, 52, 67-73. Although local authorities had repeatedly warned GrafTech regarding its wanton disregard for the health and well-being of the Monterrey facility's local community, the Company consistently refused to remediate the facility's harmful environmental effects. ¶¶67, 72.

As a result, in March 2019, the Department of Sustainable Development of the State of Nuevo León ("Department of Sustainable Development") initiated an administrative proceeding against GrafTech due to its failure to control dust emissions generated by the Monterrey facility's operations. ¶¶4, 45. In a formal resolution issued by the Department of Sustainable Development, the agency determined that GrafTech's Monterrey facility violated applicable provisions of the Environmental Law of the State of Nuevo León intended "to ensure satisfactory air quality for population well-being and ecological balance" by operating "*without the means of control to ensure that dust emissions are avoided*." ¶45. The agency further determined that GrafTech had "*benefitted economically* by evading the expense generated by the implementation of equipment or system that guarantee avoiding the generation of dust emissions to the atmosphere during its operation." *Id.* As part of its formal resolution of the administrative proceeding, the Department of

- 11 -

Sustainable Development issued an order imposing certain "corrective actions," including the mandate that GrafTech "*immediately and permanently*" implement actions necessary to "*guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere*." ¶¶4, 47. In connection with the proceedings, GrafTech also agreed to invest *over $2 million* in dust collection and containment projects to purportedly remedy its violations. ¶46.

Although GrafTech disclosed in its filings with the SEC that it had received the notice of administrative proceedings, defendants continued to conceal the full extent and severity of the Company's misconduct by falsely characterizing the probe as "involving certain *potential violations* of state environmental law" and stating that GrafTech had "cooperat[ed]" with the authorities and resolved the matter following payment of "fines that were not material to the Company." ¶¶5, 47, 95, 98, 102. Notably, defendants' disclosures made *no mention* of GrafTech's agreement to invest more than $2 million to remedy the Company's violations or the order requiring GrafTech to carry out the actions necessary to control the Monterrey facility's dust emissions. ¶¶5, 47, 100, 104.

Moreover, following the administrative proceeding's resolution, GrafTech failed to comply with the Department of Sustainable Development's order requiring the Company to remediate its deficient dust emission controls. ¶48. The Company's failure to do so is confirmed by the filing of multiple environmental complaints, including one (the "Apodaca complaint" submitted to the Secretary of Sustainable Development on March 11, 2020 by the Mayor of local municipality Apodaca, César Garza Villareal, and Apodaca's Secretary of Urban Development, Ecology, and Transportation, Andres M. Canto Ramirez, which asserted violations of environmental law against GrafTech. ¶49. Specifically, Mayor Garza and Secretary Ramirez asserted in the Apodaca complaint that GrafTech "*constantly and continuously generate[s] emissions of fine graphite and coal dust that is deposited on streets, roofs, floors, garages and the flat parts of houses that are generated by the activities [of the Company]; this affects and decreases both the health of the*

*neighbors and the surrounding environment*.”  *Id.*  The complaint further requested the State Attorney General’s Office for Sustainable Development to, among other things: (1) consider GrafTech’s acts identified within the complaint as violating applicable legal provisions and human rights; (2) exercise its regulatory power to initiate proceedings and investigations into GrafTech’s alleged misconduct; and (3) order the total stoppage of GrafTech’s Monterrey facility.  *Id.*

The Apodaca complaint, however, was unsuccessful at curbing GrafTech’s continued disregard of its environmental obligations, prompting further protests from community members, including the filing of a citizen’s complaint (the “Citizen complaint”) with the Federal Prosecutor’s Office for Environmental Protection on September 30, 2021, asserting that GrafTech’s Monterrey facility was continuing to pollute the neighboring community with harmful dust emissions.  ¶51. Specifically, the Citizen complaint stated: “IT’S A COMPANY THAT POLLUTES WITH EMISSIONS OF LARGE AMOUNTS OF GRAPHITE INTO THE ATMOSPHERE, THE PLACE IS DIRTY ALL THE TIME, THE HOUSES FULL OF GRAPHITE.  THE COMPANY HAS BEEN AROUND FOR 70 YEARS, THE MAYORS HAVE DONE NOTHING AND NEITHER HAVE STATE GOVERNMENTS.  THE INHABITANTS HAVE BECOME ILL.”  *Id.*

Despite the multiple complaints from local officials and community members, GrafTech failed to remedy the Monterrey facility’s deficient dust emission controls – in direct violation of the Department of Sustainability’s order requiring the Company to do so – while continuing to tout GrafTech’s purported commitment to environmental protections and compliance with environmental laws and regulations, thus concealing from investors the truth that the Monterrey facility’s failure to operate in accordance with those representations exposed GrafTech to known material risks regarding government enforcement actions and corresponding business disruptions.  ¶¶6, 52; *see also, e.g.*, ¶¶106-107, 111-113, 117-118, 125, 127-128, 133-134, 136, 139, 144-148, 155-156, 159-160, 164-166, 192-205.

F.      Defendants Deceive Investors About GrafTech's Purported De-
        Risking of the Company's Pin Production

During the Class Period, defendants also misled investors regarding the Company's purported efforts to "de[-]risk" its critical pin production – which was entirely concentrated at GrafTech's Monterrey facility – by supposedly implementing "pin production" operations at the St. Marys facility. ¶¶8, 53. Specifically, on August 6, 2021, defendant Halford told investors that GrafTech was "investing in a *pin production line* at our St. Marys, Pennsylvania facility that *will be online in the third quarter*." ¶¶54, 142. At the time, Halford further represented that the St. Marys facility's pin production line "diversifies our pin capability and provides *production flexibility*." *Id.* The following quarter, Halford continued to promote the St. Marys facility's pin production capabilities, telling investors on November 5, 2021, that "[t]he *pin production line* at our St. Mary's, Pennsylvania facility is *now operational*, and we are ramping up *production*," thus "[i]mportantly" providing GrafTech with "*2 connecting pin production facilities*." ¶¶54, 153. In subsequent earnings calls, Halford continued to tout the purported benefits of the St. Marys facility's pin production operations by claiming that the facility had helped to "*de[-]risk [GrafTech's] pin production capacity*," thus conveying that the Company was insulated from potential commercial disruptions due to insufficient pin supply in the event that operations at the Monterrey facility were interrupted. ¶¶8, 56-57, 158, 168.

The truth, however, was that the St. Marys facility did not actually produce any pins or pin stock during 2021 or 2022 – and, in fact, did not even possess the necessary operating permits to perform such activities. ¶¶58-65. That St. Marys was not actually engaged in "pin production" at the time of the above misstatements is confirmed by the Company's *own subsequent admissions*. Specifically, on November 4, 2022, GrafTech disclosed – a full year *after* defendant Halford represented that St. Marys's "operational" "pin production line" provided GrafTech with two "connecting *pin production facilities*" – that the Company was just then "pursuing approvals for

- 14 -

operating permits to restart the [St. Marys] facility for ***pin production***," thereby confirming that St. Marys was not previously engaged in "***pin production***," despite defendants' false representations that it was.  ¶¶54, 65, 75, 172.  This admission is also consistent with allegations sourced from a former GrafTech Manufacturer Engineering Lead (the "Former Engineering Lead"), which confirm that St. Marys had neither the functioning equipment nor the proper operating permits needed to engage in the "production" of pins or pin stock at the time of the above misstatements.  ¶¶58-62.

Because the St. Marys facility was not actually involved in "pin production" during 2021 or 2022, and because the Monterrey facility remained the Company's only facility capable of producing GrafTech's critical connecting pins, defendants' representations that GrafTech had "***de[-]risk[ed]*** [its] ***pin production capacity***," by opening a "***pin production line***" at its St. Marys facility that supposedly provided the Company with "***2 connecting pin production facilities***" were materially false and misleading.  ¶¶8, 64, 143, 154, 163, 169.  These misrepresentations conveyed to investors that GrafTech had insulated itself from potential commercial disruptions in the event that the Monterrey facility's operations were interrupted, when in fact GrafTech remained significantly exposed to such risks (the materialization of which was eminently foreseeable due to GrafTech's repeated failure to remedy the Monterrey facility's deficient dust emission controls).  ¶¶8, 64-65.

## G.  Defendants Continue to Deceive Investors as Their Fraud Begins to Unravel

Defendants' fraud began to unravel on September 16, 2022, when defendants disclosed in a Form 8-K that GrafTech's critical Monterrey facility had received a "temporary suspension notice" ordering the facility to "wind down operations within seven days," following the conclusion of an inspection by Mexican environmental regulators.  ¶¶70, 72, 170, 239.  Multiple Mexican news outlets linked the cessation order to GrafTech's excessive pollution of hazardous emissions into neighboring communities, and Mayor Garza took to Facebook Live to applaud the shutdown, while also disclosing that the Apodaca municipality had voted in August 2022 to formally request that

- 15 -

GrafTech's facility be required to close and relocate, citing more than 30 years of environmental abuses by the Company. ¶¶71-72, 240. As a result of these disclosures, the price of GrafTech common stock fell $0.45 per share, or approximately 8.5%, from a closing price of $5.30 per share on September 16, 2022, to a closing price of $4.85 per share the following trading day, September 19, 2022. ¶¶74, 241. GrafTech's stock price remained inflated, however, by defendants' concealment of material facts concerning the financial impact of the Monterrey facility's closure – namely, that GrafTech relied on the Monterrey facility for *all* of its critical pin stock inventory, and that the closure had coincided with a "critical" "negotiation window" for the Company's 2023 customer contracts. ¶¶74, 81, 171.

Then, on November 4, 2022, defendants disclosed for the first time that the Monterrey facility was "***the only site that produces the pin stock needed for all our electrodes***." ¶¶65, 75, 172, 242. Defendants also admitted that, contrary to defendant Halford's previous representations, GrafTech was ***just then*** "actively pursuing approvals for operating permits to restart the [St. Marys] facility ***for pin production***" and that GrafTech's business performance could be "significantly impacted" during the first two quarters of 2023, "***unless Monterrey reopens***." ¶¶65, 75, 172. As a result of these disclosures, the price of GrafTech common stock fell $0.24 per share, or approximately 5%, from a closing price of $4.85 per share on November 3, 2022, to a closing price of $4.61 per share on November 4, 2022. ¶¶76, 243.

Defendants, however, continued to mislead investors by concealing the full truth regarding the financial impact of the Monterrey facility's closure. ¶¶76-79. In particular, during the Company's November 4, 2022 earnings call, defendants Kessler and Halford both assured investors that the impact of the Monterrey shutdown would be mitigated by the fact that GrafTech possessed a "substantial amount of inventory" of "pins and pin stock." ¶176. During the same call, Halford was asked about his "***perspective on contracting***," and specifically, whether the Monterrey shutdown

- 16 -

would "*limit[] the kind of commercial opportunities that [GrafTech] can put forward to [its] customers*."  ¶¶78, 177.  Halford responded by stating that the Monterrey shutdown would not impact GrafTech's "*commercial strategy at all*."  *Id.*  Halford's response, however, concealed the truth that – *at the time of his comments* – GrafTech was in the middle of a "critical time frame to secure customer orders" for 2023, and the Monterrey shutdown was – *at that time* – limiting the Company's "ability to enter into new customer commitments."  ¶¶78-79, 81, 177-178, 182, 218.

On November 18, 2022, GrafTech announced that the Monterrey facility was conditionally permitted to resume operations subject to the Company's completion of certain remediation efforts.  ¶¶11, 80, 179, 182.  Given defendants' previous misrepresentations that the closure would only have a significant impact if the Monterrey facility remained closed into 2023, the market reacted positively to this disclosure.  ¶¶11, 80.

However, on February 3, 2023, defendants disclosed that, contrary to defendants' previous misrepresentations: (i) the Monterrey facility's shutdown "*coincide[d] with the critical time frame to secure customer orders for the first half of 2023*," and "the uncertainty caused by the suspension *during this contract negotiation window*" limited GrafTech's "ability to enter into new customer commitments for the first half of 2023"; and (ii) *despite the facility reopening within two weeks of the Company's November 4, 2022 earnings call*, the temporary closure was expected to have a significant impact upon GrafTech's sales volume "in the first half of 2023," due in part to the fact that "the required manufacturing time for [GrafTech's] products is generally *several months*," meaning "the rebuilding of our pin stock inventory *will take time*."  ¶¶12, 81, 182, 218, 220, 244.  The market was once again shocked by this news, with the price of GrafTech common stock plummeting $1.01 per share, or approximately 15%, from a closing price of $6.59 per share on February 2, 2023, to a closing price of $5.58 per share on February 3, 2023.  ¶¶82, 245.

- 17 -

Finally, on August 4, 2023, GrafTech reported a net loss of $8 million for the second quarter of 2023, driven by a 49% year-over-year decline in sales as GrafTech continued to "recover" from the effects of the Monterrey facility's shutdown.  ¶¶13, 83, 246.  Defendant Kessler described the Monterrey facility's suspension as the "***key driver***" of the Company's continued underperformance and revealed that, contrary to Kessler's previous representations, the impact of the "contract negotiation window" issue was ***not*** limited to the first half of 2023.  *Id.*  These disclosures again shocked investors, causing the price of GrafTech common stock to plunge $1.18 per share, or nearly 23%, from its $5.23 per share closing price on August 3, 2023, to a closing price of $4.05 per share on August 4, 2023 – a more than 73% decline from its Class Period high of $15.35 per share.  ¶¶13, 84, 247.

