IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN C. PORTER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GRAFTECH INTERNATIONAL LTD., DAVID RINTOUL, QUINN COBURN, MARCEL KESSLER, TIMOTHY K. FLANAGAN, JEREMY S. HALFORD, BCP IV GRAFTECH HOLDINGS LP, BROOKFIELD CAPITAL PARTNERS LTD., and BROOKFIELD ASSET MANAGEMENT LTD.,<br><br>Defendants. | Case No. 1:24-cv-00154<br><br>Judge Donald C. Nugent<br><br>Magistrate Judge Jonathan D. Greenberg |

**REPLY IN SUPPORT
OF THE MOTION OF DEFENDANTS
GRAFTECH, KESSLER, COBURN, FLANAGAN,
AND HALFORD TO DISMISS THE FIRST AMENDED
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

                                                                                                    **Page**

TABLE OF AUTHORITIES ................................................................................................iii

I.    THE COMPLAINT FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS
      OR OMISSIONS. ................................................................................................... 2

      A.   The Alleged Misstatements Predicated On Supposed Non-Disclosures About
           The Monterrey Plant Are Inactionable. ........................................................ 2

           1.   The Complaint Contains No Particularized Facts Showing That Any Pre-
                September 2022 Statement About Monterrey Was False When Made. .................. 3

                a.   Statements About Cost And Competitive Advantages ................................... 3

                b.   Statements About Environmental Compliance And Aspirations .................... 4

                c.   Statements About The 2019 Administrative Proceeding .............................. 5

           2.   Honest Application Of *Omnicare* Compels Dismissal Of Opinion-Based
                Claims. ................................................................................................. 6

           3.   Many Of The Alleged Misstatements Are Too General To Be Actionable. .......... 7

      B.   The Complaint Cannot Survive The Absence Of Particularized Facts
           Suggesting Contemporaneous Falsity Of Any Alleged Misstatements About St.
           Marys. ................................................................................................... 9

           1.   GrafTech Repeatedly Disclosed That The Automated Pin Line At St.
                Marys Was A Pin Machining Line, And That Operations At St. Marys
                Were Limited To Graphitizing And Machining. ...................................... 9

           2.   Plaintiff Offers Zero Particularized, Non-Conclusory Facts Suggesting
                GrafTech Did Not De-Risk Its Pin Production Capacity. ................................... 11

           3.   The Peaking Plant Statement Is Not Actionable. ................................................. 13

      C.   None Of The Statements About The Anticipated Impact Of The Monterrey
           Shutdown Are Actionable. ......................................................................... 14

           1.   The Opposition Does Nothing To Demonstrate That The Challenged
                Statements About The Future Impact Of The Shutdown Were False When
                Made. .................................................................................................... 14

                a.   The Opposition Fails To Meaningfully Address Falsity For Nearly All
                     Of The Challenged Statements About The Future Impact Of The
                     Shutdown. ........................................................................................ 15

                b.   Neither The Complaint Nor The Opposition Explain How The
                     November 4, 2022 Statements Were False When Made. ............................. 16

           2.   The Forward-Looking Statements About The Shutdown's Anticipated
                Effects Are Inactionable Opinions And Are Protected By The Reform
                Act's Safe Harbor. ............................................................................ 18

-i-

**TABLE OF CONTENTS**
(continued)

**Page**

II.   THE COMPLAINT DOES NOT PLEAD A "STRONG" INFERENCE OF SCIENTER THAT IS MORE PLAUSIBLE THAN NON-FRAUDULENT INFERENCES. ...................................................................................... 20

    A.  There Is No Inference Of Scienter As To The Alleged Misstatements About Environmental Matters And The Monterrey Plant. ........................................ 21

       1.  Courts Routinely Reject Attempts To Plead Scienter By Reference To Defendants' Corporate Roles Or Their Monitoring Of Unspecified Metrics.................................................................................................. 21

       2.  Nothing Else Supports An Inference Of Scienter For The Statements About The Monterrey Plant.................................................................. 24

    B.  No Particularized Allegations Support An Inference Of Scienter For Any Statement Related To St. Marys. ...................................................................... 26

    C.  There Can Be No Inference Of Scienter As To Predictions About The Impact Of The Monterrey Shutdown...................................................................... 27

    D.  Plaintiff's Perfunctory Holistic Analysis Of Scienter Supports Dismissal. ................ 29

CONCLUSION............................................................................................................ 31

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Albert Fadem Tr. v. Am. Elec. Power Co.*,
334 F. Supp. 2d 985 (S.D. Ohio 2004) ...................................................................19

*Benzon v. Morgan Stanley Distribs., Inc.*,
420 F.3d 598 (6th Cir. 2005) ....................................................................................6

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ..........................................................30

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) .......................................................................7, 31

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..................................................................................15

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010).....................................................................4

*City of Edinburgh Council ex rel. Lothian Pension Fund v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014).....................................................................................10

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) ...................................................................5

*Dailey v. Medlock*,
551 F. App'x 841 (6th Cir. 2014) .......................................................................25, 28

*Doshi v. Gen. Cable Corp.*,
386 F. Supp. 3d 815 (E.D. Ky. 2019) ..................................................................8, 30

*Doshi v. Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) ...........................................................................25, 28

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*,
964 F. Supp. 2d 875 (N.D. Ohio 2013), *aff'd sub nom.*, 572 F. App'x 356 (6th
Cir. 2014) ...............................................................................................................30

iii

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..................................................................................18

*Grae v. Corr. Corp. of Am.*,
    2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017).................................................................23

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)......................7, 8

*Gruhn v. Tween Brands, Inc.*,
    2009 WL 1542795 (S.D. Ohio June 2, 2009) ....................................................................30

*In re Century Bus. Servs. Sec. Litig.*,
    2002 WL 32254513 (N.D. Ohio June 27, 2002)...................................................................3

*In re Envision Healthcare Corp. Sec. Litig.*,
    2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ..................................................................7

*In re Home Point Cap. Inc. Sec. Litig.*,
    2022 WL 18932069 (E.D. Mich. Oct. 5, 2022) ...................................................................8

*In re Huntington Bancshares Inc. Sec. Litig.*,
    674 F. Supp. 2d 951 (S.D. Ohio 2009) .........................................................................15, 16

*In re Micron Techs., Inc. Sec. Litig.*,
    2007 WL 576468 (D. Idaho Feb. 21, 2007)........................................................................4

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) .............................................................................................1

*In re United Am. Healthcare Corp. Sec. Litig.*,
    2007 WL 313491 (E.D. Mich. Jan. 30, 2007).....................................................................6

*In re Yum! Brands, Inc. Sec. Litig.*,
    73 F. Supp. 3d 846 (W.D. Ky. 2014) , *aff'd sub nom.*, 620 F. App'x 483 (6th
    Cir. 2015) ...........................................................................................................................6

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
    2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021).....................................................................7

*Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v.
Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009) ..........................................................................8

*Kelly v. Elec. Arts, Inc.*,
   2015 WL 1967233 (N.D. Cal. Apr. 30, 2015) ........................................................................12

*Kolominsky v. Root, Inc.*,
   667 F. Supp. 3d 685 (S.D. Ohio 2023), *aff'd*, 100 F.4th 675 (6th Cir. 2024)...........................8

*Konkol v. Diebold, Inc.*,
   590 F.3d 390 (6th Cir. 2009) ..............................................................................21, 23, 28

*Kuyat v. BioMimetic Therapeutics, Inc.*,
   747 F.3d 435 (6th Cir. 2014) ...........................................................................................25, 29

*Ley v. Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008)....................................................................10, 21

*Lim v. Hightower*,
   2024 WL 4349409 (N.D. Ohio Sept. 30, 2024)............................................................13, 17, 19

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ...........................................................................................18, 28

*Lubbers v. Flagstar Bancorp. Inc.*,
   162 F. Supp. 3d 571 (E.D. Mich. 2016)....................................................................................6

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024)...................................................................................................6, 13, 15

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) ................................................................................................12

*Miller v. Champion Enters., Inc.*,
   346 F.3d 660 (6th Cir. 2003) ................................................................................................31

*Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*,
   2022 WL 1449184 (7th Cir. May 9, 2022) .............................................................................19

*Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*,
   22 F. Supp. 3d 669 (E.D. Ky. 2014), *aff'd sub nom.*, 614 F. App'x 237 (6th
   Cir. 2015) ..............................................................................................................................8

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................................7, 19

*Pittman v. Unum Grp.*,
   861 F. App'x 51 (6th Cir. 2021) ..................................................................................23, 24, 29

*Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*,
   556 F. Supp. 3d 772 (N.D. Ohio 2021),  *aff'd*, 2022 WL 3972478 (6th Cir.
   Sept. 1, 2022) ....................................................................................................... passim

*PR Diamonds, Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004) .................................................................................24, 31

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*,
   2021 WL 195370 (M.D. Tenn. Jan. 20, 2021)........................................................7

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
   83 F.4th 514 (6th Cir. 2023) ........................................................................... passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................20

*Tian v. Peloton Interactive, Inc.*,
   2025 WL 510043 (E.D.N.Y. Feb. 14, 2025) ................................................5, 10, 11

*Winslow v. BancorpSouth, Inc.*,
   2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ....................................................23

*Zhou v. Desktop Metal, Inc.*,
   120 F.4th 278 (1st Cir. 2024)................................................................................13

**STATUTES**

15 U.S.C. § 78u-4(b)(2)(A)...........................................................................................20

The Opposition crystallizes a few key points.[1] First, on the spectrum of securities cases, this is a weak one. The Amended Complaint does not identify a single byte of data, piece of paper, or word spoken to any Defendant that contradicted any of their public statements. No number in any financial statement is alleged to have been falsely reported. There was no restatement, no SEC enforcement action, and no auditor resignation. Each Individual Defendant accumulated stock during the relevant period—and GrafTech repurchased its stock—resulting in the Defendants experiencing significant financial losses, not gains. None of those uncontested facts suggests fraud.

