IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN C. PORTER,<br>Individually and on Behalf of All<br>Others Similarly Situated, | )<br>)<br>) | CASE NO. 1:24 CV 00154 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| v. | )<br>) | |
| GRAFTECH<br>INTERNATIONAL LTD., et al., | )<br>) | **MEMORANDUM OF OPINION<br>AND ORDER** |
| | ) | |
| Defendants. | )<br>) | (This Memorandum and Order Applies<br>to Documents ECF #64, #65, #66 & #67) |

This matter is before the Court on various *Motions to Dismiss*, filed by Defendants, each

on December 6, 2024, in this Private Securities Litigation Reform Act of 1995 ("PSLRA")

proposed class action complaint, (*see* ECF #56, *First Amended Complaint for Violations of the*

*Federal Securities Laws*, hereinafter "*First Amended Complaint*"), asserting alleged violation of

Section 10(b) of the Securities Exchange Act of 1934 and Securities Exchange Commission Rule

10b-5,[1] pled against Defendant GrafTech International Ltd. ("GrafTech") and individual-person

Defendants David Rintoul, Quinn Coburn, Marcel Kessler, Timothy Flanagan, and Jeremy

Halford (collectively referred to as the "Individual Defendants"), each of whom is or was a

---

[1]

  Throughout this *Memorandum of Opinion*, the Securities Exchange Act of 1934 (which
primarily regulates the transaction of securities in the secondary market) is often referred to as
the "Exchange Act" to contrast it with the Securities Act of 1933 (which primarily regulates the
initial issuance of securities in the primary market). Securities Exchange Commission Rule
10b-5 will often be referred to as simply "Rule 10b-5."

Senior-level Officer of GrafTech (Count I), and a claim alleging "control person" liability in violation of Section 20(a) of the Exchange Act against each of these Individual Defendants as well as Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd. (collectively referred to as "the Brookfield Defendants") (Count II), specifically:

(1) *Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws* (ECF #64);

(2) *Defendant David Rintoul's Motion to Dismiss the First Amended Complaint* (ECF #65); and

(3) *Motion of Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd., to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws* (ECF #66).

In response to these *Motions to Dismiss*, Lead Plaintiff University of Puerto Rico Retirement System ("Plaintiff") filed an *Omnibus Memorandum in Opposition to the Motions to Dismiss* (ECF #69) on February 3, 2025.[2]  On March 17, 2025, each of the Defendants filed their respective *Replies* in support of their *Motions to Dismiss*.  (ECF #72 [Brookfield], ECF #73 [Rintoul] & ECF #74 [Graftech & Individual Officers]).  These motions are now ready for decision.

---

[2]

On May 7, 2024, the Court held a hearing on two competing motions to be named as Lead Plaintiff, those of Shekhar Agrawal and University of Puerto Rico Retirement System. (ECF #23 & Un-numbered Docket Entry following ECF #38).  There were initially five competing motions, but three of the movants withdrew their motions prior to the hearing, either through *Notice of Withdrawal* or *Notice of Non-Opposition*.  (*See* ECF #41, n.1).  By *Memorandum of Opinion and Order* dated May 15, 2024, (ECF #41 & ECF #42), University of Puerto Rico Retirement System was named as Lead Plaintiff to represent the interests of the proposed class plaintiffs.

This matter is also before the Court on *Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Strike Allegations Regarding "Former Engineering Lead"* (ECF #67), which is now also fully briefed, (*see* ECF #70 & ECF #71), and ready for decision. Because the *Motion to Strike* addresses an issue predicate to determination of the *Motions to Dismiss*, the *Motion to Strike* will be addressed first.

For each of the reasons stated below:

(1) *Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Strike Allegations Regarding "Former Engineering Lead"* (ECF #67), is **GRANTED**;.

(2) *Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws* (ECF #64), is **GRANTED**;

(3) *Defendant David Rintoul's Motion to Dismiss the First Amended Complaint* (ECF #65), is **GRANTED**; and

(4) *Motion of Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd., to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws* (ECF #66), is **GRANTED**.

## I. <u>FACTUAL BACKGROUND</u>

### A. <u>The Parties</u>

Lead Plaintiff University of Puerto Rico Retirement System manages the pension benefits for employees of the University of Puerto Rico.  (ECF #56, *First Amended Complaint,* ¶ 20).  It is an investor which, during the proposed Class Period, purchased 226,300 shares of GrafTech securities, expended $1,690,398.78, had net purchases of 102,900 shares of GrafTech common stock, and incurred net losses of $623,340.38.  (ECF #20-1, *Brief in Support of Motion for Appointment as Lead Plaintiff,* PageID #412-#413; ECF #20-4, *Certification of Plaintiff,*

PageID #428-429 & ECF #20-5, *Gain (Loss) Chart*, PageID #431-#433).  On May 15, 2024, the Court appointed University of Puerto Rico Retirement System as Lead Plaintiff.  (ECF #41, *Memorandum of Opinion*, dated May 15, 2024 & ECF #42, *Order*; *see also* ECF #56, ¶ 20).

Defendant GrafTech is a global manufacturer of graphite electrode products and is headquartered in Brooklyn Heights, Ohio.  Graftech common stock is listed on the New York Stock Exchange as "EAF."  (ECF #56, ¶ 21).

Defendant David Rintoul served as GrafTech's President and Chief Executive Officer, and as a member of GrafTech's Board of Directors, from March 2018 until his resignation from GrafTech at the end of June 2022.  (ECF #56, ¶ 22).

Defendant Quinn Coburn served as GrafTech's Chief Financial Officer from September 2015 until November 29, 2021.  Prior to his role as Chief Financial Officer, he served as GrafTech's Vice President of Finance and as Treasurer.  (ECF #56, ¶ 23).

Defendant Marcel Kessler served as GrafTech's Chief Executive Officer following Defendant David Rintoul's resignation in June 2022, and he held that position until his departure from GrafTech in November 2023.  (ECF #56, ¶ 24).

Defendant Timothy K. Flanagan served as GrafTech's Chief Financial Officer and Vice President of Finance and Treasurer after Defendant Coburn's resignation in November 2021.  Following the resignation of Defendant Kessler, he became GrafTech's Interim Chief Executive Officer from November 2023 to March 2024.  Mr. Flanagan now currently serves as GrafTech's CEO and President.   (ECF #56, ¶ 25).[3]

_____

[3]

Paragraph 25 of the *First Amended Complaint* states that "Kessler currently serves as the Company's CEO and President," but it is clear that the paragraph intended to state "Flanagan."

Defendant Jeremy S. Halford has served as GrafTech's Executive Vice President, Chief Operating Officer since October 2021.  Prior to his role as Chief Operating Officer, he served as GrafTech's Senior Vice President, Operations and Development, beginning in May 2019.  (ECF #56, ¶ 26).

Defendant Brookfield Asset Management Ltd., is a global alternative asset management firm based in Canada.  (ECF #56, ¶ 30).[4]

Defendant Brookfield Capital Partners Ltd., is the private equity arm of Defendant Brookfield Asset Management Ltd.  (ECF #56, ¶ 29).[5]

Defendant BCP IV GrafTech Holdings LP is an indirect wholly-owned subsidiary of Defendant Brookfield Capital Partners Ltd.  (ECF #56, ¶ 28).

### B.  Underline[Background Facts as Asserted in the *First Amended Complaint*]

The following recitation of facts regarding Plaintiffs' claims is drawn largely from the paragraphs of the *First Amended Complaint*, as well as from information contained in documents referenced in the *First Amended Complaint*.[6]

_____

[4]    Paragraphs 28-30 of the First Amended Complaint identify Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners, Ltd., and Brookfield Asset Management Ltd., in "ascending" order.  These entities are identified here in "descending" order, such that each entity's description is stated in relation to an earlier-named parent entity.

[5]    Paragraph 29 of the First Amended Complaint identifies Brookfield Capital Partners Ltd., as "the private equity arm of [D]efendant Brookfield Asset Management *Inc.*"  Both the original *Complaint* (ECF #1) and Paragraph 31 of the *First Amended Complaint* appear to indicate that this reference is intended to state Brookfield Asset Management *Ltd.*

[6]    In considering the *Motions to Dismiss*, well-pled factual allegations are taken as true. The Court may also consider documents that are referenced in the complaint and matters of which it may take judicial notice.  *See, e.g., Lim v. Hightower*, No. 4:23-CV-01454, 2024 WL 4349409, at *6 (N.D. Ohio Sept. 30, 2024) ("Under the Private Securities Litigation Reform Act

GrafTech, headquartered in Brooklyn Heights, Ohio, is a global manufacturer of graphite electrode products that are used in the production of electric arc furnace ("EAF") steel – a purportedly greener alternative to traditional steelmaking methods. (ECF #56, ¶ 1 & 21).[7]

Over the nearly 54-month putative Class Period, from February 8, 2019 to August 3, 2023, GrafTech's executives included Defendants David Rintoul (Chief Executive Officer from the beginning of the period until June 2022), Marcel Kessler (Chief Executive Officer beginning in June 2002 to the end of the period), Quinn Coburn (Chief Financial Officer from the beginning of the period to November 2021), Timothy K. Flanagan (Chief Financial Officer beginning in November 2021 to the end of the period),[8] and Jeremy S. Halford (Chief Operating Officer beginning in October 2021).

### *GrafTech's Manufacturing Operations*

GrafTech's customers are manufacturers that use GrafTech's graphite electrode products to produce EAF steel. (ECF #56, ¶ 32). In contrast to conventional blast furnaces, which rely

---

of 1995, 'courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." . . . The Court may consider documents that are 'referred to in the complaint and [are] central to the plaintiff's claim' without converting a 12(b)(6) motion into a motion for summary judgment.") (citations omitted). In examining the *Motions to Dismiss*, the Court considers these exhibits in order to "analyze the statements and omissions at issue in their full context." *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772,784 (N.D. Ohio 2021), *aff'd* 2022 WL 3972478 (6th Cir. Sept. 1, 2022).

[7]    The company that is now GrafTech initially went public in 1995 as UCAR International Inc., before changing its name to GrafTech International, Ltd., in 2002. (ECF #56, ¶ 32).

[8]    As noted earlier, Mr. Flanagan later became Interim Chief Executive Officer of GrafTech, after the putative Class Period, from November 2023 to March 2024, and began serving as GrafTech's Chief Executive Officer in March 2024. (ECF #56, ¶ 25).

directly on coal, natural gas, and oil, EAF utilizes graphite electrodes to conduct electricity and to generate sufficient heat to melt scrap metal, iron ore, or other raw materials used to produce steel. (ECF #56, ¶ 32). To be utilized by GrafTech's customers, each graphite electrode must be affixed with one "connecting pin," making the "pin stock" from which such devices are machined a critical component of GrafTech's manufacturing process. (ECF #56, ¶ 1).

The graphite electrodes and connecting pins used in electric arc furnaces ("EAFs") must be strong enough to withstand the steel-melting electricity they conduct and the very high temperatures the furnaces produce. While the primary raw material used to make these electrodes and connecting pins – needle coke – has properties that prevent fracturing, it is GrafTech's manufacturing process that gives its products their strength and conductivity. (ECF #64-6, GrafTech International Ltd., Annual Report (Form 10-K), p.16 (Feb. 21, 2020) ("2019 10-K")).[9] There are six steps to GrafTech's manufacturing process: (1) Screening and Blending; (2) Extrusion (Forming); (3) Baking; (4) Impregnating; (5) Graphitizing; and (6) Machining. (ECF #64-6, 2019 10-K, p.16).

GrafTech has four principal manufacturing facilities: (1) Monterrey, Mexico (the "Monterrey Plant"), operated by a subsidiary called GrafTech México Sociedad Anónima de Capital Variable ("GrafTech México"); (2) St. Marys, Pennsylvania (the "St. Marys Plant"); (3) Pamplona, Spain; and (4) Calais, France. (ECF #56, ¶ 35). At various times throughout

---

[9] Copies of the various GrafTech Securities and Exchange Commission filings and other corporate documents referenced or incorporated into the *First Amended Complaint* are attached as Exhibits to the *Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws* (ECF #64). A full citation is given the first time each document is cited, with a short-form citation used thereafter, *e.g.*, "(ECF #64-6, *2019 10-K*, p. 16)."

GrafTech's history, each facility ran all six steps of the manufacturing process.  (ECF #56, ¶¶ 38-39).  In the second quarter 2016, GrafTech "warm idled" its St. Marys Plant.  (ECF #56, ¶ 38).  By "warm idling" the St. Mary's Plant, GrafTech could restart the facility in short order if additional manufacturing volumes were needed, which would provide GrafTech with flexibility and variability to meet peak demand or mitigate disruptions within its manufacturing footprint. (ECF #56, ¶ 38).  Following the warm idling of the St. Marys Plant, GrafTech shifted all of its graphite electrode manufacturing operations to its highest-capacity and lowest-cost facilities, the Monterrey Plant, and the other Plants located in Pamplona, Spain and Calais, France.  (ECF #56, ¶ 39).  Although all three of these manufacturing facilities were each capable of being full-scale manufacturing facilities, the Monterrey Plant was the sole supplier of connecting pins and pin stock for all of GrafTech's manufacturing facilities.  (ECF #56, ¶ 39).  As a result, the uninterrupted operation of the Monterrey facility was of paramount importance for GrafTech's business and operational performance.  (ECF #56, ¶ 39).

All the allegations of the *First Amended Complaint* relate, either directly or indirectly, to facts surrounding the Monterrey Plant.  Specifically, the allegations relate to GrafTech's statements made about the environmental conditions at the Monterrey Plant over the course of its operations (including a 2019 administrative proceeding brought against GrafTech México, and a shutdown of the Monterrey Plant between September 16, 2022 and November 18, 2022), the manufacturing capabilities of the St. Marys Plant during the Monterrey Plant shutdown, and the financial impact of the Monterrey Plant shutdown.[10]

---

[10]

A recitation of each of the statements at issue – including not only the portions cited in the *First Amended Complaint*, but also the surrounding text accompanying those portions – is set forth in full later in this *Memorandum of Opinion*, at the conclusion of this statement of facts.

*The Monterrey Plant*

The Monterrey Plant is located in the municipality of Apodaca within the Monterrey metropolitan area, in the Mexican state of Nuevo León. (ECF #56, ¶¶ 1, 4 & 6). The Monterrey Plant was established over 60 years ago as one of the first industrial investments in the area. (ECF #64-9, *GrafTech International Ltd., 2019 Sustainability Report*, p.17 (Sept. 16, 2020) ("*2019 Sustainability Report*"); *cited at* ECF #56, ¶¶ 111-113). The area experienced significant growth since the 1960s when it opened, leading some to express environmental concerns about its operations over the years. (ECF #64-9, *2019 Sustainability Report*, p.17).

The gist of Plaintiffs' allegations related to GrafTech's statements made about the environmental conditions at the Monterrey Plant over the course of its operations is captured in the opening paragraphs of the *First Amended Complaint*:

> "Throughout the Class Period, Defendants repeatedly touted the competitive advantages of GrafTech's 'low-cost' manufacturing plants to investors, while also extolling the Company's purportedly 'proactive' commitment to reducing its environmental impacts and complying with all environmental laws and regulations. But these representations were materially false and misleading. The undisclosed truth was that GrafTech's purported cost leadership was achieved in substantial part by the Company's failure to adhere to its professed 'rigorous internal environmental protection standards' at the Monterrey facility." (ECF #56, ¶ 2)

> "[I]n direct contrast to Defendants' representations, GrafTech had, for decades, blatantly disregarded environmental regulations and chronically contaminated neighboring communities with harmful dust and emissions at its Monterrey facility, resulting in repeated warnings from local authorities. These warnings, however, were ineffective at curbing GrafTech's wanton disregard for the health and wellbeing of the Monterrey facility's surrounding communities." (ECF #56, ¶ 3).

> "As a result, in March 2019, the Department of Sustainable Development of the State of Nuevo León initiated an administrative proceeding against GrafTech concerning the Monterrey facility's failure to control the dust emissions generated by its manufacturing operations. Among other things, the resolution of the

proceedings resulted in: (i) a finding that GrafTech's Monterrey facility operated 'without the means of control to ensure that dust emissions are avoided, which is mandatory as established in Article 131 section II of the Environmental Law of the State of Nuevo León, to ensure satisfactory air quality for population well-being and ecological balance'; (ii) a finding that GrafTech 'benefitted economically by evading the expense generated by the implementation of equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere during its operation'; (iii) an order that GrafTech 'immediately and permanently . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere'; and (iv) an agreement by Graftech to invest over $2 million in dust collection and containment projects to remedy its violations." (ECF #56, ¶ 4).

"Although Defendants disclosed the administrative proceeding in GrafTech's SEC filings, they concealed the full extent and severity of GrafTech's environmental misconduct by mischaracterizing the proceeding as 'involving certain potential violations of state environmental law' and reporting that the Company had paid 'certain fines that were not material to the Company,' without disclosing GrafTech's agreement to invest more than $2 million in dust collection and containment projects or the order requiring GrafTech to 'immediately and permanently' remedy its deficient emission controls." (ECF #56, ¶ 5).

"[F]ollowing the administrative proceeding's resolution, GrafTech quickly resumed its decades-long practice of failing to follow through on its repeated commitments to remedy the Monterrey facility's deficient environmental safeguards. The Company's actions led to the filing of multiple environmental complaints, including one by the mayor of local municipality Apodaca, César Garza Villareal. Defendants, however, continued to tout their purported commitment to environmental protections and compliance with environmental laws and regulations, while concealing from investors the truth that the Monterrey facility's failure to operate in accordance with those representations exposed GrafTech to known material risks regarding government enforcement actions and corresponding business disruptions." (ECF #56, ¶ 6).

"There is no doubt that Defendants were aware of the environmental failures at the Monterrey facility, given: (i) GrafTech's long history of environmental disputes with the Monterrey facility's surrounding communities; (ii) the significant fallout from the 2019 administrative proceeding, of which Defendants' SEC filings confirm they were undoubtedly aware; and (iii) Defendants' repeated representations touting their active involvement in, and leadership of, GrafTech's environmental management systems and initiatives – which, among other things, provided them with monthly environmental reports from site managers and weekly communications concerning 'observations from site walk-throughs.'"

(ECF #56, ¶ 7).

(ECF #56, *First Amended Complaint*, ¶¶ 2-7).

The *First Amended Complaint* does not allege that the Monterrey Plant was the subject of any environmental enforcement matters prior to the 2019 administrative proceeding. The July 30, 2019 Resolution issued by the Department of Sustainable Development, referenced in the *First Amended Complaint*, shows that GrafTech was required to pay fines equivalent to $140,253.40 and $9,800.84 as a result of the administrative proceeding. (ECF #64-10, *Resolution of the Department of Sustainable Development of Nuevo León*, p.11 (July 30, 2019) ("*Resolution*"); *cited at* ECF #56, ¶ 45). After paying the fines, GrafTech disclosed the following in its Third Quarter 2019 10-Q Report:

> On March 1, 2019, the Department of Sustainable Development of the State of Nuevo León provided notice of an administrative proceeding with respect to the Company's Monterrey facility. The proceeding requires the Company to design and implement certain corrective measures involving certain potential violations of state environmental law relating to emissions. The Company cooperated with the Department with respect to this matter, including payment of certain fines that were not material to the Company. In September 2019, the Department of Sustainable Development formally closed the proceeding.

(ECF #64-11, *GrafTech International Ltd., Quarterly Report (Form 10-Q)*, p.40 (Nov. 7, 2019) ("*Third Quarter 2019 10-Q*")). At about the same time, GrafTech invested approximately $2 million in dust collection and containment projects at the Monterrey Plant. (ECF #56, ¶ 46). There was no shutdown of the Monterrey Plant.

The *First Amended Complaint* also states that, on March 11, 2020, the mayor of Apodaca, César Garza Villareal, along with Apodaca's Secretary of Urban Development, Ecology[,] and Transportation, Andres M. Canto Ramirez, filed a complaint against GrafTech with the Secretary of Sustainable Development for the Nuevo León State Government asserting

violations of "environmental regulations, biosafety and wildlife, among others, affecting matters of public order and social interest by expending risks or threats of environmental contingency in neighborhoods, municipality[,] and surrounding municipalities," and that on September 30, 2021, an individual filed a citizen's complaint with the Federal Prosecutor's Office for Environmental Protection regarding the Monterrey Plant's dust emissions.  (ECF #56, ¶¶ 49-51). The *First Amended Complaint* further notes that, "[i]t is unclear what action, if any, the State Attorney General's Office of Sustainable Development took in response to the complaint filed by Mayor Garza and Mr. Ramirez, (ECF #56, ¶ 49), and "[a]s with the 2020 complaint filed by Mayor Garza and Mr. Ramirez, it is unclear what action, if any, was taken in response to [the later] citizen's complaint, (ECF #56, ¶ 51).  The *First Amended Complaint* does not assert that any enforcement action resulted from either complaint, or that GrafTech or the Individual Defendants were aware of them.  The *First Amended Complaint* further states that Mayor Garza "addressed the Apodaca City Council with an impassioned plea for the Council to take action against the Company" related to the emissions issues.  (ECF #56, ¶¶ 67-69).  The *First Amended Complaint* does not allege that GrafTech or any of the Individual Defendants were aware of the mayor's remarks.

On September 15, 2022, Nuevo León officials (from the State Attorney's Office for the Secretary of Environment) inspected the Monterrey Plant's "facility and certain of the facility's environmental and operating permits," following which the Plant received a temporary suspension notice requiring it to "wind down operations within seven days."  (ECF #56, ¶ 70; ECF #64-12, *GrafTech International Ltd., [Third] Quarterly Report (Form 10-Q)*, p.41 (Nov. 4, 2022) ("*Third Quarter 2022 10-Q*")).  A parallel investigation by another Nuevo León official

(the Director of Integral Air Management of the Undersecretary of Climate Change and Air

Quality of the Ministry of the Environment) concluded that the Plant's operating license was no

longer in effect, resulting in the indefinite suspension of operations.  (ECF #56, ¶ 70; ECF #64-

12, *Third Quarter 2022 10-Q*, p.41).  GrafTech disclosed the suspension one day later in a

"Current Report" filed with the SEC (as well as in its Quarterly Report filed in November 2022),

and noted "At this time, the Company is not able to assess how long operations at the

manufacturing facility will be temporarily suspended.  While the Company strongly disagrees

with this course of action, the Company is actively evaluating the notice and the allegations

contained therein and the Company intends to work with the authorities to address these

allegations and will vigorously defend against these allegations."  (ECF #64-8, *GrafTech*

*International Ltd., Current Report (Form 8-K)*, p.2 (Sept. 16, 2022) ("*9/16/22 8-K*"); ECF #64-

12, *Third Quarter 2022 10-Q,* p.24)).