## III.    ARGUMENT

Federal Rule of Civil Procedure 12(b)(6) requires a court to "consider the complaint in its entirety," "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).  A complaint "does not need detailed factual allegations" but only "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A securities fraud complaint must satisfy the additional pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016).  "'Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.'"  *Williams*

- 18 -

*v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012).  The PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. §78u-4(b)(1)(B); 15 U.S.C. §78u-4(b)(2)(A).  The Sixth Circuit has interpreted Federal Rule of Civil Procedure 9(b)'s heightened pleading standard as requiring a plaintiff to """"allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."""" *Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *10 (S.D. Ohio Jan. 21, 2016) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003)).

To state a claim for securities fraud under §10(b) of the Exchange Act, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Fed. Home Loan Mortg.*, 830 F.3d at 383-84 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)); *accord Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 694 (6th Cir. 2017). Here, defendants challenge only the first two elements, falsity and scienter.[4]

## A. The Complaint Alleges Actionable Misstatements and Omissions

The Exchange Act prohibits "the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005); *see also Berson v. Applied Signal Tech.,*

---

[4]   Defendants submit over 500 pages of extraneous documents to their Motions, some of which are offered under the doctrines of judicial notice or incorporation by reference.  *See, e.g.*, GrafTech Mem. at 15 n.17, 28 n.20; ECF 64-5; ECF 65-2; ECF 66-2.  While, in certain instances, the Court may take judicial notice of the existence of public information available to investors, "judicial notice cannot be considered if it also asks the Court to decide a fact in dispute or to accept a disputed fact as true." *Chamberlain v. Reddy Ice Holdings, Inc.*, 2010 WL 1711760, at *5 (E.D. Mich. Apr. 28, 2010).

- 19 -

*Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) ("[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'"). Accordingly, corporate actors must "'provide complete and non-misleading information with respect to the subjects on which [they] undertake[] to speak.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001), *abrogated by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007). "[A] company may choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths." *Id.*; *see also Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 611 (M.D. Tenn. 2020) ("'once a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading'").

### 1. Defendants Made Materially False and Misleading Statements About the Monterrey Facility

#### a. Defendants' Statements About GrafTech's Competitive and Cost Advantages Were Materially Misleading When Made

Throughout the Class Period, defendants repeatedly touted the competitive and cost advantages that GrafTech possessed from its operation of the "lowest cost large-scale" graphite electrode manufacturing facilities in the world. ¶¶92, 108, 120-122, 129, 161. In connection with these representations, defendants also frequently discussed the various sources of GrafTech's purported cost savings that were available at each of its facilities, including in Monterrey. For example:

- "Because of the ***attractive cost of labor available to our Monterrey facility***, we believe we have a significant cost advantage in the production of pins . . . ." ¶93.

- "Our manufacturing facilities are located in the Americas and EMEA, providing us ***with access to low-cost*** and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors . . . ." ¶¶92, 108.

- 20 -

- "Moreover, our Seadrift, Calais, Pamplona, Monterrey and St. Marys facilities each provide unique advantages for us. . . . We believe our facilities have significant *cost advantages given their scale and access to low cost, reliable energy sources*." ¶¶93, 109, 130, 162.

- "Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw material, and our substantial vertical integration with Seadrift. Our Calais, Pamplona, *Monterrey* and St. Marys facilities have access to *low-cost sources of electricity with essential logistical infrastructure in place*, which is a significant element of manufacturing costs." ¶¶109, 130, 162.

Defendants also represented to investors that GrafTech managed its capital expenditures by taking into account applicable environmental and regulatory requirements, and assured investors that the Company maintained its competitive and cost advantages through "[o]ngoing operational improvements." ¶87; *see also* ¶¶91, 107, 128, 160.  In other words, defendants' statements created the impression that GrafTech had secured its industry-leading cost advantages with manufacturing facilities that complied with applicable legal requirements.

However, defendants' statements were materially misleading when made because they failed to disclose that GrafTech's cost advantages had been achieved in substantial part by failing to implement necessary environmental safeguards at the Company's Monterrey facility that were necessary to prevent unlawful air emissions and to comply with environmental regulations. Specifically, the Complaint's particularized allegations show that, in connection with the 2019 administrative proceeding, the Department of Sustainable Development found that GrafTech's Monterrey facility violated provisions of the Environmental Law of the State of Nuevo León by operating "without the means of control to ensure that dust emissions are avoided."  ¶45.  The agency also expressly tied GrafTech's cost structure to its pollution by finding that GrafTech had "*benefitted economically by evading the expense* generated by the implementation of equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere during the operation." *Id.*

- 21 -

To remedy these violations, the Department of Sustainable Development imposed corrective actions on the Company, requiring GrafTech to "***immediately and permanently*** . . . carry out the necessary actions, adaptations, and/or maneuvers that ***guarantee avoiding the generation of emissions or dust or any other contaminant to the atmosphere***." *Id.* However, as the Complaint alleges, GrafTech continued to forego the capital expenditures required to implement equipment needed to avoid dust emissions at its Monterrey facility (¶¶49-52, 67-72), rendering defendants' subsequent statements regarding the Company's advantaged and competitive low-cost structure materially misleading. *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 708 (E.D. Mich. 2010) ("'A statement regarding financial performance, even when accurate, is still misleading under the securities laws if the speaker attributes the performance to the wrong source.'"); *In re Micron Techs., Inc. Sec. Litig.*, 2007 WL 576468, at *7 (D. Idaho Feb. 21, 2007) (allegations sufficiently pled falsity where the company explained pricing as a product of market factors when in fact pricing was directly related to the underlying alleged price-fixing scheme).

Defendants' contention that the Complaint "cites no documents, communications, or data" showing that GrafTech was in violation of environmental regulations and that such violations directly impacted its cost-structure ignores the above allegations. GrafTech Mem. at 14. Indeed, the Complaint expressly cites the formal resolution issued following the 2019 administrative proceeding, which set forth the Department of Sustainable Development's conclusion that GrafTech ***did violate*** state environmental laws – and that it "***benefitted economically***" from doing so – and further ordered the Company to "immediately and permanently" remedy its violations. ¶¶4, 45. In addition, the Complaint also cites environmental complaints submitted by government officials and a private citizen following the 2019 administrative proceeding in support of Plaintiff's allegation that GrafTech failed to remedy its unlawful conduct despite clear regulatory orders requiring it do so. ¶¶49-51. Accepting these allegations as true and construing them in the light most favorable to

- 22 -

plaintiff – as the Court must at this stage – the Complaint readily establishes that defendants' statements regarding GrafTech's competitive and cost advantages were materially misleading when made.

**b.      Defendants' Statements About GrafTech's Environmental Compliance and Efforts Were Materially Misleading When Made**

Throughout the Class Period, defendants represented that GrafTech operated in compliance with environmental laws (¶¶90, 106, 127), adhered to "rigorous internal environmental protection standards" (¶¶91, 107, 128, 160), and was proactively advancing its environmental initiatives (¶¶133, 139, 144, 164, 166). Defendants also frequently spoke about the specific actions GrafTech had purportedly taken to address dust and air emissions at the Company's Monterrey facility. For example:

- "To reduce emissions, we have installed control technology on our equipment, which limits the amount of air emissions that enter the environment. . . . ***In Monterrey, a new dust collector was installed*** for our bake process and a new material transport system was installed for moving raw materials from storage to the processing area." ¶112.

- "During 2020, at our Monterrey, Mexico facility, ***we continued to implement projects focused on controlling emissions***, such as installation of new dust collection systems and upgrades to our mill, mix and forming, and baking operations to enhance our air emission controls." ¶144.

- "In Monterrey, ***we recently invested in automated controls***, which maintain temperatures in the bake furnace thermal oxidizers, ***resulting in more thorough reduction of air emissions from these operations***. We modified our bake ovens to allow for increased air circulation to reduce accumulation of particulate matter in the ovens. Our team in charge of this project meets on a regular basis to report on progress." ¶148.

However, these statements were materially false and misleading when made because, as was known by defendants at the time, GrafTech's Monterrey facility had failed to stop its decades-long practice of chronically polluting the communities in which it operated with harmful dust and air emissions. ¶¶49-52, 67-72. Contrary to statements that GrafTech was committed to "rigorous

- 23 -

internal environmental standards" and "proactively" took actions to reduce air emissions, the Company had repeatedly failed to remediate the Monterrey facility's polluting dust emissions, in violation of its own commitments to Apodaca officials and applicable environmental laws of the State of Nuevo León.  *See, e.g.*, ¶¶4, 45, 49, 67, 72, 111, 114.  Although GrafTech had been unambiguously ordered by regulators to "***immediately and permanently***" address the dust emissions generated by its Monterrey facility, the Company failed to carry out the required remedial actions, as evidenced by continued protests from public officials and private citizens.  For example, in March 2020, Mayor Garza and Andres M. Canto Ramirez, Apodaca's Secretary of Urban Development, Ecology, and Transportation, filed a complaint with the Secretary of Urban Development for the State of Nuevo León, asserting that GrafTech had violated environmental regulations.  ¶49. Specifically, the complaint stated, in part, that GrafTech's manufacturing operations in Monterrey "***constantly and continuously*** generate[d]" dust emissions, which negatively impacted the health of neighbors and the environment.  *Id.*

Despite its inaction and continued unlawful pollution by its Monterrey facility, GrafTech continued to tout its compliance with environmental regulations, the purported rigor of its internal environmental protection standards, and the "good progress" the Company was making on its environmental initiatives.  ¶¶106-107, 127-128, 139, 155, 156, 159-160, 164, 166.

Having chosen to voluntarily speak about matters regarding GrafTech's environmental compliance and specific efforts to address dust emissions at its Monterrey facility, defendants were required to provide complete and non-misleading information regarding GrafTech's failure to control the dust emissions generated by its Monterrey facility.  *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004) (finding defendants had duty to disclose state of disrepair of nuclear facility where company chose to speak regarding problems at facility) (citing *Helwig*, 251 F.3d at 561 ("a company may choose silence or speech elaborated by the factual basis

as then known – but it ***may not choose half-truths***”)); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (statements describing “pollution-preventing equipment” were actionable where defendant omitted that equipment failed to “prevent substantial violations of the Chinese regulations”).[5]

Defendants' argument that Plaintiff's pleading rests on fraud-by-hindsight misconstrues the Complaint's allegations. For example, defendants ignore Plaintiff's particularized allegations by contending that the Complaint bases the falsity of GrafTech's statements regarding its environmental efforts and compliance ***solely*** on the September 2022 shutdown of the Monterrey facility. GrafTech Mem. at 15. Contrary to this assertion, however, Plaintiff's claims regarding the falsity of such statements are also supported by the formal resolution of the 2019 administrative resolution and multiple other contemporaneous facts showing that GrafTech failed to remedy its deficient dust emission controls following the 2019 administrative proceeding, despite the Department of Sustainable Development's explicit order that the Company “immediately and permanently” do so. *See, e.g.*, ¶¶4, 45, 49-51.[6]

Defendants' additional argument that Mayor Garza's comments do not support falsity merely because his statements were made in August 2022 is also misguided. GrafTech Mem. at 16. Specifically, defendants' argument conveniently ignores the content of Mayor Garza's statements,

---

[5] Defendants' heavy reliance on *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015) is misplaced. GrafTech Mem. at 15-16. There, the court found that allegations that a “few suppliers” did not adhere to defendants' standards and protocols were insufficient to establish the falsity of statements describing those standards as “‘strict.’” *Yum! Brands*, 620 F. App'x at 489-90. Unlike the allegations in *Yum! Brands*, the Complaint's allegations show that defendants' compliance statements were demonstrably false through, *inter alia*, allegations that: (i) regulators had formally concluded that the Monterrey facility violated provisions of state environmental law; and (ii) government officials and private citizens had confirmed that the GrafTech failed to remedy the violations following that conclusion. ¶¶4, 45.

[6] Defendants' additional contention that the Complaint “cites no document, communication, or other source” (GrafTech Mem. at 15) to establish falsity is wrong for the same reasons set forth in §III.A.1.a., *supra*.

4903-3909-1988.v1

which detail *past* events that occurred before and during the Class Period and further establish the falsity of defendants' statements. *See* ¶¶67-69 ("I have witnessed how various attempts have been made over time, none of which have been successfully completed. . . . Agreements were signed, follow-ups were carried out, investments were made, but we have no results."); *see also* ¶72 ("[GrafTech] always signs agreements and always says it will solve the problem, but it never does. . . . We already gave them 30 years to correct themselves and they didn't.").[7]

The Court should see past defendants' ploys and reject these arguments. *In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *14 (S.D. Ohio Sept. 29, 2023) ("courts must be cautious when considering fraud by hindsight arguments at the motion to dismiss stage because there has been little if any discovery and the court has no visibility in the evidence that was available to the corporate [defendants] when they made the allegedly-false statements").

### c. Defendants' Statements About the 2019 Administrative Proceeding Were Materially False and Misleading When Made

Defendants materially misrepresented the events of the 2019 administrative proceeding. In particular, defendants characterized the regulatory action as one merely involving certain "potential violations" of environmental law, and claimed that GrafTech had "cooperated" with the agency, including by complying with orders to implement certain "corrective actions." These statements, however, were affirmatively false when made because, as the Complaint alleges, the Department of Sustainable Development expressly found that GrafTech had, in fact, *violated* provisions of state environmental law by operating "without the means of control to ensure that dust emissions [were]

---

[7] Defendants also attempt to discount the import of the Complaint's well-pled allegations by recasting them as mere opinions. GrafTech Mem. at 16-17. In doing so, defendants improperly ask the Court to resolve factual disputes in their favor. The Court should decline defendants' request. *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (the task of the court in ruling on a Federal Rule of Civil Procedure 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence").