Second, the parties agree about the Reform Act's stringent requirements, which the Sixth Circuit has called an "elephant-sized boulder." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014). Fraud claims can survive a motion to dismiss only if particularized facts show the statements were false when made. Plaintiff agrees that, when it considers the challenged statements, the Court must look at "the actual words [D]efendants used." Opp. at 38. Only particularized facts can support an inference of scienter, and that inference must be "strong." And there is no dispute, as far as the mental state of each Defendant is concerned, that there is no proverbial smoking gun here.

But the parties diverge from there. "When the Complaint's actual allegations are accepted as true and appropriately afforded all reasonable inferences," *id*. at 7, it is **Plaintiff's** argument that "defies common sense," *id.* at 38. None of the alleged misstatements—about matters relating to the Monterrey Plant, about operations at the St. Marys Plant, or about the anticipated impact of the temporary suspension of operations at Monterrey—is actionable. Rather than plead

---

[1] The Memorandum of Law in Support of the Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws is referred to as the "Opening Brief" and cited as ECF 64-1, at ___. The Omnibus Memorandum in Opposition to the Motions to Dismiss is referred to as the "Opposition" and cited as Opp. at ___. All other terms are either defined herein or have the same meaning as in the Opening Brief. All internal citations, internal quotations, and original emphases and alterations are omitted, and all emphases are added unless otherwise noted.

contemporaneous falsity, the Complaint points to the various ways that things did not go according to plan and concludes (without particularized facts in support) that there must have been material misrepresentations or omissions. But things not turning out as expected is not tantamount to fraud; stock prices rise and fall all the time without anyone telling a lie.

The Complaint fails on scienter grounds, too. There are exactly zero non-conclusory allegations that support an inference of scienter that is more plausible than the non-fraudulent inferences. With no motive to commit fraud and no particularized allegations about any information possessed by any Individual Defendant that contradicted any challenged statement, Plaintiff's proposed fraudulent inferences fall short. They also pale in comparison to the non-fraudulent inferences identified in the Opening Brief, which the Opposition ignores. Plaintiff is wrong in suggesting that the Court cannot consider what is missing from the Complaint in conducting its analysis. No "fact-bound" inquiry is required, but the Court can and should consider what the Complaint ***does not*** say, because those silences speak volumes.

The Motion must be granted; the Complaint should be dismissed with prejudice.

## I. THE COMPLAINT FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS.

### A. The Alleged Misstatements Predicated On Supposed Non-Disclosures About The Monterrey Plant Are Inactionable.

Despite its 70 pages, the sprawling Opposition does not show that any Defendant made a single actionable misstatement about the Monterrey Plant before the September 2022 shutdown. Plaintiff ignores the key arguments in the Opening Brief, misconstrues established case law, and distorts the pleading requirements. The Opposition confirms that the Complaint does not plead any particularized facts showing that any statement was false when made, and many of the challenged statements were inactionable opinions or puffery to boot.

2

**1. The Complaint Contains No Particularized Facts Showing That Any Pre-September 2022 Statement About Monterrey Was False When Made.**

The Complaint fails to identify a single particularized fact showing that any of the challenged statements regarding Monterrey were ***false when made***, and the Opposition doesn't really contend otherwise. Because the alleged misstatements must be "false at the time they were made, rather than merely erroneous in hindsight," *In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513, at *15 (N.D. Ohio June 27, 2002), these claims fail.

**a. Statements About Cost And Competitive Advantages**

Plaintiff challenges three-plus years of statements about "cost advantages" and "competitive advantages" at Monterrey, asserting they were misleading because GrafTech "concealed" that these advantages supposedly were achieved by failing to implement "environmental safeguards" and comply with regulations. Opp. at 21; *see also* ¶¶89, 94, 110, 123 131, 137, 143, 154, 163, 169. But, as Defendants explained (ECF 64-1, at 13–14), there are no particularized allegations about the "environmental safeguards" GrafTech supposedly subverted. *See, e.g.*, *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 788 (N.D. Ohio 2021) (no particularized allegations that defendants made materially misleading statements or omissions), *aff'd*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022).

GrafTech attributed the cost advantages to "the attractive cost of labor," "access to low-cost and reliable energy sources," "logistical infrastructure in place," and "scale" at Monterrey. *See* ECF 64-2. As noted in the Opening Brief (ECF 64-1, at 13–14), the Complaint does not allege that GrafTech did not actually enjoy those cost advantages, and the Opposition doesn't deny this.

The Complaint cites no document, communication, data, report, or anything else showing the actual costs at the time of any challenged statement, how they would have differed had GrafTech taken the (unspecified) environmental measures that Plaintiff thinks it should have taken,

or how GrafTech's costs compared to its competitors'. *See* ECF 64-1, at 13–14. The Opposition concedes these points by offering no response; instead, it merely repeats the assertion that these undisputed "cost advantages had been achieved in substantial part by failing to implement necessary environmental safeguards" at Monterrey. Opp. at 21–22.[2] But repeating a conclusion does not equate to particularity.[3]

### b. Statements About Environmental Compliance And Aspirations

Plaintiff also challenges years of statements that GrafTech was committed to environmental stewardship, sought to comply with environmental laws, and the like. *See* ECF 64-2. As the Opening Brief explained, the Complaint has no particularized facts that Monterrey was, in fact, non-compliant with any identified environmental requirement at the time of any challenged statement. *See* ECF 64-1, at 14–17. Nor does the Opposition identify a single specific environmental requirement that Monterrey violated as of any particular time.[4]

The Opposition instead points to a few citizen "complaints" and statements by the Mayor.

---

[2] The sole support Plaintiff offers for this theory is the July 2019 resolution of an administrative proceeding, which suggested GrafTech "benefitted economically" from unspecified, past environmental violations. *See, e.g.*, Opp. at 22–23. But the vague "economic benefit" referenced is far too unparticularized to adequately allege falsity. *See, e.g.*, *ViewRay*, 556 F. Supp. 3d at 788–89. Both the Complaint and Opposition stay silent on the amount of the supposed "benefit" and any relationship to the Monterrey Plant's undisputed competitive and cost advantages. That makes this case very different than Plaintiff's cited cases, where the allegations were far more particularized. *See, e.g.*, *In re Micron Techs., Inc. Sec. Litig.*, 2007 WL 576468, at \*7 (D. Idaho Feb. 21, 2007).

[3] Plaintiff's reliance on a smattering of older district court cases cannot cure the Complaint's failures. Each involved particularized facts showing that the sources of financial performance disclosed by defendants were demonstrably false when made. In *Reddy Ice*, a packaged ice manufacturer attributed its positive financial performance to higher average pricing. *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 709 (E.D. Mich. 2010). In reality, however, the benefits resulted from an illegal antitrust conspiracy that artificially inflated prices. *Id.* Unlike here, the *Reddy* complaint alleged with particularity the anti-competitive agreements into which the defendant company entered "for the express . . . purposes of driving up prices." *Id.* The court found that the particularized facts showed a "direct nexus" between the illegal conduct and the misstatements—a connection wholly absent here. *Id.*; *see also In re Micron Techs., Inc. Sec. Litig.*, 2007 WL 576468, at \*7 (plaintiff adequately alleged a "close connection" between the challenged statements and disclosures about financial performance).

[4] Plaintiff again points to the 2019 proceeding. *See, e.g.*, Opp. at 25; ECF 64-10 (7/30/19 Resolution); *see also supra* at 4 n.2. But the fact that GrafTech disclosed a settled proceeding in 2019 is not a particularized fact even remotely showing that the Company was violating environmental regulations for years ***after*** the settlement. Plaintiff does not point to a single law or regulation that GrafTech supposedly violated. *See* ECF 64-1, at 14–15.

*E.g.*, Opp. at 12–13.  But the supposed unhappiness of some in the Monterrey community is not a particularized fact showing that there was actually non-compliance with or material violation of any specific environmental law or regulation at the time of a challenged statement (much less that executives in Ohio knew or believed there was such a violation).  *See* ECF 64-1, at 16–17; *see also, e.g.*, *Tian v. Peloton Interactive, Inc.*, 2025 WL 510043, at *9–10 (E.D.N.Y. Feb. 14, 2025) ("Plaintiffs do not allege that Peloton knew, at the time of the risk disclosures, that approximately five customer complaints about the Bike seat posts . . . would later lead to a recall of every Bike Peloton sold between 2018 and 2023.").[5]  The Opposition does not argue otherwise, and these third-party opinions cannot cure the Complaint's failure to allege a single document, communication, report, or piece of data showing that any challenged statement was objectively false when made.[6]

### c.    Statements About The 2019 Administrative Proceeding

Plaintiff also alleges misstatements regarding the 2019 administrative proceeding, claiming that—despite GrafTech's disclosure of the proceeding and its outcome—the Company somehow deceived investors by not saying more.  *See* Opp. at 26–28; *see also, e.g.*, ¶¶95, 98, 102.  Not so.