   As this is a case alleging that specific statements made by GrafTech were false or

misleading, and the *Motions to Dismiss* ask the Court to evaluate those statements in light of

whether a legally actionable claim has been stated in the *First Amended Complaint* based on

those statements, the Court is called upon to examine the actual statements.  The specific

statements at issue are set forth at Appendix A of this *Memorandum of Opinion and Order*.[11]

---

[11]

   As noted, (*see* note 6, *supra*), the Court may look to the actual documents cited in the
*First Amended Complaint*, and not merely the portions of the allegedly false or misleading
statements cited in the Plaintiffs' pleadings.  The full statements are identified in Appendix A.
The portions of those statements, as quoted in the *First Amended Complaint*, are shown in plain
text.  The remainder of the full statement is shown in italics.

### *The St. Mary's Plant*

While the primary focus of Plaintiffs' allegations of purported false and misleading statements relate to statements made by GrafTech in various corporate filings made with the Securities Exchange Commission, and in other communications with investors, about the environmental conditions existing at the Monterrey Plant, the manufacturing capabilities and operations of the St. Marys Plant are also a significant focus of the allegations of the *First Amended Complaint*. A complete recitation of these statements is attached to this *Memorandum of Opinion and Order* as Appendix B.

Plaintiffs' allegations of misrepresentation about the manufacturing capabilities of the St. Marys Plant prior to and during the Monterrey Plant shutdown are described in the *First Amended Complaint* at paragraphs 53 to 65:[12]

> "In addition to deceiving investors about the Company's purported commitment to environmental compliance and the true basis for GrafTech's manufacturing cost advantages, Defendants further misled investors during the Class Period regarding the Company's purported efforts to 'de[-]risk' its critical pin production, which was entirely concentrated at GrafTech's Monterrey facility, by supposedly implementing pin production operations at the St. Mary's facility. (ECF #56, ¶ 53).

> "Specifically, during GrafTech's August 6, 2021 earnings call for the second quarter of 2021 ("2Q21"), defendant [Jeremy] Halford told

---

[12] The full text assertions at issue related to the operations at the St. Marys Plant in the *First Amended Complaint* are included within this *Memorandum of Opinion and Order* (as Appendix B) in that the allegations made within that text are also central to the issues raised in the *Motion to Strike*. The paragraphs at issue in the *Motion to Strike* are highlighted in boldfaced text here. These paragraphs, as stated in the *First Amended Complaint*, contain emphasis on certain words provided by Plaintiffs. Because the Court is highlighting the text of the paragraphs pertinent to the *Motion to Strike* in boldfaced text in this portion of the *Memorandum of Opinion and Order*, Plaintiffs' emphasis, as included in the text of the *First Amended Complaint*, is designated by italics.

-14-

investors that Graftech was 'investing in a *pin production line* at our St. Marys, Pennsylvania facility that *will be online in the third quarter*.'  At the time, Halford further represented that the St. Marys facility's pin production line 'diversifies our pin capability and provides production flexibility.'  The following quarter, during the Company's November 5, 2021 earnings call for the third quarter of 2021 ("3Q21"), Halford continued to promote the St. Mary's facility's pin production capabilities, stating in pertinent part, that '[t]he *pin production line* at our St. Marys, Pennsylvania facility is *now operational*, and we are ramping up *production*." Halford then went on to state" 'Importantly, *this provides us with 2 connecting pin production facilities*."  (ECF #56, ¶ 54).

"Analysts and investors credited these representations.  For example, in an August 6, 2021 report, BMO Capital Markets ("BMO") analyst David Gagliano identified the '[r]estart of St. Marys graphite electrode facility' as one of the 'Key Catalysts' for GrafTech."  (ECF #56, ¶ 55).

"During GrafTech's February 4, 2022 earnings call for the fourth quarter and year-end of 2021 ("4Q21"), Halford again touted the purported benefits of the St. Marys facility's pin production line, specifically stating: 'Our investment in the new automated pin line at St. Mary's continues to progress well and helps to de[-]risk our pin production capacity.'  The following quarter, during the Company's May 6, 2022 earnings call for the first quarter of 2022 ("1Q22"), Halford reiterated these comments, stating: '[O]ur recent investment in the automated pin line at St. Marys continues to progress and helps to *de[-]risk our pin production capacity*."  (ECF #56, ¶ 56).

"Defendant Halford's statements regarding the 'de[-]risk[ing]' of GrafTech's 'pin production capacity' through St. Mary's facility's supposed 'pin production line' were important to investors, because they conveyed that the Company was insulated from potential commercial disruptions due to insufficient pin supply in the event that operations at the Monterrey facility were interrupted."  (ECF #56, ¶ 57).

**"But according to a former GrafTech Manufacturing Engineering Lead (the "Former Engineering Lead") – and Defendants' *own subsequent admissions* – Halford's statements regarding the purported 'de[-]risking' of GrafTech's 'pin production' were false and misleading.  Contrary to Halford's statements about the supposedly "operational' 'pin production line' at the St. Marys facility, the truth was that the St. Marys facility produced *no pins or pin stock* at all during 2021 or 2022 and, in fact, did not even have the proper 'operating permits' to perform such activities."  (ECF #56,**

-15-

¶ 58).

"The Former Engineering Lead was hired by GrafTech in August 2022 to work as part of the team responsible for restarting the St. Marys facility.  In this role, the Former Engineering Lead reported to GrafTech's Director of Central Engineering and Reliability, Tom Knoll.  According to the Former Engineering Lead, at the time of his hiring, the St. Marys facility was not involved in the production or manufacturing of any pins." (ECF #56, ¶ 59).

"One of the Former Engineering Lead's primary responsibilities upon being hired was to ensure that the St. Marys facility had the proper equipment needed for manufacturing graphite electrode products and pins, which included a large press for extruding graphite, a cooling pond, and the tools needed to operate such equipment.  At the time of the Former Engineering Lead's hiring, there was no water in the cooling pond and it was apparent that the press had not been run in well over a year, given that the tools for the press were rusted and covered in dust.  As such, it was clear to the Former Engineering Lead that the St Marys facility had not produced or manufactured pins at any point within the last year." (ECF #56, ¶ 60).

"At the time of the Former Engineering Lead's hiring, the objectives for his team included preparing the St. Marys facility to be capable of producing graphite electrode products at some point in late-2023 or early-2024.  However, shortly after the Monterrey facility was shut down by Mexican regulators in September 2022, Knoll called an emergency meeting, which was attended by the Former Engineering Lead and other members of the team responsible for restarting the St. Marys facility, during which the employees were informed that the efforts to restart production at the St. Marys facility would need to be accelerated.  At the time, however, the St. Marys facility did not have the appropriate operating permits to produce graphite electrode products and pins, despite Halford's statement to investors nearly one year prior that "[t]he *pin production line* at our St. Marys, Pennsylvania facility is *now operational*.'  Indeed, GrafTech did not begin the process of obtaining the operating permits required for such production until early 2023." (ECF #56, ¶ 61).

"Moreover, it was not until late-2023 that the St. Marys facility conducted its first "pin trial run."  According to the Former Engineering Lead, the St. Marys facility conducted three trials, but never actually got the pin production operation up and running.  Thus, according to this former employee, the St. Marys facility never

-16-

**produced or manufactured any actual pins at any point during his tenure with GrafTech, which came to an end in April 2024.**" (ECF #56, ¶ 62).

"**According to the Former Engineering Lead, defendant Halford was aware of and familiar with the activities at the St. Marys facility, and definitely would have known that the plant was not involved in actual pin production during 2021 and 2022.  According to the Former Engineering Lead, Halford regularly visited the St. Marys facility, was ultimately responsible for overseeing GrafTech's efforts to restart the plant, and was regularly informed about the activities and issues at the St. Marys facility by Knoll**." (ECF #56, ¶ 63).

"Because the St. Marys facility was not actually involved in any manufacturing or production of pins during 2021 or 2022, and the Monterrey facility remained the Company's only facility capable of producing the pin stock needed for all of GrafTech's electrodes and pins, Halford's statements to investors regarding the St. Mary's facility's supposedly '*operational*' 'pin *production* line,' which purportedly helped to '*de[-]risk [GrafTech's] pin production capacity*,' were materially false and misleading.  Halford's statements misleadingly conveyed to investors that GrafTech had secured an alternative source of pins through the St. Marys facility's 'pin production,' thereby insulating GrafTech from potential commercial disruptions in the event that operations at the Monterrey facility were interrupted.  The truth, however, was that the Company remained exposed to significant commercial disruptions in the event that operations at the Monterrey facility were interrupted." (ECF #56, ¶64).

"Indeed, Defendants' *own subsequent admissions* confirm as much, while also serving to corroborate the above facts provided by the Former Engineering Lead.  Specifically, on November 4, 2022, during GrafTech's first earnings call following the Monterrey facility's closure, defendant Kessler told investors, for the first time, that the Monterrey facility was 'the *only site that produces the pin stock needed for all our electrodes*.' During that same call, Kessler further revealed: 'We are *now* actively *pursuing approvals for operating permits to restart the [St. Marys] facility for pin production*.'  Then, on April 28, 2023, defendant Halford responded to a question from an analyst by admitting that, "*when we came into [2023] our intent was to do the full restart of St. Marys really to de-risk our pin supply chain*,' further confirming the falsity of his previous statements from 2022 that the St. Marys facility's 'pin production line . . . is *now operational*' and 'help[ing] to *de[-]risk our pin production capacity*.'" (ECF #56, ¶ 65).

(ECF #56, ¶¶ 53-65) (emphasis as noted).[13]

_____

[13]

     The *Motion to Strike* also relates to the allegations of the *First Amended Complaint* made at paragraphs 8, 213, and 214, which stated (highlighting conventions same as above related to paragraphs 53-65:  Court's emphasis in bold highlighting paragraphs related to Motion to Strike; Plaintiffs' emphasis in italics):

> **"In addition, Defendants also misled investors about material facts that directly bore on the potential impacts of any operational disruptions at the Monterrey facility.  Specifically, over the course of four earnings calls between August 6, 2021, and May 6, 2022, Defendants told investors that GrafTech had '*de[-]risk[ed] [its] pin production capacity*,'" by opening a '*pin production line*' at its St. Marys, Pennsylvania facility ("St. Marys facility"), which was purportedly '*operational*' by November 5, 2021, thus providing the Company with two 'pin production facilities.'  In truth, however, the St. Mary's facility was not actually involved in any production of pins or pin stock during this time.  Indeed, as confirmed by a former GrafTech employee and Defendants' own subsequent admissions, Defendants had not even *begun* the process of obtaining the appropriate operating permits required for pin production at the St. Marys facility, and Monterrey remained GrafTech's only facility capable of producing the pin stock needed for all of the Company's electrodes.  As a result, contrary to Defendants' statements that they had 'de[-]risk[ed] all of GrafTech's pin production, the Company remained exposed to significant risks of commercial harm in the event that the Monterrey facility's operations were disrupted."  (ECF #56, ¶ 8).**

\*   \*   \*   \*   \*

> **"Defendant Halford's knowledge of and access to information directly contradicting his misrepresentations is confirmed by the allegations from the Former Engineering Lead, the specific nature of Halford's repeated false statements, and Defendants' subsequent admissions concerning the falsity of Halford's statements."  (ECF #56, ¶ 213).**

> **"Specifically, according to the Former Engineering Lead, the St. Mary's facility did *not produce any pins at all* during the time frame when Halford represented that the St. Marys facility had an '*operational*' '*pin production line*.'  Indeed, during this time, the St. Marys facility lacked the appropriate operating permits required for**

*The Financial Impact of the Monterrey Plant Shutdown*

The final series of Plaintiffs' allegations of false or misleading statements relates to various statements released by GrafTech regarding the expected long-term impact of the shutdown of the Monterrey Plant.  Specifically, Plaintiffs contend that statements made in the following releases of information regarding the effect of the shutdown were false or misleading:

(1) GrafTech International Ltd., Current Report (Form 8-K) (Sept. 16, 2022) (ECF #64-8); *see* ECF #56, ¶ 170;

(2) GrafTech International Ltd., Quarterly Report (Form 10-Q) (Nov. 4, 2022) (ECF #64-12); *see* ECF #56, ¶ 172, 173;

(3) GrafTech International Ltd., Third Quarter 2022 Earnings Call (Nov. 4, 2022) (ECF #64-13); *see* ECF #56, ¶¶ 174, 175, 176; 177;

(4) GrafTech International Ltd., Current Report (Form 8-K) (Nov. 18, 2022) (ECF #64-14); *see* ECF #56, ¶ 179;

(5) GrafTech International Ltd., Fourth Quarter 2022 Earnings Call (Feb. 3, 2023) (ECF #64-15); *see* ECF #56, ¶ 183;

---

**pin production, and GrafTech had not yet even *begun* the process of obtaining such permits – and, in fact, did not begin that process until *at least* six months after the latest of Halford's misrepresentations regarding the St. Marys facility's purported pin production. Moreover, according to the Former Engineering Lead, Halford regularly visited the St. Marys facility, was ultimtely responsible for overseeing GrafTech's efforts to restart the plant, and was regularly informed about the activities and issues at the St. Marys facility by Knoll [GrafTech's Director of Central Engineering and Reliability]. As a result, it is inconceivable that Halford would have been unaware that the St. Mary's facility was not involved in actual pin production at the time he made the above misrepresentations concerning the St. Mary's facility's supposedly 'operational' 'pin production line.'"** (ECF #56, ¶ 214).

(ECF #56, ¶¶ 8, 213 & 214) (explanatory insert supplied).

(6)  GrafTech International Ltd., First Quarter 2023 Earnings Press Release on Form 8-K  (Apr. 28, 2023) (ECF #64-16); *see* ECF #56, ¶ 184;

(7)  GrafTech International Ltd., First Quarter 2023 Earnings Call (Apr. 28, 2023) (ECF #64-33); *see* ECF #56, ¶ 184
.

The actual statements at issue are reproduced within this Memorandum of Opinion and Order, as Appendix C.

<u>GrafTech Ownership and the Brookfield Defendants</u>

Finally, Count II of the *First Amended Complaint* includes as Defendants three "Brookfield" entities,[14] which at times held various ownership interests in GrafTech:  Brookfield Asset Management Ltd., which is a global alternative asset management firm based in Canada, (ECF #56, ¶ 30); Brookfield Capital Partners Ltd., which is the private equity arm of Defendant Brookfield Asset Management Ltd., (ECF #56, ¶ 29); and BCP IV GrafTech Holdings LP, which is an indirect wholly-owned subsidiary of Defendant Brookfield Capital Partners Ltd., (ECF #56, ¶ 28).  The specific claims of Count II are described in the *First Amended Complaint* as follows:

> The Individual Defendants acted as controlling persons of GrafTech within the meaning of § 20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause GrafTech to engage in the wrongful conduct complained of herein.  Defendant Brookfield controlled GrafTech and the Individual Defendants for the reasons detailed herein, including their ownership of a majority of GrafTech voting stock, control of the Board, influence over GrafTech's management, historical relationship with the Company, and the various agreements that these Defendants caused the Company to enter into.  GrafTech controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act.

---

[14]  The *First Amended Complaint* refers to Defendants Brookfield Asset Management Ltd., Brookfield Capital Partners Ltd., and BCP IV GrafTech Holdings LP collectively as "Defendant Brookfield."  (ECF #56, ¶ 31).

(ECF #56, ¶ 265).

According to the *First Amended Complaint*, the history of the Brookfield Defendants'
acquisition of GrafTech traces its roots to 2011.

Beginning in 2011, GrafTech underwent a period of declining demand for its graphite
electrodes, which led to falling revenues and growing losses. By the end of 2014, GrafTech's
annual net losses had ballooned to more than $285 million, growing 1,000% year-over-year from
a net loss of approximately $27 million in 2013. In April 2015, GrafTech's then-CEO Joel
Hawthorne warned that the challenges were expected to continue, stating:

> [G]raphite electrode demand continued to soften as global electric arc furnace
> (EAF) steel production weakened. Lower end-market demand in certain steel
> consuming sectors, continued high Chinese steel exports and other market
> dynamics led to lower EAF customer utilization rates, particularly in North
> America. These factors are expected to create a challenging environment for
> our Company and the industry as a whole for the remainder of 2015.

(ECF #56, ¶ 36). Amid this slump in the market for graphite electrodes, GrafTech announced on
May 17, 2015, that it had entered into an agreement to be purchased by Brookfield. Pursuant to
the Plan of Merger Agreement, Brookfield made a cash tender offer to purchase all outstanding
shares of GrafTech common stock. On August 17, 2015, GrafTech announced that its
acquisition by Brookfield had been completed and that it had become a wholly owned affiliate of
Brookfield. As a result, trading of GrafTech common stock on the New York Stock Exchange
ceased that day. (ECF #56, ¶ 37).

Over the course of the next three years, GrafTech underwent an extensive transformation
that was intended to revamp the Company's business and return it to profitability. As part of
this transformation, GrafTech "warm idled" its St. Marys facility – which had previously been a
full-scale production facility capable of manufacturing graphite electrodes and pins from their

primary raw material, needle coke – during the second quarter of 2016.  By "warm idling" the St. Marys facility, GrafTech would be in a position to restart the facility in short order if additional manufacturing volumes were needed, which would provide GrafTech with flexibility and variability to meet peak demand or mitigate disruptions within its manufacturing footprint. (ECF #56, ¶ 38).

Following the warm idling of the St. Marys facility, GrafTech shifted all of its graphite electrode manufacturing operations to its highest-capacity and lowest-cost facilities, located in Monterrey, Mexico, Pamplona, Spain, and Calais, France.  Although all three of these facilities were capable of being full-scale manufacturing facilities, the Monterrey facility was the sole supplier of connecting pins and pin stock for all of GrafTech's manufacturing facilities.  (ECF #56, ¶ 39).

On April 19, 2018, Brookfield conducted GrafTech's second IPO (Initial Public Offering),[15] selling roughly 35 million shares, or 12% of its equity stake.  An additional 3.1 million shares were sold by Brookfield pursuant to a partial exercise of the underwriters' overallotment option.  As part of the IPO, Brookfield also caused GrafTech to enter into an agreement to pay Brookfield a special cash dividend, conditioned on GrafTech's financial results and certain other factors.  (ECF #56, ¶ 40).

### C. The Class Action Period

As asserted in the *First Amended Complaint*, "[t]his is a federal securities class action on behalf of all persons or entities that purchased or otherwise acquired GrafTech common stock

---

[15]    GrafTech first went public, through an IPO, in 1995 as UCAR International, Inc., before changing its name to GrafTech International Ltd., in 2002.  (ECF #56, ¶ 32).

between February 8, 2019, and August 3, 2023, inclusive (the 'Class Period'), and were harmed thereby (the 'Class'). . . .  Excluded from the Class are: (i) Defendants, . . . and members of their immediate families; (ii) the officers and directors of GrafTech, at all relevant times, and members of their immediate families; (iii) the legal representatives, heirs, successors, or assigns of any of the foregoing; and (iv) any entity in which Defendants have or had a controlling interest."  (ECF #56, *First Amended Complaint*, ¶ 15 & n.2).

### D.  Procedural History

On January 25, 2024, Plaintiff John C. Porter filed this action in the U.S. District Court for the Northern District of Ohio, on behalf of all purchasers of GrafTech common stock between February 8, 2019 and August 3, 2023, inclusive (the "Class Period"), against Defendants asserting violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  (ECF #1, ¶ 1).  On May 7, 2024, the Court held a hearing related to two competing motions to be named as Lead Plaintiff.  On May 15, 2024, University of Puerto Rico Retirement System was named as Lead Plaintiff to represent the interests of the proposed class plaintiffs.  (ECF #41, *Memorandum of Opinion and Order* & ECF #42, *Order*).

### II.  THE MOTION TO STRIKE ALLEGATIONS REGARDING "FORMER ENGINEERING LEAD"

Before addressing the three *Motions to Dismiss* now before the Court,[16] the Court first

---

[16] These motions are:  (1) *Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws* (ECF #64); (2) *Defendant David Rintoul's Motion to Dismiss the First Amended Complaint* (ECF #65); and (3) *Motion of Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd., to Dismiss the First Amended Complaint*

turns to the *Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Strike Allegations Regarding "Former Engineering Lead"* (ECF #67).

The "Former Engineering Lead" referenced in the *First Amended Complaint*, and now the *Motion to Strike*, is Joshua Geitner, who was employed at the St. Marys Plant between August 2022 and April 2024.  (*See* ECF #56, ¶¶ 58-63, 8, 213 & 214; ECF #67-3, *Declaration of Joshua Geitner*, ¶¶ 1-2).  Before the *First Amended Complaint* was filed, Mr. Geitner spoke with representatives for Plaintiffs by telephone on two or three occasions.  (ECF #67-3, ¶ 3).  In an affidavit filed along with the *Motion to Strike*, Mr. Geitner states that he was never given a draft of the *First Amended Complaint* prior to its filing, or a written summary of what statements would be attributed to him, so that he could review it for accuracy or note any needed corrections.  (ECF #67-3, ¶ 3).  Later, when he was shown a copy of the *First Amended Complaint* by counsel for GrafTech after its filing, he saw that the *First Amended Complaint* plainly misrepresented – or at best misconstrued – what he had said, causing him to later sign a declaration under penalty of perjury stating, among other things, "*Contrary* to what is included in Paragraph 59 of the First Amended Complaint, I do not recall telling the lawyers or investigators that 'the St. Marys facility was not involved in the production or manufacturing of any pins.'  I specifically did not tell the lawyers or investigators for plaintiff that GrafTech was not graphitizing or machining at St. Marys during my tenure with the Company"  (ECF #67-3, ¶ 5) (emphasis supplied).  Thus, the references to "graphitizing pin stock" and "machining pin stock" made in the declaration confirm directly that the "Former Engineering Lead" ***does*** consider

---

*for Violations of the Federal Securities Laws* (ECF #66).

graphitizing and machining to be *a part* of the "pin production and manufacturing process," and thus directly *refutes* the statement attributed to him by Plaintiffs that *"the St. Marys facility was not involved in the production or manufacturing of any pins."*

The full text of the "Former Engineering Lead's affidavit is set forth below:

1.  During the period between August 2022 and April 2024, I was employed by GrafTech International Holdings Inc., a subsidiary of GrafTech International Ltd. ("GrafTech" or "the Company").  I began employment on August 29, 2022 as a Manufacturing Engineering Lead, and my title changed to Process Engineer on April 1, 2023.  Throughout my employment with GrafTech, I worked at the Company's St. Marys, Pennsylvania plant.  My employment ended on April 13, 2024.

2.  I believe that I am the individual referred to as "Former Engineering Lead" in the First Amended Complaint, a copy of which has been provided to me by counsel to GrafTech.