- 26 -

avoided." ¶¶4, 45. Similarly, defendants' other statements that GrafTech had "cooperated" with the agency's requirements were materially misleading when made because they failed to disclose that GrafTech's Monterrey facility had, in fact, failed to comply with regulatory requirements, including those requiring it to "***immediately and permanently***" take "necessary" actions to "guarantee avoiding the generation of emissions of dust." *Id.* As the Complaint alleges in detail, GrafTech's Monterrey facility fell woefully short of complying with these obligations. ¶¶49-52, 67-72. In addition, defendants' representations that GrafTech resolved the 2019 administrative proceeding following payment of fines that were "not material" to the Company were materially misleading because they failed to disclose that the resolution also included an agreement by GrafTech to invest more than $2 million in dust containment projects. ¶¶4, 46. Having chosen to describe the events of the 2019 administrative proceeding, defendants were required to do so truthfully and completely. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 673 n.19 (6th Cir. 2005) ("[Defendants] chose to speak, implicating, through that choice, the duty to speak truthfully as to the topics on which it spoke."). But defendants failed to do so, rendering their statements materially false and misleading when made.

Defendants again contend that the Complaint "cites no document, communication, or statement" that contradicts defendants' statements regarding the 2019 administrative proceeding. GrafTech Mem. at 17. Here again, however, defendants' argument ignores the Complaint's well-pled allegations regarding the formal resolution of the 2019 administrative proceeding, which set forth the Department of Sustainable Development's conclusion that GrafTech's Monterrey facility did, ***in fact*** – not potentially – violate applicable provisions of environmental law. ¶¶4, 45-46. Likewise, the Complaint's allegations regarding the formal resolution also show that, in addition to payment of non-material fines, GrafTech also agreed to invest more than $2 million in remedial measures to purportedly address the violations of environmental law at its Monterrey facility. *Id.*

- 27 -

Defendants' other argument that requiring disclosure of the undisclosed truth regarding the outcome of the 2019 administrative proceeding would result in a deluge of trivial information is pure hyperbole. GrafTech Mem. at 19. As the Sixth Circuit has recognized, "'[t]he requirement is not to dump all known information with every public announcement, but the law requires "an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.""" *Bridgestone*, 399 F.3d at 673 (emphasis omitted) (citing *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002).

The Court should reject defendants' arguments.

### d. The Challenged Statements About the Monterrey Facility Are Actionable Opinions Because Defendants Omitted Material Facts Regarding the Basis for Their Opinions

Defendants contend that many of the alleged misstatements regarding GrafTech's "advantaged low-cost structure," including statements that GrafTech's manufacturing facilities were the "lowest-cost large scale graphite electrode manufacturing facilities in the world" are non-actionable statements of opinion. Defendants' arguments fail.

"[T]he word 'believe' is no shield when the profession of belief itself is a lie." *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 673 (M.D. Tenn. 2022). Rather, "a statement couched as an opinion can still be misleading if it omits material facts about the basis for the opinion." *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *11 (M.D. Tenn. Nov. 19, 2019). A reasonable investor may be materially misled when the contents of an opinion fail to "fairly align[] with the information in the [statement maker's] possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015).

Here, defendants repeatedly touted GrafTech's competitive low-cost structure without disclosing that the Company's purported cost leadership had been achieved in material part by failing to adequately control dust emissions at its Monterrey facility. The omission of information

- 28 -

regarding GrafTech's failure to address the known dust control problem – from which regulators expressly found that GrafTech "***benefitted economically***" – rendered statements regarding the Company's cost structure materially misleading.  *See, e.g.*, *Envision*, 2019 WL 6168254, at \*12 (opinion statements "regarding the drivers of success [were] misleading for omitting information regarding out-of-network-billing as a factor driving revenue"); *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at \*15 (M.D. Tenn. Apr. 8, 2021) (opinion statements regarding "merits and potential success of [defendant's] marketing strategies" were misleading "for omitting information regarding the increased scrutiny of [its] methods and the widespread rejection of its deceptive and misleading practices").

Defendants' additional contention that GrafTech's compliance statements were inactionable opinion statements is also incorrect.  As defendants concede, statements of opinion are actionable where it is alleged that the defendant was aware that their statement was false.  GrafTech Mem. at 20 (citing *Omnicare*, 575 U.S. at 185-86.  As detailed in §III.B.1., defendants were undoubtedly aware that GrafTech's Monterrey facility materially failed to comply with applicable legal and regulatory requirements.  Accordingly, defendants' statements that GrafTech complied with environmental regulations are actionable.  *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2021 WL 195370, at \*5 (M.D. Tenn. Jan. 20, 2021) (finding that statements claiming company was in "'substantial compliance'" were materially misleading because facilities were in "'regular violation'" of regulations).

> ### e. The Challenged Statements About the Monterrey Facility Are Not Puffery

Defendants further contend that statements regarding GrafTech's low-cost structure, environmental efforts, and compliance with laws and regulations are too general to be actionable.  GrafTech Mem. at 21-22.  Defendants are incorrect.

Even "puffery, in particular contexts in which it is both factual and material, may be actionable." *Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *23 (M.D. Tenn. Aug. 17, 2022). "The Sixth Circuit has made clear that even superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism." *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017). "The key is whether the proposition at issue can be proven or disproven using standard tools of evidence." *Bridgestone*, 399 F.3d at 674. Materiality is a question of fact that should not typically be decided on a motion to dismiss. *See Helwig*, 251 F.3d at 563. Accordingly, courts "must tread lightly at the motion-to-dismiss stage" and "engag[e] carefully with the facts of a given case and considering them in their full context." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014); *Upstart*, 2023 WL 6379810, at *12 (dismissal on grounds of puffery "should not be done lightly").

Defendants' statements regarding GrafTech's purported cost leadership were routinely paired with factual representations regarding the basis for the Company's low-cost structure. For example, in representing that GrafTech had the "lowest cost large-scale graphite electrode manufacturing facilities in the world," defendants also told investors that the Company's low-cost structure was due to low-cost energy sources, logistical and freight advantages in sourcing raw materials, and shipping its products. ¶¶92, 108, 129, 161. As such, these statements are "subject to both measurement and verification," and therefore cannot be deemed unactionable puffery. *In re Home Point Cap. Inc. Sec. Litig.*, 2022 WL 18932069, at *5 (E.D. Mich. Oct. 5, 2022) (finding that statements such as "we are able to operate with a lower fixed cost than many of our competitors" were not puffery) (emphasis omitted).

Defendants' arguments with respect to GrafTech's environmental and sustainability initiatives fail for similar reasons. There too, defendants' representations were mixed with material

4903-3909-1988.v1

statements of fact regarding specific actions GrafTech had undertaken to address pollution at its Monterrey facility. For example, Rintoul's representation that GrafTech was "committed to improving [its] environmental footprint" was paired together with the representation that GrafTech had "continued to implement projects focused on controlling emissions" at its Monterrey facility, including the "installation of new dust collection systems and upgrades to our mill, mix and forming, and baking operation to enhance our air emission controls." ¶144. Similarly, other seemingly standalone statements, including for example, that GrafTech "proactively take[s] steps to reduce" its impact on the environment (¶111), were included within broader reports that contained other factual representations regarding steps GrafTech had claimed to undertake: "In Monterrey, a new dust collector was installed . . . ." ¶112 (citing GrafTech's 2019 Sustainability Report). In doing so, defendants "peg[ged] [their] claims to something concrete," rendering their statements actionable misrepresentations of material facts. *Grae*, 2017 WL 6442145, at *14.

Defendants' remaining arguments regarding GrafTech's compliance statements attack a strawman. As courts in this Circuit have recognized, "the distinction between hard information and soft information is of little consequence" where, as here, "[p]laintiffs allege facts demonstrating that [defendants] chose to speak . . . but did not do so truthfully." *In re CBL & Assocs. Props., Inc. Sec. Litig.*, 2022 WL 1405415, at *7 (E.D. Tenn. May 3, 2022) (citing *Helwig*, 251 F.3d at 561) ("stating that '[t]he characterization of opinions and projections as "soft" is beside the point in this case' because 'the question here is . . . liability for not having spoken enough'").

Accordingly, the Court should reject defendants' contentions.

### 2. Defendants Made Materially False and Misleading Statements About the St. Marys Facility

Throughout the Class Period, defendants described the shuttered St. Marys facility as a valuable asset that provided critical flexibility and risk mitigation to GrafTech's "manufacturing footprint." ¶88. Contrary to defendants' representations, however, after ceasing manufacturing

- 31 -

4903-3909-1988.v1

operations at St. Marys in 2016, GrafTech failed to take the steps necessary to actually "warm idle" the plant, such as keeping operating permits valid and maintaining equipment. ¶¶58, 60. This neglect precluded St. Marys from serving as a "peaking plant," as claimed by defendant Rintoul at the start of the Class Period. ¶¶88-89. Defendant Halford's subsequent statements that GrafTech had invested in a new "pin *production* line" at St. Marys, which was supposedly "operational" by November 2021, further misled investors by falsely conveying that GrafTech had "de[-]risked [its] pin *production* capacity" by supposedly having "2 connecting *pin production facilities*." ¶¶53-65. Contrary to these representations, the truth was that St. Marys had neither the equipment nor the proper operating permits to produce connecting pins or pin stock, and thus, was incapable of "de[-]risk[ing] [GrafTech's] pin *production* capacity," which remained concentrated at the Monterrey facility.

### a.      Defendant Rintoul Falsely Claimed St. Marys Was a Peaking Plant

At the start of the Class Period, defendant Rintoul told investors that St. Marys was "essentially the equivalent of a peaking plant," meaning that GrafTech could "ramp up production at St. Marys if required by the market." ¶88. Defendants thus assured investors that even though St. Marys was closed, it was being "warm idled" and primed for production if needed. This was false. For St. Marys to have actually been a warm-idled "peaking plant," GrafTech needed it to be permitted and in a condition in which it could actually ramp up for production at the time such production was needed. But as confirmed by the Former Engineering Lead and defendants' *own subsequent admissions*, St. Marys had neither the requisite operating permits nor functioning equipment required to produce pins, and would thus, require at least 18-24 months to actually ramp up for full production. ¶¶60-63, 65, 75, 89(b), 171(d).

Defendants respond that, at the time Rintoul made his statement, GrafTech had really intended to use St. Marys as a peaking plant. GrafTech Mem. at 28. This disputed fact cannot be

- 32 -

inferred from the Complaint because actions speak louder than words: if GrafTech had actually intended to position St. Marys as a peaking plant, it would have maintained the equipment and permits needed to ramp up such operations when the need arose. ¶¶88-89. Defendants further suggest that GrafTech's subsequent silence on the peaking plant issue corrected the misconception that St. Marys was a peaking plant. GrafTech Mem. at 28 n.19. But this silence did not convey information which ""counter-balance[d] effectively any misleading information."" *Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 671 (E.D. Mich. 2023) ("'the corrective information must be conveyed to the public "with a degree of intensity and credibility"'"); *In re N. Dynasty Mins. Ltd. Sec. Litig.*, 2023 WL 9509337, at *4 (E.D.N.Y. Jan. 25, 2023) ("silence about expansion of the Project could reasonably lead investors to believe that [defendant] still planned, as they [previously] stated . . . not to expand the Project"). Moreover, defendants' failure to repeat their misrepresentations does not render them any less false and misleading at the time they were made. *Helwig*, 251 F.3d at 561 ("a company may choose silence or speech elaborated by the factual basis **as then known**").

Defendants also claim that Rintoul's "'peaking plant'" statements were forward-looking and, thus, protected by the PSLRA Safe Harbor. GrafTech Mem. at 28 n.20. But the statements challenged by Plaintiff concern present and historical facts regarding the then-existing status of the St. Marys facility. *See* ¶88 ("St. Marys can be thought of as essentially the equivalent of a peaking plant . . . ."). Specifically, by describing St. Marys as a "peaking plant" capable of ramping up production in short order, Rintoul falsely conveyed facts regarding not only the current status of St. Marys, but also the steps GrafTech had supposedly taken with regard to St. Marys after ceasing its manufacturing operations in 2016. *See Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 984 (6th Cir. 2018) ("statements . . . phrased as an observation of a historical fact" are not covered by the Safe Harbor).

- 33 -

Even if defendants' statements could be construed as forward-looking (which they are not), they were not accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]."  15 U.S.C. §78u-5(c)(1)(A)(i).  "'[B]oilerplate warnings will not suffice'" but "'must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge.'"  *Helwig*, 251 F.3d at 558-59.  The sole risk defendants identify is that "'***plant capacity expansion*** may be delayed or may not achieve the expected benefits.'"  GrafTech Mem. at 28 n.20.  But plant capacity expansion is a different kind of activity than designating a facility's existing capabilities for peak demand.  Defendants' warnings that those unrelated activities "may not achieve the expected benefits" are the same kind of generic warnings that "future results could differ" that courts across the country have regularly rejected as inadequate to invoke the Safe Harbor's protection.  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015).