Plaintiff claims GrafTech "materially misrepresented the events" leading to the resolution of the proceeding.  Opp. at 26.  Plaintiff takes issue with GrafTech's statement that the proceeding involved "potential violations" of environmental regulations, urging that GrafTech instead should

---

[5] The Opposition does not contest the Complaint's failure to plead that Defendants even were aware of those third-party statements at the time of any challenged statement.  *See infra* at Section II; *see also, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 824–25 (W.D. Mich. 2012) (reliance on witness statements, absent allegations that defendants had any direct contact with the witnesses, was insufficient to plead falsity).

[6] The Opposition argues that August 2022 comments by the Mayor somehow render statements from months or years earlier false because they referred to "***past*** events that occurred before and during the Class Period."  Opp. at 25–26.  Putting aside the obvious problem—i.e., third-party opinions are not particularized facts—that argument falls flat.  That the Mayor used the past tense in his comments and vaguely stated that GrafTech had "30 years to correct themselves" for an undefined "problem" (¶72) does not meet the demanding particularity standards of the Reform Act.

have said that the Company actually violated the law. Opp. at 26–27. Such a "semantic quibble" is inactionable in the Sixth Circuit. *See Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005) (disclosure that brokers "may" receive certain compensation, when in actuality brokers ***did*** receive that compensation, was a "semantic quibble" that put "prospective investors on notice that there was a possibility that brokers were being compensated more highly").

Reframing the alleged misstatements about the 2019 proceeding as material omissions fails, too, because Plaintiff offers no counter to the Supreme Court's holding that an omission is actionable under Section 10(b) only if it renders another affirmative statement materially misleading. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024). GrafTech disclosed the proceeding, the immaterial fine, and that it had taken "corrective measures" to prevent potential violations of environmental laws. *See* ¶¶95, 98, 102; *see also* ECF 64-2, at 2; ECF 64-10 (7/30/19 Resolution). Nothing more was required. *See, e.g.*, *Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 579 (E.D. Mich. 2016) (undisclosed information did not give rise to actionable omission claim); *see also* ECF 64-1, at 17–19. As for the argument that GrafTech should have disclosed that the "corrective measures" cost $2 million, the Opposition does not even attempt to argue that that amount was material. And for good reason: in the context of net sales of $1.8 billion, it surely was not. *See* ECF 64-6 (2019 10-K at 42); *see also In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 865 (W.D. Ky. 2014) ("a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact"), *aff'd sub nom.*, 620 F. App'x 483 (6th Cir. 2015); *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *6 (E.D. Mich. Jan. 30, 2007) (same).

    **2.**   **Honest Application Of *Omnicare* Compels Dismissal Of Opinion-Based Claims.**

Many of the challenged statements about "advantages" and compliance were opinions. *See* ECF 64-1, at 19–21. Plaintiff does not disagree, but argues that the opinions are nonetheless

6

actionable because GrafTech omitted "material facts about the basis for the opinion" or knew that the statements were false when made. Opp. at 28.

In so arguing, the Opposition fundamentally misapplies *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183–96 (2015), which held that opinions are actionable only if the speaker did not hold the belief he professed, or possessed a specific item of contradictory information that a reasonable person would have thought undercut the opinion so strongly that the speaker knew it was misleading not to disclose that information. After *Omnicare*, Plaintiff must make ***particularized allegations*** about specific items of contradictory information a defendant had when he voiced an opinion. *Id.* at 189–90. There are no such allegations here. *See supra* at Section I.A.1; ECF 64-1, at 13–17, 19–21.[7] This Court and others faithfully applying *Omnicare* reject Plaintiff's argument. *See, e.g.*, *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 488–91 (6th Cir. 2015) (affirming dismissal of similar opinions regarding compliance); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) (opinions inactionable because "plaintiffs make no allegation that any of the supporting facts contained in these statements . . . were untrue"), *aff'd*, 757 F. App'x 35 (2d Cir. 2018); *see also* ECF 64-1, at 19–21.

### 3. Many Of The Alleged Misstatements Are Too General To Be Actionable.

Finally, under established law, many of the statements about Monterrey are also too vague to be actionable. *See* ECF 64-1, at 21–22. Plaintiff claims the statements were "routinely paired with factual representations" and "mixed with material statements of fact." Opp. at 30–31.

---

[7] Attempting to evade *Omnicare*, Plaintiff clings to a few unpublished cases from other districts that misapply it. *See, e.g., Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *15 (M.D. Tenn. Apr. 8, 2021) (holding opinions were actionable for "omitting information" known to speakers and due to embedded false statements); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2021 WL 195370, at *2–6 (M.D. Tenn. Jan. 20, 2021) (discussing *Omnicare* only as part of scienter analysis); *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *12 (M.D. Tenn. Nov. 19, 2019) (considering only if statements, "[w]hether stated as opinion or fact," were "misleading" to a "reasonable investor" without applying *Omnicare*'s test for opinion liability).

Specifically, Plaintiff argues that GrafTech's statements were "subject to both measurement and verification" such that they cannot be deemed inactionable puffery. *Id.* at 30.

But there is nothing "measurable" about general, non-specific statements that GrafTech had cost or competitive advantages or generally believed it was in compliance with legal requirements. *See* ECF 64-1, at 21–22. Courts in the Sixth Circuit routinely hold that those are "borderline boilerplate" and too "soft" to be actionable. *E.g.*, *Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 828–29, 832–33 (E.D. Ky. 2019) ("*Doshi I*"); *see also Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945 (6th Cir. 2009) (affirming dismissal when company "made several general statements that it complied with state law and regulations and had a policy of complying with the law"); *Kolominsky v. Root, Inc.*, 667 F. Supp. 3d 685, 706–07 (S.D. Ohio 2023) (dismissing statements that company had lower costs than competitors), *aff'd*, 100 F.4th 675 (6th Cir. 2024); *ProNai Therapeutics Inc.*, 297 F. Supp. 3d at 399 (dismissing statement about "competitive advantages" as puffery).[8]

Under Plaintiff's view, no court ever would dismiss on grounds of generality or puffery, because there is always a fact embedded somewhere. But courts routinely do so, with the critical question being whether statements are "soft" information that is "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 676–87 (E.D. Ky. 2014), *aff'd sub nom.*, 614 F. App'x 237, 245 (6th Cir. 2015). Such is the case here.

---

[8] Here, again, Plaintiff misinterprets its cited authority. In *In re Home Point Capital Inc. Securities Litigation*, the court specifically found that statements about "sustainable competitive advantages" like the ones at issue here were "non-actionable puffery." 2022 WL 18932069, at *5 (E.D. Mich. Oct. 5, 2022). The statements that the court **did** deem actionable were far more specific and measurable. *See id.* (denying motion to dismiss as to statements about specific operating platform and performance in light of particular interest rates).

**B.  The Complaint Cannot Survive The Absence Of Particularized Facts Suggesting Contemporaneous Falsity Of Any Alleged Misstatements About St. Marys.**

The bulk of the alleged misstatements about the St. Marys Plant concern an automated pin line that became operational in late 2021.  Like the Complaint, the Opposition ignores GrafTech's repeated public statements that the automated pin line was a pin ***machining*** line.  *See* ECF 64-1, at 24–26.  The other challenged statements about St. Marys—saying that it might come to serve as a "peaking plant" in the future—fare no better.  *See* ECF 64-3, at 2.  The Opposition points to no contemporaneous facts that suggest Mr. Rintoul did not contemplate the possible operation of the Plant as a peaking plant in February 2019, when those statements were made.

**1.  GrafTech Repeatedly Disclosed That The Automated Pin Line At St. Marys Was A Pin Machining Line, And That Operations At St. Marys Were Limited To Graphitizing And Machining.**

Plaintiff now concedes that "the Complaint contains no allegations that St. Marys wasn't engaged in graphitizing or machining activities."  Opp. at 40.  In other words, ***there is no dispute that St. Marys was doing exactly what Defendants said it was doing***.

Aware of the damning impact of this quite proper admission, Plaintiff assaults a straw man instead, claiming that statements about the automated pin line were misleading because they ***implied*** that the St. Marys Plant was running the ***full*** manufacturing process.  *Id.* at 40–41.  Not so.  GrafTech repeatedly stated that it was conducting the machining and graphitizing steps of the manufacturing process using "semi-finished product" from other plants[9] and persistently described the pin line as a "pin machining line."  ECF No. 64-1, at 25.  In the face of these disclosures regarding the limited scope of operations at St. Marys, Plaintiff offers no real response other than

---

[9] *See* ECF No. 64-1, at 24 n.15 (citing a dozen disclosures about the limited nature of operations at St. Marys); *see, e.g.*, ECF No. 64-19 (2018 10-K at 49) ("The St. Marys, Pennsylvania facility was temporarily idled effective the second quarter of 2016 except for the machining of semi-finished products sourced from other plants.").

this "implication" argument that impermissibly asks the Court to ignore the context of the challenged statements.