3.  To the best of my recollection, I communicated verbally by telephone with individuals who called me and identified themselves as lawyers or investigators seeking information about GrafTech on two or three occasions in the summer of 2024.  The first call involved only one individual; the second involved multiple.  *I recall informing the lawyers or investigators that I did not wish to be referenced in court documents.  I never received a copy of the First Amended Complaint from them, either before or after the plaintiff filed it.  Nor did the lawyers or investigators provide me with a written version of anything they thought I said, so that I could review it and confirm its accuracy (or make any corrections)*.

4.  My comments to the lawyers or investigators about operations, equipment (including a press and cooling pond), and permits at the St. Marys plant were limited to initial stages of the production process (e.g., forming). The initial stages, not the later stages (e.g., graphitizing pin stock and machining the pin stock to produce pins), were the portions of the process on which I was focused during my employment at the St. Marys facility.

5.  *Contrary to what is included in Paragraph 59 of the First Amended Complaint, I do not recall telling the lawyers or investigators that "the St. Marys facility was not involved in the production or manufacturing of any pins."  I specifically did not tell the lawyers or investigators for Plaintiff that GrafTech was not graphitizing or machining at St. Marys during my tenure with the Company*.

-25-

6.  To the contrary, during the entirety of my tenure at GrafTech, I believe that the St. Marys facility was operational from the standpoint of graphitizing and machining.

7.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of November, 2024                    /s/  Joshua Geitner

(ECF #67-3, *Declaration of Joshua Geitner*) (emphasis supplied).

Against this, Plaintiffs represent to the Court in the *First Amended Complaint* that, "as confirmed by a former GrafTech employee" or "according to a former GrafTech Manufacturing Engineering Lead":

> "In truth, however, the St. Mary's facility was not actually involved in ***any production of pins or pin stock during this time***.  Indeed, as confirmed by a former GrafTech employee . . . , Defendants had not even *begun* the process of obtaining the appropriate operating permits required for pin production at the St. Marys facility."  (ECF #56, ¶ 8).

> "But according to a former GrafTech Manufacturing Engineering Lead . . . the truth was that the St. Marys facility produced *no pins or pin stock* at all during 2021 or 2022 and, in fact, did not even have the proper 'operating permits' to perform such activities."  (ECF #56, ¶ 58).

> "According to the Former Engineering Lead, at the time of his hiring, the St. Marys facility was ***not involved in the production or manufacturing of any pins***."  (ECF #56, ¶ 59).

> "At the time of the Former Engineering Lead's hiring, . . . it was clear to the Former Engineering Lead that ***the St Marys facility had not produced or manufactured pins at any point within the last year***."  (ECF #56, ¶ 60).

> "According to the Former Engineering Lead, . . . the St. Marys facility ***never produced or manufactured any actual pins at any point during his tenure*** with GrafTech, which came to an end in April 2024."  (ECF #56, ¶ 62).

> "According to the Former Engineering Lead, defendant Halford was aware of and familiar with the activities at the St. Marys facility, and definitely would have known that the plant was not involved in actual pin production during

2021 and 2022.  According to the Former Engineering Lead, Halford regularly visited the St. Marys facility, was ultimately responsible for overseeing GrafTech's efforts to restart the plant, and was regularly informed about the activities and issues at the St. Marys facility by Knoll."  (ECF #56, ¶ 63).

"Specifically, according to the Former Engineering Lead, the St. Mary's facility ***did not produce any pins at all*** during the time frame when Halford represented that the St. Marys facility had an 'operational' 'pin production line.'"  (ECF #56, ¶ 214) (underlined emphasis in original).

While perhaps not every one of the statements offered by Plaintiffs as being "confirmed" by the "Former Engineering Lead" is as ***directly misrepresented*** (and directly refuted by the "Former Engineering Lead" as being his statement) as that found in paragraph 59 of the *First Amended Complaint*, it is clear that all of these paragraphs are infused with some level of misrepresentation by Plaintiffs in presenting their *First Amended Complaint* – or at minimum, represent an attempt to manipulate the Court's directive to "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff, *see Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007), in an effort to avoid a well-pled motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and the "exacting pleading requirements" of the PSLRA intended to "screen out frivolous suits."[17]  *Tellabs*, 551 U.S. at 313, 319-21.

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  FED. R. CIV. P. 12(f).  Immaterial matters are those that have "no bearing on the subject matter of the litigation"; impertinent

---

[17]  The Court, by this reference to the pleading standards of the PSLRA, does not intend to label the *First Amended Complaint* as "frivolous," but rather to highlight that "[N]ot all allegations that would survive a traditional motion to dismiss under Rule 12(b)(6) are sufficient to survive dismissal in a private securities class action."  *Lim v. Hightower*, No. 4:23-CV-01454, 2024 WL 4349409, at *8 (N.D. Ohio Sept. 30, 2024).

matters are those that "are not necessary to the issues presented"; and scandalous matters are those that "unnecessarily reflect[] on the moral character of an individual or state[] anything in repulsive language that detracts from the dignity of the court." *McKinney v. Bayer Corp.*, No. 10-CV-224, 2010 WL 2756915, at *1 (N.D. Ohio July 12, 2010). Motions to strike "serve a useful purpose by saving the time and expense which would otherwise be spent in litigating issues which would not affect the outcome of the case." *Student Res. Ctr., LLC v. E. Gateway Cmty. Coll.*, No. 2:22-CV-2653, 2024 WL 3849440, at *7 (S.D. Ohio Aug. 15, 2024). District courts are endowed with "broad discretion in determining whether to grant a motion to strike." *McKinney*, 2010 WL 2756915, at *2. Courts may exercise this discretion when the allegations at issue are "both irrelevant to the subject matter of the litigation and prejudicial to the objecting party," *id.*, and when they are "designed to improperly illicit sympathy, to curry favor, or to cast aspersions on the defendants." *Novolex Holdings, LLC v. Wurzburger*, No. 19-145-DLB-CJS, 2022 WL 391307, at *3 (E.D. Ky. Feb 8, 2022).

The situation now before the Court presents an unusual, and hopefully rare, case in the context of a motion to strike. It is not unusual for complaints filed in connection with claims made under the Private Securities Litigation Reform Act to cite information obtained from "confidential witnesses." As the reliance on such confidential witnesses has grown, courts have responded by closely examining the allegations and "sharply discounting" those that are vague, conclusory, or irrelevant. *Konkol v. Diebold*, 590 F.3d 390, 399 (6th Cir. 2009) ("Bare-bones statements, such as the allegation that the Scorecards were 'of huge importance to the decision-making of the Company,' are the type of vague and conclusory allegations from confidential witnesses that are properly discounted."), *abrogated on other grounds (related to establishing*

-28-

*the element of "scienter")* by *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48-49 (2011);

*Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("Usually that discount

will be steep.").  What is unusual is for a Court to be presented with a sworn affidavit by the

"confidential witness" directly refuting the statements attributed to him.  This calls for more

than a "steep discount" of the allegations, and rather represents grounds to strike the noted

paragraphs as "immaterial and impertinent" by virtue of the fact that they directly misrepresent

what the confidential witness stated, injects unfair prejudice into the Court's consideration of

the motions to dismiss, and only serves to confuse the issues before the Court.  While "[t]he

falsity of a matter alleged is not specifically included among the grounds for a motion to

strike[,] *Hughes* [*v. Lavender*, No. 2:10-CV-674], 2011 WL 2945843, at *2 [(S.D. Ohio July 20,

2011)]; [h]owever, although caution is advised, a court may grant a motion to strike for falsity if

the court finds that the allegations are 'obviously false and clearly injurious to a party.'"

*Schlosser v. Univ. of Tenn.*, No. 3:12-CV-534, 2014 WL 5325350, at *3 (E.D. Tenn. Oct. 20,

2014) (inserts supplied).  This is such a case.  Accordingly, the Court GRANTS the *Motion of

Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Strike Allegations Regarding

"Former Engineering Lead"* (ECF #67).[18]  The Court notes here that this ruling does not have

---

18

     In their *Memorandum in Opposition to Motion to Strike*, Plaintiffs argue that the *Motion to Strike* is untimely under Federal Rule of Civil Procedure 12(f)(2) ("The court may act . . . on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading") and "procedurally improper" under Federal Rule of Civil Procedure 12(g)(2) ("[A] party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion").  (ECF #70, p.9).  As to the first argument, no Defendant has filed an answer in response to the *First Amended Complaint*, thus Rule 12(f)(2) permits the motion.  *See Tracfone Wireless, Inc. v. Access Telecom, Inc.*, 642 F. Supp. 2d 1354, 1361 (S.D. Fla. 2009) ("Plaintiff's claim that this [m]otion is untimely under Rule 12(f) is without merit; despite the fact that this [m]otion was filed over four months after the

the effect of otherwise altering its independent determination that Defendants are entitled to judgment on their *Motions to Dismiss*, in that, as discussed later in this *Memorandum of Opinion and Order*, the Court can consider documents that are referenced in the complaint and matters of which it may take judicial notice, including the numerous times between 2018 and 2022 that GrafTech stated in its filings that the St. Marys Plant was engaged in the graphitizing and machining steps in pin production and manufacturing at the St. Marys Plant.

### III. LEGAL STANDARDS RELATED TO MOTIONS TO DISMISS

The *Motions to Dismiss* raise three fundamental questions of law:

*First*, does the *First Amended Complaint* plead, with requisite particularity, claims of materially false or misleading statements, or an omission that rendered another statement materially misleading, as required to state a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder?

*Second*, does the First Amended Complaint plead, with requisite particularity, facts giving rise to a strong inference of scienter as to each Defendant and each alleged misstatement, as required to state a claim under  Section 10(b) of the Securities Exchange Act of 1934 (the

---

[c]omplaint," and after the defendants had filed motions to dismiss, "it was timely filed before a responsive pleading to the [c]omplaint was filed."). Moreover, even when faced with an allegedly untimely motion to strike, the Court may strike allegations "on its own." FED. R. CIV. P. 12(f)(1). As to the second argument, courts in the Sixth Circuit have long recognized that "the purpose of Rule 12(g)(2) is to prevent the dilatory motion practice fostered by common law procedure and many of the codes whereby numerous pretrial motions could be made, many of them in sequence a course of conduct that often was pursued for the sole purpose of delay," *Blick v. Ann Arbor Pub. Sch. Dist.*, No. 19-12127, 2021 WL 10132110, at *2 (E.D. Mich. Sept. 30 2021), "[b]ut a line of precedent exists in which the district courts have been willing to overlook a 12(g) defect where doing so would better serve the purpose underlying subdivision (g)." *Id.* There is no indication that the *Motion to Strike* had *any* effect of delaying the proceedings, as it was filed prior to Plaintiffs even responding to the *Motions to Dismiss*.

"Exchange Act") and Rule 10b-5?

*Third*, does the First Amended Complaint plead a viable claim under Section 20(a) of the Exchange Act?

In determining the *Motions to Dismiss* in this case, the Court not only looks to the standards applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), but also to the more exacting and heightened pleading standards applicable to cases alleging securities fraud under Sections 10(b) and 20(a) of the Securities Act.

### A.  <u>Motions to Dismiss Generally Under Federal Rule of Civil Procedure 12(b)(6)</u>

In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual material" which, if accepted as true, would state a valid "claim to relief that is plausible on its face." *Sampson*, 2020 U.S. Dist. LEXIS 231649, at *4; *see also Askew v. True Hearts of Care, LLC*, No. 5:19-CV-01619, 2020 U.S. Dist. LEXIS 2187, at *4 (N.D. Ohio Jan. 7, 2020) ("While detailed factual allegations are not required, Fed. R. Civ. P. 8(a)(2) calls for sufficient factual matter, accepted as true, to "'state a claim to relief that is plausible on its face."') (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), in turn quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"[A]ll well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Colbert v. Cuyahoga Cnty, Ohio*, No. 1:23-CV-01414, 2024 U.S. Dist. LEXIS 173672, at *7 (N.D. Ohio Sept. 25, 2024) (quoting *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 240 (6th Cir. 2011). Although a court must accept the well-pleaded allegations of a complaint as true, it "need not accept as true legal conclusions or

-31-

unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Willman v. Attorney General of the United States*, 972 F.3d 819, 823 (6th Cir. 2020) (quoting *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 276 (6th Cir. 2010)). Under the general standard, as the Supreme Court noted in *Twombly*, a complaint is "not require[d] [to include] heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.[19]

### B.  The Heightened Standard Applied in Federal Securities Law Cases

Because Sections 10(b) and 20(a) of the Exchange Act involve fraud, the Court also must apply the pleading requirements set forth in Federal Rule of Civil Procedure 9(b).  While a court interprets all facts in the complaint as true, a plaintiff must, at minimum, "detail[] the 'who, what, when, where, and how' of the alleged fraud." *Bondali v. Yum! Brands*, 620 F. App'x 483, 489 (6th Cir. 2015).  In addition to this, for securities fraud cases, a plaintiff must satisfy the "exacting pleading requirements" of the PSLRA. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  The legislative history of the PSLRA states that it was enacted by Congress to act as a "check against abusive litigation by private parties" and to "screen out frivolous suits," *Tellabs*, 551 U.S. at 319-21, based on a concern that private securities actions can be ripe for abuse. *Id.* at 308-09.  The PSLRA demands that a securities complaint state "with particularity" "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *Id.* at 321.  A complaint must also allege particularized facts

---

[19]

As noted below, in the discussion on the standards applied under the PSLRA, securities fraud claims must meet a higher standard of specificity than that applied under the general standard of FED. R. CIV. P. 12(b)(6) analysis.

giving rise to a "strong" inference of scienter.  *Id.*  "Scienter" is not the product of mistake, miscalculation, overoptimism, or unfulfilled prediction, but rather a is a mental state embracing an intent "to deceive, manipulate, or defraud."  *Id.* at 313.  Pleading a violation of the federal securities laws is not easy.  The pleading standards of the PSLRA have been described by the Sixth Circuit as creating an "elephant-sized boulder" that must be surmounted to successfully state a claim.  *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014).  "[N]ot all allegations that would survive a traditional motion to dismiss under Rule 12(b) are sufficient to survive dismissal in a private securities action."  *Lim v. Hightower*, No. 4:23-CV-1454, 2024 WL 4349409, at *8 (N.D. Ohio Sept. 30, 2024).

### IV.  THE LAW GOVERNING THE CLAIMS ASSERTED IN THIS CASE

#### A.  Section 10(b) of the Exchange Act and Rule 10b-5

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5,[20] a plaintiff

---

[20]     Securities Exchange Act Rule 10b-5 is the vehicle by which violations of Securities Exchange Act of 1934 Section 10(b) is pursued.  Section 10(b) of the Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any

must establish:  "(1) a material misrepresentation or omission by the defendant; (2) scienter;
(3) a connection between the misrepresentation or omission and the purchase or sale of a
security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss
causation."  *Bondali*, 620 F. App'x at 489 (quoting *Stoneridge Inv. Partners, LLC v. Scientific-
Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  Here, the dispositive elements are those of "material
misrepresentation or omission" and "scienter."  The Court first examines the element of
"material misrepresentation or omission."

### 1. *Actionable Material Misrepresentations or Omissions*

To successfully plead an actionable material misrepresentation or omission, a plaintiff
must allege facts demonstrating two things:  (1)  that a defendant made a statement or omission
that was false or misleading; and (2) that the statement or omission concerned a material fact.
*Omnicare*, 769 F.3d at 470.  "Materiality" is dependent on the significance a reasonable investor
would place on the withheld or misrepresented information.  *Basic v. Levinson*, 485 U.S. 224,
240 (1988); *see also In re Nat'l Auto Credit, Inc. Sec.Litig.*, No. 1:98-CV-0264, 1999 WL
33919791, at *11 (N.D. Ohio Oct. 12, 1999) (holding that facts are material only if a reasonable
investor would have viewed the misrepresentation or omission as "having significantly altered
the total mix of information made available") (citations omitted).  It is not enough for a

---

facility of any national securities exchange, (a) [t]o employ any device,
scheme, or artifice to defraud, (b) [t]o make any untrue statement of a
material fact or to omit to state a material fact fact necessary in order to
make the statements made, in the light of the circumstances under which
they were made, not misleading, or (c) [t]o engage in any act, practice, or
course of business which operates or would operate as a fraud or deceit
upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

statement to be "false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic*, 485 U.S. at 238.

A key concept that almost always arises in determining whether an allegedly false or misleading statement is "material," and actionable, is whether the statement concerns "hard" or "soft information."  "Hard information" is "typically historical information or other factual information that is objectively verifiable" – and it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading. *Omnicare*, 769 F.3d at 470 (citations omitted).  If the statement is one concerning "soft information," which "includes predictions and matters of opinion," a plaintiff must additionally plead facts showing that the statement was "made with knowledge of its falsity." *Indiana State Dist. Council of Laborers Pension & Welfare Fund v. Omnicare*, 583 F.3d 935, 945-46 (6th Cir. 2009).

"Soft information," and "puffery" do not constitute a material misrepresentation upon which stockholders would reasonably rely. *Lim*, 2024 WL 4349409, at *9 (citing *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 576 (6th Cir. 2008); *Indiana State Dist. Council of Laborers*, 583 F.3d at 943).  Statements are not actionable if they are overly general, "lack[ing] the sort of definite projections that might require later correction." *Lim*, 2024 WL 4349409, at *9 (citing *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9,12 (6th Cir. 2019)). Any generally optimistic or overly broad statements cannot be the basis for a Section 10(b) claim. *Id.*  And, particularly pertinent to many of the claims at issue in this case, "a generic claim of legal compliance, absent any specifics, does not form the basis for a misrepresentation actionable under Rule 10b-5" (and thus Section 10(b) as well). *In re Sotera Health Company*

*Sec. Litig.*, No. 1:23-CV-00143, 2025 WL 860897, at *25 (N.D. Ohio Mar. 19, 2025) (citing *Dailey v. Medlock*, 551 F. App'x 841, 849 (6th Cir. 2014), in turn citing *Indiana State Dist. Council of Laborers*, 583 F.3d at 945-947). In *Indiana State Dist. Council of Laborers*,[21] the Sixth Circuit affirmed a district court's ruling that the company's general assertions of legal compliance – that it "complied with state law and regulations and had a policy of complying with the law" – were not actionable because the plaintiffs failed to show the defendants *knew* the statements were untruthful. *Indiana State Dist. Council of Laborers*, 583 F.3d at 945-47.

Plaintiffs' allegations of "material misstatements or omissions" involve three categories: (1) those related to purported non-disclosures about the Monterrey Plant, particularly about its compliance with applicable environmental laws and the Administrative Proceeding in 2019; (2) statements related to the operations and activities at the St. Marys Plant; and (3) statements about the anticipated effects of the Monterrey Plant shutdown in November 2022.

The Court first looks to the statements related to the Monterrey Plant.

### a. Statements About the Monterrey Plant

A key factor in determining whether an alleged statement or omission is actionably false or misleading is whether the statement was false when made. An actionable assertion cannot be based on what has come to be known as allegations of "fraud by hindsight." *See In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 959 (S.D. Ohio 2009) ("[W]e have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate

---

[21] This cited case is often referred to as "*Omnicare*" or "*Omnicare I*," but to avoid confusion with the first-cited *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014), this case is referred to as "*Indiana State Dist. Council of Laborers*."

officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.") (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2nd Cir. 2000)); *see also City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 188 (2nd Cir. 2014) ("We do not recognize allegations of 'fraud by hindsight'") (company's failure to recognize the vulnerability of *all* of its mortgage-related assets may have been "poor judgment," but not actionable misstatement); *In re Century Bus. Servs. Sec. Litig.*, No. 1:99-CV-2200, 2002 WL 32254513 (N.D. Ohio June 27, 2002) ("Plaintiffs cannot simply set forth the relevant statements and 'summarily characterize the statements as "false and misleading."' In other words, plaintiffs must demonstrate a basis for the claim that the defendants' statements were false at the time they were made, rather than merely erroneous in hindsight."). Here, the Plaintiffs assertions regarding the Monterrey Plant amount to claiming that because the facility was the subject of an Administrative Proceeding in 2019, and operations were temporarily suspended in 2022, all of its earlier statements about having a competitive advantage and beliefs about being in full compliance with applicable environmental laws must have been false. These are not actionable claims.

### (i) Cost and Competitive Advantage

Plaintiffs first challenge GrafTech's statements about its competitive advantages and cost advantages, such as statements about how it had an "advantaged low cost structure" (ECF #56, ¶¶ 115-116, 124, 126), a "long-term competitive advantage" (ECF #56, ¶ 119), and a "portfolio of low-cost graphite electrode manufacturing facilities" (ECF #56, ¶ 120). Plaintiffs state that

-37-

these statements were misleading because the Defendants "concealed that GrafTech's cost advantages had been achieved in substantial part by the Company's failure to implement necessary environmental safeguards and comply with environmental regulations at its Monterrey facility."  (ECF #56, ¶ 123; *see also* ¶¶ 89, 94, 110, 131, 137, 143, 154, 163 & 169).  Yet, there are no identified facts or specific factual allegations about what GrafTech's costs actually were, or that they were different from what was reported as of the date of any alleged misstatement.  Nor are there any factual allegations comparing GrafTech's costs and competitive advantages to those of its competitors.  Most significantly, the *First Amended Complaint* cites no documents, communications, or data showing that the Monterrey Plant was in material violation of any specific environmental regulation or requirement as of the date of any alleged misstatement – or those showing that this purported "noncompliance" rendered any challenged statement about costs materially misleading.

### (ii)  Environmental Compliance

The main focus of Plaintiffs' claims about the Monterrey Plant concerns statements about GrafTech's efforts to comply with applicable environmental requirements, made months or even years before the temporary shutdown in 2002, such as that GrafTech had "an on-going commitment to rigorous internal environmental protection standards," (ECF #56, ¶ 223), "proactively [took] steps to reduce [environmental] impacts throughout [its] operations," (ECF #56, ¶ 111), focused on "being good environmental stewards" and continued to "monitor progress on [its] environmental initiatives," (ECF #56, ¶ 118), and was "in compliance in all material respects with federal, state, local, and foreign environmental laws and regulations," (ECF #56, ¶¶ 90, 106, 127, 159).  Plaintiffs now assert that these statements were false because

-38-

the Monterrey Plant was, at least at some points in time, not in compliance with all such environmental requirements, as later revealed by the brief shutdown in 2022.

Plaintiffs do not identify any particularized facts showing that any of such statements (*see* Appendix A of this *Memorandum of Opinion*) supporting their claim that they were false when made. The *First Amended Complaint* does not identify any specific environmental requirement that applied to the Monterrey Plant at the time of any challenged statement, or any particularized facts showing known violation at the time of any such statement – such as any limits imposed by law or regulation on plant emissions, the actual quantity of emissions that were occurring at the time of any statement, or any data, documents, or reports identifying violations of a law or regulation at the time of any alleged misstatement.