> **b.** **Defendants Falsely Represented that St. Marys Was an Operational "Pin Production Facilit[y]" Capable of "De-Risk[ing]" GrafTech's "Pin Production Capacity"**

Later in the Class Period, defendants further misled investors by falsely claiming that St. Marys had an operational pin production facility, which supposedly de-risked the Company's pin production capacity by providing it with two pin production facilities.  ¶¶53-65, 75, 142-143, 151, 153-154, 158, 163, 168-169.  Specifically, on August 6, 2021, Halford told investors that the Company was "investing in a ***pin production*** line" at St. Marys that would "diversif[y] [GrafTech's] pin capacity and provide[] ***production*** flexibility."  ¶142.  On November 5, 2021, Halford stated that St. Marys's "***pin production*** line" was "***now operational***," which "[i]mportantly" provided GrafTech with "2 connecting ***pin production facilities***."  ¶153.[8]  During subsequent earnings calls

---

[8]  That same day, GrafTech also filed its Form 10-Q for the third quarter of 2021, which was signed by defendants Rintoul and Coburn and further touted GrafTech's introduction of "additional connecting pin ***production*** capabilities" at its St. Marys facility.  ¶151.

4903-3909-1988.v1

on February 4, 2022 and May 6, 2022, Halford continued to extoll the purported benefits of the St. Marys facility's pin production operations by claiming that the facility helped "*de[-]risk* [GrafTech's] *pin production* capacity." ¶¶158, 168.[9]

The Complaint alleges that these statements were materially false and misleading because they falsely conveyed that the Company had insulated itself against the risk of commercial disruptions due to insufficient pin supply in the event that operations at the Monterrey facility were interrupted, when in fact St. Marys's operations provided no such insulation at all. ¶¶57-58, 64. Indeed, in direct contrast to defendants' affirmative representations, St. Marys had neither the functioning equipment nor the operating permits required for "pin production" – and was, thus, incapable of "de[-]risk[ing] [GrafTech's] pin *production* capacity." ¶¶60-63, 65, 75, 143(b), 154(b), 163(b), 169(b). These allegations are supported by defendants' *own subsequent admissions* and allegations sourced from the Former Engineering Lead.[10]

---

[9]   The alleged misstatements concerned an issue that arose when Brookfield achieved purported cost savings by reducing GrafTech's manufacturing footprint, as these savings came at the cost of lower resilience to operational shocks. By concentrating the Company's pin and pin stock production in Monterrey, any disruption there would bring the entire Company's operations to a standstill as its graphite electrodes were incomplete and could not be sold without the connecting pins. ¶¶1, 39, 53, 64.

[10]   On January 20, 2025, defendants filed a motion to strike the allegations attributed to the Former Engineering Lead. ECF 67, *et seq.* ("Motion to Strike"). As detailed in Plaintiff's Memorandum in Opposition to Motion to Strike ("OMTS"), filed concurrently herewith, the Motion to Strike is baseless. The basis for such motion purportedly comes from the Declaration of Joshua Geitner ("Geitner Declaration") (ECF 67-3), which was submitted with the Motion to Strike. Notably, the Geitner Declaration was signed on November 26, 2024 – *ten days before* defendants' Motions were filed. Yet, the Motions do *not* contest in any way the reliability or accuracy of the allegations attributed to the Former Engineering Lead. *See* GrafTech Mem. at 26-27. Moreover, contrary to defendants' insinuations in the Motion to Strike, the Geitner Declaration does *not* refute or contradict the factual allegations attributed to the Former Engineering Lead. OMTS at 4-5. Instead, the Geitner Declaration primarily seeks to clarify that the factual allegations attributed to him – which he does not retract or refute – pertained only to the "initial stages of the *production* process," not the later stages of graphitizing and machining pins. Geitner Declaration, ¶4. As further explained below and in Plaintiff's OMTS, this clarification is irrelevant to Plaintiff's claims, which are *not* based on *any allegation* that St. Marys was not involved in graphitizing or machining activities. *See* OMTS at 2-4, 10-11.

- 35 -

Specifically, on November 4, 2022, defendants disclosed that the Company was just then, *at that time*, "pursuing approvals for operating permits to restart the [St. Marys] facility for *pin production*." ¶¶65, 172. This admission expressly confirms that St. Marys was not previously engaged in "pin production" – directly contradicting defendant Halford's prior representations that St. Marys's "*pin production* line" was "operational" and "ramping up production," thus providing GrafTech with "2 connecting *pin production* facilities." ¶¶54, 65, 153. defendants' admission also corroborates the allegations attributed to the Former Engineering Lead, which establish that: at the time of defendants' alleged misstatements, St. Marys lacked the functioning equipment and operating permits needed to produce pins; GrafTech did not even begin the process of obtaining such permits until 2023; and St. Marys did not conduct its first "pin trial run" until late-2023 (approximately two years after Halford told investors that St. Marys had provided GrafTech with a second "pin production facilit[y]"). ¶¶54, 60-62, 65. Moreover, the falsity of Halford's "de[-]risk" statements is further confirmed by his subsequent admissions on April 28, 2023, which conceded that a "*full restart of St. Marys*" would be required "*to de-risk [GrafTech's] pin supply chain*." ¶65.

The above facts plainly establish that Halford's statements regarding St. Marys's "pin production" operations and the facility's purported ability to "de[-]risk [GrafTech's] pin production capacity" were materially false and misleading when made. ¶¶154(b), 163(b), 169(b). Defendants, however, claim that investors could not possibly have been misled by these alleged misstatements because the Company supposedly disclosed on separate occasions that St. Marys's activities were "limited to pin machining." GrafTech Mem. at 24-25. But this truth-on-the-market argument fails for multiple reasons.

First, "the Sixth Circuit has 'not applied the truth-on-the-market defense,'" and "[e]ven if it had, truth on the market is an issue for the trier of fact." *Shupe*, 660 F. Supp. 3d at 671. This is

- 36 -

4903-3909-1988.v1

because arguments concerning "the extent to which the market . . . was, or was not, aware of the [allegedly concealed facts] . . . is a fact-intensive issue and improper for consideration here at the pleading stage." *CBL*, 2022 WL 1405415, at *15; *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *10 (M.D. Tenn. Apr. 19, 2018) (same); *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010) (same).

Second, the majority of disclosures defendants point to contain nothing more than descriptions of the activities St. Marys was engaged in several years ***prior*** to the alleged misstatements. *See, e.g.*, Ex. 17 (3Q20 Form 10-Q) at 26 ("[i]n the first quarter of 2018, our St. Marys facility began graphitizing a limited amount of electrodes sourced from our Monterrey, Mexico facility"); Ex. 18 (1Q21 Form 10-Q) at 25 (same); Ex. 19 (2Q21 Form 10-Q) at 26 (same); Ex. 20 (3Q21 Form 10-Q) at 26 (same); Ex. 22 (1Q22 Form 10-Q) at 25 (same).[11] But the alleged misstatements, which were made by defendants in the second half of 2021 and the first half of 2022, clearly conveyed to investors that St. Marys was engaging in ***different*** activities than it had previously. Specifically, Halford's August 6, 2021 statements told investors that GrafTech was "***investing*** in a ***pin production*** line" that would "be online in the third quarter" and would "provide[] ***production*** flexibility." ¶142. And Halford's November 5, 2021 statements represented that the production line was "now operational," while further proclaiming: "***Importantly, this provides us with 2 connecting pin production facilities***." ¶153. Because the alleged misstatements clearly conveyed that St. Marys's pin-related operations had undergone a significant change, GrafTech's representations regarding St. Marys's operations prior to those changes are irrelevant to Plaintiff's claims.

---

[11] All "Ex.__" citations herein are to the Declaration of Geoffrey J. Ritts in support of motion to dismiss. ECF 64-5.

Third, defendants' argument defies common sense and ignores the ***actual words*** defendants used to mislead investors. As detailed herein, the alleged misstatements unambiguously conveyed that St. Marys was engaged in "***pin production***" and was purportedly helping to "***de[-]risk*** [GrafTech's] ***pin production*** capacity." ¶¶53-57, 142-143, 151, 153-154, 158, 163, 168-169. Defendants' argument implicitly contends that the words "pin production" actually meant "graphitizing and machining" – or that they had no specific meaning at all. But either contention directly refutes GrafTech's subsequent admission that the St. Marys facility did not previously possess the necessary operating permits "***for pin production***" – the very ***same words*** defendants used to describe activities that were supposedly "operational" at St. Marys one year prior. ¶¶65, 75, 153, 172. Moreover, if defendants' representations were, as they contend, intended to describe nothing more than a continuation of St. Marys's previously disclosed "graphitizing and machining" activities, they would not have deviated from their previous descriptions of those activities. But they did when they told investors that St. Marys's had an "operational" "***pin production*** line," which provided GrafTech with two "***pin production facilities***" and helped "***de[-]risk*** [GrafTech's] ***pin production*** capacity." ¶¶151, 153-154, 158, 163, 168-169.

Fourth, contrary to defendants' contentions, none of GrafTech's disclosures prior to November 4, 2022 clearly conveyed that St. Marys's activities were "***limited*** to pin machining." GrafTech Mem. at 25. In fact, the ***only*** time GrafTech expressly stated that St. Marys's activities were "***limited*** to graphitizing and machining" was in connection with their November 4, 2022 admission that St. Marys previously lacked the operating permits required for "pin production." ¶172. Although some of GrafTech's previous statements did discuss machining or graphitizing activities at St. Marys, they did not expressly state that those were the ***only*** activities St. Marys was engaged in – or that St. Marys was ***not*** involved in "pin production," as the defendants falsely represented. *See, e.g.*, Ex. 2 (3Q21 Earnings Tr.) at 7; Ex. 17 (3Q20 Form 10-Q) at 26; Ex. 18

(1Q21 Form 10-Q) at 25; Ex. 19 (2Q21 Form 10-Q) at 26; Ex. 20 (3Q21 Form 10-Q) at 26; Ex. 21 (2021 Form 10-K at 6, 14); Ex. 22 (1Q22 Form 10-Q) at 25.[12] Thus, given the unambiguous wording of the alleged misstatements regarding St. Marys's purported "pin production," it cannot be said as a matter of law that defendants' other disclosures effectively negated the false and misleading impression created by their alleged misstatements. *Shupe*, 660 F. Supp. 3d at 671 ("'corrective information must be conveyed to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by" the alleged misstatements'"); *Zwick Partners*, 2018 WL 2933406, at \*10 (rejecting defendants' argument that they had disclosed relevant information to the market, finding such argument "intensely fact-specific" and stating that "[t]he Court cannot conclude, at this time, that the information known publicly to the investors dispelled the false impressions created by defendants' alleged misrepresentations").

Moreover, even if defendants' statements regarding St. Marys's purported engagement in "pin production" were not materially misleading to investors (which they were, given defendants' subsequent admission that St. Marys was not actually permitted for "pin production"), Halford's statements regarding St. Marys's purported ability to "*de[-]risk* [GrafTech's] pin production capacity" were materially misleading for the additional reason that they concealed the fact that Monterrey was the only GrafTech facility capable of producing the critical "pin stock" required for all of GrafTech's electrodes and pins. ¶¶53, 64-65, 163(b), 169(b). Halford's "de[-]risk" statements misleadingly conveyed to investors that GrafTech had protected itself from potential commercial disruptions in the event that operations at the Monterrey facility were interrupted. Without an

---

[12] Defendants' contention that Rintoul's statement regarding GrafTech "not currently running the front end of St. Marys" clearly informed investors that St. Marys was not engaged in pin production (GrafTech Mem. at 25) is belied by the context of the analyst's question, which was about "electrode utilization" rates, ***not pins***, further highlighting the fact-intensive nature of defendants' procedurally inappropriate arguments concerning what investors purportedly understood Halford's statements to actually mean. *See* Ex. 23 (4Q21 Earnings Tr.) at 7.

4903-3909-1988.v1

alternative source of pin stock, however, it was impossible for the Company to insulate itself from such disruptions – and thus, impossible for St. Marys's activities to actually "de[-]risk [GrafTech's] pin production capacity." ¶¶39, 57-58, 64-65, 172, 182.[13] Prior to November 4, 2022, however, GrafTech never disclosed that Monterrey was the only GrafTech facility capable of producing pin stock, which resulted in Halford's "de[-]risk" statements creating a misleading impression of the state of affairs at GrafTech. ¶¶64-65, 75, 172; *see, e.g.*, *Big Lots*, 2016 WL 8199124, at *27 (finding statements that concealed known "issues that would call into question the viability of [the issuer's] business model or the integrity of its . . . operations" to be actionable); *Bridgestone*, 399 F.3d at 670 ("Our securities laws therefore 'require an actor to "provide complete and non-misleading information with respect to the subjects on which he undertakes to speak."'").

Finally, defendants contend that the allegations attributed to the Former Engineering Lead fail to support Plaintiff's claims because such "allegations do not touch on the graphitizing or machining operations at St. Marys" and "the Former Engineering Lead is not alleged to have said that St. Mary's *wasn't* engaging in the graphitizing and machining steps." GrafTech Mem. at 26-27 (emphasis in original). This argument is nothing more than a red herring premised on a complete misapprehension of Plaintiff's claims.

As thoroughly explained in Plaintiff's OMTS, the Complaint contains *no allegation* that St. Marys "*wasn't* engaged in graphitizing or machining activities" (*id.*), because whether "graphitizing and machining" were – or were not – occurring at St. Marys is *irrelevant* to Plaintiff's claims.

---

[13] Defendants contend that Halford's insertion of the word "helps" before his alleged misrepresentations concerning St. Marys's "de[-]risk[ing]" of GrafTech's "pin production capacity" precluded his statements from misleading investors. GrafTech Mem. at 26. But Halford's use of the words "*pin production capability*" negates any curative inference from the word "helps." As alleged in the Complaint, and confirmed by defendants' subsequent admissions, it was impossible for St. Marys to even "help" de-risk GrafTech's "pin *production* capacity," given that 100% of the Company's pins and pin stock were produced at Monterrey – as confirmed by defendants' subsequent admissions that St. Marys was incapable of "help[ing]" to supplement *any* of GrafTech's "pin production capacity" following the Monterrey shut down. ¶¶64-65, 172, 182.