Even at the motion to dismiss stage, courts must consider such context. *E.g.*, *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) ("Moreover, the context of the statement involves a press release wherein Visteon had just prior to [an officer]'s comment stated 2002 earnings were higher than 2001 earnings and therefore Plaintiffs are wrong to suggest that [the officer] was commenting on liquidity when he was commenting about earnings."), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48–49 (2011); *City of Edinburgh Council ex rel. Lothian Pension Fund v. Pfizer, Inc.*, 754 F.3d 159, 168 (3d Cir. 2014) (affirming dismissal where plaintiffs' argument based on a "selective reading"); *Peloton Interactive*, 2025 WL 510043, at *9 ("Plaintiffs may not cherry pick certain public statements for their complaint and divorce them from the universe of disclosed information to plausibly allege fraud.") (cleaned up). Here, unless Plaintiff resorts to cherry picking or ignores context, it cannot plausibly argue that Defendants implied, far less stated, that St. Marys was running the full, six-step manufacturing process.

The Company's statements about the automated pin line began in February 2021. That month, its Form 10-K disclosed that "[w]e have begun a series of projects at our Monterrey and St. Marys facilities that will shift ***graphitization and machining of additional volume of semi-finished product*** from Monterrey to St. Marys." ECF 64-18 (2020 10-K at 7, 14). When Mr. Halford made the first of the allegedly misleading statements during the August 2021 earnings call a few months later (¶142), it was in the wake of this clear, unequivocal disclosure.

During its November 2021 earnings call, the Company announced that the automated pin line had become operational. On that call, an analyst asked whether St. Marys would be restarted "outside of the pin machining." ECF No. 64-7 (3Q21 Earnings Tr. at 7). Mr. Rintoul's response—

10

like St. Marys' operations—was limited, referring only to a "pin machining operation." *Id.*  During

the August 2022 earnings call, an analyst again asked if GrafTech would consider "reopening St.

Marys."[10]  ECF No. 64-29 (2Q22 Earnings Tr. at 10).  Mr. Halford responded by referring to the

"installation of the new pin machining line." *Id*.  The Opposition contests none of this.

As for Plaintiff's assertion that "none of GrafTech's disclosures prior to November 4, 2022

clearly conveyed that St. Marys activities were limited to pin machining"—that is blatantly false.[11]

Opp. at 38.  Many of the 10-Qs and 10-Ks Plaintiff itself cited stated that "[t]he St. Marys,

Pennsylvania facility was temporarily idled effective the second quarter of 2016 except for the

machining of semi-finished products sourced from other plants." *E.g.*, ECF 64-6 (2019 Form 10-

K at 42); *see also* ECF No. 64-7 (3Q21 Earnings Tr. at 7).

**2.  Plaintiff Offers Zero Particularized, Non-Conclusory Facts Suggesting GrafTech Did Not De-Risk Its Pin Production Capacity.**

Plaintiff attacks two statements about St. Marys (*see* ECF 64-3, at 2–3) that said the

automated pin line "helps" to "de-risk" GrafTech's pin production capacity.  Opp. at 40 & n.13.

Plaintiff says this was untrue because, as it later turned out, the September 2022 shutdown at

Monterrey temporarily hamstrung pin production.  *Id.*  Plaintiff's interpretation fails because it

requires the reader to ignore the word "helps," which was prominent in the disclosure:  GrafTech

---

[10] In February 2022, GrafTech once again said that "[i]n 2021, we shifted graphitization and machining of a portion of semi-finished products from Monterrey to St. Marys, Pennsylvania."  ECF No. 64-26 (2021 10-K at 6, 14).

[11] Plaintiff goes too far in asserting that "production" could not possibly describe graphitizing and machining semi-finished product into a finished product.  Opp. at 38.  Plaintiff cites no source—either legal or technical, internal or external to GrafTech—to suggest that "production" could mean *only* carrying out each and every step of the manufacturing process and not portions of the process, including the final stages that yield a finished product.  Plaintiff's idiosyncratic understanding of the word "production" is no substitute for the particularized factual allegations that the Reform Act requires.  ECF 64-1, at 27; *Peloton Interactive*, 2025 WL 510043, at *11 (finding statements about a recall described as "voluntary" "were not false or misleading" because "Defendants' description of the recall as 'voluntary' aligns with the 'ordinary meaning' of the word voluntary in this context").

never said the pin machining line at St. Marys *eliminated* production risks, only that it "***helps***" reduce risks.  *E.g.*, ECF 64-28 (4Q21 Earnings Tr. at 3); 64-30 (1Q22 Earnings Tr. at 3).

Plaintiff's argument defies common sense, in addition to ignoring what GrafTech actually said.  *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009) ("[W]e only afford their allegations the inferential weight warranted by context and common sense."). Even if the Monterrey Plant manufactured all of the semi-finished product eventually turned into pins (i.e., every unit of pin stock), shifting some of the machining operations to another plant would still "help" to de-risk production capacity.  For example, with the St. Marys pin machining line operational, if the machining line at the Monterrey Plant were to break down, GrafTech would still be able to conduct machining operations at St. Marys.

Plaintiff does not confront this problem.  It points to no particularized facts to suggest that, by taking steps to conduct the back end of the production process at an additional plant, the newly operational line at St. Marys did not, in fact, "help[] to de-risk" pin production.  Rather, Plaintiff's semantic gripe about what Defendants meant by "helps to de-risk" illustrates another fatal defect the Opposition failed to address:  these challenged statements express an opinion (and a vague one), which also renders them inactionable.  *See Kelly v. Elec. Arts, Inc.*, 2015 WL 1967233, at *7–8 (N.D. Cal. Apr. 30, 2015) ("The Court previously likened [de-risk] to the word 'improved,' which also signifies making a product ***better or safer***, and is a statement of corporate optimism and a vague assessment of past results.").  The Opposition points to no particularized facts, as required by *Omnicare*, that GrafTech possessed information that suggested that shifting some pin machining to St. Marys did not help to de-risk pin production, or that Defendants didn't honestly

hold this opinion. For the same reasons that the opinion statements about the Monterrey Plant fail, opinion statements about "helping to de-risk" are likewise inactionable.[12]

### 3. The Peaking Plant Statement Is Not Actionable.

In a February 2019 earnings call, Mr. Rintoul commented that, in light of the idling of parts of St. Marys, that plant could be "analog[ized]" to a "peaking plant" and that he expected its future activities to "move up and down based upon the market dynamics." ECF 64-3, at 2. Plaintiff attacks that statement, but the Opposition does not point to a single allegation about St. Marys' status as of February 2019 or Mr. Rintoul's plans or opinions then about its future operations. Instead, the Opposition directs the Court to allegations about much later points in time, such as the Former Engineering Lead's observations in 2021 or 2022 (ECF 64-1, at 28) that GrafTech did not have operable equipment and permits for the initial steps of the manufacturing process. Opp. at 32. But what the Former Engineering Lead allegedly saw two or three years later has no bearing on what Mr. Rintoul believed or planned in February 2019. The Opposition does not contest, and thus concedes, that observations made two or three years *after* the February 2019 statement cannot show contemporaneous falsity. ECF 64-1, at 28. And Plaintiff admits that the peaking plant statement was about the "***then existing*** status of the St. Marys facility" (Opp. at 33), not about the Plant's state years later. The lack of particularized facts suggesting that Mr. Rintoul did not in fact think of St. Marys as a "peaking plant" in February 2019 dooms this claim.

---

[12] To the extent Plaintiff argues the de-risk statements were misleading because GrafTech omitted to also say that Monterrey was the only facility that produced the semi-finished product the St. Marys Plant machined into pins, Plaintiff comes nowhere close to pleading an actionable omission. "Pure omissions are not actionable under Rule 10b–5(b)," *Macquarie*, 601 U.S. at 266, and that is all Plaintiff alleges here. Plaintiff has not pled any facts that contradict the statement that opening another machining line at St. Marys "helped" to mitigate production risks. *Lim v. Hightower*, 2024 WL 4349409, at *11 (N.D. Ohio Sept. 30, 2024) ("Without alleging specific facts contradicting existing statements, Plaintiffs fail to plead omissions with the required particularity."). Moreover, the statements were not about operations at the Monterrey Plant—on their face they are limited to the St. Marys Plant—so the alleged omission was not within the scope of GrafTech's affirmative statement. *Zhou v. Desktop Metal, Inc.*, 120 F.4th 278, 296 (1st Cir. 2024) ("To render a statement misleading, the omission must be within the scope of the disclosure."). Any supposed omission about risks related to pin stock is thus not actionable.

Realizing this, Plaintiff resorts to a familiar trope, claiming this is a dispute of fact. Opp. at 32–33. Nonsense. Defendants' argument is not that the claim should be dismissed because the statement was true (even though it was true). Rather, the Defendants' argument—here, and everywhere in the Opening Brief—is that the Complaint failed to plead particularized facts showing that this challenged statement, like all the others, was false when made.[13]

**C. None Of The Statements About The Anticipated Impact Of The Monterrey Shutdown Are Actionable.**

Plaintiff alleges that GrafTech and the Individual Defendants made misstatements or omissions regarding the anticipated impact of the Monterrey shutdown. *See* ECF 64-4. Those claims fail because, yet again, Plaintiff does not plead contemporaneous falsity, and many of the statements are inactionable opinions or forward-looking statements protected by the safe harbor. *See* ECF 64-1, at 29–35. With no effective counter, Plaintiff's Opposition zeroes in on one alleged misstatement and effectively concedes the others are not actionable.