Nor does the *First Amended Complaint* identify any document, communication, data, or other source showing that GrafTech was not committed to environmental compliance, that it was not monitoring its progress on environmental efforts, or that it was knowingly aware that it was not in compliance with any standard at the time of any statement. The fact that operations at the Plant were briefly shut down in 2022, in some cases years after a statement, is not demonstrative of contemporaneous falsity, and rather is best described as asserting "fraud by hindsight." An example of this is found in the facts asserted in the case of *Bondali v. Yum! Brands*, 620 F. App'x 483 (6th Cir. 2015), where the Sixth Circuit affirmed the district court's dismissal of the claims. In *Bondali*, the plaintiff alleged that "Yum's general statements touting its standards and protocols" including that it "adhere[d] to a strict food safety testing program" and "[c]ontinually monitor[ed] and improve[d] its procedures and practices to ensure food safety," were false and misleading because some of Yum's products later tested positive for drug and antibiotic residue.

*Bondali*, 620 F. App'x at 487-90.  The district court dismissed the complaint.  The Sixth Circuit affirmed, finding that the complaint failed to state a claim because it "alleged no facts to suggest that Yum did not require its suppliers to adhere to corporate food standards and safety protocols." *Id.* at 489.  The Sixth Circuit further held that it was "not reasonable to interpret Yum's statements as a guarantee." *Id.*  Such is also the case here.

Nor can contemporaneous falsity be established by the existence of the complaint filed by the mayor of Apodaca, César Garza Villareal, along with Apodaca's Secretary of Urban Development, Ecology[,] and Transportation, Andres M. Canto Ramirez, filed in May 2020 against GrafTech with the Secretary of Sustainable Development for the Nuevo León State Government, asserting violations of "environmental regulations, biosafety and wildlife, among others, affecting matters of public order and social interest by expending risks or threats of environmental contingency in neighborhoods, municipality[,] and surrounding municipalities," or the September 2021 citizen's complaint filed with the Federal Prosecutor's Office for Environmental Protection regarding the Monterrey Plant's dust emissions.  (ECF #56, ¶¶ 49-51). First, as Plaintiffs' admit, "[i]t is unclear what action, if any, the State Attorney General's Office of Sustainable Development took in response to the complaint filed by Mayor Garza and Mr. Ramirez, (ECF #56, ¶ 49), and "[a]s with the 2020 complaint filed by Mayor Garza and Mr. Ramirez, it is unclear what action, if any, was taken in response to [the later] citizen's complaint, (ECF #56, ¶ 51).  Plaintiffs do not show that any enforcement action resulted from either complaint, or that GrafTech or the Individual Defendants were aware of them.  Nor is a claim of contemporaneous falsity supported by Mayor Garza's "address" to the Apodaca City Council asking the Council to take action against the Company related to the emissions issues.  (ECF

#56, ¶¶ 67-69).  Again, Plaintiffs do not show, or even assert, that GrafTech or any of the Individual Defendants were aware of the mayor's remarks.  These allegations also fall within the description of "fraud by hindsight," and are thus not actionable under the PSLRA.

### (iii)  2019 Administrative Proceeding

The remaining allegations of "material misstatement or omission" in connection with the Monterrey Plant relate to statements made by GrafTech regarding the Administrative Hearing initiated in March 2019 by the Nuevo León Department of Sustainable Development, which culminated in GrafTech paying fines amounting to approximately $150,000,[22] and being directed to implement corrective measures to address violations of the environmental laws relating to emissions.  (ECF #56, ¶¶ 95, 98, 102).

The First Amended Complaint does not identify any document, communication, or statement that any of the disclosures or other statements made by Defendants on this matter were either false or incorrect.  The gist of Plaintiffs' claims are that GrafTech should have included more information in its public statements, such as the detailed findings of the Nuevo León Department of Sustainable Development in its *Resolution*, as stated in the *First Amended Complaint*:

> Defendants concealed that, on July 30, 2019, the Department of Sustainable Development issued a formal resolution of the administrative proceeding with respect to the Company's Monterrey facility, which:  (i) determined that GrafTech's Monterrey facility operated "without the means of control to ensure that dust emissions are avoided, which is mandatory as established in Article 131 section II of the Environmental Law of the State of Nuevo León, to ensure satisfactory air quality for population well-being and ecological

---

[22]    Specifically, $150,054.25, comprised of $140,253.40 and $9,800.84.  (*See* ECF #64-10, *Resolution of the Department of Sustainable Development of Nuevo León*, p.11 [PageID #1207] (July 30, 2019)).

balance"; (ii) found that GrafTech "benefitted economically by evading the expense generated by implementation of equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere during its operation"; and (iii) ordered GrafTech to immediately and permanently . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere."

(ECF #56, ¶ 100; *see also* ¶ 104, similar allegations).

An omission is actionable under Section 10(b) only if it renders another affirmative statement materially misleading. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024). Corporate executives "have no general duty to disclose every problem that arises." *In re Allscripts, Inc. Sec. Litig.*, No. 00-C-6796, 2001 WL 743411, at *9 (N.D. Ill. June 29, 2001); *see also Singh v. Cigna Corp.*, 277 F. Supp.3d 291, 310 (D. Conn. 2017) ("A reasonable investor's interest is not sufficient, standing alone, to require disclosure"), *aff'd* 918 F.3d 57 (2nd Cir. 2019); *In re United Am. Healthcare Corp. Sec. Litig.*, No. 2:05-CV-72112, 2007 WL 313491, at *6 (E.D. Mich. Jan. 30, 2007) ("A corporation not required to disclose a fact merely because an investor would very much like to know that fact") (quoting *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2nd Cir. 1993)). Nor are companies required to provide an overly cautious or negative picture of current performance or future prospects. *Albert Fadem Tr. v. American Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1026 (S.D. Ohio 2004); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2nd Cir. 2004) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future").

A company or its officers is required to disclose information only if its absence would "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also*

-42-

*Macquarie*, 601 U.S. at 265; *United Am. Healthcare*, 2007 WL 313491, at *10 (finding the

omission of information was immaterial when it did not render the defendant's factual

statements inaccurate); *Lim*, 2024 WL 4349409, at *11 ("Because they did not result in an

affirmative misleading statement, Defendants had no duty to disclose the omitted details").

Section 10(b) "do[es] not create . . . an affirmative duty to disclose any and all material

information."  *Plymouth Cty. Ret. Assn. v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 784 (N.D. Ohio

2021), *aff'd*, 2022 WL 3972478 (6ᵗʰ Cir. Sept. 1, 2022).  It also merits mention here that

GrafTech's full statements on such issues were often more than as identified in the *First

Amended Complaint*:

> We believe that we are currently in compliance in all material respects with
> the federal, state, local and foreign environmental laws and regulations to
> which we are subject.  ***We have experienced some level of regulatory
> scrutiny at most of our current and former facilities and, in some cases,
> have been required to take or are continuing to take corrective or remedial
> actions and incur related costs, and may experience further regulatory
> scrutiny, and may be required to take further corrective or remedial actions
> and incur additional costs, in the future.***

(*See* ECF #56, ¶¶ 90, 106, 127) (text omitted from statements as quoted in *First Amended

Complaint* shown in bold italic type).[23]

A review of the actual statements made by GrafTech (including the example quoted

above and others identified in Appendix A of this *Memorandum of Opinion*) shows that it

disclosed the existence of the 2019 Administrative Proceeding, that GrafTech was required to

---

[23]

    *See* ECF #64-19, PageID #1374 (partially quoted at ECF #56, ¶ 90), *GrafTech
International Ltd., 2018 Annual Report (Form 10-K), p.16 (Feb. 22, 2019)*; ECF #64-6, PageID
#1160 (partially quoted at ECF #56, ¶ 106), *GrafTech International Ltd., 2019 Annual Report
(Form 10-K), p.17 (Feb. 21, 2020)*; ECF #64-18, PageID #1300 (partially quoted at ECF #56,
¶ 127), *GrafTech International Ltd., 2020 Annual Report (Form 10-K), p.16 (Feb. 23, 2021)*.

take corrective measures, that GrafTech paid a fine (and the specific amounts are stated in the

*Resolution* cited in the *First Amended Complaint*), and that the matter was closed – as admitted

by Plaintiffs in their *First Amended Complaint*:

> The [Third Quarter 2019] Form 10-Q reiterated that "[o]n March 1, 2019, the
> [Department of Sustainable Development] provided notice of an
> administrative proceeding with respect to the Company's Monterrey facility,"
> which required the "Company to design and implement certain corrective
> measures involving certain potential violations of state environmental law
> relating to emissions." The [Third Quarter 2019] Form 10-Q further
> represented that GrafTech had "cooperated with the Department" with respect
> to the proceeding, "including payment of certain fines that were not material
> to the Company." The [Third Quarter 2019] Form 10-Q also reported that, in
> September 2019, "the Department of Sustainable Development formally
> closed the proceeding."

(ECF #56, ¶ 102) (bracketed text in original, with exception of "[Third Quarter 2019]" added by

Court to replace "3Q19" of original).  None of this information is alleged by Plaintiffs to be

false, nor do the statements create "an impression of a state of affairs that differs in a material

way from the one that actually exists."  *Brody*, 280 F.3d at 1006; *see also Zaluski v. United Am.*

*Healthcare Corp.*, 527 F.3d 564, 574 (6th Cir. 2008) ("These statements are not the type . . . that

give rise to a duty to disclose; they are accurate portrayals of the status of the company and its

operations"); *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 865 (W.D. Ky. 2014) ("[A]

corporation is not required to disclose a fact merely because a reasonable investor would very

much like to know that fact."), *aff'd* 620 F. App'x 483 (6th Cir. 2015).

In addition, many of the statements about the Monterrey Plant that Plaintiff now alleges

are false or misleading amount to non-actionable opinions.  Opinions are actionable under

Section 10(b) only if the speaker did not hold the belief professed, or if the speaker possessed a

specific item of contradictory information that a reasonable person would have thought undercut

the opinion so strongly that the speaker knew it was misleading not to disclose that information. *Omnicare, Inc. v. Laborers Dist. Council Indus. Pension Fund*, 575 U.S. 175, 183-96 (2015) (describing that pleading an actionable opinion is "no small task"). The allegations of the *First Amended Complaint* do not identify such "actional opinion" statements.

GrafTech's or its officers' statements on cost advantages, to the effect of "we believe our facilities have significant cost advantages," or "[w]e believe that we have the most competitive portfolio" of production facilities, or "[w]e believe our facilities are among the most strategically located and lowest cost graphite electrode manufacturing plants," were plainly subjective opinions about GrafTech and its business operations. *See, e.g.*, *Yum! Brands*, 73 F. Supp. 3d at 863-64 ("opinions of management" with "no obvious, objective meaning" are not actionable); *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 764 (N.D. Ohio 2020) (statements about "value-based operating strategy," "value drivers," "value creation," and "highly engineered value-added products," as well as statements regarding "strength" and "quality" of products, were inactionable opinions). Plaintiffs do not identify particularized facts showing that any Defendant was in possession of information contradicting these opinions, or that the speakers did not genuinely hold such opinions. *See, e.g.*, *ViewRay, Inc.*, 556 F. Supp. 3d at 789-90 (statements about the value of certain backlogs were "estimate[s] and opinions," and plaintiffs offered no information to show "math" was wrong); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y.) (statements were opinions, as indicated by use of "phrases classically indicative of opinion such as 'I believe' and 'I think.'"), *aff'd*, 757 F. App'x 35 (2nd Cir. 2018).

GrafTech's statements about its environmental efforts and compliance were also opinions

-45-

that do not rise to the level of "actionable opinions" under Section 10(b).  Statements such as

"we believe we are currently in compliance in all material respects with the federal, state, local

and foreign environmental laws and regulations to which we are subject," (*see* ECF #56, ¶¶ 90,

106, 127), and "we believe we operate in compliance in all material respects with applicable

laws and regulations," (ECF #56, ¶ 159), are also the kind of statements consistently held to be

inactionable opinions.  *See, e.g., Omnicare*, 575 U.S. at 185-86 ("we believe we are obeying the

law" not an actionable misstatement).  Again, Plaintiffs do not identify particularized facts

showing that any Defendant was in possession of information contradicting these opinions, or

that the speakers did not genuinely hold such opinions.

     Finally, many of the statements Plaintiffs identify as "false or misleading" lack the

factual specificity required to be actionable statements.  The Sixth Circuit has consistently held

that "soft" information, such as "puffery," general predictions, aspirational statements, and

"corporate optimism" is not actionable because the information does not meaningfully alter the

total mix of information available to investors.  *See, e.g., Zaluski*, 527 F.3d at 573 ("loosely

optimistic statements" that were "insufficiently specific" were not actionable); *In re Ford Motor

Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) ("Immaterial statements include vague, soft,

puffing statements or obvious hyperbole" upon which a reasonable investor would not rely;

identifying numerous such inactionable statements).[24]

---

[24]
  As stated by the Sixth Circuit:

> [P]laintiffs allege that Ford made many misleading statements regarding its
> commitment to quality, safety, and corporate citizenship, such as:  (1) "[A]t Ford,
> quality comes first." (2) "We aim to be the quality leader"; (3) "Ford has its best
> quality ever"; (4) Ford is "taking across-the-board actions to improve . . . [its]
> quality."; (5) Ford has made "quality a top priority"; (6) "Ford is a worldwide

Several of the alleged misstatements expressed generic hopes or characterizations about GrafTech's growth and cost structure.  (*See, e.g.*, ECF #56, ¶ 87 ("economies of scale and a competitive cost structure"); ¶¶ 115-116, 124 ("advantaged low cost structure"); ¶¶ 119, 126, 132, 135, 138, 141, 150 ("low-cost structure . . . sustainable and long term competitive advantage"); ¶¶ 96, 99, 132, 150 (""manage capital expenditures by taking into account . . . environmental and regulatory requirements")).  Courts in the Sixth Circuit and elsewhere routinely dismiss claims based on such generic characterizations or expressions, or "puffery." *See, e.g., Kolominsky v. Root, Inc.*, 667 F. Supp. 3d 685, 706-07 (S.D. Ohio 2023) (statements that company kept "acquisition costs much lower that [its] competitors" were "vague puffery by

---

leader in automotive safety"; (7) Ford has made "quality a top priority" [*sic*, repeating the same statement identified as "(5)"]; (8) Ford is "designing safety into . . . [its] cars and trucks" because it wants its "customers to feel safe and secure in their vehicles at all times"; (9) Ford "want[s] to make customers' lives . . . safer"; (10) Ford has "dedicated . . . [itself] to finding even better ways of delivering . . . safer vehicles to [the] consumer"; (11) Ford "want[s] to be clear leaders in corporate citizenship"; (12) Ford's "greatest asset is the trust and confidence . . . [it] has earned from . . . [its] customers"; (13) Ford "is going to lead in corporate social responsibility." ***Such statements are either mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information, and thus, are not material, even if they were misleading.  All public companies praise their products and their objectives.  Courts everywhere "have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available*.***"

*Ford Motor Co.*, 381 F.3d at 570-71 (inserts and omissions in original; emphasis supplied).

-47-

an executive that is immaterial as a matter of law"); *ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d

at 399 (statement about "competitive advantages" was puffery).

The statements on environmental efforts and commitment to sustainability, (*see, e.g.*,

ECF #56, ¶¶ 103, 105 ("continue to invest in health, safety and environmental performance");

¶ 118 ("being good environmental stewards"), are of the same character of immaterial "soft"

information or "puffery." *See Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d

669, 677 (E.D. Ky. 2014), *aff'd*, 614 F. App'x 237 (6th Cir. 2015); *City of Pontiac Gen. Emps.*

*Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 829 (W.D. Mich. 2012) (statements that

company was "committed to . . . manufacturing . . . medical products that are safe and effective

and that comply with applicable laws and regulations" were "[v]ague statements of opinion

[that] are not actionable under the federal securities laws").

The statements regarding GrafTech believing itself to be "in compliance in all material

respects with federal, state, local and foreign environmental laws and regulations to which [it

was] subject," (*see* ECF #56, ¶¶ 90, 10-6, 127, 159), also fit within this category. Generic

statements assuring "legal compliance" constitute "soft" information, as companies generally

"have no duty to opine about the legality of their own actions." *Indiana State Dist. Council of*

*Laborers*, 583 F.3d at 945. This is especially so where the statement can be described as one

routinely included in a company's public statements, as is the case here. *Doshi v. General Cable*

*Corp.*, 386 F. Supp. 3d 815, 829 (E.D. Ky. 2019) (the "vague nature" of such statements and

their "borderline boilerplate quality" weigh against a finding of materiality, and generally lead to

dismissal).

Put simply, Plaintiffs have not stated an actionable claim under Section 10(b) of the

-48-

Exchange Act and the PSLRA in connection with GrafTech's statements regarding its Monterrey Plant.

### b.  Statements About the St. Marys Plant

The *First Amended Complaint's* allegations about GrafTech's statements regarding the St. Marys Plant fall into two categories.  The first category involves statements about an automated pin production line at the St. Marys Plant that became operational in 2021.  The second category is comprised of a single forward-looking statement from early 2019 that GrafTech could operate the St. Marys Plant as a peaking plant if needed in the future.

### (i)  Statements About Production at St. Marys

As to the first category, the *First Amended Complaint* alleges that certain statements made by GrafTech or its officers between August 2021 and May 2022 regarding GrafTech's investment in an automated pin production line at the St. Marys Plant were false or misleading, as stated in the *First Amended Complaint*:[25]

> "[GrafTech was] investing in a pin production line at our St. Marys, Pennsylvania facility that will be online in the third quarter. . . .  This diversifies our pin capacity and provides production flexibility."  (*See* ECF #56, ¶¶ 54, 142);[26]

> "In the third quarter of 2021, we introduced additional connecting pin production capabilities at our St. Marys, Pennsylvania facility."  (*See* ECF

---

[25]

The full statements as made by GrafTech and/or its officers are collected in Appendix B to this *Memorandum of Opinion*.

[26]

Referencing GrafTech International Ltd., Second Quarter 2021 Earnings Call, p.3 (Aug. 6, 2021) ("Second Quarter 2021 Earnings Call") (ECF #64-55, PageID #1629).

#56, ¶ 151);[27]

"The pin production line at our St. Marys, Pennsylvania facility is now operational, and we are ramping up production.  Importantly, this provides us with 2 connecting pin production facilities."  (*See* ECF #56, ¶ 153);[28]

"Our investment in the new automated pin line at St. Marys continues to progress well and helps to de[-]risk our pin production capacity."  (*See* ECF #56, ¶ 158);[29]

""[O]ur recent investment in the automated pin line at St. Marys continues to progress and helps to de[-]risk our pin production capacity."  (See ECF #56, ¶¶ 56, 168).[30]

As asserted in the *First Amended Complaint*, the Third Quarter 2022 10-Q filing, (ECF #64-12, PageID #1241, *GrafTech International Ltd., Quarterly Report (Form 10-Q)*, p.24 (Nov. 4, 2022), issued during the Monterrey Plant shutdown, allegedly revealed that these earlier statements about operations at the St. Marys Plant were false.  Specifically, Plaintiffs contend that GrafTech, for the first time in that filing, disclosed that the St. Marys Plant was not running the full manufacturing process and that it was not producing the "pin stock" from which connecting pins were machined:

[Monterrey is] currently [GrafTech's] only site that produces the pin stock

---

[27]
     Referencing GrafTech International Ltd., Quarterly Report (Form 10-Q), p.25 (Nov. 5, 2021) ("Third Quarter 2021 10-Q") (ECF #64-25, PageID #1467).

[28]
     Referencing GrafTech International Ltd., Third Quarter 2021 Earnings Call, p.3 (Nov. 5, 2021) ("Third Quarter 2021 Earnings Call") (ECF #64-7, PageID #1179).

[29]
     Referencing GrafTech International Ltd., Fourth Quarter 2021 Earnings Call, p.3 (Feb. 4, 2022) ("Fourth Quarter 2021 Earnings Call") (ECF #64-28, PageID #1516).

[30]
     Referencing GrafTech International Ltd., First Quarter 2022 Earnings Call, p.3 (May 6, 2022) ("First Quarter 2022 Earnings Call") (ECF #64-30, PageID #1532).

> utilized for all [of GrafTech's graphite] electrodes . . . . [W]e are pursuing
> several alternatives with respect to production and sourcing of pin stock as
> well as other mitigation activities to minimize the impact on our business and
> our customers if the Monterrey suspension continues for the foreseeable
> future. These include a potential restart of our St. Marys, Pennsylvania
> facility, where the scope of production is currently limited to graphitizing and
> machining of electrodes and pins. We are actively pursuing approvals for
> operating permits for a restart of the facility for pin production.

(ECF #56, ¶ 172) (quoting the Third Quarter 2022 10-Q filing, ECF #64-12, PageID #1241).

An examination of GrafTech's prior statements about the operations of the St. Marys Plant as contained in documents referenced in the *First Amended Complaint,* (which the Court is entitled to do, *see* note 6, *supra*), shows that this statement does not contradict any of GrafTech's prior statements about the operations of the St. Marys plant or otherwise show falsity regarding any such prior statement. Plaintiffs have not identified any prior statement that claimed that the St. Marys made the "pin stock" from which connecting pins were made.