OMTS at 3-4.  Plaintiff alleges that defendants' misrepresentations falsely represented that St. Marys was engaged in "pin production," which supposedly provided GrafTech with two "***pin production*** facilities" and helped "***de[-]risk*** [GrafTech's] ***pin production*** capacity."  ¶¶53-65, 142-143, 151, 153-154, 158, 163, 169, 172.  The allegations attributed to the Former Engineering Lead – as well as defendants' own admissions – confirm that St. Marys was not engaged in "pin production," and defendants do not contend otherwise.  That such allegations do not also support a separate contention the Complaint never attempts to make (that St. Marys was not engaged in graphitizing or machining activities) is wholly irrelevant to Plaintiff's claims.

### 3.  Defendants Made Materially False and Misleading Statements About the Impact of the Monterrey Shutdown

Following the shutdown of GrafTech's Monterrey facility in September 2022, defendants made several false and misleading statements to investors, which concealed material known facts directly bearing on the financial impact of the Monterrey shutdown.

First, when GrafTech announced the facility's closure on September 16, 2022, defendants failed to disclose the known material facts that: (i) GrafTech relied on the Monterrey facility for ***all*** of its critical pin stock inventory; and (ii) the closure had coincided with a "critical" "negotiation window" for the Company's 2023 customer contracts.  ¶¶74, 81, 171.

Then, on November 4, 2022—when defendants disclosed that the Monterrey facility was "the only site that produces the pin stock needed for all [of GrafTech's] electrodes" and admitted that St. Marys was not actually involved in "***pin production***" – defendants made several false and misleading statements that continued to conceal known material facts directly bearing on the financial impact of the Monterrey shutdown.  ¶¶75-79, 172-174.

Specifically, defendants told investors that the financial impact of the Monterrey facility shutdown would only be significant ***if*** the facility remained closed into 2023 – and even then, would be limited to the first two quarters of 2023.  ¶¶77, 79, 173-174.  In addition, defendants Kessler and

- 41 -

Halford both assured investors that the impact of the Monterrey shutdown would be mitigated by the fact that GrafTech possessed a "substantial amount of inventory" of "pins and pin stock."  ¶176. And finally, when asked by an analyst for his "***perspective on contracting***" – and specifically, whether the Monterrey shutdown would "***limit[] the kind of commercial opportunities that [GrafTech] can put forward to [its] customers***" – defendant Halford responded by stating that the Monterrey shutdown would not impact GrafTech's "***commercial strategy at all***."  ¶¶78, 177.

These statements were materially false and misleading because they concealed the truth – which was known to defendants ***at the time*** – that, because the Monterrey shutdown had limited GrafTech's ability to enter into customer contracts for 2023 during a critical contract negotiation window and significantly depleted the Company's pin stock inventory, the effects of the Monterrey shutdown would be significant, ***even if*** the facility reopened in short order.  ¶¶78-79, 81, 177-178, 182, 218.  That these facts were known to defendants at the time of their alleged misstatements is confirmed by defendants' subsequent admissions.  ¶¶12, 79, 81, 182, 218.

Specifically, on February 3, 2023, defendants disclosed that, despite the Monterrey facility reopening ***within two weeks*** of the Company's November 4, 2022 disclosures, the temporary closure would nonetheless have a significant negative impact on the Company's performance during "the first half of 2023." *Id.*  At the same time, the Company revealed the previously concealed facts that: (i) the temporary closure had coincided with a "***critical time frame to secure customer orders***" for 2023; (ii) "[a]s a result of the uncertainty caused by the suspension ***during this contract negotiation window***, [GrafTech's] ability to enter into new customer commitments for the first half of 2023 was limited"; and (iii) although the Monterrey facility's "production of electrodes and pin stock ***began immediately*** upon the [lifting] of the suspension," the manufacturing of such products takes "***several months***," meaning "the ***rebuilding of [GrafTech's] pin stock inventory will take time***." *Id.*

- 42 -

In other words, *at the time* of defendants' November 4, 2022 misrepresentations: (i) GrafTech was *in the middle* of a "critical time frame to secure customer orders" for 2023; (ii) the Monterrey shutdown was, *at that time*, limiting the Company's "ability to enter into new customer commitments"; and (iii) defendants were aware that it would take "*several months*" to rebuild GrafTech's pin stock inventory, *even if* Monterrey reopened immediately. *Id.*[14]

Defendants misconstrue Plaintiff's allegations to argue that the Complaint's allegations regarding the Monterrey facility amount to fraud-by-hindsight. GrafTech Mem. at 29. Specifically, defendants contend that the Complaint alleges that their statements regarding the shutdown were materially misleading simply because the "ultimate impact turned out to be more severe than originally expected." *Id.* Defendants are incorrect. As set forth above, Plaintiff's allegations are based upon defendants' *own admissions* centered around information known to defendants *at the time of their statements*, and thus, are not fraud-by-hindsight. *See, e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191-92 (S.D.N.Y. 2010) (rejecting "'fraud by hindsight' arguments" where "subsequent admissions . . . established the falsity of the representation"); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (finding that even post-class period admissions can "directly and cogently tend to prove [defendants] state-of-mind at the time of their misleading statements and omissions").[15]

---

[14] Defendants' contention that GrafTech had previously "shared with analysts on an earnings call that it negotiates some annual contracts in October and November and that its critical LTAs were up the following year" fails for multiple reasons. GrafTech Mem. at 31-32 n.22. First, defendants' argument raises a truth-on-the-market defense that is inappropriate for the same reasons stated in §III.A.2.b., *supra*. Moreover, defendants' disclosure of the existence of a negotiation window *a year prior* cannot be said, as a matter of law, to have fully informed investors that the uncertainty caused by the Monterrey shutdown had necessarily "limited" GrafTech's "ability to negotiate customer contracts for 2023" during the negotiation window that coincided with the shutdown *a year later*, particularly in light of Halford's statement that the shutdown would *not* impact GrafTech's "*commercial strategy at all*." ¶¶78-79, 81, 171, 177-178, 180, 182, 218.

[15] Defendants rely on *Lim v. Hightower*, 2024 WL 4349409 (N.D. Ohio Sept. 30, 2024), but as *Lim* makes clear, defendants "had a duty to disclose contemporary information that would make material

- 43 -

### a.      Defendants' Misstatements Are Not Inactionable Statements of Opinion

Statements of opinion are actionable where it is alleged that the defendant was aware that their statement was false.   Under *Omnicare*, statements that do not "fairly align[] with the information in the [statement maker]'s possession at the time," like the ones here, are also actionable.  575 U.S. at 188-89.  Defendants contend Plaintiff has not alleged such "contradictory information" in defendants' possession.  GrafTech Mem. at 32 (citing *Omnicare*, 575 U.S. at 185-86).[16]  As detailed in §III.B.3., *supra*, defendants were aware that the Monterrey facility was the Company's only facility capable of producing the pin stock needed for all of GrafTech's pins; that the Monterrey shutdown coincided with a "critical" negotiating window, thereby significantly limiting GrafTech's ability to negotiate customer contracts for 2023; and that GrafTech also did not have sufficient pin stock to withstand even a temporary shutdown of the Monterrey facility.  Accordingly, statements, such as those indicating that GrafTech would avoid the 50% reduction in sales volume "in the first half of 2023" if Monterrey were to reopen (which it did two weeks later) (¶¶77-78), are actionable as they were wholly incompatible with facts in defendants' possession.  *See, e.g.*, *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 52 F. Supp. 3d 189, 212 (E.D. Pa. 2021) (statements of opinion were actionable where plaintiffs "present[ed] numerous facts . . . that

---

statements misleading."  *Id.* at *14.  Plaintiff is alleging exactly that – that defendants knew of contemporaneous information that contradicted the impression that investors were left with from defendants' false and misleading statements.

[16]   Defendants' reliance on *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 789-90 (N.D. Ohio 2021), *aff'd*, 2022 WL 3972478 (6th Cir. 2022), and *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 224-25 (S.D.N.Y. 2020) is misplaced.  In *Plymouth*, 556 F. Supp. 3d at 790, the challenged statements concerned backlog estimates and the court found that "no factual allegation in the second amended complaint suggests or implies that ViewRay's math was incorrect," unlike here, where the allegations show the defendants knew of information that contradicted their assurances to the market on the impact of the Monterrey facility's shutdown. ¶¶75, 81, 83.  Similarly, in *Woolgar*, plaintiff failed to offer contradictory information, arguing only that "Defendants did not honestly believe their opinions regarding the strength or adequacy of the Company's loss reserves, or that they believed those estimates to be false."  477 F. Supp. 3d at 224.

directly contradicted the statements" that they alleged "were known to the speakers and could not be reconciled with the assurances offered to investors"); *Bridgestone*, 399 F.3d at 675 (noting "opinions about a verifiable assertion" imply """that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement""").

Moreover, defendants' statements about the impact of the Monterrey facility's shutdown were not mere "opinions." GrafTech Mem. at 33. Defendants' statements were direct assurances about the Company's pin stock and impact from the Monterrey facility's closure, and accordingly are actionable. *Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 462 (E.D. Pa. 2019) ("objective statements of fact" not considered opinion even though couched in terms of belief). Further, defendants' statements were framed as facts, not opinions, stating for example, "[w]e are ***actively pursuing approvals for operating permits for a restart of the facility for pin production***," (¶172), "the impact would be ***limited to the first half of 2023***," (¶174), and "***[w]e have kept a substantial amount of inventory all the way along of pins and pin stock***" (¶176). Regardless, even if defendants' statements are opinions, they are still actionable. *See, e.g.*, *Envision*, 2019 WL 6168254, at *11 ("statement couched as an opinion can still be misleading if it omits material facts about the basis for the opinion").

### b. Defendants' Misstatements Are Not Protected by the PSLRA Safe Harbor

Defendants assert that their statements regarding the expected impacts from the Monterrey facility's shutdown were forward-looking and protected by the PSLRA Safe Harbor. GrafTech Mem. at 33-35. Defendants' forward-looking statements are not protected because defendants knew their statements were false when made, and any so-called cautionary language was in actuality

- 45 -

affirmatively misleading, *see* §III.B.3., *infra*.[17] "The 'critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made. If so, then the statement is not forward-looking' – even if the statement pertains to a future event." *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at \*12 (S.D. Ohio Sept. 27, 2021). *See also Helwig*, 251 F.3d at 548 (safe harbor protection for statement denied when "defendants had actual knowledge that it was false or misleading" and "lacked meaningful cautionary statements"); *AAC Holdings*, 2021 WL 1316705, at \*14 (no forward-looking statement protection because "Defendants were aware, at the time the statements were made, that the facts stated were, at best deceptive and misleading"); *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 689-90 (M.D. Tenn. 2000) (plaintiff may remove forward-looking statements from the Safe Harbor provisions by asserting that "certain of defendants' forward-looking statements were knowingly false when made").

Additionally, defendants' alleged misrepresentations were not accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. §78u-5(c)(1)(A)(i). Defendants' warnings that GrafTech was "'not able to assess how long operations at the manufacturing facility will be temporarily suspended'" or that GrafTech could not assure that its mitigation "'measures will be effective in limiting the impact of the suspension'" are inadequate. GrafTech Mem. at 34-35. "'If a company were to warn of the potential deterioration of one line of business, when in fact it was established that that line of business had already deteriorated, then . . . its cautionary language would be inadequate to meet the safe harbor standard.'" *Envision*, 2019 WL 6168254, at \*16. "'By analogy, the safe harbor would not protect from liability a person "who warns his hiking companion

---

[17] Accordingly, *Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l Inc.*, 2013 WL 9925989 (E.D. Ky. July 31, 2013), where the court found plaintiffs' supporting evidence of knowledge of known risks lacking, is inapposite.

- 46 -

to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."'" *Id.*; *see also MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*, 2009 WL 4506418, at *9 (E.D. Mich. Nov. 30, 2009) ("'There is a difference between knowing that [the relationship and transactions] may run into a few snags, and knowing that a particular [agreement] has already developed problems so significant as to require months of delay.'").

Here, defendants' warnings about the length of the Monterrey facility's shutdown or the effectiveness in limiting the impact of the shutdown portrayed the shutdown's worst impacts as merely potential outcomes. These warnings were inadequate because at the time those warnings were given, defendants knew with near certainty that there would be adverse impacts because Monterrey was GrafTech's only facility capable of producing the needed pin stock, and it was not until November that defendants admitted that they were ***just now*** "actively ***pursuing approvals for operating permits to restart the [St. Marys] facility for pin production***." ¶75. Similarly, the Monterrey facility's shutdown coincided with "critical" negotiation windows, which defendants knew, but failed to disclose. ¶81. Moreover, the Company did not have enough pin stock to withstand even a temporary shutdown notwithstanding the fact that pin production operations resumed once the suspension was lifted. *Id.* Indeed, defendants later admitted on February 3, 2023, that "rebuilding of our pin stock inventory will take time" as the "required manufacturing time . . . is generally several months." *Id.*

### B. The Complaint Alleges a Strong Inference of Scienter

To adequately plead scienter, the Complaint's allegations must raise a "'"strong inference"'" that defendants "'"acted with the required state of mind."'" *Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011) ("*Dana II*"). In the Sixth Circuit, the "'"required state of mind"'" can be shown through either: (1) "'knowing and deliberate intent to manipulate, deceive, or defraud'"; or (2) "recklessness." *Id.* at 959. "Recklessness is not negligence, but more "'akin to conscious

disregard."'" *Id.*; *see also Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 4064256, at *4-*5 (N.D. Ohio Aug. 18, 2014); *Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at *8-*9 (M.D. Tenn. Mar. 31, 2016).  For purposes of corporate scienter, the "'knowledge of a corporate officer or agent acting within the scope of [his] authority is attributable to the corporation.'"  *Bridgestone*, 399 F.3d at 688.