**1. The Opposition Does Nothing To Demonstrate That The Challenged Statements About The Future Impact Of The Shutdown Were False When Made.**

True to form, the Opposition does not explain how any of the challenged statements regarding the expected impact of the Monterrey shutdown were false when made. The alleged misstatements or omissions occurred in September 2022, November 2022, February 2023, and April 2023. *See* ECF 64-4. Each is inactionable.

---

[13] The peaking plant statement was also forward-looking and protected by the Reform Act's safe harbor. ECF 64-1, at 28 n.20. Plaintiff's only response is that the risk warnings somehow did not encompass St. Marys. Opp. at 33–34. But St. Marys very much was included. The same month as the alleged misstatement about St.-Marys-as-a-peaking-plant, the 2018 Form 10-K discussed St. Marys as requiring capacity expansion for additional volume production. On page 30, the Company disclosed: "Our ability to complete future production capacity expansions, including the potential full restart of our St. Marys plant, may be delayed, interrupted or otherwise limited by the need to obtain environmental and other regulatory approvals, unexpected cost increases, availability of labor and materials, unforeseen hazards such as weather conditions, and other risks customarily associated with construction projects."

**a.   The Opposition Fails To Meaningfully Address Falsity For Nearly All Of The Challenged Statements About The Future Impact Of The Shutdown.**

The Court can make quick work of four of the statements at issue:  those from September 2022, November 18, 2022, February 2023, and April 2023.

As to the alleged misstatement in September 2022—part of the 8-K filed less than 24 hours after the Monterrey shutdown—Plaintiff does nothing to explain how the supposed omissions (i.e., that Monterrey manufactured all pin stock inventory, and the then-day-long shutdown coincided with a contract negotiation window) rendered anything in the 8-K materially misleading, as required to make an omission actionable.  *See, e.g.*, *Macquarie*, 601 U.S. at 265; *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (companies need disclose information only if the challenged statements "create an impression of a state of affairs that differs in a material way from the one that actually exists").  All the 8-K said was that operations at Monterrey were temporarily suspended, GrafTech could not assess how long the suspension would last, and GrafTech "strongly" disagreed with the government's action and intended to "vigorously defend against" it.  *See* ECF 64-8 (9/16/22 8-K at 2).  The filing said nothing about pin stock or contract negotiations and explicitly told investors that GrafTech was "not able to assess how long operations … will be temporarily suspended." *Id*.

The Opposition also says nothing about the November 18, 2022 statement, conceding the Opening Brief's argument that the Complaint lacks particulars showing it was false when made. *See* ECF 64-1, at 31; ECF 64-14 (11/18/22 8-K).

Nor does Plaintiff point to any contemporaneous particularized facts that suggest the February 2023 and April 2023 statements were false when made, only that events did not play out as the speakers hoped.  Opp. at 41–42; *see also* ECF 64-4.  That is not enough.  *See In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 959 (S.D. Ohio 2009) ("Corporate officials need

not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *see also ViewRay*, 556 F. Supp. 3d at 791.

> **b. Neither The Complaint Nor The Opposition Explain How The November 4, 2022 Statements Were False When Made.**

The only other challenged statements about the anticipated impact of the shutdown are from the November 4, 2022 earnings call and release. Opp. at 41–42; *see also* ECF 64-4. Those stated that (1) Monterrey was the only facility that produced pin stock (¶172); (2) the Company expected the immediate effects of the shutdown to be "modest" due to "existing pin inventory" (¶175); (3) if Monterrey remained closed, the anticipated financial impact would be "significant" (¶173); and (4) the shutdown was not expected to change GrafTech's long-term commercial strategy (¶177). As the Opening Brief explains, those statements are inactionable because Plaintiff does not plead particularized facts showing they were contemporaneously false. ECF 64-1, at 29–32; *see also* ECF 64-4.

Plaintiff admits that its *only* allegations that supposedly support falsity come from well *after* November 4, 2022, in the form of so-called "subsequent admissions." Opp. at 42. Specifically, the Opposition points to statements on February 3, 2023, that updated GrafTech's outlook for 2023 and disclosed that the shutdown's effects would impact first-half 2023 results. *See* ECF 64-1, at 31; ECF 64-15 (4Q22 Earnings Tr. at 2). Those *subsequent* statements hardly show *contemporaneous* falsity of statements made three months earlier; they are classic fraud-by-hindsight. In any event, the statements are not "admissions" at all. The February 3, 2023 disclosures neither stated nor implied that the updated outlook was known to Defendants back in November 2022. *See infra* Section II.

16

The remaining arguments about the November 4 statements fare no better.  First, the Opposition claims that GrafTech failed to disclose that the Monterrey shutdown coincided with a contract negotiation window and negatively impacted those discussions.  *See* Opp. at 41–42.  But Plaintiff does not allege a single particularized fact about the status of the contract negotiations *as of November 2022*.  Instead, the Opposition concedes the absence of these particularized facts.  *See, e.g.*, *id*. at 42–43.  Whether customers ultimately did not enter into contracts as GrafTech had hoped does not even begin to suggest that the statements were false when made (or that their speakers did not believe them).  *See, e.g.*, *Lim*, 2024 WL 4349409, at *14 ("Claims of securities fraud or misrepresentation based on allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did fail on their merits.").

Second, Plaintiff claims that GrafTech should have told investors on November 4, 2022 that it would take several months to replenish its pin stock inventory.  *See* Opp. at 41–43.  But the Complaint contains *no* allegations—let alone particularized ones—regarding the levels of pin stock inventory in November 2022, the depletion rate of that inventory, or any tracking of the inventory by GrafTech or otherwise.  *See* ECF 64-1, at 29–30.  Just because the pin stock inventory later ran low does not mean the November 4 statements were false when made.  *Id.*

Finally, Plaintiff complains that GrafTech disclosed what would happen if the Monterrey Plant remained *closed*, but not if the Plant *reopened*—which, it alleges, amounts to a material omission.  Opp. at 41–43.  But in the 8-K that announced the reopening just two weeks later, GrafTech explicitly stated that its outlook for the fourth quarter of 2022 remained unchanged and that GrafTech would "provide an update on the estimated impact of the suspension on its 2023 outlook when it reports its fourth quarter 2022 results" in February 2023.  ECF 64-1, at 31; ECF 64-14 (11/18/22 8-K at 1).  Plaintiff ignores this disclosure, because addressing it would illuminate

17

the nonsensical argument that the November 4 statements were misleading. When Monterrey reopened, GrafTech plainly disclosed that it was unable to estimate the impact on 2023 outlook. ECF 64-1, at 31; *see also* ECF 64-15 (4Q22 Earnings Tr. at 2). GrafTech further disclosed that the fourth-quarter results would be severely impacted. ECF 64-1, at 31; *see also* ECF 64-15 (4Q22 Earnings Tr. at 2–3). Here again, Plaintiff cannot save the Complaint by ignoring the disclosures GrafTech actually made.

These faults are terminal. Plaintiff cites no case in which a court found statements similar to those made by Defendants to be actionable. The few decisions the Opposition does cite are inapposite. *See, e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (finding statements that loan-to-value ratios were updated actionable because defendants later admitted that loan-to-value ratios were not updated at that time, which "established the falsity of the representation"); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (specifically finding "contemporaneous documents and post-period admissions" that defendants had "wrongful state of mind" and "knew earlier what they chose not to disclose until later"). Courts universally reject the fraud-by-hindsight Plaintiff advances. *See* ECF 64-1, at 17, 29 .

> **2. The Forward-Looking Statements About The Shutdown's Anticipated Effects Are Inactionable Opinions And Are Protected By The Reform Act's Safe Harbor.**

The challenged statements about the anticipated effects of the shutdown fail for other reasons, too. They are both inactionable opinions and forward-looking statements protected by the safe harbor. *See* ECF 64-1, at 32–35. GrafTech's beliefs that it could continue to pursue renewals of LTAs despite the shutdown, and that the shutdown's effects were likely to be confined to first-half 2023, were opinions and were expressed as such. *Id.* *Omnicare* explains that opinions are actionable only if the speaker did not hold the belief professed, or possessed some specific item of contradictory information that a reasonable person would have thought undercut the opinion so

strongly as to render the statement misleading. 575 U.S. at 183–96. The Complaint alleges neither, much less with particularity. *See* ECF 64-1, at 32–33. In the Opposition, Plaintiff concludes that the shutdown coincided with a "critical" negotiating window and GrafTech did not have sufficient inventory to withstand the shutdown. *See Albert Fadem Tr. v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 997 (S.D. Ohio 2004) (court need not accept conclusory allegations or bare legal conclusions). Without a specific item of contradictory information to belie the challenged opinions, they are inactionable. *ViewRay*, 556 F. Supp. 3d at 789–90 (backlog estimates were inactionable opinions absent any information to imply math was incorrect).[14]

The Opposition also claims, without basis, that GrafTech's cautionary language was "affirmatively misleading" and "inadequate." Opp. at 45–46. Plaintiff theorizes that Defendants "knew with near certainty that there would be adverse impacts because Monterrey was GrafTech's only facility capable of producing the needed pin stock," and "knew" that the shutdown "coincided with 'critical' negotiation windows." *Id.* at 46–47. But as discussed below, Plaintiff falls short in pleading any inference of scienter, let alone the requisite strong one. *See infra* Section II. Plaintiff does not identify any document, report, data, or communication demonstrating that any Defendant "knew" the shutdown's ultimate impact at the time of the challenged statements.