From well before the putative Class Period (which is asserted to begin in February 2019), GrafTech repeatedly disclosed that it had idled the St. Marys Plant in 2016, except for the operational functions of performing the final two steps of the pin manufacturing process, machining, and then later, starting in 2018, graphitizing. Numerous statements identified that the St. Marys Plant was *machining* semi-finished product received from other plants – indicating that the St. Marys Plant was not engaged in the processes of making the semi-finished materials from raw materials itself. *See*, *e.g.*, GrafTech International Ltd., 2018 Annual Report (Form 10-K), p.49 (Feb. 22, 2019) ("2018 10-K") (ECF #64-19, PageID #1380) ("The St. Marys, Pennsylvania facility was temporarily idled effective the second quarter of 2016 except for the machining of

semi-finished products sourced from other plants.").[31] And, in 2018, GrafTech began also

*graphitizing* a limited number of electrodes at the St. Marys Plant. *See* (ECF #64-19, 2018 10-K,

PageID #1384) ("In the first quarter of 2018, our St. Marys facility began graphitizing a limited

amount of electrodes sourced from our Monterrey, Mexico facility."). GrafTech's public

statements appear to have always disclosed that the St. Marys Plant was sourcing semi-finished

---

[31]      This same disclosure was made repeatedly by GrafTech throughout the purported Class Period prior to the statement identified by Plaintiffs in the Third Quarter 2022 10-Q filing (boldface type used in ECF citations to distinguish individual documents): (1) GrafTech International Ltd., 2018 Annual Report (Form 10-K), pp.8, 10, 11, 41, 49, 53 (Feb. 22, 2019) ("2018 10-K") **(ECF #64-19, PageID #1368, #1370, #1371, #1377, #1380, #1384)**; (2) GrafTech International Ltd., Quarterly Report (Form 10-Q), p.25 [*misidentified as p.26, at ECF #64-1, p.24, n.15*] (May 1, 2019) ("First Quarter 2019 10-Q") **(ECF #64-20, PageID #1398)**; (3) GrafTech International Ltd., Quarterly Report (Form 10-Q), p.28 [*misidentified as pp.29-30, at ECF #64-1, p.24, n.15*] (Nov. 7, 2019) ("Third Quarter 2019 10-Q") **(ECF #64-11, PageID #1225)**; (4) GrafTech International Ltd., 2019 Annual Report (Form 10-K), p.6, 16, 24, 42, 48-49 (Feb. 21, 2020) ("2019 10-K") **(ECF #64-6, PageID #1149, #1159, #1162, #1166, #1169)**; (5) GrafTech International Ltd., Quarterly Report (Form 10-Q), p.26 (Nov. 3, 2020) ("Third Quarter 2020 10-Q") **(ECF #64-22, PageID #1433)**; (6) GrafTech International Ltd., 2020 Annual Report (Form 10-K), pp. 7, 14, 24, 43 (Feb. 23, 2021) ("2020 10-K") **(ECF #64-18, PageID #1295, #1298, #1303, #1306)**; (7) GrafTech International Ltd., Quarterly Report (Form 10-Q), p.25 (May 5, 2021) ("First Quarter 2021 10-Q") **(ECF #64-23, PageID #1446)**; (8) GrafTech International Ltd., Quarterly Report (Form 10-Q), p.26 (Aug. 6, 2021) ("Second Quarter 2021 10-Q") **(ECF #64-24, PageID #1455)**; (9) GrafTech International Ltd., Quarterly Report (Form 10-Q), p.26 (Nov. 5, 2021) ("Third Quarter 2021 10-Q") **(ECF #64-25, PageID #1468)**; (10) GrafTech International Ltd., 2021 Annual Report (Form 10-K), pp.6, 14, 20, 36 (Feb. 22, 2022) ("2021 10-K") **(ECF #64-26, PageID #1480, #1483, #1486, #1489)**; (11) GrafTech International Ltd., Quarterly Report (Form 10-Q), p.25 (May 6, 2022) ("First Quarter 2022 10-Q") **(ECF #64-27, PageID #1507)**.

     Defendants also reference similar disclosures as appearing on page 29 of GrafTech International Ltd., Quarterly Report (Form 10-Q) (July 31, 2019) ("Second Quarter 2019 10-Q") **(ECF #64-21)** and page 38 of the Third Quarter 2019 10-Q **(ECF #64-11)**, *see Memorandum of Law in Support of the Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford* (ECF #64-1, p.24, n.15), but the Court finds no such reference at the cited page or any nearby page of such documents. Given the accuracy of each of the many other references to such disclosures, the Court suspects this is due to citation error or inadvertent omission of the correct page of these documents rather than the statement not appearing elsewhere in them.

product from other plants to then conduct its machining and graphitization processes.  (*See* ECF #64-19, PageID #1370, #1380).  Plaintiffs identify no public statement that the St. Marys facility was performing all six steps of the pin manufacturing and production process.

In fact, the record of GrafTech's public disclosures and statements prior to the Third Quarter 2022 10-Q show that it never made representations that all the steps of the pin manufacturing process were being conducted at the St. Marys facility, or that any more activities than pin machining and graphitizing were being conducted.  Numerous statements issued by GrafTech show that the activities of the St. Marys Plant were limited to machining and later graphitization.  As an example, the transcript of GrafTech's Third Quarter Earnings Call shows the following exchange, where, in response to a question from an analyst about whether GrafTech had "given any thought to be starting [restarting] St. Marys outside of the pin machining," GrafTech's then-CEO David Rintoul noted that "In terms of St. Marys, we need to finish ramping up this pin machining operation.  That's a critical addition and provides us more flexibility." (ECF #64-7, p.7, PageID #1181).  The documents cited in the *First Amended Complaint* show that in the following Earnings Call, in February 2022, Rintoul again noted that GrafTech was not running the full production process at St. Marys, by stating "Please bear in mind that is all-in and we're not currently running the front end of St. Marys."  (*See* GrafTech International Ltd., Fourth Quarter 2021 Earnings Call, p.7 (Feb. 4, 2022) ("Fourth Quarter 2021 Earnings Call") (ECF #64-28, PageID #1520).  In GrafTech's 2021 10-K Annual Statement, released shortly afterward, it noted "In 2021, we shifted graphitization and machining of a portion of semi-finished products from Monterrey to St. Marys, Pennsylvania, in order to improve environmental performance, production flexibility and overall cost efficiencies across the two facilities." (GrafTech

International Ltd., 2021 Annual Report (Form 10-K), pp. 6, 14 (Feb. 22, 2022) ("2021 10-K")

(ECF #64-26, PageID #1480, #1483).  Finally, just prior to the Monterrey Plant shutdown in

September 2022, and shortly before the referenced Third Quarter 2022 10-Q filing, GrafTech

Chief Operating Officer Jeremy Halford, at the Second Quarter 2022 Earnings Call, again stated

that operations at St. Marys were limited to a pin machining line and graphitization activities:

> [I]n response to your question on St. Mary's [*sic*], we've increased the amount
> of activity in the St. Mary's [*sic*] facility with the installation of the new pin
> machining line that complements the graphitization activities that were already
> taking place there.  And, I would point out that, I'm actually quite pleased
> with the St. Marys team and their performance on commissioning and ramping
> up that equipment.

GrafTech International Ltd., Second Quarter 2022 Earnings Call, p.10 (Aug. 5, 2022) ("Second

Quarter 2022 Earnings Call") (ECF #64-29, PageID #1525).[32]

       Thus, it is evident that, rather than the referenced Third Quarter 2022 10-Q statement

having the effect of contradicting GrafTech's prior statements about the St. Marys Plant

operations, the referenced statement confirms what had been previously reported.  None of the

alleged misstatements about GrafTech's St. Marys facility – that it "diversifies our pin capacity

and provides production flexibility," (ECF #64-55, *Second Quarter 2021 Earnings Call*, p.3,

PageID #1629), that it "introduced additional connecting pin production," (ECF #64-25, *Third*

---

[32]

     The *First Amended Complaint* does not reference the transcript of the Second Quarter 2022 Earnings Call.  Because this statement, provided in GrafTech's *Memorandum in Support of Motion to Dismiss*, places the overall statements about the St. Marys facility in context, the Court may consider it.  *See Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772,784 (N.D. Ohio 2021) (courts may "analyze the statements and omissions at issue in their full context"), *aff'd* 2022 WL 3972478 (6th Cir. Sept. 1, 2022); *see also* FED. R. EVID. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned.").

*Quarter 2021 10-Q*, p.25, PageID #1467), that the "pin production line at our St. Marys,

Pennsylvania facility is now operational" or that it "provides us with two connecting pin

production facilities," (ECF #64-7, *Third Quarter 2021 Earnings Call*, p.3, PageID #1179), that it

"helps to de[-]risk our pin production capacity," (ECF #64-28, *Fourth Quarter 2021 Earnings*

*Call*, p.3, PageID #1516; ECF #64-30, *First Quarter 2022 Earnings Call*, p.3, PageID #1532) –

claimed that the operations at St. Marys *fully* de-risked pin production, only that it "helped" to de-

risk it.  No facts are alleged that diversifying production with machining and graphitization at St.

Marys did not help to de-risk production, or did not make GrafTech's overall operations more

flexible.  A statement is not materially misleading simply because a company might have said it

better.  *See In re Yum! Brands, Inc. Sec. Litig.*, 620 F. App'x 483, 490 (6th Cir. 2015) (description

of its protocols as "strict" was "reasonably grounded in objective fact and thus, is not 'disproven'

just because Yum could have strengthened its standards and protocols.").

The record this Court is entitled to review in determining the *Motions to Dismiss* does not

support Plaintiffs' allegations that GrafTech concealed the true state of affairs at its St. Marys

facility.  Thus, the *First Amended Complaint* fails to allege with particularity that any of the

statements about operations at St. Marys were false when made, or that GrafTech's statements

were incorrect.

### (ii)  Statement About Being a "Peaking Plant"

As to the second "category" of alleged misstatement about St. Mary's (effectively, a

single statement from a 2018 Earnings Call), the *First Amended Complaint* alleges that an initial

statement and follow up statement made by GrafTech from early 2019 that GrafTech could

operate the St. Marys Plant as a "peaking plant" if needed in the future was a material

misstatement:

> We will ramp up production at St. Marys if required by the market at any point in the future.  St Marys can be thought of as essentially the equivalent of a peaking plant, and we will operate in that fashion. .. .  We will use St. Marys to allow us flexibility and variability.  We expect the degree to which we run that will move up and down based upon the market dynamics, not unlike that of, again, in the analogy of a peaking plant.

(ECF #56, ¶ 88) (quoting GrafTech International Ltd., Fourth Quarter 2018 Earnings Call, pp.2, 5 (Feb. 8, 2019) ("Fourth Quarter 2018 Earnings Call," ECF #64-31, PageID #1535, #1538).

However, the *First Amended Complaint* does not include any particularized fact demonstrating that GrafTech did not consider St. Marys as a potential peaking plant in February 2019 when the statement made, and thus, the statements are not actionable.  *See In re Century Bus. Servs. Sec. Litig.*, No. 1:99-CV-2200, 2002 WL 32254513 (N.D. Ohio June 27, 2002) (plaintiffs must demonstrate a basis for the claim that the defendants' statements were false at the time they were made, rather than merely erroneous in hindsight.").

Moreover, the statements amount to "forward looking statements" protected by the "safe harbor" provisions of the PSLRA, which encourages companies to provide forward-looking information without "[f]ear that inaccurate projections will trigger the filing of a securities fraud lawsuit." (*See* S. Rep. 104-98, at 16 (1995)).  The safe harbor provision protects "statements concerning a company's future economic performance; and statements about the assumptions underlying forward-looking statements." *Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 242 (6th Cir. 2015).  Forward looking statements are actionable only if "(1) a reasonable investor would find the statement material (2) the defendant failed to identify its statement as forward looking or provide meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking

statement, and (3) the defendant made the statement with actual knowledge that it was false or misleading." *Id.* at 242, 246-48.

GrafTech's statements regarding its possible use of the St. Marys Plant as a "peaking plant" are comprised entirely of future-looking language, such as "[w]e will ramp up," "at any point in the future," "we will operate," "we will use," "we expect," and "will move up and down." The transcript of the Fourth Quarter 2018 Earnings Call, during which the statements were made, began with an announcement of the following:

> [A]s a reminder, some of the matters discussed on this call may include forward-looking statements regarding, among other things, results, performance and strategies. These statements are based on current expectations and are subject to risks and uncertainties. Factors that could cause actual results to differ materially from those indicated by forward-looking statements are shown here.

(Fourth Quarter 2018 Earnings Call, p.1, ECF #64-31, PageID #1534). One of the factors that could "cause actual results to differ" identified in the call was "the possibility that plant capacity expansions may be delayed or may not achieve the expected benefits. (GrafTech International Ltd., Fourth Quarter 2018 Earnings Presentation, slide 1 (Feb. 8, 2019) ("Fourth Quarter 2018 Earnings Presentation") (N/A) (ECF #64-32, PageID #1541).

Again, as there are no particularized factual allegations demonstrating that these statements were false when made, they are not actionable.

### c. Statements About the Anticipated Effects of Monterrey Shutdown

The final category of Plaintiffs' allegations of "material misstatements or omissions" concerns GrafTech's and its officers' statements about the anticipated effects of the Monterrey

Plant shutdown in November 2022.[33]  These allegations are based on the premise that because the Monterrey Plant shutdown's ultimate impact turned out to be more severe than GrafTech and its officers initially predicted, the statements must have been false.

Similar to Plaintiffs' claims regarding the statements issued by GrafTech related to the Monterrey Plant on having a "competitive advantage," and its beliefs about being in full compliance with applicable environmental laws prior to the Administrative Proceeding in 2019 or the brief shutdown of that facility in 2022, the claims related to the later "inaccuracy" of GrafTech's predictions about the future ongoing effects of the Monterrey Plant shutdown fall within the definition of alleging "fraud by hindsight," which is not the basis of an actionable claim.  *See In re Huntington Bancshares Inc., Sec. Litig.*, 674 F. Supp. 2d 951, 959 (S.D. Ohio 2009) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.  Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.") (citation omitted); *see also View Ray*, 556 F. Supp. 3d at 791 (finding plaintiff to have failed to state a claim under Section 10(b) because "Plaintiff

---

[33]       At this point in time, neither Individual Defendant David Rintoul (who left his role as President and Chief Executive Officer, and as a member of GrafTech's Board of Directors, in June 2022) nor Individual Defendant Quinn Coburn (who left his role as GrafTech's Chief Financial Officer in November 2021), were employed by GrafTech at the time of any such statements.  Accordingly, no liability would attach to them for any alleged misstatement or omission made after their respective departures.  *See In re Jiangbo Pharms., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1260 (S.D. Fla. 2012), *aff'd sub nom. Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296 (11th Cir. 2015) (CEO cannot be liable for statements made by others after her departure); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 807 (S.D.N.Y. 2018) (holding defendant "could not be held liable for any public statements issued after he stepped down as CEO"); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 762 (S.D.N.Y. 2017) (former CEO "cannot be held to have violated § 10(b) based on the Form 20-Fs" filed after he left his position).

-58-

really complains that 'the fact that something turned out badly must mean that defendant knew earlier that it would turn out badly'" amounted to inactionable "fraud by hindsight"); *UBS AG*, 752 F.3d at 188 ("We do not recognize allegations of 'fraud by hindsight.'").

The gist of Plaintiffs' claims are statements issued by GrafTech, in the immediate wake of the shutdown, that the Monterrey Plant was the "only site that produce[d] the pin stock utilized for all . . . electrodes," (and thus apparently "contradicting" GrafTech's earlier statements about taking efforts to "help[] to de-risk our pin production capacity), (ECF #56, ¶ 172), that the immediate effects were expected to be "modest" due to "existing pin inventory, (ECF #56, ¶¶ 175-176), that the anticipated financial impact of the shutdown would be "significant" if Monterrey remained closed, (ECF #56, ¶¶ 173-174), and that the shutdown was not expected to change GrafTech's long-term commercial strategy, (ECF #56, ¶ 177), and particularly that GrafTech intended to pursue renewals of its long-term-agreements with parties (in response to questions about whether the shutdown would reduce GrafTech's ability to fulfill anything other than short time frame agreements) based on its belief that its customers appreciated its vertical integration and the certainty it provided to customers, (ECF #56, ¶ 177), were misleading.

As it became evident over the following months, and as referenced in the *First Amended Complaint*, some of GrafTech's stated expectations did not turn out as well as initially predicted. (*See* ECF #56, ¶¶ 83, 173-174, 181-184).  However, the *First Amended Complaint* does not identify any particularized facts demonstrating that any of GrafTech's statements about its early expectations were false when made.  Plaintiffs do not assert that GrafTech actually did not have the inventory of pin stock referenced in its statements, that it did not pursue renewals of its long

-59-

term agreements, or that it did not have the commercial strategy it described.[34]  The *First Amended Complaint* does not allege or identify facts demonstrating that, as of the date of any statement, that GrafTech's customer contract negotiations had failed or were expected to fail, or that any of the persons making statements about GrafTech's commercial strategy thought that it was not viable.  Nor is there any contemporaneous document, report, or other communication identified by Plaintiffs that demonstrates the falsity of GrafTech's statements about the expected impact of the shutdown.  The basis of Plaintiffs' claims is that because the shutdown ended up affecting GrafTech's financial health for a longer period than initially expected, the previous statements must have been false.  This is not the basis for a viable claim.  *See, e.g.*, *Lim*, 2024 WL 4349409, at *14 ("Claims of securities fraud or misrepresentation based on allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did fail on their merits.").

Plaintiffs also allege that GrafTech and the Individual Defendants omitted information about the "cause for temporary suspension" and the "potential financial impacts" on GrafTech, specifically:

> After the markets closed on September 16, 2022, GrafTech filed a Form 8-K signed by defendant Flanagan, which disclosed that GrafTech's critical Monterrey facility had received a "temporary suspension notice" ordering the facility to "wind down operations within seven days," following the conclusion of a September 15, 2022 inspection of the "facility and certain of the facility's environmental and operating permits" by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment of the State of Nuevo León, Mexico.  The Form 8-K further disclosed that "[i]n parallel, the Director of Integral Air Management of the Undersecretary of Climate Change and Air Quality of the Ministry of the Environment

---

[34]  A complete list of the statements at issue in set forth in Appendix C to this *Memorandum of Opinion*.

determined that, among other things, GrafTech Mexico's operating license was no longer in effect." The Form 8-K provided no further details regarding the cause for the temporary suspension notice or the potential financial impacts of the critical Monterrey facility's closure.

(ECF #56, ¶ 170).

The *First Amended Complaint* contends that GrafTech should have also disclosed that the Monterrey Plant was the only facility capable of producing pin stock, that the closure coincided with a "critical" negotiating window for GrafTech to negotiate its customer contracts for 2023, and that GrafTech did not have sufficient pin stock inventory to "withstand even a temporary shutdown of the Monterrey facility." (ECF #56, ¶ 171). An examination of the document cited by Plaintiffs, however, shows that GrafTech did disclose the information Plaintiffs claim was omitted – or in other instances, GrafTech did not have a "duty to disclose" each item of information noted by Plaintiffs.

The referenced document cited by Plaintiffs, which was GrafTech's initial disclosure of the shutdown, specifically identified the "cause for the temporary suspension" – that authorities found that GrafTech México's operating license was "no longer in effect." It also included the further details that it planned to dispute that finding and intended to defend against it, and that it was "not able to assess how long operations . . . will be temporarily suspended." GrafTech's full statement, as given in the September 16, 2022 Form 8-K referenced by Plaintiffs, states (portions not quoted in the *First Amended Complaint* are shown in boldface italic text):

> ***On September 15, 2022, inspectors from the State Attorney's Office for the Secretary of Environment of the State of Nuevo León, Mexico visited GrafTech México, S.A. de C.V.'s ('GrafTech Mexico,' a subsidiary of GrafTech International Ltd. (the 'Company')) graphite electrode manufacturing facility located in Monterrey, Mexico to inspect GrafTech Mexico's*** facility and certain of the facility's environmental and operating permits. ***At the conclusion of the inspection, the inspectors issued GrafTech***

-61-

> *Mexico a* temporary suspension notice.  ***The inspector's notice instructed GrafTech Mexico's graphite electrode manufacturing facility to*** wind down operations within seven days ***of the notice***.  In parallel, the Director of Integral Air Management of the Undersecretary of Climate Change and Air Quality of the Ministry of the Environment determined that, among other things, GrafTech Mexico's operating license was no longer in effect.  ***At this time, the Company is not able to assess how long operations at the manufacturing facility will be temporarily suspended.  While the Company strongly disagrees with this course of action, the Company intends to work with the authorities to address these allegations and will vigorously defend against these allegations***.

(GrafTech International Ltd., Current Report (Form 8-K), *unpaginated* "2/3" (Sept. 16, 2022))

("9/16/2022 8-K") (ECF #64-8, PageID #1185).

Other pertinent disclosure documents, issued shortly thereafter, including GrafTech's

Third Quarter 2022 10-Q and the transcript of its Third Quarter 2022 Earnings Call, provided the

same information.

As stated in the Third Quarter 2022 10-Q:

> Our facility in Monterrey has been operating since 1959, has over 550 employees and represents approximately 60 thousand MT of annual production capacity, or 30% of our total annual production capacity excluding St. Marys.  Monterrey operations can produce a broad portfolio of products, including various sizes of graphite electrodes and pins, and is currently our only site that produces the pin stock utilized for all of our graphite electrodes." * * * As such, we are pursuing several alternatives with respect to production and sourcing of pin stock as well as other mitigation activities to minimize the impact on our business and our customers if the Monterrey suspension continues for the foreseeable future.  These include a potential restart of our St. Marys, Pennsylvania facility, where the scope of production is currently limited to graphitizing and machining of electrodes and pins.  We are actively pursuing approvals for operating permits for a restart of the facility for pin production.

(GrafTech International Ltd., Quarterly Report (Form 10-Q), p.24 (Nov. 4, 2022) ("Third Quarter

2022 10-Q")) (ECF #64-12, PageID #1241) (referenced at ECF #56, ¶ 172).

Beyond the fourth quarter of 2022, if Monterrey remains suspended, the impact

on the Company's results in the first half of 2023 will be significant, with sales volume reduced by 50% or more, compared to sales volume in the first half of 2022, before recovering in the back half of the year.

(Third Quarter 2022 10-Q, p.25 (ECF #64-12, PageID #1242)) (referenced at ECF #56, ¶ 173):

And, as stated in the comments made in the Third Quarter 2022 Earnings Call:

[U]nless Monterrey reopens, our business performance will be significantly impacted for the first 2 quarters of 2023 with a reduction in sales volume of 50 percent or more before recovering in the back half of the year.

(GrafTech International Ltd., Third Quarter 2022 Earnings Call, p.2 (Nov. 4, 2022) ("Third Quarter 2022 Earnings Call") (*Marcel Kessler*, then-GrafTech CEO) (ECF #64-13, PageID #1250) (referenced at ECF #56, ¶ 174).

The substantial majority of the pins that are required to achieve what we're talking about are already in inventory in one form or another.  So this is not something that we are going to be dependent on third parties or some other source for achieving the level of achievement that Marcel [Kessler, then-GrafTech CEO] talked about.  We have a substantial amount of inventory. We have capped a substantial amount of inventory all the way along of pins and pin stock, and we will be processing that through the other facilities in order to achieve what Marcel was talking about.

(Third Quarter 2022 Earnings Call, p.7) (*Kessler*) (ECF #64-13, PageID #1255) 0referenced at ECF #56, ¶ 175)

So, as I indicated in my prepared remarks, the impact for Q4 will be modest because we do have quite a bit of existing pin inventory.

(Third Quarter 2022 Earnings Call, pp.7-8) (*Jeremy Halford*, then-GrafTech COO) (ECF #64-13, PageID #1255-#1256) (referenced at ECF #56, ¶ 176).