"The inference that the defendant acted with scienter **need not be irrefutable**, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324.  Rather, when assessing scienter, "the reviewing court must ask: When the allegations **are accepted as true and taken collectively**, would a reasonable person deem the inference of scienter **at least as strong** as any opposing inference?"  *Id.* at 326.  "[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward."  *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008) ("*Dana I*").  In other words, "'*Tellabs* now **awards the draw to the plaintiff**.'"  *Id.* (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008)).

To aid in the scienter analysis, the Sixth Circuit has identified a "non-exhaustive" list of nine factors (the "*Helwig* factors") that may be "helpful in guiding securities fraud pleading."  *Helwig*, 251 F.3d at 552.[18]  Plaintiff need **not** establish the presence of all – **or any** – of the *Helwig* factors in

---

[18]  The *Helwig* factors are:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

order to allege a strong inference of scienter.  *See, e.g.*, *Grae*, 2017 WL 6442145, at \*20 (finding scienter adequately alleged where two of nine factors were present); *In re Upstart Holdings, Inc. Sec. Litig.*, 2024 WL 3647705, at \*3 (S.D. Ohio Aug. 5, 2024) (citing *Esperion*, 905 F.3d at 979) ("not all *Helwig* factors are relevant in every case"); *see also Pittman v. Unum Grp.*, 861 F. App'x 51, 54 (6th Cir. 2021) (same).

As explained by the court in *Bond*, "[t]he *Helwig* factors are an analytical tool for courts, **not a pleading requirement**."  587 F. Supp. 3d at 676.  "[A] plaintiff can choose to acknowledge those factors explicitly if he would like.  There is, however, **nothing wrong with choosing not to**."  *Id.* Instead of focusing on the *Helwig* factors, the scienter analysis "must focus on what would support a strong inference of scienter in the context of the particular wrongdoing alleged."  *Id.*  "When securities fraud allegations involve the concealment of risks facing a company, the court looks, *inter alia*, at whether 'the plaintiffs sufficiently explained **why or how** the defendants knew about' the danger."  *Id.* (emphasis in original) (citing *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 470 (6th Cir. 2011)); *see also Ashland*, 648 F.3d at 469.[19]

As further detailed below, when the Complaint's allegations are accepted as true and taken collectively, they clearly give rise to a strong inference of scienter as to all defendants and all claims, consistent with the standards set forth above.

---

*Id.*  As further detailed herein, factors (1)-(3), (6), and (9) are all applicable to certain of Plaintiff's claims.

[19]  In making this assessment, the Court must "review the allegations holistically to determine whether the facts alleged give rise to a strong inference of scienter."  *Upstart*, 2023 WL 6379810, at \*20 (citing *Esperion*, 905 F.3d at 979); *see also Unum*, 861 F. App'x at 54 ("We evaluate scienter by looking at 'all allegations holistically.'") (citing *Tellabs*, 551 U.S. at 326).

4903-3909-1988.v1

### 1. The Complaint Alleges a Strong Inference of Scienter Regarding the Monterrey Facility Misrepresentations

The Complaint adequately alleges that defendants Rintoul, Coburn, Halford, and Kessler knew of the harmful and pervasive dust emissions that GrafTech's Monterrey facility generated. Specifically, the Complaint alleges that through their supervisory roles in GrafTech's Environmental Steering Committee ("ESC"), defendants were actively involved in efforts to address and remediate dust emissions at the Monterrey facility. ¶¶195-206. The focus of the ESC was "oversee[ing] [GrafTech's] sustainability strategy," which expressly included efforts to improve "greenhouse gas emissions" and "air quality" at the Monterrey facility. ¶¶196-197. The Complaint further alleges that, at the direction of defendants Rintoul, Coburn, Halford, and Kessler, GrafTech "implemented programs to manage and control air emissions" and tasked others on the ground to "oversee[] compliance, tracking progress, and report[] performance on environmental metrics." ¶203. Defendants were regularly apprised of Monterrey's environmental performance and received monthly reports from facility site managers regarding "ESG-related performance data and initiatives." ¶¶202-203.

Defendants' active involvement in these efforts and knowledge of the underlying dust emissions are evidenced by their own public statements describing their roles on the ESC and the reports and information they received regarding the environmental initiatives they enacted. For example:

- "*Quinn [Coburn] and I and our senior executives participate in our ESG [S]teering [C]ommittee*. The steering committee oversees our sustainability strategy." ¶196 (defendant Rintoul).

- GrafTech's "*[s]enior management-led* Steering Group oversees our sustainability Strategy." ¶197.

- Team tasked with managing Monterrey's facility's air emissions "*meets regularly to report on progress*." ¶199 (citing 2020 Sustainability Report).

- 50 -

4903-3909-1988.v1

- "GrafTech believes it is important for ***management to see and understand what is happening on the plant floor*** by walking the production floor and observing activity firsthand.  We refer to this as 'Managing by Walking Around.'  ***Each week, our plant management communicates with our CEO and senior leadership*** on their contacts with employees, observations from site walk-throughs, and any corrective actions and/or best practices that were implemented to emphasize our shared commitment to health, safety, and environmental performance." *Id.*

- "Our ESG efforts fit seamlessly with our focus on safety and quality, as Dave described.  ***Our ESG Steering Committee, comprised of several members of our executive team, including me, Dave and Quinn***, oversees our sustainability strategy."  ¶200 (defendant Halford).

- "Site managers ***provide monthly reports to the senior leadership team*** that include environmental and ESG-related performance data and initiatives.  We also report our environmental and sustainability performance metrics to the Board quarterly."  ¶203.

- GrafTech conducted an "internal review process ***including executive and subject matter expert reviews***."  ¶204.

- "***Manager-led discussions focused on environmental care***" took place during a week-long event at the Monterrey facility.  ¶205.

Defendants also repeatedly highlighted the various ESC-directed actions GrafTech purportedly undertook to address the pollutant dust emissions generated by GrafTech's Monterrey facility.  For example:

- "During 2020, ***at our Monterrey, Mexico facility, we continued to implement projects focused on controlling emissions***, such as installation of new dust collection systems and upgrades to our mill, mix and forming, and baking operations to enhance our air emission controls."  ¶198 (defendant Rintoul).

- "Ongoing focus on improving environmental metrics at all of our production facilities, including upgrading manufacturing equipment."  ¶200 (defendant Halford).

- "GrafTech had completed a full materiality assessment with the assistance of external experts to identify and prioritize the key ESG issues for our business and stakeholders," which included "***a full validation of the assessment by our executive team***" that found "climate and energy" and "air emissions" as "Material topics" for the Company.  ¶201

- 51 -

- GrafTech undertook "*emissions reduction efforts that include capital investments* and advanced engineering technology on the equipment at our sites." ¶203.

- "Our 2021 Materiality assessment revealed *two top environmental priorities: climate and energy, and air emissions*. Recognizing the importance of these topics, GrafTech Maintains environmental management systems at each of our manufacturing sites that allow us to measure our efforts and identify and address risk. Protecting the environment and reducing our environmental footprint are critical to our operations and the long-term success of our business." ¶203.

- "*Each of our sites has implemented programs to manage and control air emissions*. Air emissions are monitored alongside our climate and energy initiatives and are subject to the same management structure." *Id.*

- "At each of our sites, environmental professionals are responsible for overseeing compliance, tracking progress, and reporting performance on environmental metrics." *Id.*

Thus, for years, defendants publicly touted their active supervision and management of GrafTech's ESC and highlighted the specific actions undertaken at their direction to understand and improve the Monterrey facility's dust emissions. Accepting the Complaint's allegations as true, it is implausible that defendants could have undertaken all of these actions at GrafTech's Monterrey facility and not known the true extent and severity of the issues alleged. As such, the inference of scienter is the *only* plausible inference. *Grae*, 2017 WL 6442145, at *20 (defendants' "own public statements about its quality assurance practices go a long way" in establishing scienter where company emphasized "'rigorous'" and "'comprehensive'" monitoring of performance and complaint alleged information was "provided to and relied upon by 'senior management'"); *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *23 (M.D. Tenn. Apr. 26, 2011) (when executives admit "that they monitored portions of the company's [business]" it is a "factor[] in favor of inferring scienter").

Defendants' contention that the Complaint fails to allege facts regarding any "document, communication, or data point known to any defendant at the time of any challenged statement" again

- 52 -

4903-3909-1988.v1

ignores the Complaint's particularized allegations.  GrafTech Mem. at 38.  As explained above, defendants were regularly apprised of the Monterrey facility's environmental performance and dust emissions through their direct supervision of GrafTech's sustainability strategy, their receipt of "monthly reports" detailing ESG performance, and weekly discussions with site managers that relayed observations from site-walkthroughs.  ¶¶195-208.  The Complaint also alleges that GrafTech's violations of environmental laws were continuing and ongoing throughout the Class Period, as evidenced by the Department of Sustainable Development's formal resolution of the 2019 administrative proceeding, environmental complaints, and Mayor Garza's public comments.  ¶¶4, 49-52, 67-72.  In addition, defendants expressly acknowledged their awareness of the 2019 administrative proceeding's formal resolution, which included the Department of Sustainable Development's finding that GrafTech's Monterrey facility had violated local environmental laws and ordered the Company to "immediately and permanently" remediate Monterrey's deficient dust emission controls.  ¶¶95, 98, 102, 207-208.  As such, Plaintiff has "provided a concrete, plausible explanation of how and why [Defendants] would have been aware of facts contradicting their public statements."  *Grae*, 2017 WL 6442145, at *21.  Nothing more is required.[20]

---

[20] Defendants' cited authorities are factually inapposite.  *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 532 (6th Cir. 2023) (allegations that termite Crisis was discussed amongst executives during meeting were insufficient to establish scienter where company disclosed during class period that it "faced millions in liability for termite-damage claims" and that "the company's accounting practice was to accrue liability for termite-damage claims 'when it is probable that future costs will be incurred and such costs can be reasonably estimated'"); *Konkol v. Diebold, Inc.*, 590 F.3d 390, 403 (6th Cir. 2009) (finding that legal memoranda discussing breach of contract were not probative of scienter because they "have nothing to do with whether revenue could be properly recognized"); *Omnicare*, 769 F.3d at 482 (finding allegations that company told auditor to "'"begin looking for other employment"'" after providing audit results were insufficient to establish scienter for compliance statements); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 972 (S.D. Ohio 2009) (allegations that defendants had access to spreadsheets and financial data were insufficient to establish scienter for statements regarding adequacy of loan reserves); *ViewRay*, 556 F. Supp. 3d at 797 (allegation that defendants received reports regarding company's backlog were insufficient to establish falsity for statement regarding backlog where company "continually reiterated the subjective nature of, and discretion given to, the decision about which orders to include or remove").

- 53 -

4903-3909-1988.v1

Defendants' additional contention that the importance of GrafTech's Monterrey facility to its operational and business performance does not support an inference of scienter is also incorrect. Indeed, it is well-established in the Sixth Circuit that "'[c]ourts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to "central, day-to-day operational matters[,]"'" and especially where they are "'[f]acts critical to a business's core management.'" *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at \*57 (M.D. Tenn. Mar. 31, 2011); *accord PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).  As the Complaint alleges, GrafTech's financial and operational success was critically dependent upon the uninterrupted operation of the Monterrey facility because it produced 30% of GrafTech's graphite electrode output and 100% of the pin stock used to produce graphite electrodes at all of GrafTech's manufacturing facilities.  ¶¶39, 222.  The importance of GrafTech's Monterrey facility to the Company's financial and operational performance supports an inference of scienter.  *Envision*, 2019 WL 6168254, at \*22 (defendants were presumed to have knowledge of fraudulent billing scheme where billing practices accounted for 35% of revenue).[21]

Defendants also contend that GrafTech's disclosures regarding the 2019 administrative proceeding "precludes any inference of scienter" because those disclosures show that "Defendants were forthcoming about the 2019 administrative proceedings."  GrafTech Mem. at 39-40.  However,

---

[21] *Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 838 (E.D. Ky. 2019) is distinguishable on its facts.  In *Doshi*, the court found that allegations that the company's overseas operations were "extensive" did not sufficiently indicate that the defendant knew of "a very specific issue relat[ing] only to FCPA compliance" to establish scienter for "generalized statement[s]" regarding the company's internal controls.  Here, the alleged misstatements regarding GrafTech's environmental efforts and compliance are directly related to – and often expressly reference – the Monterrey facility's environmental performance, and thus support an inference of scienter.  Even the court in *Doshi* recognized the viability of "core operations," making clear that its findings were limited to the facts in that case.  *Id.* ("Plaintiff is correct that courts have found statements regarding a company's core operations to be more indicative of scienter.").

defendants' argument again ignores Plaintiff's allegations that GrafTech's disclosures regarding the 2019 administrative proceeding materially misrepresented what actually transpired.  As explained above, the Complaint alleges that GrafTech materially misled investors regarding the events of the 2019 administrative proceeding by, *inter alia*, falsely representing that the regulatory action involved "potential violations" of environmental law when, in fact, the regulator expressly found that the Monterrey facility had ***violated*** applicable laws and ordered it to "immediately and permanently" remedy its violations.  ¶¶5, 47, 95, 98, 102.  These allegations unequivocally negate any notion that defendants were forthcoming and instead support, rather than undermine, an inference of scienter. *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("an inference of scienter can be established by the fact that the defendants touched on [a] specific issue . . . in their public statements"); *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it.).