---

[14] Plaintiff's argument that the safe harbor does not apply because Defendants knew the statements were false (Opp. at 45–47) fails due to the utter absence of particularized facts showing actual knowledge of falsity. There are no allegations about any internal forecast, plan, or strategy, let alone that it diverged from what GrafTech and the Individual Defendants told the market. *See* ECF 64-1, at 29–31. Instead, Plaintiff relies on hindsight assertions that Defendants should have made better predictions, which isn't enough. *See, e.g.*, *Lim*, 2024 WL 4349409, at *14 ("Claims of securities fraud or misrepresentation based on allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did fail on their merits."). Whether Defendants should have managed through the crisis better is a "business problem, not a securities problem." *Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184, at *1 (7th Cir. May 9, 2022) (affirming dismissal of securities-fraud claim based on decline in sales).

## II. THE COMPLAINT DOES NOT PLEAD A "STRONG" INFERENCE OF SCIENTER THAT IS MORE PLAUSIBLE THAN NON-FRAUDULENT INFERENCES.

The Reform Act compels dismissal unless particularized facts create a "strong" inference of scienter—"a mental state embracing intent to deceive, manipulate, or defraud." 15 U.S.C. § 78u-4(b)(2)(A). Plaintiff admits that the inference must be both "cogent" and "at least as compelling as any opposing inference" of non-fraudulent intent, such as a simple failure to predict the future. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The inference must exist as to **each** alleged misstatement and **each** defendant. 15 U.S.C. § 78u-4(b)(2)(A).

The Complaint flunks that test twice over. First, it lacks particularized factual allegations to support **any** inference that any of the Defendants wanted to swindle GrafTech's shareholders. ECF No. 64-1, at 42–45. The Opposition never identifies a single specific document, report, or communication possessed by any Defendant that contradicted any of their public statements. Instead, the Opposition recites the same generalized insinuations that courts routinely find wanting. And the Opposition does not even try to defend the Complaint's impermissible practice of lumping the Defendants together into a single wrongdoing monolith. *See* ECF 65-1, at 9 (citing *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 526 (6th Cir. 2023) ("We do, however, analyze scienter on a defendant-by-defendant basis.")).

Second, the available non-fraudulent inferences are both obvious and much stronger than anything Plaintiff offers: Defendants were surprised by the abrupt (and unjustified) shutdown of Monterrey; they believed the market understood that the St. Marys operations were limited to graphitizing and machining—because they had repeatedly disclosed as much; and the impacts of the shutdown proved to be longer-lasting than foreseen. The Opposition doesn't even try to explain away these non-fraudulent inferences, choosing to ignore them. It thus forfeits the "inherently

20

comparative" analysis the Reform Act commands, under which this Court "must consider plausible, nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. at 323–24.

### A. There Is No Inference Of Scienter As To The Alleged Misstatements About Environmental Matters And The Monterrey Plant.

Plaintiff identifies just two types of allegations as supposedly probative of scienter with respect to alleged Monterrey environmental issues:  (1) unspecified ESG-related metrics Defendants received in their corporate roles, and (2) the resolution of the 2019 administrative proceeding.  Opp. at 50–55.  Neither strongly suggests scienter.

### 1. Courts Routinely Reject Attempts To Plead Scienter By Reference To Defendants' Corporate Roles Or Their Monitoring Of Unspecified Metrics.

Plaintiff posits that because Defendants had certain titles or served on certain committees, they must have received information that contradicted their public statements about the Monterrey Plant and thus must have known their statements were false (*e.g.*, "GrafTech's senior management-led Steering Group oversees our sustainability Strategy").  Opp. at 50 (cleaned up).  But the Sixth Circuit says that just holding titles or sitting on committees does not support an inference of fraud. *Konkol v. Diebold, Inc.*, 590 F.3d 390, 398 (6th Cir. 2009), *abrogated on other grounds by Matrixx Initiatives, Inc.*, 563 U.S. at 48–49 (2011) ("***general allegation*** [of 'monitoring'] ***is not sufficient*** to support a strong inference of scienter"); *Ley*, 543 F. 3d at 818 ("The Amended Complaint fails to allege what documents in particular [the defendant] had access to or what information it would have learned from reviewing said documents.  Indeed, Plaintiffs' allegations are insufficiently concrete to raise an inference of scienter, much less a strong one.").

Nor do those allegations support scienter here, because, as the Opening Brief pointed out, the Complaint does not have a single allegation about any document, report, or data provided to any Defendant (or to any committee on which a Defendant sat) that showed Monterrey was out of compliance with its permits or at risk of being shut down.  ECF 64-1, at 38.  Plaintiff does not

21

argue to the contrary, effectively conceding this critical point.  Opp. at 53.  The Opening Brief also pointed out that the Complaint never identifies any specific permit requirement that applied, far less data reflecting a violation.  ECF 64-1, at 38.  The Opposition's response, again, is silence.

In the face of these concessions, Plaintiff says it would be "implausible" for the Defendants to have been involved in ESG Steering Committee meetings, talked to plant managers, and monitored environmental metrics "and not known the true extent and severity of the issues alleged." Opp. at 52.  But that assumes away the key point:  the absence of particularized facts to show that, as of the time of any challenged statement, there were "severe" environmental violations that endangered Monterrey's ongoing operations.  The Opening Brief explained how the Complaint's unparticularized allegations miss the mark.  ECF 64-1, at 36–39.

Plaintiff's attempts to distinguish Defendants' cases fail.  Plaintiff musters only a footnote parenthetical in response to the Sixth Circuit's recent, thorough analysis in *ServiceMaster*.  Opp. at 53 n.20.  There, a complaint included scienter allegations based on executives' senior positions and the fact that a particular crisis, about which the plaintiff believed the defendants misled investors, was discussed by the defendants at meetings.  *ServiceMaster*, 83 F.4th at 531.  The Sixth Circuit concluded that "[w]ithout more information about what the ServiceMaster executives knew and when they knew it, the Fund has not supported an inference of scienter that is at least as strong as this nonfraudulent inference."  *Id*. at 532.  The reasoning in *ServiceMaster* squarely applies here:

- "Scienter is not to be inferred simply by virtue of [the defendants'] senior positions."

- "Nor does the Amended Complaint offer anything more than vague assertions that issues relating to the . . . crisis were discussed among [Company] executives."

- "Completely absent is any detail about exactly what was discussed, whether or not the extent of the problem or liability for possible claims were discussed, whether the possible impact on [the Company's] financial results was raised, or specifically when the alleged discussions occurred. . . . Without this information, the mere attendance at meetings where the . . . crisis was discussed does little to establish the kind of red flags

22

necessary to support a strong inference of scienter."

*Id.* at 531. *ServiceMaster* compels dismissal here.

Plaintiff's treatment of *ViewRay* is likewise telling.[15] Plaintiff does not attempt to distinguish the allegations about meetings and reports deemed insufficient there from those here. *See* Opp. at 53 n.20. The *ViewRay* court held that the "allegations lack a connection between the information Defendants had—bi-weekly reports, meetings, and conversations that the confidential witnesses say they were privy to—and any false statements or statements made with reckless disregard for the fact that the backlog included anything other than orders that had yet to turn into revenue." *ViewRay*, 556 F. Supp. 3d at 797. The same analysis and outcome apply here.[16]

Given Plaintiff's failure to plead any particularized facts—about what level of emissions were permitted, what levels of emissions GrafTech's internal reports and data showed, how GrafTech's metrics compared to the government's, and whether or how that information was communicated to the Individual Defendants—Plaintiff falls back on a "core operations" theory, arguing that Defendants' knowledge should be assumed because the Monterrey Plant was important to GrafTech. Opp. at 54 & n.21. But the Sixth Circuit rejects the "core operations" theory when, as here, unsupported by particularized allegations. *E.g.*, *Pittman v. Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021) ("The plaintiffs first argue that . . . the overall importance of Unum's

---

[15] As for *Konkol v. Diebold, Inc.*, Plaintiff's attempts to distinguish it are belied by the Sixth Circuit's interpretation of *Tellabs*: "The standard from *Tellabs* requires specific facts that those reports were known to Defendants ***and reflected the revenue-recognition scheme in such a way that it would have been obvious*** that Diebold was improperly inflating its revenue." 590 F.3d at 398.

[16] After failing to distinguish Defendants' Sixth Circuit cases, Plaintiff distorts the facts of its cited district-court cases. As for *Grae v. Corrections Corp. of America*, Plaintiff ignores that the court found the plaintiff had "complete[d] the picture" by alleging that a notice of concern, which contained information about staffing shortages critical to the claims, was included within information relied upon by senior management. 2017 WL 6442145, at *3, *7, *20 (M.D. Tenn. Dec. 18, 2017). As for *Winslow v. BancorpSouth, Inc.*, Plaintiff left out that the court found pivotal the allegation that an executive admitted that some loans at issue were "evaluated at the executive level" after assuring investors that the company had eyes on those same loans. 2011 WL 7090820, at *23 (M.D. Tenn. Apr. 26, 2011).