Yeah, thanks.  It's an important question, Arun.  And one of the things that I want to make clear is that while we need to consider the near-term supply constraints related to the Monterrey situation, none of this changes our commercial strategy.  We continue to believe that we are unique in the market in our ability to offer a variety of different contracting terms to our customers, that's supported by our vertical integration, and that's a key differentiator, our

-63-

> ability to provide that certainty to our customers.  And while in the very near
> term, we're dealing with the Monterrey situation, we have absolute confidence
> in our ability to resolve this current environment we're in, and it's not
> changing our commercial strategy at all.

(Third Quarter 2022 Earnings Call, p.9) (*Halford*) (ECF #64-13, PageID #1257) (referenced at

ECF #56, ¶ 177).

Thus, these statements together, made during the shutdown, disclosed that the Monterrey

Plant was the only facility that produced pin stock, that GrafTech had substantial pin inventory

going into the fourth quarter of 2022 (and Plaintiffs offer no document or other information that

such was not the case), that GrafTech would lose volume in the fourth quarter because of the

shutdown, that GrafTech expected a financial impact in the first half of 2023 if the Monterrey

Plant did not reopen, and that the shutdown did not effect GrafTech's commercial strategy.

Then, when the Monterrey Plant did reopen later in November, GrafTech issued further

statements regarding its outlook for the fourth quarter of 2022, and stated that it would "provide

an update on the estimated impact of the suspension on its 2023 outlook when it report[ed] its

fourth quarter 2022 results: in February 2023:

> On November 17, 2022, the State Attorney's Office for the Secretary of
> Environment of the State of Nuevo León, Mexico (the 'State Attorney') lifted
> the suspension notice, subject to the completion of certain agreed-upon
> activities, including the submission of an environmental impact study with
> respect to the facility's operations.
>
> \*  \*  \*
>
> For the fourth quarter of 2022, the Company continues to anticipate the
> temporary suspension will impact its ability to fulfill approximately 10
> thousand metric tons ('MT') to 12 thousand MT of customer orders,
> consistent with its previous outlook provided on November 4, 2022.  The
> Company will provide an update on the estimated impact of the suspension on
> its 2023 outlook when it reports its fourth quarter 2022 results.

(GrafTech International Ltd., Current Report (Form 8-K), *unpaginated* "1/4" (Nov. 18, 2022))

("11/18/2022 8-K") (ECF #64-14, PageID #1260).  Then, in February 2023, GrafTech issued an

update on its outlook for 2023, which disclosed that the shutdown's effects would impact the

first-half 2023 results.  (GrafTech International Ltd., Fourth Quarter 2022 Earnings Call, p.3

(Feb. 3, 2023) (ECF #64-15, PageID #1267) ("The impact of the suspension in our sales volume

in the first half of 2023 will be significant though.  However, we will be well-positioned to fully

meet our customer needs as well as – as we enter the second half of the year and we expect to

meet all our remaining LTA commitments throughout 2023").  In following statements,

GrafTech repeated its outlook, and expressed its hopes that sales volume would further recover

in the second half of 2023, but cautioned that soft demand had dampened its predictions.

(GrafTech International Ltd., First Quarter 2023 Earnings Call, p.4 (Apr. 28, 2023)) (ECF #64-

33, PageID #1546) ("In the second half of the year, we anticipate our sales volume will further

recover as we move past Monterrey suspension driven impact.  However, as we've noted, given

economic uncertainty and elevated graphite electrode inventory levels at our customers, we are

now more cautious regarding our commercial outlook for the second half of 2023.").

     Plaintiffs have not identified any facts or documents indicating that any of these

statements were false when made, or that they did not express GrafTech's then hopes or beliefs

about the longer-term impact of the Monterrey Plant shutdown.

     As to Plaintiffs' claims that GrafTech had a duty to opine more about its thoughts on the

projected impact of the Monterrey Plant shutdown, the Court notes that omissions are actionable

only if the undisclosed information renders the challenged statements materially misleading.

See, e.g., *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024) (An

omission is actionable under Section 10(b) only if it renders another affirmative statement

-65-

materially misleading); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (A company or its officers is required to disclose information only if its absence would "create an impression of a state of affairs that differs in a material way from the one that actually exists."). Here, the allegations of the *First Amended Complaint* do not plausibly demonstrate that the alleged "omissions" rendered any affirmative statement materially misleading, or that any of the factual statements issued by GrafTech were inaccurate.

GrafTech's statements identified by Plaintiffs about the expected impact of the Monterrey Plant shutdown are also inactionable opinions. The Supreme Court has held that opinions are actionable only if the speaker did not actually hold the belief expressed, or had in his possession some specific item of contradictory information that a reasonable person would have thought undercut the opinion so strongly that the speaker knew it was misleading not to disclose the contradictory information. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-96 (2015). Plaintiffs have alleged neither.

The statements identified by Plaintiffs about GrafTech's beliefs that it could continue to pursue renewals of long term agreements despite the shutdown, and that the effects of the shutdown were likely to last only through the first half of 2023, (*see* ECF #56, ¶¶ 172-177) were clearly opinions. *See, e.g., View Ray*, 556 F. Supp. 3d at 789-90 (backlog estimates, although mathematically specific, were "subjective" opinions and not actionable); *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 224-35 (S.D.N.Y. 2020) (loss reserves are predictions about future likelihood and magnitude of losses are therefore constitute opinions). Plaintiffs' claims about the statements are not actionable as they neither allege particularized facts about contradictory information that GrafTech or its officers possessed or that they did not believe what

they said.  Companies are not required to provide an "overly cautious or negative picture of current performance or future prospects" to comport with the PSLRA.  *Albert Fadem Tr. v. American Elec. Power Co., Inc*., 334 F. Supp. 2d 985, 1026 (S.D. Ohio 2004).

Moreover. GrafTech's statements about the expected impacts of the Monterrey Plant shutdown were forward-looking statements protected by the PSLRA's safe harbor provisions, which were explained in connection with GrafTech's statements about its hopes and expectations related to the operations planned for the St. Marys Plant.  Courts construe the "safe harbor" protection liberally, and routinely dismiss securities claims based on statements that fit within it. For example, statements that a company's "state of affairs" will "continue," or that it is "looking" to take a future action, are considered definitive "forward-looking statements.  *See Tempur-Pedic Int'l*, 614 F. App'x at 246.  The statements identified in the *First Amended Complaint* are of the same character:  *See, e.g*., ECF #56, ¶ 173 ("*[I]f Monterrey remains suspended*, the impact on the Company's results in the first half of 2023 will be significant"); ECF #56, ¶ 174 ("*[U]nless Monterrey reopens*, our business performance will be significantly impacted for the first 2 quarters of 2023"); ECF #56, ¶ 175 ("[T]he impact for Q4 *will* be modest"); ECF #56, ¶ 183 ("*[W]e expect* sales volume levels will further recover, as we move past Monterrey suspension-driven uncertainty").

These forward-looking statements were also accompanied by cautionary statements conveying "substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business."  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001) (en banc).  A review of the pertinent disclosures shows that GrafTech issued such

-67-

cautionary statements from the outset, such as when it warned that it was "not able to assess how long operations at the manufacturing facility will be temporarily suspended."  (9/16/2022 8-K") (ECF #64-8, PageID #1185).  In its Third Quarter 2022 10-Q, GrafTech cautioned that it could not assure that its mitigation "measures will be effective in limiting the impact of the suspension" of its Monterrey operations.  (Third Quarter 2022 10-Q, p.25) (ECF #64-12, PageID #1242). Because this cautionary language related directly to the forward-looking statements at issue, the safe harbor provision became applicable, and the statements are thus inactionable.  These statements are rendered inactionable for the additional reason that the *First Amended Complaint* does not contain any particularized allegations of actual knowledge of falsity.  Claims of "recklessness" are not enough to render forward-looking statements actionable.  *See, e.g., Lim*, 2024 WL 4349409, at *14 n.8 ("Without actual knowledge, Plaintiffs [*sic*] forward-looking statements are protected under the Safe Harbor Doctrine, even if they had not been accompanied by cautionary language").

### 2. *Scienter*

As noted earlier, in order to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must establish both "(1) a material misrepresentation or omission by the defendant" ***and*** "(2) scienter," as well as the four other elements identified in *Bondali v. Yum! Brands*, 620 F. App'x 483, 489 (6th Cir. 2015) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  Scienter requires "knowing and deliberate" conduct or "recklessness." *Doshi v. General Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (often referred to as *"Doshi II"*).  Recklessness is defined as "highly unreasonable conduct" and "an extreme departure from the standards of ordinary care, where the danger must at least be so

-68-

obvious that any reasonable man would have known of it." *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 526 (6th Cir. 2023).

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(2)(A).  A scienter inference is "strong" only if it is "cogent" and "at least as compelling as any opposing inference" of non-fraudulent intent. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The analysis is "inherently comparative," and "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favorable to the plaintiff." *Id.* at 323-24.  The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the "most plausible of competing inferences[.]" *Id.* at 324.  "Before drawing an inference of recklessness, courts typically require multiple, obvious red flags demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Doshi II*, 823 F.3d at 1039.

Here, the "scienter" allegations of the *First Amended Complaint* do not arise above the level of conclusory allegations based on an Individual Defendant's position as a Senior Officer at GrafTech or their higher compensation, rather than asserting plausible claims of "scienter" in committing securities fraud.  The *First Amended Complaint* alleges – only generally – that the Individual Defendants:

> Were "provided" "or had access to the information alleged herein to be false or misleading prior to or shortly after its issuance[.]"  (ECF #56, ¶ 187)

> "Because of their positions and access to material, non-public information, . . . knew or recklessly disregarded that the adverse facts specified herein were being concealed from the public and that the positive representations being made were then materially false and misleading."  (ECF #56, ¶ 187)

-69-

> Were "directly involved in the management and day-to-day operations of the Company at the highest levels and [were] privy to confidential proprietary information." (ECF #56, ¶ 188)
>
> "[W]ere involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements[.]" (ECF #56, ¶ 188)
>
> "[H]ad a duty to promptly disseminate accurate, truthful, and complete information." (ECF #56, ¶ 189)
>
> Had "motive and opportunity to commit fraud, including the self-interested motivation of Defendants in the form of saving their salaries and high-ranking jobs[.]" (ECF #56, ¶¶ 225-230).

(ECF #56, *First Amended Complaint*, "*Additional Scienter Allegations*," ¶¶ 187, 188, 189, 225-230).

Generic allegations such as these are not sufficient to sustain the necessary element of "scienter" needed to assert an actionable claim under Section 10(b) or Rule 10b-5.  *See, e.g.*, *ServiceMaster Glob. Holdings*, 83 F.4th at 530 (as to senior position) ("Scienter is not to be inferred simply by virtue of [a defendant's] senior position[]"); *Pittman v. Unum Grp.*, 861 F. App's 51, 57 (6th Cir. 2021) (as to compensation) (even "alleging that an executive's compensation is directly tied to the company's performance is not enough to bolster an inference of scienter");[35] *Bondali*, 620 F. App'x at 493 (as to involvement in SEC filings) (affirming dismissal where "the amended complaint alleges no facts to suggest" that "employees who prepared or were otherwise involved in making the allegedly false or misleading statements at

---

[35]     *See also In re Omnicare Sec. Litig.*, 769 F.3d 455,   (6th Cir. 2014) ("If a well-pleaded complaint can allege only that a corporation intended to defraud based on a desire to continue earning money, without showing a particular link between an actual statement and a specific payment, then the heightened pleading standard for scienter has no bite.").

issue" were "aware of the issues" at the heart of the claims); *In re Huntington Bancshares Sec.*
*Litig*, 674 F. Supp. 2d 951, 972 (S.D. Ohio 2009) (as to supposed access to unspecified
documents) (finding that "generalized allegations of Individual Defendants' access to documents
and internal information lack specific facts to establish a strong inference of scienter").

> **a.**  ***"Scienter" Allegations With Respect to***
> ***Statements Related to the Environmental***
> ***Compliance or Conditions at the Monterrey Plant***

The gist of Plaintiffs' claims alleging "scienter" with respect to the environmental
conditions at the Monterrey Plant, and its compliance with applicable environmental laws, is that
because GrafTech tracked air emissions data in connection with the Plant and because Individual
Defendants Rintoul, Coburn, and Halford were at various times on GrafTech's ESG
[Environmental, Social, and Governance] Steering Committee, they were aware of the 2019
Administrative Proceeding, and they often talked with the leadership personnel at the Monterrey
Plant, they "knew" that GrafTech's statements about the Monterrey Plant's environmental
compliance were misleading.  (*See* ECF #56, ¶¶ 194-205, 208-210).

The PSLRA does not permit supporting claims of security fraud scienter based on
unparticularized "must have known" allegations.  An example of this is found in the Sixth
Circuit case of *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th
514 (6th Cir. 2023), where the plaintiff alleged that executives made misrepresentations about the
extent of a termite crisis that exposed ServiceMaster to liability.  *ServiceMaster*, 83 F.4th at 531.
The complaint alleged that the executives discussed the termite crisis during meetings.  *Id.*  The
Sixth Circuit affirmed the district court's dismissal because "any detail about exactly what was
discussed, whether or not the extent of the problem or liability for possible claims was discussed,

whether the possible impact on ServiceMaster's financial results was raised, or specifically when the alleged discussions occurred" was "[c]ompletely absent from the complaint." *Id.*  "Without this information, the 'mere attendance at meetings' where the [] termite crisis was discussed does little to establish the kind of 'red flags' necessary to support a strong inference of scienter." *Id.*

The same situation arises here in the *First Amended Complaint*.  There are no particularized facts alleged about any document, communication, or data known to any Defendant at the time of any "challenged" statement that contradicts any statement identified. Allegations that the Defendants should have stated that they "blatantly" ignored unspecified environmental requirements relating to the Monterrey Plant, while also identifying no particularized example of "blatant" non-compliance with any specific requirement on the date of any statement does not suffice.  Even if an Individual Defendant may have been aware of challenges faced by the Plant with respect to environmental emissions, companies are not required to take the dimmest view available of the company's actions.  *See, e.g., Albert Fadem Tr. v. American Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1026 (S.D. Ohio 2004) "[C]ompanies are not liable under the securities laws merely for being optimistic, and they are not required to be overly pessimistic.").

Nor can Plaintiffs predicate a claim of "scienter" on a "core operations" basis, such that because the Monterrey Plant was a key manufacturing center of GrafTech's operations the Individual Defendants "must have known" that it was "blatantly" non-compliant with applicable environmental regulations.  (*See* ECF #56, ¶ 187) (alleging that the Monterrey Plant accounted for 30% of GrafTech's production capacity).  Again, Plaintiffs identify no document or report that contradicts any public statement made by GrafTech about the Monterrey Plant.  *See Doshi v.*

*General Cable Corp.*, 386 F. Supp. 3d 815, 838 (E.D. Ky. 2019) (often referred to as "*Doshi I*") (finding a "core operations" allegation unpersuasive because "[t]he fact that [the company] relied heavily upon its overseas operations does not establish that, first, [the company] actually knew these statements were false because of an FCPA-related [Foreign Corrupt Practices Act] issue, and secondly, that it was acting with scienter").  The Sixth Circuit has explicitly rejected such a "core operations" theory.  *See Unum Grp.*, 861 F. App'x at 55 ("Furthermore, 'the fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent"); *ServiceMaster*, 83 F.4th at 531 (rejecting assertion that because a defendant was "intimately aware" of information could alone suggest "scienter").

Nor does the existence of the 2019 Administrative Proceeding establish scienter.  First, as discussed, GrafTech disclosed the proceeding in detail.  (*See* ECF 64-21, *Second Quarter 2019 10-Q*, p.37, PageID #1422; ECF #64-11, *Third Quarter 2019 10-Q*, p.40, PageID #1232), which negates an inference of "scienter" to conceal the fact.  Second, there are no allegations that any Individual Defendant had any information that contradicted any disclosure about the 2019 Administrative Proceeding, or that any Individual Defendant did not believe that the matter was closed, or that any Individual Defendant had any reason to believe that a shutdown was likely to occur prior to the September 2022 inspection that lead to a brief Plant closure.  GrafTech's repeated disclosures about the 2019 Administrative Proceeding, and the challenges regarding environmental compliance regulation, negate an inference of illicit "scienter" to defraud.  *See, e.g.*, *I.B.E.W. v. Limited Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011) ("The fact that the negative [disclosures] were made throughout the class period suggests an inference of honest and frank behavior on the part of Defendants, as opposed to an intent to commit fraud and a

scheme to inflate the stock price"); *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 443 (6th Cir. 2014) ("It is doubtful that the company intended to defraud investors in light of its willingness to disclose information that harmed its share prices . . . . [D]isclosing adverse information to the public negates an inference of scienter.").

> ### b.   *"Scienter" Allegations With Respect to the St. Marys Plant*

The same conclusion is compelled with respect to Plaintiffs' allegations of "scienter" in connection with the St. Marys Plant (which allegations are made only with respect to Individual Defendants Rintoul and Halford).  As noted earlier, GrafTech repeatedly noted publicly that it was conducting only the machining and graphitizing steps of pin production at the St. Marys Plant, that St. Marys was only processing semi-finished product sourced from other Plants, and that its "automated pin line" at St..Marys was limited to machining.  Further, as questions posed by analysts at GrafTech's earning calls show, it was understood in the market that the St. Marys Plant was not conducting the full "pin manufacturing process" at St. Marys.  (*See, e.g.*, ECF #64-7, *Third Quarter 2021 Earnings Call*, p.7, PageID #1181) ("And is there any – have you given any thought to be starting [restarting] St. Marys . . . outside of the pin machining?") (question posed by Analyst Curt Woodworth).

Plaintiffs' allegations of "scienter" related to securities fraud in connection with the St. Marys Plant are not supported.

> ### c.   *"Scienter" Allegations With Respect to Predictions About the Impact of the Monterrey Plant Shutdown*

Because the challenged statements made in the *First Amended Complaint* in connection with predictions about the anticipated effects of the Monterrey Plant shutdown in 2022 were

forward-looking statements, a higher standard applies to allegations of "scienter."  To allege scienter in this context, a complaint must raise a strong inference that Defendants made the challenged statements "with actual knowledge as to their falsity."  *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 680 (6th Cir. 2003); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 n.14 (2011) ("Under the PSLRA, if the alleged misstatement or omission is a 'forward-looking statement,' the required level of scienter is 'actual knowledge.'").  No such allegation is made in the *First Amended Complaint*.

Plaintiffs do not identify any particularized fact related to the status of contract negotiations with GrafTech's customers at the time of any statement related to the predicted long-term effects of the shutdown, nor do they identify a customer then stating that it would not place orders in 2023 based on it.  Nor are there any particularized facts alleged that any customer believed that GrafTech's commercial strategy would be rendered non-viable by the shutdown.  Nor are there particularized allegations about GrafTech's pin stock inventory beyond its statement of likely needing to eventually replenish it.  (See ECF #64-33, *First Quarter 2023 Earnings Statement*, p.4, ECF #1546) ("In the second half of the year, we anticipate our sales volume will further recover as we move past Monterrey suspension driven impact.  However, as we've noted, given economic uncertainty and elevated graphite electrode inventory levels at our customers, we are now more cautious regarding our commercial outlook for the second half of 2023.").

As with allegations of false or misleading statements regarding forward-looking statements generally, a compelling allegation of "scienter" cannot be supported by "fraud by hindsight."  *See*, *e.g.*, *Dailey v. Medlock*, 551 F. App'x 841, 847 (6th Cir. 2014) ("With no facts

alleged to support the contention that defendants had prior knowledge that a valuation allowance would be taken for the fourth quarter of 2009, plaintiffs make the *ipso facto* assertion that the mere fact that it ultimately was taken demonstrates such knowledge. It is hard to imagine a clearer example of alleging "fraud by hindsight.") (plaintiffs had alleged that defendant's taking of a valuation allowance after stating in a 10-Q one month earlier that it would not take one for that quarter – a decision the company had said was re-analyzed quarterly – demonstrated fraudulent "scienter").

### d. *"Scienter" Allegations Generally*

Thus, even viewed as a whole, the allegations of the *First Amended Complaint* do not suggest a "strong, cogent, and compelling" inference of scienter as to any of the challenged statements. The courts of the Sixth Circuit, in conducting an overall analysis of scienter, considers nine non-exclusive factors:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc). "Although the Sixth Circuit's *en banc* decision in '*Helwig* is no longer good law' when it comes to the legal standard for scienter, its framework remains useful for analyzing factual allegations." *Plymouth Cnty. Ret.*

*Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772,792 (N.D. Ohio 2021), *aff'd* 2022 WL 3972478 (6th

Cir. Sept. 1, 2022).  A review of these factors does not support an inference of "scienter."

First, the *First Amended Complaint* alleges that only one Individual Defendant, David

Rintoul, sold any stock during the class period.[36]  Evidence shows that all the other Individual

Defendants accumulated stock during the class period.  (*Compare* ECF #64-34, ECF #64-36,

ECF #64-38, & ECF #64-40 [initial class period Form 4s for the remaining Individual

Defendants], *with* ECF #64-35, ECF #64-37, ECF #64-39 & ECF #64-41 [final class period

Form 4s]),[37] which undermines a finding of scienter as to the first factor.  *Gruhn v. Tween*

*Brands, Inc.*, Nos. 2:07-CV-852, 2:07-CV-894, 2:07-CV-925, 2009 WL 1542795, at *10 (S.D.

Ohio June 2, 2009) ("[T]he amended consolidated complaint relies on but one insider's stock

sales . . . .  This does not assist the establishment of a strong inference of scienter."); *Lim*, 2024

WL 4349409, at *15 (lack of sales undermines inference of scienter).  And, as stated in

*Memorandum of Law in Support of Defendant David Rintoul's Motion to Dismiss*, (ECF #65-1),

his stock sale represented only a small percentage of his total GrafTech holdings, which overall

increased during his time as CEO of GrafTech.  *Id.*, p.11 (PageID #1668).

As to factor two, there are no particularized allegations that demonstrate a divergence

between specific internal reports and specific external statements.  As to factor three, the only

---

[36]

      The *First Amended Complaint* does not allege that the Brookfield Defendants' stock sales
suggest scienter.  (*See* ECF #56, ¶¶ 225-230).