### 2.    The Complaint Alleges a Strong Inference of Scienter Regarding the St. Marys Facility Misrepresentations

As detailed above, defendants Halford, Rintoul, and Coburn made clear and specific false representations regarding St. Marys's "pin production" capabilities during the second half of 2021 and the first half of 2022.  ¶¶53-65, 75, 142-143, 151, 153-154, 158, 163, 168-169, 212. Specifically, on August 6, 2021, Halford told investors that the Company was "investing in a ***pin production*** line" at St. Marys that would "diversif[y] [GrafTech's] pin capacity and provide[] ***production flexibility***."  ¶142.  Then, on November 5, 2021, Halford stated that St. Marys's "pin production line" was "***now operational***" and "***ramping up production***."  ¶153.  During the same call, Halford also told investors: "***Importantly***, this provides us with ***2 connecting pin production facilities***."  *Id.*  Also on November 5, 2021, GrafTech filed its Form 10-Q for the third quarter of 2021, which was signed by defendants Rintoul and Coburn and stated that GrafTech had

- 55 -

"*introduced* additional connecting pin *production* capabilities" at the St. Marys facility. ¶151. During subsequent earnings calls on February 4, 2022 and May 6, 2022, Halford continued to extoll the benefits of St. Marys's pin producing capabilities by claiming that the facility's operations were helping to "*de[-]risk* [GrafTech's] *pin production capacity*." ¶¶158, 168.

These statements were false because St. Marys was not, in fact, engaged in "pin production" – and thus, the purported enhancements to St. Marys's operations during 2021 did not "provide[] [GrafTech] with 2 connecting *pin production facilities*" or "*de[-]risk* [GrafTech's] pin production capacity." ¶¶53-65, 143(b), 154(b), 163(b), 169(b); *see also* §III.A.2.b., *supra*. Halford's statements regarding St. Marys's purported ability to "de[-]risk [GrafTech's] pin production capacity" were materially misleading for the additional reason that they concealed the fact that Monterrey was the *only GrafTech facility* capable of producing the critical "pin stock" required for all of GrafTech's electrodes and pins. ¶¶53, 64-65, 163(b), 169(b). Without an alternative source of pin stock, it was impossible for St. Marys's activities to actually "*de[-]risk* [GrafTech's] pin production capacity." ¶¶39, 57-58, 64-65, 172, 182.

The falsity of the above misstatements is confirmed by GrafTech's own admission on November 4, 2022 – a full year after Halford represented that St. Marys's "operational" "*pin production* line" provided GrafTech with two "connecting *pin production facilities*" – that St. Marys's did not previously possess, and was only just then pursuing, the operating permits required for "*pin production*." ¶¶65, 75, 172. In that same disclosure, GrafTech also revealed, for the first time, that the Monterrey facility was "the only site that produces the pin stock needed for all [the Company's] electrodes." ¶¶65, 75, 242.

As detailed above and in Plaintiff's OMTS, the falsity of the St. Marys misstatements is also supported by the allegations attributed to the Former Engineering Lead. *See* §III.A.2.b., *supra*; OMTS at 7. Among other things, these allegations establish that, at the time of the alleged

misrepresentations, St. Marys had neither the operating permits nor the necessary functioning equipment to engage in the "production" of pins or pin stock. ¶¶58-62.

Defendants' definitive misrepresentations conveyed clear and specific facts to investors regarding the activities that were supposedly then-occurring at St. Marys: namely, "pin production." ¶¶54-57, 64, 215. Given GrafTech's subsequent *admission* that St. Marys was not even permitted to engage in those specific activities at the time of the misrepresentations, it is inconceivable that defendants were unaware of – or at least severely reckless in disregarding – the falsity of their representations at the time they made them. ¶¶65, 214-215. There is simply no other plausible inference. *See, e.g.*, *Bond*, 587 F. Supp. 3d at 679 (finding "a strong inference of scienter" where defendants "openly admitted" to having knowledge of the "key facts rendering the relevant statements actionable"); *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 741 (N.D. Cal. 2022) (finding scienter adequately alleged where "the individual defendants personally reported facts about the company that are alleged to be completely at odds with reality"); *accord Lormand*, 565 F.3d at 254; *Freudenberg*, 712 F. Supp. 2d at 191-92; *see also Upstart*, 2023 WL 6379810, at *23 ("The challenged statements cover topics that the . . . Defendants voluntarily and repeatedly discussed with the public, which 'demonstrates [their] sensitivity' towards the issues.") (alteration in original); *Roberti*, 2015 WL 1985562, at *12 ("an assertion that defendants were unaware of the alleged issues can be 'directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]'") (alterations in original).

In addition, the allegations attributed to the Former Engineering Lead establish that defendant Halford "regularly visited the St. Marys facility, was ultimately responsible for overseeing GrafTech's efforts to restart the plant, and was regularly informed about the activities and issues at

- 57 -

the St. Marys facility by [the Former Engineering Lead's boss]." ¶¶63, 214.[22]  As such, according to the Former Engineering Lead, Halford "definitely would have known that the plant was not involved in actual pin production during 2021 and 2022." ¶63.  These allegations further confirm Halford's awareness that his misstatements were false and misleading at the time he made them.

Defendants' only argument against the adequacy of the Complaint's scienter allegations for Plaintiff's claims regarding St. Marys is a repetition of the same argument defendants lodge against the falsity of such claims: namely, that "Defendants explained – and the market understood – the limited operations at the St. Marys Plant." GrafTech Mem. at 40-41.  As explained above, this fact-bound argument is inappropriate at the pleading stage and flawed for several reasons, including the fact that none of GrafTech's disclosures prior to November 4, 2022 actually stated that the Company "was conducting *only* the graphitizing and machining steps of the manufacturing process at St. Marys." *Id.* at 40; *see* §III.A.2.b., *supra*.

At bottom, defendants' argument rests on the untenable premise that the words "pin production" either had no specific meaning or actually meant "graphitizing and machining." *Id.* But both of those interpretations are directly refuted by the specific words GrafTech chose to use on November 4, 2022, when it disclosed that the Company did not previously possess the operating permits required "*for pin production*."  ¶¶65, 75, 172.  Moreover, defendants' argument defies common sense.  If defendant Halford's representations were truly intended to refer only to graphitizing and machining, he would not have described St. Marys's operations as providing GrafTech with two "*pin production facilities*" and claimed that they helped "*de[-]risk* [GrafTech's] *pin production capacity*." ¶¶142, 153, 158, 168.  In this regard, defendants' reliance on GrafTech's previous disclosures regarding "machining and graphitizing" activities at St. Marys actually

---

[22]  Neither the Geitner Declaration nor defendants' Motion to Strike contest the veracity of these allegations.

*supports*, rather than negates, the inference of scienter.  *See* GrafTech Mem. at 24-25.  If, as defendants contend, the alleged misrepresentations were intended to describe nothing more than a continuation of St. Marys's previously disclosed "graphitizing and machining" activities, there would have been no reason for defendants to deviate from their previous descriptions of those activities.  *Id.*  But the alleged misrepresentations *did* deviate from those previous descriptions of St. Marys's activities by stating that GrafTech had "*introduced*" new "pin *production* capabilities" at St. Marys and claiming that the new operations at St. Marys "[i]mportantly . . . provide[d] [GrafTech] with 2 connecting *pin production facilities*," thus helping to "*de[-]risk* [GrafTech's] *pin production capacity*."  ¶¶142, 151, 153, 158, 168.  The obvious – and only – explanation for defendants' decision to use the words "pin production" is that they intended to falsely represent that St. Marys had undergone a significant change and was now engaged in "pin production," when in fact defendants knew that was not the case.[23]

---

[23]  As explained above and in Plaintiff's OMTS, defendants' argument that "the allegations attributed to the Former Engineering Lead do not support a strong inference of scienter because they do not contradict any of the challenged statements," (GrafTech Mem. at 40), is based on a clear misapprehension of Plaintiff's claims.  *See* §III.A.2.b., *supra*; OMTS at 4.  As such, the cases they rely upon are all inapt.  GrafTech Mem. at 40-41.  In *ServiceMaster*, the court found that confidential witness allegations did not support an inference of scienter because the allegations "offer[ed] no detail that allows an assessment of whether ServiceMaster's disclosures differed in any significant way from those internal discussions."  83 F.4th at 533.  Unlike in *ServiceMaster*, the Complaint alleges numerous facts establishing the falsity of defendants' representations regarding the St. Marys facility, including for example, that the facility lacked the functional equipment and operating permits needed for pin production.  ¶¶58-61.  Defendants' reliance on *ViewRay* fails for the same reason.  *Plymouth*, 556 F. Supp. 3d at 788 (rejecting confidential witness allegations because allegations "fail[ed] to state facts" establishing that defendants' statements were false).  In *Diebold*, the court found that a confidential witness allegation asserting that "individual defendants had extensive knowledge about the true financial condition and accounting practices of the Company" were too "generalized" to support an inference of scienter.  *Diebold*, 590 F.3d at 400-401.  Unlike the allegations in *Diebold*, the Complaint alleges detailed facts demonstrating how and why defendants' clearly knew their statements were false.  ¶¶63-65, 213-215.

### 3. The Complaint Alleges a Strong Inference of Scienter Regarding the Misrepresentations Concerning the Impact of the Monterrey Shutdown

Scienter is adequately plead as to defendants Halford, Kessler, and Flanagan in connection with their misrepresentations concerning the impact of the Monterrey facility's shutdown. Specifically, Plaintiff alleges that defendants' own subsequent admissions demonstrate that they were aware of facts – at the time of their misstatements – that directly contradicted their representations to investors regarding the impact of the Monterrey facility. ¶¶217-221.

For example, during the 3Q22 earnings call on November 4, 2022, an analyst directly asked defendants about the impact of the Monterrey facility's closure upon GrafTech's contract negotiations with its customers:

> And then maybe you could just help us understand or get *your perspective on contracting*. Unfortunately, the Monterrey facility is not running full out. So your volumes are going to be down in the first half. And so maybe that *limits the kind of commercial opportunities that you can put forward to your customers, is that true*?

¶78. Defendant Halford responded:

> It's an important question . . . . And one of the things that I want to make clear is that while we need to consider the near-term supply constraints related to the Monterrey situation, *none of this changes our commercial strategy*. . . . And while in the very near term, we're dealing with the Monterrey situation, we have absolute confidence in our ability to resolve this current environment we're in, and *it's not changing our commercial strategy at all*.

*Id.* Defendant Halford's response was made just seven weeks after the Monterrey closure and just two weeks before the plant reopened. ¶218.

Similarly, on February 3, 2023, defendant Kessler admitted that "the timing of the suspension coincide[d] with a critical time frame to secure customer orders for the first half of 2023." ¶218. As the Complaint alleges, defendants made their misstatements regarding the impact of the Monterrey facility shutdown during the back-end of GrafTech's "critical time frame," meaning that customer contract negotiations were *already* well under way and/or largely completed at the time of

- 60 -

defendants' misrepresentations. ¶218. As such, it is inconceivable that defendants would have been unaware, at that time, of the Monterrey shutdown's impact on GrafTech's ability to secure customer contracts for 2023.

Similarly, defendants represented that the impact of the "contract negotiation window" issue would be limited to the "first half of 2023" on February 3, 2023, and April 28, 2023 – nearly three months after the Monterrey facility had reopened, and well after the "critical" "contract negotiation window" had closed. ¶219. Thus, at the time of their alleged misstatements, defendants would have had a complete understanding of the impact of the shutdown. However, defendants did not accurately convey that understanding to investors, as defendant Kessler would confirm during the August 4, 2023 earnings call, when he revealed that the impacts from the "contract negotiation window" issue extended into the second half of 2023. *Id.*

Finally, on February 3, 2023, defendant Kessler revealed that "[a]lthough production of electrodes and pin stock [at Monterrey] began immediately upon the [lifting] of the suspension, ***the required manufacturing time for our products is generally several months***. As such, the rebuilding of our pin stock inventory will take time." ¶220. Plaintiff alleges that it is implausible that defendants would not have been aware of this information when they represented to investors on November 4, 2022 that the Monterrey facility's closure would not significantly impact GrafTech's business performance unless the facility remained closed beyond 2022. This demonstrates that defendants disregarded the most current factual information in their possession at the time of their November 4, 2022 misrepresentations, which was just seven weeks after the Monterrey facility was suspended. ¶221.

Defendants argue that the "challenged statements about the anticipated effects of the Monterrey shutdown were forward-looking" (which they are not, as discussed above in §III.A.3.b.); that Plaintiff fails to plead specific facts about the contract negotiations or customer orders; that

- 61 -

Plaintiff fails to plead facts about what defendants believed; and that Plaintiff pleads nothing more than fraud-by-hindsight, thus lacking any adequate allegations regarding scienter. GrafTech Mem. at 42. However, defendants' argument ignores that, as set forth above, Plaintiff adequately alleges "the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, *i.e.*, they are evidence that the defendants actually knew earlier that the course of action would turn out badly." *Lormand*, 565 F.3d at 254; *see* ¶¶218-219, 221. There is no fraud-by-hindsight where, as here, defendants' admissions demonstrate their state-of-mind at the time they discussed the impact of the Monterrey shutdown with investors in late 2022 and early 2023.