[insurance policy] reserves support an inference of fraudulent intent. . . . But the fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent.  So this is not a scienter-bolstering fact."); *ServiceMaster*, 83 F.4th at 531 ("[T]he fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent.").[17]   Plaintiff's "core operations" theory is no substitute for the particularized facts missing from the Complaint.

### 2. Nothing Else Supports An Inference Of Scienter For The Statements About The Monterrey Plant.

With nothing else left to save its Complaint, Plaintiff once again falls back on the 2019 administrative proceeding.  In Plaintiff's world, the mere existence of the proceeding shows Defendants knew their statements about the Monterrey Plant were false or misleading.  According to Plaintiff, its resolution demonstrated that "GrafTech's violations of environmental laws were continuing and ongoing throughout the Class Period."  Opp. at 53.  But Plaintiff never explains how the resolution of that publicly-disclosed proceeding, which concluded early in the Class Period, could possibly show "continuing and ongoing" environmental violations for years to come.  As explained in the Opening Brief, Defendants had no reason to believe the proceeding was not fully resolved in 2019, and the Opposition offers no response, conceding the point.  *See* ECF 64-1, at 39–40.[18]  Plaintiff waves its hands at a few other allegations,[19] but none have anything to do

---

[17] Tellingly, even the primary Sixth Circuit case Plaintiff relies on, *PR Diamonds, Inc. v. Chandler*, accords with the Sixth Circuit's recent *Unum Group* and *ServiceMaster* decisions.  364 F.3d  671, 688 (6th Cir. 2004)("[F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information. . . . [i]t cannot be said that the alleged misrepresentations or omissions pertained to central, day-to-day operational matters.  Instead, they turn largely on accounting issues[.]"), *abrogated on other grounds by Matrixx Initiatives*, 563 U.S. at 48–49.

[18] Plaintiff has no response to Defendants' refutation of the Complaint's allegations about agreements GrafTech supposedly made with the local government.  ECF 64-1, at 40 n.27.  Here, again, Plaintiff's silence is a concession that no inference of scienter can be found.

[19] These other allegations are an anonymous citizen's complaint and comments the mayor of the local municipality made to the media about dust emissions at Monterrey.  Opp. at 53.  Neither supports an inference of scienter.  Indeed, there is no allegation that GrafTech knew about the anonymous citizen's complaint or the mayor's comments.  *See*

24

with "violations of environmental laws," and they cannot support an inference of scienter.[20]

*   *   *

None of the allegations are sufficiently particularized to infer scienter for the Monterrey-related statements.  What's more, the Opposition ignores the non-fraudulent inferences addressed in the Opening Brief.  ECF No. 64-1, at 39–40.  Without any allegations about documents, data, or reports showing the Monterrey Plant was out of compliance with its permits leading up to the shutdown, the far more cogent inference is that the Defendants were surprised by the Mexican government's sudden, aggressive (and, GrafTech thought, unjustified) actions in September 2022. *See Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1043 (6th Cir. 2016) ("*Doshi II*") ("[T]hese allegations produce a stronger countervailing inference:  that a theft scheme in Brazil aided by local managers overriding financial controls, combined with . . . legitimate freedom to submit financial data to [the parent company], resulted in [the individual defendants] at most negligently issuing or authorizing false public financial statements.").

---

ECF 64-1, at 40 n.27.  Neither are there allegations that connect the level of dust observed by any citizen or the mayor to  any emission level the state government had agreed to permit.  These third-party views are entirely subjective, untethered to any objective emissions benchmark.

[20] Plaintiff relies on the Defendants' awareness of the 2019 administrative proceeding to argue that Defendants had scienter with respect to alleged misstatements before the proceeding began (those on February 8, 2019) and while the proceeding was ongoing (those between March and September 2019).  Opp. at 53.  For the February 8, 2019 statements, this is nonsensical.  Defendants could not have been aware of a proceeding that had not started yet, and there are zero allegations that Defendants anticipated it or were otherwise aware of environmental issues at Monterrey.  These types of fraud-by-hindsight allegations do not suffice.  *Dailey v. Medlock*, 551 F. App'x 841, 847 (6th Cir. 2014) ("[T]he *ipso facto* assertion that the mere fact that" an event occurred "demonstrates . . . knowledge" is an impermissible "fraud by hindsight" allegation).  For the statements in April and July 2019 (while the proceeding was ongoing), GrafTech disclosed the proceeding and noted that the Company would be required "to design and implement certain corrective measures" related to air emissions.  *E.g.*, ECF 64-20 (1Q19 10-Q at 35).  Similarly, in the November 2019 statements, where the Company announced the proceeding's closure, the Company disclosed that—despite its disagreement with the government—it "cooperated" with the government authority, had to pay "certain fines that were not material to the Company," and had "to design and implement certain corrective measures."  ECF 64-6 (3Q19 at 40).  This information was adverse to the Company.  The Sixth Circuit has recognized that disclosures of this type negate inferences of scienter.  *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 443 (6th Cir. 2014) ("Other courts have concluded that disclosing adverse information to the public negates an inference of scienter.").

25

**B. No Particularized Allegations Support An Inference Of Scienter For Any Statement Related To St. Marys.**

As described above (*see supra* at Section I.B.1 & n.9), Plaintiff agrees that the St. Marys Plant was doing exactly what GrafTech said it was doing. Opp. at 40 (admitting that "the Complaint contains no allegations that St. Marys wasn't engaged in graphitizing or machining activities"). In light of that concession, it is mystifying that Plaintiff nevertheless seeks an inference that the Defendants were trying to trick the market into believing that the full scope of manufacturing operations was occurring at St. Marys.

Given that everyone agrees that GrafTech disclosed the limited scope of manufacturing activities at St. Marys, no inference of scienter—let alone a strong one—can arise out of the use of the word "production" in various statements. Referring to "production" activities did not connote that St. Marys was carrying out every single step of the manufacturing process, any more than it would be misleading to say that an automobile assembly plant in Ohio is engaged in the "production" of cars if the engines come from Michigan and the transmissions from Indiana.[21]

The non-fraudulent inference set forth in the Opening Brief (and ignored in the Opposition) is obvious: Defendants reasonably believed the market understood that St. Marys was machining and graphitizing semi-finished product sourced from elsewhere and was not conducting every step of the manufacturing process. ECF No. 64-1, at 41. That conclusion is cemented by analyst questions acknowledging that the new pin line was a pin machining line, which would have only

---

[21] Plaintiff's scienter inference for the "de-risking" statements is just as weak. As discussed in Section I.B.2 *supra*, Plaintiff never alleges that risks were not actually mitigated by conducting machining and graphitizing operations at St. Marys. Conducting certain steps of the manufacturing process at multiple locations rather than one would obviously tend to reduce risk. Plaintiff's argument does nothing to suggest Defendants did not believe that the new machining line helped to reduce risks. And GrafTech said only that the St. Marys operations "***helped***" to de-risk production—not that they eliminated all risks completely.

confirmed to Defendants that analysts understood the limited scope of operations at St. Marys. *ServiceMaster*, 83 F.4th at 533 ("[T[he context of the question and answer makes an innocent inference of [an executive]'s motivation for making the statement far more likely.").[22]

### C. There Can Be No Inference Of Scienter As To Predictions About The Impact Of The Monterrey Shutdown.[23]

The alleged misstatements about the impact of the Monterrey Plant shutdown differ significantly depending on whether they were made at the start of the shutdown, during the shutdown, immediately after the shutdown, or a few months later. The Opposition lacks *any* scienter argument for the alleged misstatements on September 16, 2022[24] and November 18, 2022,[25] and there are no particularized facts suggesting any Defendant had scienter with respect to either. Plaintiff implicitly concedes the claims attacking these statements must be dismissed.

Likewise, Plaintiff's scienter pitch with respect to the February 2023 and April 2023 alleged misstatements is cursory. *See* Opp. at 61. The Opposition fails to point to any non-

---

[22] Plaintiff spends little time on the alleged "peaking plant" misstatement, where the lack of particularity discussed in the falsity section, *supra* Section I.B.3, is fatal on scienter as well. Plaintiff has not pointed to any particularized fact that suggests the Company did not contemplate possible future operation of St. Marys as a peaking plant at the time the statement was made in 2019, and Plaintiff admits that the statement was about the "then existing status of the St. Marys facility." Opp. at 33. Allegations about operations years later have no bearing on scienter. Without any allegations about the status of St. Marys in 2019, when the statement was made, the far stronger inference is that Defendants were not seeking to mislead.

[23] For the statements about the impact of the Monterrey Plant shutdown (those set forth in Exhibit C to the Motion to Dismiss (ECF 64-4)), Plaintiff attempts to allege scienter only with respect to Messrs. Halford, Kessler, and Flanagan. Opp. at 60. Plaintiff has abandoned claims against Messrs. Rintoul and Coburn with respect to these statements, and they can therefore be dismissed outright. *See* ECF 64-1, at 42 n.29.

[24] The September statement was GrafTech's announcement of the Plant's closure the day before, which Plaintiff claims was misleading because it did not predict the ultimate impact of the shutdown on the Company months or quarters later. ¶171. But Plaintiff points to no document or information suggesting the full scope of the impact was known (or even knowable) in the immediate aftermath of the shutdown.