[37]

      "[T]he Form 4s are filed with the SEC and publicly accessible, and an objectively reliable
sourse, making them subject to judicial notice." *Lim*, 2024 WL 4349409, at *7.  "Courts in the
Sixth Circuit often review SEC filings, including Form 4s, in determining motions to dismiss."
*Id.*, at *7, n.2; *see also* FED. R. EVID. 201 (Judicial Notice of Adjudicative Facts).

allegation of temporal proximity between an allegedly fraudulent statement and later disclosure of inconsistent information is that the alleged misstatement in November 2022 about the anticipated impact of the Monterrey Plant shutdown was close in time to the reopening of the Monterrey Plant; but, there were no representations made about what would happen if the Monterrey Plant reopened, and Plaintiffs offer no facts alleged to demonstrate contemporaneous falsity.  As to the fourth and fifth factors, there are no allegations of bribery or another lawsuit alleging fraud that GrafTech quickly settled.  As to the sixth factor, there are no particularized allegations about any factual information contemporaneously disregarded by any Individual Defendant.  As to the seventh and eighth factors, none of the allegations of the *First Amended Complaint* have anything to do with the disclosure of accounting information or the interest of some directors versus others in connection with the impending sale of stock.  And, as to the ninth factor, the *First Amended Complaint* does not connect the Individual Defendants' purported desire to keep their salaries or their jobs with any of the specific issues they allegedly misrepresented.  *See ServiceMaster Glob. Holdings*, 83 F.4th at 530 (generalized non-specific allegations based to senior position); *Pittman v. Unum Grp.*, 861 F. App's 51, 57 (6th Cir. 2021) (generalized non-specific allegations based on compensation); *see also Florida Carpenters Reg'l Council Pension Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 889 (N.D. Ohio 2013) ("[G]eneric allegations that the individual defendants had economic incentives, in terms of maintaining their positions in the company and their salaries, do not support a strong inference of scienter."), *aff'd*, 572 F. App'x 356 (6th Cir. 2014).

Put simply, because none of the nine factors support a strong inference of scienter, Plaintiffs have not made allegations sufficient to support their claim of illicit "scienter."  *See*,

*e.g.*, *ServiceMaster*, 83 F.4th at 534 ("The tenuous application of the second, third, and sixth *Helwig* factors, together with the complete absence of [facts supporting the remaining factors], supports the conclusion that [plaintiff] has not alleged a strong inference of scienter.").[38]

### B. Section 20(a) of the Securities Exchange Act

Plaintiffs contend that Individual Defendants Rintoul, Coburn, Kessler, Flanagan, and Halford acted as controlling persons of GrafTech within the meaning of Section 20(a) of the Exchange Act, and that by reason of their positions with GrafTech they had the power and authority to cause GrafTech to engage in the allegedly wrongful conduct identified in the *First Amended Complaint*.  (ECF #56, *First Amended Complaint*, ¶ 265).

Plaintiffs also assert the Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd., (collectively, "Brookfield"), controlled GrafTech and the Individual Defendants with respect to their ownership of a majority of GrafTech voting stock, control of the GrafTech Board of Directors, influence over GrafTech's management, historical relationship with GrafTech, and the various agreements that the Brookfield Defendants caused Graftech to enter into.  (ECF #56, *First Amended Complaint*,

---

[38]     The *First Amended Complaint* also fails to state a clim for scheme liability under Rule 10b-5(a) and (c).  To state such a claim, "a plaintiff must show:  (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *ServiceMaster*, 83 F.4th at 525.  The *First Amended Complaint* does not include any allegations specific to scheme liability.  It instead relies on the same allegations as with the Rule 10b-5(b) misrepresentation claim.  Thus, its allegations of falsity and scienter fail for the same reasons as with their Section 10(b) claims.  The *First Amended Complaint* makes no allegation of a deceptive or manipulative act independent of those alleged in its other claims.  *See ServiceMaster*, 83 F.4th at 533 ("Although scheme-liability claims under Rule 10b-5(a) and (c) are separate from misrepresentation-and-omission claims under Rule 10b-5(b), [plaintiff's] showing of scienter is therefore no stronger with respect to the scheme-liability claim that it is for the Rule 10b-5[(b)] claim.").

¶ 265).

Plaintiffs further assert that GrafTech controlled the Individual Defendants (Rintoul, Coburn, Kessler, Flanagan, and Halford) and all of its employees in engaging in the allegedly wrongful conduct identified in the *First Amended Complaint*.  (ECF #56, *First Amended Complaint*, ¶ 265).

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides:

> **§ 78t.  Liability of controlling persons and persons who aid and abet violations**
>
> **(a)  Joint and several liability; good faith defense**
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To plead a claim under Section 20(a), a Plaintiff must allege (1) "an underlying violation of the securities laws or the rules and regulations promulgated thereunder," and (2) that the control persons "directly or indirectly controlled the person liable for the securities law violation." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004).  "'Control' is defined as 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  *Id.* (quoting 17 C.F.R. § 230.405).  A controlling person must be alleged to be "'in some meaningful sense a culpable participant in the primary violation.'"  *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 875 (N.D. Ohio 2013) (quoting *In re Telxon Corp. Sec. Litig.*,

133 F. Supp. 2d 1010, 1032 (N.D. Ohio 2000); *see also In re FirstEnergy Corp. Sec. Litig.*, 316 F.

Supp. 2d 5781, 600 (N.D. Ohio 2004) ("To plead a § 20(a) violation, a complaint must allege

facts establishing that the defendant 'controlled' another person who committed an underlying

violation of the Securities Act, and that the defendant 'culpably participated' in that violation.")

(quoting *D.E.&J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 750 (E.D. Mich. 2003)).

"Plaintiffs must show that defendants generally exercised control over the accused operations, but

need not demonstrate that defendants actually exercised their authority to control the specific

transaction or activity that is alleged to give rise to liability." *In re Telxon Corp.*, 133 F. Supp. 2d

at 1032.

Thus, when a primary violation of the securities law is shown, Section 20(a) imposes joint

and several liability on "controlling persons."  However, if a plaintiff's Section 10(b) and Rule

10b-5 claim fails, the Section 20(a) claim also fails.  *See Indiana State Dist. Council of Laborers

Pension & Welfare Fund v. Omnicare*, 583 F.3d 935, 947 (6th Cir. 2009) ("[T]he district court

properly dismissed the Plaintiff's claims under § 10(b) and Rule 10b-5.  Therefore, dismissal of

control person liability under § 20 was also proper."); *Bondali v. Yum! Brands*, 620 F. App'x 483,

493 (6th Cir. 2015).

Here, in addition to the fact that Plaintiffs' Section 20(a) claims fail by virtue of the fact

that their prerequisite Section 10(b) and Rule 10b-5 claims against GrafTech and the Individual

Defendants fail, the allegations of the *First Amended Complaint* contain no specific allegations of

how the Brookfield Defendants "exercised control" at all.

Accordingly, Plaintiffs' Section 20(a) claims are dismissed as well.

## III.  CONCLUSION

Accordingly, for each of the reasons stated above, in connection with the *Motions to Dismiss*:

(1) *Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws* (ECF #64), is **GRANTED**;

(2) *Defendant David Rintoul's Motion to Dismiss the First Amended Complaint* (ECF #65), is **GRANTED**; and

(3) *Motion of Defendants BCP IV GrafTech Holdings LP, Brookfield Capital Partners Ltd., and Brookfield Asset Management Ltd., to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws* (ECF #66), is **GRANTED**.

Additionally, for the reasons stated herein, the *Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Strike Allegations Regarding "Former Engineering Lead"* (ECF #67), is **GRANTED**.

IT IS SO ORDERED.

DONALD C. NUGENT
United States District Judge

DATED: August 18, 2025

-82-

## APPENDIX A

### *Alleged Misstatements Related to Non-Disclosures About the Monterrey Plant*

*Parenthetical References to Persons are to the Speaker/Signer of the Referenced Document;*

*Exhibit References are to the ECF # of the Referenced Document as filed along with "Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws" (ECF #64);*

*Paragraph References in brackets are to the paragraphs of the First Amended Complaint (ECF #56):*

**GrafTech International Ltd., Fourth Quarter 2018 Earnings Call, p.4 (Feb. 8, 2019) ("Fourth Quarter 2018 Earnings Call")** (*Rintoul*) (ECF #64-31, PageID #1537) [¶ 87]:

"Ongoing operational improvements and vertical integration give GrafTech economies of scale and a competitive cost structure."

**GrafTech International Ltd., 2018 Annual Report (Form 10-K), p.16 (Feb. 22, 2019) ("2018 10-K")** (*Rintoul*, *Coburn*) (ECF #64-19, PageID #1374) [¶ 90];

**GrafTech International Ltd., 2019 Annual Report (Form 10-K), p.17 (Feb. 21, 2020) ("2019 10-K")** (*Rintoul*, *Coburn*) (ECF #64-6, PageID #1160) [¶ 106 ];

**GrafTech International Ltd., 2020 Annual Report (Form 10-K), p.16 (Feb. 23, 2021) ("2020 10-K")** (*Rintoul*, *Coburn*) (ECF #64-18, PageID #1300) [¶ 127]:

"We believe that we are currently in compliance in all material respects with the federal, state, local and foreign environmental laws and regulations to which we are subject. *We have experienced some level of regulatory scrutiny at most of our current and former facilities and, in some cases, have been required to take or are continuing to take corrective or remedial actions and incur related costs, and may experience further regulatory scrutiny, and may be required to take further corrective or remedial actions and incur additional costs, in the future.*"

**GrafTech International Ltd., 2021 Annual Report (Form 10-K), p.15 (Feb. 22, 2022) ("2021 10-K")** (*Rintoul*, *Flanagan*) (ECF #64-26, PageID #1484) [¶ 159]:

> "We believe we operate in compliance in all material respects with applicable laws and regulations, *and maintaining compliance with them is not expected to materially affect our capital expenditures, earnings and competitive position.*"

**2018 10-K, p.57** (*Rintoul*, *Coburn*) (ECF #64-19, PageID #1387) [¶ 91];

**2019 10-K, p.48** (*Rintoul*, *Coburn*) (ECF #64-6, PageID #1169) [¶ 107];

**2020 10-K, p.49** (*Rintoul*, *Coburn*) (ECF #64-18, PageID #1309) [¶ 128];

**2021 10-K, p.44** (*Rintoul*, *Flanagan*) (ECF #64-26, PageID #1492) [¶ 160]:

> "*We* manage our capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements, *prudent or essential maintenance requirements, global economic conditions, available capital resources, liquidity, long-term business strategy and return on invested capital for the relevant expenditures, cost of capital and return on invested capital of the Company as a whole and [among] other factors.*"

**2018 10-K, p.64** (*Rintoul*, *Coburn*) (ECF #64-19, PageID #1390) [¶ 91];

**2019 10-K, p.54** (*Rintoul*, *Coburn*) (ECF #64-6, PageID #1173) [¶ 107];

**2020 10-K, p.55** (*Rintoul*, *Coburn*) (ECF #64-18, PageID #1312) [¶ 128];

**2021 10-K, p.48** (*Rintoul*, *Flanagan*) (ECF #64-26, PageID #1495) [¶ 160]:

> "*We have been and are subject to increasingly stringent environmental protection laws and regulations.  In addition, we have an* on-going commitment to rigorous internal environmental protection standards.  Environmental considerations are part of all significant capital expenditure decisions."

**2018 10-K, p.9** (*Rintoul*, *Coburn*) (ECF #64-19, PageID #1369) [¶ 92]:

> "We believe our facilities are among the most strategically located and lowest cost large-scale graphite electrode manufacturing plants in the world.  Of the graphite electrode manufacturing facilities currently operating outside of China, we estimate that our three operating manufacturing facilities represent approximately 24% of estimated production capacity for graphite electrodes, making us a critical supplier to global EAF steel manufacturers.  Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping graphite electrodes to our customers compared to our competitors, and excellent visibility into the large North American and European EAF steelmaking markets."

**2019 10-K, p.7** (*Rintoul*, *Coburn*) (ECF #64-6, PageID #1150) [¶ 108]:

> "We believe our facilities are among the most strategically located and lowest cost large-scale graphite electrode manufacturing plants in the world.  Of the graphite electrode manufacturing facilities currently operating, we estimate that our three operating manufacturing facilities represent approximately 24% of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers.  Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping graphite electrodes to our customers compared to our competitors, and excellent visibility into the large North American and European EAF steelmaking markets.

**2019 10-K, p.16** (*Rintoul*, *Coburn*) (ECF #64-6, PageID #1159) [¶ 108]:

> "We believe our business has the lowest manufacturing cost structure of all of our major competitors, primarily due to the large scale of our manufacturing facilities."

**2020 10-K, p.7** (*Rintoul, Coburn*) (ECF #64-18, PageID #1295) [¶ 129];

**2021 10-K, p.7** (*Rintoul, Flanagan*) (ECF #64-26, PageID #1481) [¶ 161]:

> "We believe our facilities are among the most strategically located and lowest cost, large-scale graphite electrode manufacturing plants in the world.  Of the graphite electrode manufacturing facilities currently operating, we estimate that our three operating manufacturing facilities represent approximately a quarter of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers.  Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping graphite electrodes to our customers compared to our competitors, and excellent visibility into the large North American and European EAF steelmaking markets.

**2018 10-K, p.12** (*Rintoul, Coburn*) (ECF #64-19, PageID #1372) [¶ 93]:

> "Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift.  By operating three of the five highest capacity graphite electrode production facilities in the world, we are able to achieve meaningful operating leverage relative to our competitors.  Because of the attractive cost of labor available to our Monterrey facility, we believe we have a significant cost advantage in the production of pins, which are used to connect and fasten graphite electrodes together in a furnace and are more labor-intensive to produce than other graphite electrodes.  Our Calais, Pamplona and Monterrey facilities have access to low-cost sources of electricity, a significant element of our manufacturing costs."

**2018 10-K, p.10** (*Rintoul, Coburn*) (ECF #64-19, PageID #1370) [¶ 93]:

> "Moreover, our Seadrift, Calais, Pamplona, Monterrey and St. Marys facilities each provide unique advantages for us.  *Seadrift provides a substantial portion of our petroleum needle coke supply needs internally and at a competitive cost and allows us to maximize capacity utilization more efficiently than competitors, who may be more constrained by petroleum needle coke supply.  Seadrift is one of only five petroleum needle coke facilities in the world outside of China, and we believe it is the second largest petroleum needle coke producer in the world.  We also believe that Calais,*

*Pamplona, and Monterrey are three of the highest capacity graphite electrode facilities in the world (excluding China), allowing for significant operating leverage.* We believe our facilities have significant cost advantages given their scale and access to low cost, reliable energy sources.

**2019 10-K, p.8** (*Rintoul, Coburn*) (ECF #64-6, PageID #1151) [¶ 109];

**2020 10-K, p.7** (*Rintoul, Coburn*) (ECF #64-18, PageID #1295) [¶ 130];

**2021 10-K, p.7** (*Rintoul, Flanagan*) (ECF #64-26, PageID #1481) [¶ 162]:

> "*Moreover*, our Calais, Pamplona, Monterrey and St. Marys facilities each provide[] unique cost advantages given their scale and access to low cost, reliable energy sources."

**2019 10-K, p.16** (*Rintoul, Coburn*) (ECF #64-6, PageID #1159) [¶ 109];

**2020 10-K, p.14** (*Rintoul, Coburn*) (ECF #64-18, PageID #1298) [¶ 130];

**2021 10-K, p.14** (*Rintoul, Flanagan*) (ECF #64-26, PageID #1483) [¶ 162]:

> "Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift.  Our Calais, Pamplona, Monterrey and St. Marys facilities have access to [reliable] low-cost sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs."

-87-

**GrafTech International Ltd., Prospectus, p.S-1 (Nov. 10, 2020) ("Prospectus Dated 11/10/2020")** (N/A) (ECF #64-43, PageID #1577) [¶ 120];

**GrafTech International Ltd., Prospectus, p.S-1 (Dec. 14, 2020) ("Prospectus Dated 12/14/2020")** (N/A) (ECF #64-44, PageID #1580) [¶ 121];

**GrafTech International Ltd., Prospectus, p.S-1 (Jan. 14, 2021) ("Prospectus Dated 01/14/2020")** (N/A) (ECF #64-45, PageID #1583) [¶ 122];

**GrafTech International Ltd., Prospectus, p.S-1 (Mar. 1, 2021) ("Prospectus Dated 03/01/2021")** (N/A) (ECF #64-46, PageID #1586) [¶ 122];

**GrafTech International Ltd., Prospectus, p.S-1 (May 4, 2021) ("Prospectus Dated 05/24/2021")** (N/A) (ECF #64-47, PageID #1589) [¶ 122]:

> "We believe that we have the most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry, including three of the highest capacity facilities in the world.  We are the only large scale graphite electrode produce that is substantially vertically integrated into petroleum needle coke, a key raw material for graphite electrode manufacturing.  This unique position provides us with competitive advantages in product quality and cost."

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.35 (May 1, 2019) ("First Quarter 2019 10-Q")** (*Rintoul*, *Coburn*) (ECF #64-20, PageID #1406) [¶ 95]:

> "On March 1, 2019, the Department of Sustainable Development *of the State of Nuevo León* provided notice of an administrative proceeding with respect to the Company's Monterrey facility.  *The proceeding requires* the Company to design and implement certain corrective measures involving certain potential violations of state environmental law relating to omissions.  *The Company is* cooperating with the Department *with respect to this matter*."

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.37 (July 31, 2019) ("Second Quarter 2019 10-Q")** (*Rintoul*, *Coburn*) (ECF #64-21, PageID #1422) [¶ 98]:

> "On March 1, 2019, the Department of Sustainable Development *of the State of Nuevo León* provided notice of an administrative proceeding with respect to the Company's Monterrey facility.  *The proceeding requires* the Company to design and implement

certain corrective measures involving certain potential violations of state environmental law relating to omissions.  The Company *is* cooperating with the Department with respect to this matter."

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.40 (Nov. 7, 2019) ("Third Quarter 2019 10-Q")** (*Rintoul, Coburn*) (ECF #64-11, PageID #1232) [¶ 102]:

> "On March 1, 2019, the Department of Sustainable Development *of the State of Nuevo León* provided notice of an administrative proceeding with respect to the Company's Monterrey facility.  *The proceeding requires* the Company to design and implement certain corrective measures involving certain potential violations of state environmental law relating to omissions.  *The Company* cooperated with the Department *with respect to this matter*, including payment of certain fines that were not material to the Company. *In September 2019*, the Department of Sustainable Development formally closed the proceeding"

**First Quarter 2019 10-Q, pp.30-31** (*Rintoul, Coburn*) (ECF #64-20, PageID #1402-#1403) [¶ 96];

**Second Quarter 2019 10-Q, pp.32-33** (*Rintoul, Coburn*) (ECF #64-21, PageID #1418-#1419) [¶ 99];

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.32 (Nov. 3, 2020) ("Third Quarter 2020 10-Q")** (*Rintoul, Coburn*) (ECF #64-22, PageID #1436) [¶ 117];

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.32 (May 5, 2021) ("First Quarter 2021 10-Q")** (*Rintoul, Coburn*) (ECF #64-23, PageID [*missing page following #1447*]) [¶ 132];

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.37 (Aug. 6, 2021) ("Second Quarter 2021 10-Q")** (*Rintoul, Coburn*) (ECF #64-24, PageID #1458) [¶ 138];

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.37 (Nov. 5, 2021) ("Third Quarter 2021 10-Q")** (*Rintoul, Coburn*) (ECF #64-25, PageID #1471) [¶ 150];

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.32 (May 6, 2022) ("First Quarter 2022 10-Q")** (*Rintoul, Flanagan*) (ECF #64-27, PageID #1510) [¶ 165]:

> "*We* mange our capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements, prudent or essential maintenance requirements, global economic conditions, available capital resources, liquidity, long-term business strategy and return on invested capital for the relevant expenditures, cost of capital and return on invested capital of the Company as a whole and other factors"

**GrafTech International Ltd., Third Quarter 2019 Earnings Call, p.3 (Nov. 7, 2019) ("Third Quarter 2019 Earnings Call")** (*Coburn*) (ECF #64-48, PageID #1593) [¶ 103];

**GrafTech International Ltd., Fourth Quarter 2019 Earnings Call, p.3 (Feb. 6, 2020) ("Fourth Quarter 2019 Earnings Call")** (*Coburn*) (ECF #64-49, PageID #1598) [¶ 105]:

> "*In addition*, we will continue to invest in health, safety and environmental performance."

**GrafTech International Ltd., Third Quarter 2020 Press Release on Form 8-K, p.3 (Nov. 3, 2020) ("Third Quarter 2020 Press Release on Form 8-K")** (*Coburn*) (ECF #64-50, PageID #1603) [¶ 115];

**Third Quarter 2020 10-Q, p.24** (*Rintoul, Coburn*) (ECF #64-22, PageID #1431) [¶ 116];

**GrafTech International Ltd., Fourth Quarter 2020 Press Release on Form 8-K, p.1 (Feb. 5, 2021) ("Fourth Quarter 2020 Press Release on Form 8-K")** (*Coburn*) (ECF #64-51, PageID #1606) [¶ 124]:

> "*We believe GrafTech's leadership position, strong cash flows, and* advantaged low cost structure *and vertical integration are* sustainable *competitive advantages*."

**First Quarter 2021 10-Q, p.24** (*Rintoul, Coburn*) (ECF #64-23, PageID #1445) [¶ 132];

**Second Quarter 2021 10-Q, p.26** (*Rintoul, Coburn*) (ECF #64-24, PageID #1455) [¶ 138];

**Third Quarter 2021 10-Q, p.25** (*Rintoul, Coburn*) (ECF #64-25, PageID #1467) [¶ 150];

**First Quarter 2022 10-Q, p.23** (*Rintoul, Flanagan*) (ECF #64-27, PageID #1505) [¶ 165]:

> *"We believe GrafTech's leadership position, strong cash flows, and [] advanced low cost structure and vertical integration are sustainable competitive advantages."*

**GrafTech International Ltd., Third Quarter 2020 Earnings Call, p.3 (Nov. 3, 2020) ("Third Quarter 2020 Earnings Call")** (*Rintoul*) (ECF #64-52, PageID #1610) [¶ 119]:

> *"We have a sustainable and long-term competitive advantage from our low-cost structure and vertical integration into our key raw material petroleum needle coke.  And our global footprint provides us flexibility should any operating environments become challenged due to a second wave of the pandemic.  Our balance sheet and proven track record of cash flow generation gives us the strength to manage through industry cycles.  With commitment to our people and our significant competitive advantages.  We continue to strongly believe GrafTech is well-positioned today and over the long term."*

**GrafTech International Ltd., Fourth Quarter 2020 Earnings Call, p.5 (Feb. 5, 2021) ("Fourth Quarter 2020 Earnings Call")** (*Rintoul*) (ECF #64-53, PageID #1617) [¶ 126];

**GrafTech International Ltd., First Quarter 2021 Earnings Call, p.5 (May 5, 2021) ("First Quarter 2021 Earnings Call")** (*Rintoul*) (ECF #64-54, PageID #1624) [¶ 135];

**GrafTech International Ltd., Second Quarter 2021 Earnings Call, p.4 (Aug. 6, 2021) ("Second Quarter 2021 Earnings Call")** (*Rintoul*) (ECF #64-55, PageID #1630) [¶ 141];

**GrafTech International Ltd., Third Quarter 2021 Earnings Call, p.4 (Nov. 5, 2021) ("Third Quarter 2021 Earnings Call")** (*Rintoul*) (ECF #64-7, PageID #1179) [¶ 152];

**GrafTech International Ltd., Fourth Quarter 2021 Earnings Call, p.5 (Feb. 4, 2022) ("Fourth Quarter 2021 Earnings Call")** (*Rintoul*) (ECF #64-28, PageID #1518) [¶ 157];

**GrafTech International Ltd., First Quarter 2022 Earnings Call, p.5 (May 6, 2022) ("First Quarter 2022 Earnings Call")** (*Rintoul*) (ECF #64-30, PageID #1532) [¶ 167]:

> *"We have a sustainable and long-term competitive advantage from our low-cost structure and vertical integration into our key raw material petroleum needle coke."*

**GrafTech International Ltd., 2019 Sustainability Report, p.4 (Sept. 16, 2020) ("2019 Sustainability Report")** (*Rintoul*) (ECF #64-9, PageID #1189) [¶ 111]:

> "*With this report, we aim to provide our stakeholders and broader community* a better understanding of our sharp focus on and plans for continued improvement of our ESG programs."