Moreover, the "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" can create a strong inference of scienter. *Dana II*, 646 F.3d at 958 n.2. Although there is no bright line for when timing contributes to an inference of scienter, courts have held that a matter of weeks or even months apart may support the inference. *See, e.g.*, *Winslow*, 2011 WL 7090820, at *22 (noting the "speed with which [d]efendants" changed their story, from reaffirming financial results on February 2 and 10, 2010, to admitting those results to be questionable on February 25 and restating the results on March 15, 2010); *In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) ("[G]iven the short time frame from [a] December offering, through the opening of [defendants' project] in late April 1996, to the revelations of mammoth problems beginning on July 22, 1996, it is reasonable to infer that management was on notice of these problems during the class period.").

Here, for example, less than two months after defendants announced that the Monterrey facility had received a "temporary suspension notice" and that its "operating license was no longer in effect," (¶70), defendants disclosed on November 4, 2022 that the Monterrey facility was "the only site that produces the pin stock needed for all our electrodes" and that defendant Halford's previous

statements regarding the St. Marys facility's supposedly "operational" "pin production line," which purportedly helped to "de[-]risk [GrafTech's] pin production capacity" were materially false and misleading, by admitting that GrafTech was just now "actively pursuing approvals for operating permits to restart the [St. Marys] facility for pin production." ¶75. Similarly, the February 3, 2023 admissions described above occurred only three months after defendants' November 4, 2022 material misrepresentations. ¶¶77-81. The closeness in time of defendants' false and misleading statements to their later disclosures further supports an inference of scienter.

### 4. The Individual Defendants' Inference of Scienter Is Bolstered by Their Financial Incentive to Deceive

The "self-interested motivation of defendants in the form of saving their salaries or jobs" provides additional support for Plaintiff's scienter allegations. *Helwig*, 251 F.3d at 552; ¶¶225-230. Here, Plaintiff alleges that each of the Individual Defendants had the self-interested motivation of saving their substantial salaries and high-ranking jobs at the Company. For example, defendant Coburn's compensation was $758,582 in 2019 and grew to over $26 million by 2021; defendant Halford's compensation ranged from $1.3 million to $2.7 million between 2019 – 2023; defendant Rintoul's compensation ranged from $1.4 million to $3.4 million between 2019 – 2022; defendant Flanagan's compensation ranged from $1.3 million to $1.5 million between 2022 – 2023; and defendant Kessler's compensation ranged from $1.4 million to $3.5 million between 2022 – 2023. ¶¶226-230. Indeed, as the Supreme Court has noted, "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325.

Additionally, defendant Rintoul executed a Rule 10b5-1 trading plan four days after defendant Halford falsely and misleading told investors that GrafTech was "investing in a pin production line at our St. Marys, Pennsylvania facility that will be online in the third quarter," pursuant to which he sold approximately $588,000 worth of GrafTech common stock on November

8, 2021. ¶228.[24]  This further supports Plaintiff's allegations of scienter.  *See, e.g.*, *Helwig*, 251 F.3d at 573 (sale of stock can be suspicious if it is "unusual in scope *or* timing"); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 727 (S.D. Ohio 2006) ("'[I]nsider trading at a suspicious time or in an unusual amount comprises one of the "fixed constellations of facts" that courts have found probative of securities fraud.'"); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 539 (S.D. Ohio 2000) (allegations of insider trading at "rather high levels and suspiciously timed in proximity to the false statements" coupled with other allegations "give rise to a strong inference of scienter").  Defendants argue that because the Individual Defendants accumulated stock during the Class Period, any inference of scienter is undermined.  GrafTech Mem. at 43-44; Rintoul Mem. at 11.  Not so.  *See, e.g.*, *Big Lots*, 2016 WL 8199124, at *33 (scienter not defeated even where stock holdings of individual defendants allegedly increased).  In any event, "[a]ssuming an ambiguity about the justifications for [Rintoul]'s stock sales, Defendants' contentions on this issue cannot be resolved on a motion to dismiss." *Psychiatric Sols.*, 2011 WL 1335803, at *58 (citing *Helwig*, 251 F.3d at 558).

## C.      Defendants Are Liable Under Section 20(a)

Section 20(a) of the Exchange Act establishes liability for anyone who "directly or indirectly, controls any person liable" under the Exchange Act.  15 U.S.C. §78t(a).  There are two requirements

---

[24]   For this reason, Rintoul's reliance on *In re Ferro Corp.*, 2007 WL 1691358, at *14 (N.D. Ohio June 11, 2007) is misplaced.  The court there found that "[t]he only thing even arguably 'suspicious' about the sale of his stock, however, is that it was sold during the class period.  Plaintiff pleads no other facts that are probative of motive."  Here, Plaintiff alleges that the timing of when Rintoul executed the Rule 10b5-1 trading plan was suspicious, as it occurred shortly after defendant Halford made false and misleading statements to the market about St. Marys's "pin production" operations.  Similarly, in *Plymouth*, the court found that the defendant had "exercised his options at his earliest opportunity" according to the Rule 10b5-1 trading plan, and there were no suspicious indicia surrounding the plan, unlike here.  556 F. Supp. 3d at 800.  Likewise, in *Century Business*, the court found that the insider sales allegations did not support an inference of scienter because, unlike the allegations here, plaintiffs had failed to "allege any facts demonstrating that these sales were unusual or suspicious." *In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513, at *8 (N.D. Ohio June 27, 2002).

for a finding of control person liability. "First, the 'controlled person' must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder." *PR Diamonds*, 364 F.3d at 696. "Second, the 'controlling person' defendant . . . must have directly or indirectly controlled the person liable for the securities law violation." *Id.*

### 1. The Complaint Adequately Alleges the Predicate Section 10(b) Claim

All defendants challenge Plaintiff's §20(a) claims by arguing that Plaintiff failed to allege a primary violation under §10(b). GrafTech Mem. at 25; Brookfield Mem. at 5; Rintoul Mem. at 1 (incorporating GrafTech Memorandum's arguments). As Plaintiff has adequately alleged §10(b) violations, as set forth above, this argument fails. Plaintiff has thus adequately alleged §20(a) claims against the GrafTech defendants and Rintoul, because they do not challenge the control allegations on any other basis.

### 2. The Complaint Adequately Alleges the Brookfield Defendants Had "Control" Under Section 20(a)

For purposes of §20(a), "'[c]ontrol' is [broadly] defined as 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *PR Diamonds*, 364 F.3d at 696-97 (citing 17 C.F.R. §230.405). "[A] Section 20(a) plaintiff must allege only the power to control, and not an actual exercise of control, in order to survive a motion to dismiss. *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 303 (S.D. Ohio 2007); *accord Stavroff v. Meyo*, 1997 WL 720475, at *7 n.5 (6th Cir. Nov. 12, 1997); *City of Painsville v. First Montauk Fin. Corp.*, 178 F.R.D. 180, 192 (N.D. Ohio 1998). Because allegations of control are "'not averments of fraud,'" they "'need not be pleaded with particularity'" but "'need satisfy only the less stringent requirements of Fed. R. Civ. P. 8.'" *Nat'l Century*, 504 F. Supp. 2d at 300 (citing cases).

- 65 -

The Complaint alleges multiple facts indicating Brookfield possessed, and indeed exercised, "'the "power or potential power to influence and control the activities of"'" GrafTech and its management, *i.e.*, the Individual Defendants. *See First Montauk*, 178 F.R.D. at 192. First, as Brookfield acknowledges, the SEC explicitly defines that "control" – the direct or indirect possession of power – can be established "through the ownership of voting securities, by contract, or otherwise." *See* Brookfield Mem. at 4. Thus, going far beyond the requirements of Federal Rule of Civil Procedure 8, the Complaint adequately alleges facts which show that Brookfield was a controlling shareholder of GrafTech during the Class Period and therefore a controlling person through Brookfield's ownership of a majority of GrafTech voting stock (¶¶231-232).

The Complaint further details how Brookfield entrenched its control by maintaining a right to appoint at least 37.5% of the composition of the Board of Directors, which it filled with Brookfield partners and executives (¶¶232-233); exercised its power to hire Rintoul and Coburn as GrafTech's CEO and CFO, respectively (¶¶22-23, 66, 233-234); had a history of total control over the Company through its take-private acquisition (¶¶36-41); and caused GrafTech to conduct six additional offerings and enter into share repurchase agreements in Brookfield's financial interest (¶¶66, 232, 234). ¶265; *see First Montauk*, 178 F.R.D. at 192 ("Stock can be a means of control over a corporate entity but it is not the exclusive means of exercising control for purposes of Section 20(a). Other means include 'other business relationships, interlocking directors, family relationships and a myriad of other factors.'"); *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945-46 (9th Cir. 2003) (identifying three indicia of control, such as "having a prior lending relationship, owning stock in the target company, or having a seat on the board").

Brookfield argues that Plaintiff did not plead they "generally exercised control over GrafTech's operations." Brookfield Mem. at 5. First, Brookfield overstates Plaintiff's burden, as it

- 66 -

only needs to allege a "power to control," not actual control.  *Nat'l Century*, 504 F. Supp. 2d at 303.  Second, Brookfield does not dispute that for at least a portion of the Class Period, they held a majority of GrafTech shares.  Brookfield Mem. at 5.  Third, Brookfield's remaining critiques ignore critical pieces of Plaintiff's allegations.  For example, Plaintiff describes Brookfield "exploit[ing] their equity ownership" (*id.*) by causing GrafTech to enter into transactions in Brookfield's financial interest, which allowed Brookfield to cash in on the alleged fraud.  ¶¶66, 234.  And the "generic affiliations" (Brookfield Mem. at 5) Brookfield downplays are specifically identified as executive level: Brookfield Managing Partners, a President, and a Vice President sitting on GrafTech's Board of Directors.  ¶233.

Brookfield also implies that Plaintiff must allege their "culpable participation" in the underlying fraud.  Brookfield Mem. at 4-5.  However, §20(a) makes no mention of such requirement.  Indeed, the Sixth Circuit has not required that plaintiffs allege culpable participation to plead a §20(a) claim and the weight of out-of-circuit authority is against its application here.  *See Nat'l Century*, 504 F. Supp. 2d at 301 (crediting the criticisms of the Eighth, Ninth, and Tenth circuit of the culpable participation element, and recognizing that the Sixth Circuit's decision in *PR Diamonds* failed to mention culpable participation).[25]

In any event, the Complaint adequately alleges Brookfield's culpable participation.  Brookfield's "transformation" of GrafTech was directly responsible for the undisclosed issues resulting from shuttering of the St. Marys facility and the risky concentration of pin production at the Monterrey facility.  ¶¶38-39.  Despite saddling the Company with these issues, Brookfield reaped

---

[25]  While the four cases cited in Brookfield's motion include "culpable participation" in the recitation of the law, none of those courts actually conduct any analysis on the validity of the rule in the Sixth Circuit nor do they draw any conclusions with respect to defendants who are not also alleged to be the primary violators whose culpable participation is already established through scienter.  Accordingly, the plain language of §20(a) and circuit-split analysis in *Nat'l Century* which recognized the Sixth Circuit omission of that requirement in *PR Diamonds*, is far more persuasive.

4903-3909-1988.v1

the reward of defendants' false and misleading statements by selling more the $2.8 billion of GrafTech stock during the Class Period.  ¶66.  These facts show that Brookfield had culpable participation in the alleged misconduct.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Motions be denied in their entirety.  In the event the Court grants any aspect of the Motions, Plaintiff respectfully requests leave to amend the Complaint in order to cure any deficiencies identified by the Court, given that this is the first adjudication of any complaint in this action.  *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003) ("'[W]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice.'").

DATED:  February 3, 2025

LAW OFFICE OF GEORGE W. COCHRAN
GEORGE W. COCHRAN


s/ George W. Cochran
GEORGE W. COCHRAN (Bar # 0031691)
1981 Crossfield Circle
Kent, OH  44240
Telephone:  330/607-2187
330/230-6136 (fax)
lawchrist@gmail.com

Local Counsel for Lead Plaintiff

- 68 -

4903-3909-1988.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
NATHAN R. LINDELL (admitted *pro hac vice*)
JENNIFER N. CARINGAL (admitted *pro hac vice*)
KEVIN S. SCIARANI (admitted *pro hac vice*)
FRANCISCO J. MEJIA (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com
jcaringal@rgrdlaw.com
ksciarani@rgrdlaw.com
fmejia@rgrdlaw.com

ABRAHAM, FRUCHTER & TWERSKY, LLP
MITCHELL M.Z. TWERSKY (admitted *pro hac vice*)
MICHAEL J. KLEIN (admitted *pro hac vice*)
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: 212/279-5050
212/279-3655 (fax)
mtwersky@aftlaw.com
mklein@aftlaw.com

ABRAHAM, FRUCHTER & TWERSKY, LLP
PATRICE L. BISHOP (admitted *pro hac vice*)
9440 Santa Monica Boulevard, Suite 301
Beverly Hills, CA 90210
Telephone: 310/279-5125
pbishop@aftlaw.com

Lead Counsel for Lead Plaintiff

- 69 -

4903-3909-1988.v1

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(F)

The foregoing Omnibus Memorandum in Opposition to the Motions to Dismiss complies

with the page limitation set forth in the Court's November 22, 2024 Order (ECF 63).

DATED:  February 3, 2025

LAW OFFICE OF GEORGE W. COCHRAN
GEORGE W. COCHRAN


<u>        s/ George W. Cochran       </u>
GEORGE W. COCHRAN (Bar # 0031691)
1981 Crossfield Circle
Kent, OH  44240
Telephone:  330/607-2187
330/230-6136 (fax)
lawchrist@gmail.com

4903-3909-1988.v1