[25] The November statement was GrafTech's announcement of the Plant's reopening, which Plaintiff claims was misleading because it failed to disclose there would be a continued impact to GrafTech's financial results. ¶180. Perhaps Plaintiff skipped over this statement in its scienter discussion because, on its face, when read in full and not cherrypicked (ECF No. 64-1, at 7, 31), GrafTech disclosed that "[f]or the fourth quarter of 2022, the Company continues to anticipate the temporary suspension will impact its ability to fulfill approximately 10 thousand metric tons ('MT') to 12 thousand MT of customer orders, consistent with its previous outlook provided on November 4, 2022" and that "[t]he Company will provide an update on the estimated impact of the suspension on its 2023 outlook when it reports its fourth quarter 2022 results." ECF 64-14 (11/18/22 8-K at 1).

conclusory, particularized allegations that Defendants knew, at the time of those statements, that the recovery from the shutdown would leak into the second half of the year, and it ignores Mr. Halford's February 3, 2023 statement that discussions with customers led the Company to believe volumes would recover in the back half of the year. *See* ECF No. 64-1, at 42 n.30. Plaintiff's hindsight-based allegations don't amount even to a yellow flag where "multiple, obvious red flags" are required. *Doshi II*, 823 F.3d at 1039; *Dailey*, 551 F. App'x at 847.[26]

Plaintiff mostly focuses on the November 4, 2022 alleged misstatements, made in connection with the third quarter earnings release in the thick of the Monterrey Plant shutdown. Plaintiff claims the statements were false because they ***implied*** the Company would not experience any negative financial consequences if the Plant reopened. Opp. at 42. To suggest scienter, Plaintiff alleges only that there was a contract negotiation window in the Fall of 2022 and that there is a long lead-time to produce pin stock. *Id*. at 60–61. The Complaint has no particulars that indicate Defendants were aware of "multiple, obvious red flags" on November 4 that suggested GrafTech's commercial strategy was doomed to fail or that customers would not re-engage after the Plant reopened. *Doshi II*, 823 F.3d at 1039. There are no allegations about, for instance, whether the negotiations had concluded, what any customers had told GrafTech about their plans as of November 4, or GrafTech's inventories. And there are no allegations that the public statements diverged from any of GrafTech's internal plans or projections.

---

[26] Plaintiff's reliance on *Lormand* to counter the fraud-by-hindsight case law cited in the Opening Brief is surprising given the factual differences. There, ***a defendant admitted*** that "the management recognized these clearly present dangers at the time of their alleged misrepresentations." 565 F.3d. at 252. In addition, the plaintiff attached "numerous contemporaneous documents, such as internal emails and memos" to the complaint that suggested the defendants knew privately, before the time of their statements, that the statements were misleading. *Id*. at 254. Here, Plaintiff did not attach, let alone cite, a single contemporaneous document or allege any similar admissions, which is fatal in this Circuit. *See Diebold*, 590 F.3d at 403 ("***Without specific allegations*** showing that the [d]efendants either knew of or recklessly disregarded the falsity of their own statements ***at the time the statements were made***, the fact that their statements later turned out to be false is irrelevant to a cause of action under the PSLRA.").

28

Worse, Plaintiff ignores the language of the November 18, 2022 disclosures, which, as discussed in Section I.C.1 *supra*, along with announcing the reopening of Monterrey, explained that the Company could not provide guidance for the impact of the shutdown on future results other than negative volume impacts in the fourth quarter, but that it would later update its guidance. *See* ECF 64-14 (11/18/22 8-K at 1). This disclosure—that there would still be significant, negative volume impacts in the fourth quarter despite the reopening, and the commitment to provide an update on impacts—negates any inference that defendants sought to deceive investors about the impact of the shutdown. *See BioMimetic Therapeutics*, 747 F.3d at 443 ("It is doubtful that the company intended to defraud investors in light of its willingness to disclose information that harmed its share prices.").

Without particularized facts supporting an inference of fraud, the much stronger inference is that Defendants believed the impacts of the shutdown would not be as severe or long-lasting as they ultimately turned out to be. The Monterrey Plant shutdown was a fast-developing, wide-ranging, and unprecedented emergency for the Company, and failing to fully predict from the outset how it would unfold was not fraud. The Sixth Circuit said it best in *Unum Group*: "the facts in this case are more consistent with a company playing a constant game of catch-up than with fraud." 861 F. App'x at 57. GrafTech's repeated disclosure of the negative consequences of the shutdown to its bottom line as those consequences crystallized "is hardly the sort of behavior one would expect from the perpetrator of securities fraud." *Id*.

**D.** **Plaintiff's Perfunctory Holistic Analysis Of Scienter Supports Dismissal.**[27]

---

[27] Plaintiff **both** claims that it need not submit to a scienter analysis using the *Helwig* factors, **and** concedes that, if the Court does use the factors as a framework for the scienter analysis, then factors 4, 5, 7, and 8 are inapplicable here. Opp. at 48 n.18.

Plaintiff's "analysis" hinges on the stock sale of one Individual Defendant and on all of the Individual Defendants' supposed desire to save their jobs and salaries. Opp. at 63. Those arguments are regularly rejected as probative of scienter.

Plaintiff stands mute in response to the Opening Brief's argument that allegations of a stock sale by Mr. Rintoul cannot be imputed to the other Individual Defendants, and Mr. Rintoul's brief explained why his sale was not suspicious. *See* ECF 64-1, at 43–44 (citing *Gruhn v. Tween Brands, Inc.*, 2009 WL 1542795, at *10 (S.D. Ohio June 2, 2009) ("[T]he amended consolidated complaint relies on but one insider's stock sales . . . This does not assist the establishment of a strong inference of scienter.")); ECF 65-1, at 9–11. And Plaintiff's argument about the Individual Defendants wanting to keep their jobs and salaries runs headlong into the abundant case law in the Opening Brief holding that such a general allegation cannot support scienter. *See* ECF 64-1, at 36–37, 45 (citing, *e.g.*, *ServiceMaster*, 83 F.4th at 531; *Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 889 (N.D. Ohio 2013), *aff'd sub nom.*, 572 F. App'x 356 (6th Cir. 2014)).

What's more, the Opposition fails to respond to the Opening Brief's argument about the Company's stock repurchases and the fact that each Individual Defendant accumulated stock during the Class Period. *See* ECF 64-1, at 44 n.34; *see also* ECF 65-1, at 10–11. Rather than address case law where courts have found stock purchases undermined inferences of scienter, Plaintiff ignores it. *See* ECF 64-1, at 44 n.34 (citing *Doshi I*, 386 F. Supp. 3d at 838; *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *15 (S.D.N.Y. Mar. 15, 2022)). And while Plaintiff argues that the Individual Defendants' accumulation does not preclude a scienter inference (Opp. at 64), Plaintiff does not dispute it weighs against that inference.

30

The most cogent inference is that GrafTech and its executives were not seeking to deceive the market. During the Class Period, the Individual Defendants accumulated large quantities of stock and GrafTech repurchased significant amounts of stock, resulting in large financial losses for the Individual Defendants and GrafTech. There was no reason for Defendants to commit a fraud, and the Complaint does not sufficiently allege otherwise.

**CONCLUSION**

Plaintiff does not point to particularized allegations in the Complaint that suggest the alleged misstatements were contemporaneously false or misleading, and fails to adequately plead scienter. [28] The Court should dismiss the Complaint in its entirety and with prejudice. [29]

---

[28] Plaintiff does not dispute that if the Court dismisses its Section 10(b) claim, the Section 20(a) claim also fails. Plaintiff similarly does not raise, in earnest, any argument for scheme liability.

[29] Dismissal with prejudice is appropriate, because "it is correct to interpret the [Reform Act] as restricting the ability of plaintiffs to amend their complaint." *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 692 (6th Cir. 2003). Moreover, further amendment could not cure the Complaint's pleading deficiencies, as underscored by Plaintiff's failure to propose anything that might fix them. *See, e.g.*, *Yum! Brands*, 620 F. App'x at 485–86 (affirming dismissal with prejudice); *PR Diamonds*, 364 F.3d at 699 (noting the Sixth Circuit's "disfavor of . . . a bare request in lieu of a properly filed motion for leave to amend").

Dated:  March 17, 2025

/s/ *Geoffrey J. Ritts*

Geoffrey J. Ritts (0062603)
Adrienne Ferraro Mueller (0076332)
Brittany N. Wilhelm (0096866)
Connor F. Lang (0100348)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone:  (216) 586-3939
gjritts@jonesday.com
afmueller@jonesday.com
bwilhelm@jonesday.com
clang@jonesday.com

Marjorie P. Duffy (0083452)
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
Telephone: (614) 469-3939
mpduffy@jonesday.com

*Attorneys for Defendants GrafTech International Ltd., Marcel Kessler, Quinn Coburn, Timothy K. Flanagan, and Jeremy S. Halford*

## CERTIFICATE OF SERVICE

A copy of the foregoing Reply in Support of the Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws was filed electronically this 17th day of March, 2025.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.    Parties may access this filing through the Court's system.

/s/ *Geoffrey J. Ritts*
Geoffrey J. Ritts (0062603)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone:  (216) 586-3939
gjritts@jonesday.com

*One of the Attorneys for Defendants GrafTech International Ltd., Marcel Kessler, Quinn Coburn, Timothy K. Flanagan, and Jeremy S. Halford*