**2019 Sustainability Report, p.7** (*Rintoul*) (ECF #64-9, PageID #1190) [¶ 111]:

> "*This is GrafTech's inaugural Sustainability Report, an* important step towards demonstrating our commitment to transparency regarding environmental, social, and governance topics."

**2019 Sustainability Report, p.22** (*Rintoul*) (ECF #64-9, PageID #1194) [¶ 111]:

> "As a manufacturer of graphite electrodes, we are cognizant of our impacts on the environment.  From energy consumption and air emissions to water use and waste handling, we proactively take steps to reduce these impacts throughout our operations."

**2019 Sustainability Report, p.24** (*Rintoul*) (ECF #64-9, PageID #1195) [¶ 112]:

> "To reduce emissions, we have installed control technology on our equipment, which limits the amount of air emissions that enter the environment.  In coordination with our sites, our HS&EP and Technology Teams look for and evaluate new and innovative ways to reduce our emissions.  Reducing air emissions may come from a variety of activities, including changes and upgrades in processes; upgrading and adding control equipment (dust collectors and $SO_2$ abatement systems); and increased preventative maintenance programs.  GrafTech has also focused on improving the housekeeping around our plants to further reduce dirt and dust.  In Monterrey, a new dust collector was installed for our bake process and a new material transport system was installed for moving raw materials from storage to the processing area."

**2019 Sustainability Report, p.17** (*Rintoul*) (ECF #64-9, PageID #1192) [¶ 113]:

> "While this exponential growth of the Monterrey community has substantial benefits, it also raises concerns – including noise, dust, traffic, and pollution.  Over the last year, we have worked hard to develop and foster relationships with the government and community representatives.  Whether it is upgrading the perimeter of our property, planting trees, sharing our sports complex with the community, or holding open houses to educate people about our business, GrafTech is looking for ways to become a better neighbor."

**Third Quarter 2020 Earnings Call, p.2** (*Rintoul*) (ECF #64-52, PageID #1609) [¶ 118]:

> "*We are very pleased to have launched our inaugural Sustainability Report in September.  We are committed to advancing our ESG efforts and continue to* monitor progress on our environmental initiatives.  *As we focus globally* on being good environmental stewards, *we are mindful that electric arc furnace steel production yields 75 percent less carbon emission than traditional blast furnace arc [sic] production.  The steel industry overall is a leader in recycling and more steel is being recycled every year in North America than paper, aluminum, plastic, and glass combined.  We are proud of our inaugural sustainability report and are* fully committed *to these efforts across our organization.*"

**Fourth Quarter 2020 Earnings Call, p.2** (*Rintoul*) (ECF #64-53, PageID #1614) [¶ 125]:

> "Quinn and I and our senior executives participate in our ESG steering committee.  The steering committee oversees our sustainability strategy, which compromises – or comprises rather, of employee health and safety, community relations, materials sourcing and efficiency, energy management, greenhouse gas emissions, air quality, water and wastewater management and waste management.  The strategy encompasses activities as varied as our community involvement and outreach in Monterrey, Mexico, our capture of energy generated at our Seadrift Coke facility to create additional sources of electricity for the area and our emission reduction efforts that include the installation of control technology on equipment on all of our sites.  Our goals are centered on improving our environmental footprint across our operations.  We are working hard to be good corporate citizens in the communities where we operate.  And every day, our business decisions and actions are guided by our code of conduct and ethics.  We look forward to continuing our ESF dialogue with you and publishing our second annual sustainability report later this year."

**First Quarter 2021 Earnings Call, p.3** (*Rintoul*) (ECF #64-54, PageID #1622) [¶ 136]:

> "*So then turning to Slide 7.* Our ESG efforts fit seamlessly with our focus on safety, environment and quality, as Dave described. Our ESG Steering Committee, comprised of several members of our executive team, including me, Dave and Quinn, oversees our sustainability strategy."

**GrafTech International Ltd., First Quarter 2021 Earnings Presentation, slide 7 (May 5, 2021) ("First Quarter 2021 Earnings Presentation")** (N/A) (ECF #64-56, PageID #1635) [¶ 133]:

> "*We are being* proactive to improve our environmental footprint *across our operations.*"

**First Quarter 2021 Earnings Presentation, slide 7** (N/A) (ECF #64-56, PageID #1635) [¶ 133]:

> "*Ongoing focus on improving environmental metrics at all of our production facilities*, including upgrading manufacturing equipment."

**First Quarter 2021 Earnings Presentation, slide 3** (N/A) (ECF #64-56, PageID #1634) [¶ 133];

> "Protect our Environment."

**First Quarter 2021 Earnings Call, p.2** (*Rintoul*) (ECF #64-54, PageID #1621) [¶ 134]:

> "*We have also included on this slide the graphic we use internally to indicate our* constant focus *on SEQ*, safety, environment, quality. SEQ *is a* core mission *for the GrafTech organization.*

**GrafTech International Ltd., Second Quarter 2021 Earnings Presentation, slide 7 (Aug. 6, 2021) ("Second Quarter 2021 Earnings Presentation")** (N/A) (ECF #64-57, PageID #1638) [¶ 140]:

> (Slide titled "ESG Progress")

**Second Quarter 2021 Earnings Call 8/6/21, p.3** (*Rintoul*) (ECF #64-55, PageID #1629) [¶ 139];

> "*Turning to Slide 7*.  We continue to make good progress with our ESG efforts along several paths.  Notably, in the second quarter, we completed a full materiality assessment wit the assistance of external experts to identify and prioritize the key ESG issues for our business and our stakeholders.  The process allowed us to objectively determine the ESG topics that will drive our sustainability strategy, reporting and actions moving forward.  The assessment included peer and industry benchmarking, a robust series of interviews with internal and external stakeholders and a full validation of the assessment by our executive team."

**GrafTech International Ltd., 2020 Sustainability Report, p.4 (Sept. 23, 2021) ("2020 Sustainability Report")** (*Rintoul*) (ECF #64-58, PageID #1641) [¶ 144]:

> "As you will read about further in this report, we are committed to improving our environmental footprint.  We continue to monitor and track our progress on energy consumption and air emissions to identify opportunities for improvements.  During 2020, at our Monterrey, Mexico facility, we continued to implement projects focused on controlling emissions, such as installation of new dust collection systems and upgrades to our mill, mix and forming, and baking operations to enhance our air emission controls."

**2020 Sustainability Report, p.20** (*Rintoul*) (ECF #64-58, PageID #1642) [¶ 145]:

> "*During 2020, we conducted* extensive work *to better understand our environmental footprint, including greenhouse gas emissions, air quality, energy, water, and waste.*"

**2020 Sustainability Report, p.21** (*Rintoul*) (ECF #64-58, PageID #1642) [¶ 145]:

> "*GrafTech is* committed to the protection of our communities and environment *and we recognize the ISO 14001 standard as best practice for environment management.  Our Pamplona plant received this certification in early 2021.*"

**2020 Sustainability Report, p.21** (*Rintoul*) (ECF #64-58, PageID #1642) [¶ 146]:

> "GrafTech believes in a strong environmental management system, which is anchored by policies and procedures that allow us to operate in compliance with our regulatory obligations, identify risks, and understand and reduce our environmental impacts."

**2020 Sustainability Report, p.24** (*Rintoul*) (ECF #64-58, PageID #1643) [¶ 147]:

> "At GrafTech, our employees are actively engaged in efforts to improve HS&EP.  It is not only acknowledged and communicated as a priority, but it is clear in our operations when you visit our sites.  Our employees in Monterrey, Mexico, are involved in how we translate our health, safety, and environmental commitment into practice.  *In 2020, Monterrey kicked-off a Healthy Habits campaign to help employees improve their overall wellbeing.  More than 110 employees participated in the program and they have continued it into 2021 based on the success of the first campaign.  Monterrey began integrating their behavior-based safety program into their Planned Job Observations, shift start-up meetings and pre-job planning – reinforcing the importance of safety in all aspects of their work.*  Our Monterrey team continued their work on housekeeping, improving environmental controls and facility upgrades.  For example, during 2020, we completed construction of a new raw material handling system and improved management of our dust collection systems."

**2020 Sustainability Report, p.24** (*Rintoul*) (ECF #64-58, PageID #1643) [¶ 148]:

> "Each GrafTech operation has a program that details the standard practices for managing and controlling air emissions.  *We calculate Scope 1 and 2 emissions using the GHG Protocol methodology.  Based on reviewed data, GrafTech has identified the baking processes as the primary driver of Scope 1 emissions and the graphitizing process for Scope 2 emissions.  We have implemented projects in both the baking and*

*graphitizing processes to identify opportunities for energy and emission reductions.* We have undertaken an initiative to improve critical assets , such as our bake and graphitizing furnaces and emission control equipment, with digital controls and predictive alerts, to help identify potential issues and mitigate process interruptions. These enhancements are expected to result in improved process efficiency and reliability in our operations. In Monterrey, we recently invested in automated controls, which maintain temperatures in the bake furnace thermal oxidizers, resulting in more thorough reduction of air emissions from these operations. We modified our bake ovens to allow for increased air circulation to reduce accumulation of particulate matter in the ovens. Our team in charge of this project meets on a regular basis to report on progress."

**GrafTech International Ltd., Fourth Quarter 2021 Press Release on Form 8-K, p.2 (Feb. 4, 2022) ("Fourth Quarter 2021 Press Release on Form 8-K")** (*Flanagan*) (ECF #64-59, PageID #1646) [¶ 155];

"We continued to make progress with our ESG efforts including a number of projects throughout our manufacturing plants in an effort to minimize our environmental footprint."

**Fourth Quarter 2021 Earnings Call, p.3** (*Rintoul*) (ECF #64-28, PageID #1516) [¶ 156];

"*Now turning to Slide 7.* We continue to progress on our ESG journey. In September, we published our second annual sustainability report, which is available on our website. Our enhanced reporting in this area will not only benefit our stakeholders but will also assist us in identifying projects that will improve our environmental impact. We've already completed several projects in this area. For example, in 2021, every electrode manufacturing plant completed at least one capital project to improve air emissions. We plan to keep up our momentum in this area and have already identified additional projects for 2022 that will further advance our environmental efforts."

**GrafTech International Ltd., First Quarter 2022 Press Release on Form 8-K, p.1 (May 6, 2022) ("First Quarter 2022 Press Release on Form 8-K")** (*Flanagan*) (ECF #64-60, PageID #1649) [¶ 164]:

"We are proud of the continued progress we are making with our sustainability efforts

-97-

across the organization.  These include capital projects to improve our environmental footprint and the establishment of key environmental goals, which includes targeting a meaningful reduction in greenhouse gas emissions."

**GrafTech International Ltd., First Quarter 2022 Earnings Call, p.4 (May 6, 2022) ("First Quarter 2022 Earnings Call"), p.4** (*Halford*) (ECF #64-30, PageID [*missing page following* #1649]) [¶ 166]:

> "*In addition to these broader contributions to the steel industry*, we also continue to make good progress on our own key sustainability initiatives.  Most recently, we've established environmental goals, which will be highlighted in our next annual sustainability report.  These include a commitment for a meaningful reduction in greenhouse gas emissions.  To support this objective, we continue to invest in capital projects that will further improve our environmental impact."

# APPENDIX B

## *Alleged Misstatements Related to Operations at the St. Marys Plant*

*Parenthetical References to Persons are to the Speaker/Signer of the Referenced Document;*

*Exhibit References are to the ECF # of the Referenced Document as filed along with "Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws" (ECF #64);*

*Paragraph References in brackets are to the paragraphs of the First Amended Complaint (ECF #56):*

**GrafTech International Ltd., Fourth Quarter 2018 Earnings Call, p.2 (Feb. 8, 2019) ("Fourth Quarter 2018 Earnings Call")** (*Rintoul*) (ECF #64-31, PageID #1535) [¶ 88]:

> "*The finishing operations of our St. Marys plant are currently operating at varying levels to* support overall flexibility of our manufacturing footprint.  We will ramp up production at St. Marys if required by the market at any point in the future.  St. Marys can be thought of as essentially the equivalent of a peaking plant, and we will operate in that fashion.

**Fourth Quarter 2018 Earnings Call, p.5** (*Rintoul*) (ECF #64-31, PageID #1538) [¶ 88]:

> "We will use St. Marys to allow us flexibility and variability.  We expect the degree to which we run that will move up and down based upon the market dynamics and not unlike that of, again, in the analogy of a peaking plant."

**GrafTech International Ltd., Second Quarter 2021 Earnings Call, p.3 (Aug. 6, 2021) ("Second Quarter 2021 Earnings Call")** (*Rintoul*) (ECF #64-55, PageID #1629) [¶ 142]:

> "*For example*, we're investing in a pin production line at our St. Marys, Pennsylvania facility that will be online in the third quarter.  This diversifies our pin capacity and provides production flexibility."

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.25 (Nov. 5, 2021) ("Third Quarter 2021 10-Q")** (*Rintoul*, *Coburn*) (ECF #64-25, PageID #1467) [¶ 151]:

> "In the third quarter of 2021, we introduced additional connecting pin production capabilities at our St. Marys, Pennsylvania facility."

**GrafTech International Ltd., Third Quarter 2021 Earnings Call, p.3 (Nov. 5, 2021) ("Third Quarter 2021 Earnings Call")** (*Rintoul*) (ECF #64-7, PageID #1179) [¶ 153];

> "The pin production line at our St. Marys, Pennsylvania facility is now operational, and we are ramping up production.  Importantly, this provides us with two connecting pin production facilities."

**GrafTech International Ltd., Fourth Quarter 2021 Earnings Call, p.3 (Feb. 4, 2022) ("Fourth Quarter 2021 Earnings Call")** (*Rintoul*) (ECF #64-28, PageID #1516) [¶ 158]:

> "Our investment in the new automated pin line at St. Marys continues to progress well and helps to de-risk our pin production capacity."

**GrafTech International Ltd., First Quarter 2022 Earnings Call, p.3 (May 6, 2022) ("First Quarter 2022 Earnings Call")** (*Rintoul*) (ECF #64-30, PageID #1532) [¶ 168]:

> "*For example*, our recent investment in the automated pin line at St. Marys continues to progress and helps to de-risk our pin production capacity."

# APPENDIX C

## Alleged Misstatements Related to the Impact of the Monterrey Plant Shutdown

*Parenthetical References to Persons are to the Speaker/Signer of the Referenced Document;*

*Exhibit References are to the ECF # of the Referenced Document as filed along with "Motion of Defendants GrafTech, Kessler, Coburn, Flanagan, and Halford to Dismiss the First Amended Complaint for Violations of the Federal Securities Laws" (ECF #64);*

*Paragraph References in brackets are to the paragraphs of the First Amended Complaint (ECF #56):*

**GrafTech International Ltd., Current Report (Form 8-K),** *unpaginated* **"2/3" (Sept. 16, 2022) ("9/16/2022 8-K")** (*Flanagan*) (ECF #64-8, PageID #1185) [¶ 170]:

> "*On September 15, 2022, inspectors from the State Attorney's Office for the Secretary of Environment of the State of Nuevo León, Mexico visited GrafTech México, S.A. de C.V.'s ('GrafTech Mexico,' a subsidiary of GrafTech International Ltd. (the 'Company')) graphite electrode manufacturing facility located in Monterrey, Mexico to inspect GrafTech Mexico's facility and certain of the facility's environmental and operating permits. At the conclusion of the inspection, the inspectors issued GrafTech Mexico a temporary suspension notice. The inspector's notice instructed GrafTech Mexico's graphite electrode manufacturing facility to wind down operations within seven days of the notice. In parallel, the Director of Integral Air Management of the Undersecretary of Climate Change and Air Quality of the Ministry of the Environment determined that, among other things, GrafTech Mexico's operating license was no longer in effect. At this time, the Company is not able to assess how long operations at the manufacturing facility will be temporarily suspended. While the Company strongly disagrees with this course of action, the Company intends to work with the authorities to address these allegations and will vigorously defend against these allegations.*"

**GrafTech International Ltd., Quarterly Report (Form 10-Q), p.24 (Nov. 4, 2022) ("Third Quarter 2022 10-Q")** (*Kessler, Flanagan*) (ECF #64-12, PageID #1241) [¶ 172]:

> "*Our facility in Monterrey has been operating since 1959, has over 550 employees and represents approximately 60 thousand MT of annual production capacity, or 30% of our total annual production capacity excluding St. Marys. Monterrey operations can*

> produce a broad portfolio of products, including various sizes of graphite electrodes and pins, and is* currently our only site that produces the pin stock utilized for all of our graphite electrodes.”

**Third Quarter 2022 10-Q, p.24** (*Kessler*, *Flanagan*) (ECF #64-12, PageID #1241) [¶ 172]:

> “*As such*, we are pursuing several alternatives with respect to production and sourcing of pin stock as well as other mitigation activities to minimize the impact on our business and our customers if the Monterrey suspension continues for the foreseeable future. These include a potential restart of our St. Marys, Pennsylvania facility, where the scope of production is currently limited to graphitizing and machining of electrodes and pins. We are actively pursuing approvals for operating permits for a restart of the facility for pin production.”

**GrafTech International Ltd., Third Quarter 2022 Earnings Call, p.7 (Nov. 4, 2022) (“Third Quarter 2022 Earnings Call”)** (*Kessler*) (ECF #64-13, PageID #1255) [¶ 175]:

> “*So, as I indicated in my prepared remarks*, the impact for Q4 will be modest because we do have quite a bit of existing pin inventory.”

**Third Quarter 2022 Earnings Call, pp.7-8** (*Halford*) (ECF #64-13, PageID #1255-#1256) [¶ 176]:

> “The substantial majority of the pins that are required to achieve what we’re talking about are already in inventory in one form or another.  So this is not something that we are going to be dependent on third parties or some other source for achieving the level of achievement that Marcel talked about.  We have a substantial amount of inventory.  We have capped a substantial amount of inventory all the way along of pins and pin stock, and we will be processing that through the other facilities in order to achieve what Marcel was talking about.”

**Third Quarter 2022 10-Q, p.25** (*Kessler*, *Flanagan*) (ECF #64-12, PageID #1242) [¶ 173]:

> "Beyond the fourth quarter of 2022, if Monterrey remains suspended, the impact on the Company's results in the first half of 2023 will be significant, with ales volume reduced by 50% or more, compared to sales volume in the first half of 2022, before recovering in the back half of the year."

**Third Quarter 2022 Earnings Call, p.2** (*Kessler*) (ECF #64-13, PageID #1250) [¶ 174]:

> "*Third*, unless Monterrey reopens, our business performance will be significantly impacted for the first 2 quarters of 2023 with a reduction in sales volume of 50 percent or more before recovering in the back half of the year."

**Third Quarter 2022 Earnings Call, p.9** (*Halford*) (ECF #64-13, PageID #1257) [¶ 177]:

> "Yeah, thanks.  It's an important question, Arun.  And one of the things that I want to make clear is that while we need to consider the near-term supply constraints related to the Monterrey situation, none of this changes our commercial strategy.  We continue to believe that we are unique in the market in our ability to offer a variety of different contracting terms to our customers, that's supported by our vertical integration, and that's a key differentiator, our ability to provide that certainty to our customers.  And while in the very near term, we're dealing with the Monterrey situation, we have absolute confidence in our ability to resolve this current environment we're in, and it's not changing our commercial strategy at all."

**GrafTech International Ltd., Current Report (Form 8-K), *unpaginated* "1/4" (Nov. 18, 2022) ("11/18/2022 8-K")** (*Flanagan*) (ECF #64-14, PageID #1260) [¶ 179]:

> "*On November 17, 2022, the State Attorney's Office for the Secretary of Environment of the State of Nuevo León, Mexico (the 'State Attorney') lifted the suspension notice, subject to the* completion of certain agreed-upon activities, *including the submission of an environmental impact study with respect to the facility's operations.*"

**11/18/2022 8-K (*Flanagan*), *unpaginated* "1/4"** (ECF #64-14, PageID #1260) [¶ 179]:

> "*For the fourth quarter of 2022, the Company continues to anticipate the temporary suspension will impact its ability to fulfill approximately 10 thousand metric tons ('MT') to 12 thousand MT of customer orders*, consistent with its previous outlook provided on November 4, 2022. *The Company will provide an update on the estimated impact of the suspension on its 2023 outlook when it reports its fourth quarter 2022 results*."

**GrafTech International Ltd., Fourth Quarter 2022 Earnings Call, p.3 (Feb. 3, 2023) ("Fourth Quarter 2022 Earnings Call")** (*Kessler*) (ECF #64-15, PageID #1267) [¶ 183]:

> "We expect our second half sales volumes to recover as we move past the Monterrey suspension driven uncertainty *and that we anticipate a gradual improvement in market conditions*."

**GrafTech International Ltd., First Quarter 2023 Press Release on Form 8-K, p.4 (Apr. 28, 2023) ("First Quarter 2023 Press Release on Form 8-K")** (*Flanagan*) (ECF #64-16, PageID #1277) [¶ 184]:

> "In the second half of the year, we anticipate sales volume levels will further recover, as we move past Monterrey suspension-driven uncertainty, *however we expect demand for graphite electrodes will continue to be impacted by softness in the commercial environment*."

**GrafTech International Ltd., First Quarter 2023 Earnings Call, p.4 (Apr. 28, 2023) ("First Quarter 2023 Earnings Call")** (*Halford*) (ECF #64-33, PageID #1546) [¶ 184]:

> "In the second half of the year, we anticipate our sales volume will further recover as we move past Monterrey suspension driven impact. *However, as we've noted, given economic uncertainty and elevated graphite electrode inventory levels at our customers, we are now more cautious regarding our commercial outlook for the second half of 2023*."

– *end* –